ORIGINAL

1   Rocky C. Tsai (SBN 221452)
    (rocky.tsai@ropesgray.com)
2   ROPES & GRAY LLP
    Three Embarcadero Center
3   San Francisco, CA 94111-4006
    Telephone: (415) 315-6300
4   Facsimile: (415) 315-6350

5   John C. Ertman
    (john.ertman@ropesgray.com)
6   (Pro hac vice applications pending)
    Lee S. Gayer
7   (lee.gayer@ropesgray.com)
    Evan P. Lestelle
8   (evan.lestelle@ropesgray.com)
    ROPES & GRAY LLP
9   1211 Avenue of the Americas
    New York, NY 10036-8704
10  Telephone: (212) 596-9000
    Facsimile: (212) 596-9090

11
    Douglas H. Hallward-Driemeier
12  (douglas.hallward-driemeier@ropesgray.com)
    (Pro hac vice application pending)
13  ROPES & GRAY LLP
    One Metro Center
14  700 12th Street, NW
    Suite 900
15  Washington, DC 20005-3948
    Phone: 202-508-4600
16

17  Daniel V. McCaughey
    (daniel.mccaughey@ropesgray.com)
18  Nick W. Rose
    (nick.rose@ropesgray.com)
19  ROPES & GRAY LLP
    800 Boylston St.
20  Boston, MA
    Phone: 617-951-7000

21  *Attorneys for all Plaintiffs*

THOMAS O. JACOB (SBN 125665)
tojacob@wellsfargo.com
**WELLS FARGO & COMPANY**
Office of General Counsel
45 Fremont Street, Twenty-Sixth Floor
MAC A0194-266
San Francisco, CA 94105
Telephone:  (415) 396-4425
Facsimile:  (415) 975-7864

*Attorney for Wells Fargo Bank, solely in its trustee capacity*

FILED

AUG 07 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CRB

CV 13 3663

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **WELLS FARGO BANK, NATIONAL ASSOCIATION**, *solely in its capacity as Trustee for* ABFC 2002-OPT1 Trust, ABFC 2005-OPT1 Trust, ABFC 2006-OPT1 Trust, Asset Backed Securities Corporation Home Equity Loan Trust, Series 2003-HE6, Asset Backed | Case No. _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

|   |   |
|---|---|
| 1 | Securities Corporation Home Equity Loan Trust, Series 2004-HE2, Asset Backed |
| 2 | Securities Corporation Home Equity Loan Trust, Series AMQ 2007-HE2, Banc of America |
| 3 | Funding 2005-B Trust, Banc of America |
| 4 | Funding 2005-G Trust, Banc of America Funding 2006-E Trust, Banc of America |
| 5 | Funding 2007-E Trust, BCAP LLC TRUST 2006-AA1, BNC Mortgage Loan Trust 2007-4, |
| 6 | Banc of America Alternative Loan Trust 2003-8, Banc of America Alternative Loan Trust |
| 7 | 2006-5, Banc of America Alternative Loan |
| 8 | Trust 2003-10, Banc of America Alternative Loan Trust 2003-11, Banc of America |
| 9 | Alternative Loan Trust 2003-4, Banc of |
| 10 | America Alternative Loan Trust 2003-5, Banc of America Alternative Loan Trust 2003-6, |
| 11 | Banc of America Alternative Loan Trust 2003-8, Banc of America Alternative Loan Trust |
| 12 | 2003-9, Banc of America Alternative Loan |
| 13 | Trust 2004-1, Banc of America Alternative Loan Trust 2004-11, Banc of America |
| 14 | Alternative Loan Trust 2004-6, Banc of |
| 15 | America Alternative Loan Trust 2004-7, Banc of America Alternative Loan Trust 2005-6, |
| 16 | Banc of America Alternative Loan Trust 2005-7, Banc of America Alternative Loan Trust |
| 17 | 2006-2, Banc of America Alternative Loan |
| 18 | Trust 2006-3, Banc of America Alternative Loan Trust 2006-5, Banc of America |
| 19 | Alternative Loan Trust 2006-7, Banc of |
| 20 | America Mortgage 2003-6 Trust, Banc of America Mortgage 2003-D Trust, Banc of |
| 21 | America Mortgage 2003-H Trust, Banc of America Mortgage 2003-K Trust, Banc of |
| 22 | America Mortgage Trust 2004-11, Banc of |
| 23 | America Mortgage Trust 2004-6, Banc of America Mortgage Trust 2004-8, Banc of |
| 24 | America Mortgage Trust 2004-9, Banc of |
| 25 | America Mortgage 2004-B Trust, Banc of America Mortgage 2004-C Trust, Banc of |
| 26 | America Mortgage 2004-D Trust, Banc of America Mortgage 2004-I Trust, Banc of |
| 27 | America Mortgage 2004-K Trust, Banc of |
| 28 | America Mortgage 2004-L Trust, Banc of America Mortgage Trust 2005-10, Banc of |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
Case No.

1

| | |
|---|---|
| 1 | America Mortgage Trust 2005-11, Banc of |
| | America Mortgage Trust 2005-4, Banc of |
| 2 | America Mortgage Trust 2005-7, Banc of |
| | America Mortgage 2005-A Trust, Banc of |
| 3 | America Mortgage 2005-E Trust, Banc of |
| 4 | America Mortgage 2005-J Trust, Banc of |
| | America Mortgage 2007-1 Trust, Banc of |
| 5 | America Mortgage 2007-2 Trust, Banc of |
| | America Mortgage 2004-J Trust, Banc of |
| 6 | America Mortgage 2005-D Trust, Banc of |
| 7 | America Mortgage 2005-E Trust, Banc of |
| | America Mortgage 2007-3 Trust, Bear Stearns |
| 8 | Asset Backed Securities, Inc. 2000-2, Bear |
| 9 | Stearns Mortgage Funding Trust 2006-AR1, |
| | Bear Stearns Mortgage Funding Trust 2006- |
| 10 | AR2, Bear Stearns Mortgage Funding Trust |
| 11 | 2006-AR3, Bear Stearns Mortgage Funding |
| | Trust 2006-AR4, Bear Stearns Mortgage |
| 12 | Funding Trust 2006-AR5, Bear Stearns |
| 13 | Mortgage Funding Trust 2007-AR1, Bear |
| | Stearns Mortgage Funding Trust 2007-AR2, |
| 14 | Bear Stearns Mortgage Funding Trust 2007- |
| | AR3, Bear Stearns Mortgage Funding Trust |
| 15 | 2007-AR4, Bear Stearns Mortgage Funding |
| 16 | Trust 2007-AR5, Bear Stearns ARM Trust |
| | 2007-3, Carrington Mortgage Loan Trust, |
| 17 | Series 2006-FRE2, Carrington Mortgage Loan |
| | Trust, Series 2006-NC2, Carrington Mortgage |
| 18 | Loan Trust, Series 2006-NC3, Carrington |
| 19 | Mortgage Loan Trust, Series 2006-NC3, |
| | Carrington Mortgage Loan Trust, Series 2006- |
| 20 | NC5, Carrington Mortgage Loan Trust, Series |
| 21 | 2006-OPT1, Carrington Mortgage Loan Trust, |
| | Series 2006-RFC1, First Franklin Mortgage |
| 22 | Loan Trust 2004-FF11, First Franklin Mortgage |
| | Loan Trust 2006-FF15, Freddie Mac Securities |
| 23 | REMIC Trust 2005-S001, GMACM Home |
| 24 | Equity Loan Trust 2003-HE2, GreenPoint MTA |
| | Trust 2005-AR3, GreenPoint Mortgage Funding |
| 25 | Trust 2005-AR4, GreenPoint Mortgage Funding |
| | Trust 2005-AR5, GreenPoint Mortgage Funding |
| 26 | Trust 2006-AR1, GreenPoint Mortgage Funding |
| 27 | Trust 2006-AR2, GreenPoint Mortgage Funding |
| | Trust 2006-AR3, HarborView Mortgage Loan |
| 28 | Trust 2006-10, HarborView Mortgage Loan |
| | Trust 2006-12, HarborView Mortgage Loan |

| | |
|---|---|
| 1 | Trust 2007-1, HarborView Mortgage Loan )
| | Trust 2007-3, Impac CMB Trust Series 2004- )
| 2 | 11, Impac CMB Trust Series 2004-6, Impac )
| | CMB Trust Series 2005-6, Irwin Home Equity )
| 3 | Loan Trust 2007-1, Impac Secured Assets )
| 4 | Corp., Mortgage Pass- Through Certificates, )
| | Series 2005-2, Lehman Mortgage Trust 2006-9, )
| 5 | Lehman Mortgage Trust 2007-4, MASTR Asset )
| | Backed Securities Trust 2003-OPT2, MASTR )
| 6 | Asset Backed Securities Trust 2007-NCW, )
| 7 | Merrill Lynch Mortgage Investors Trust, Series )
| | 2004-WMC5, Merrill Lynch Mortgage )
| 8 | Investors Trust, Series 2005-WMC2, Merrill )
| | Lynch Mortgage Investors Trust Series MLCC )
| 9 | 2004-B, Merrill Lynch Mortgage Investors )
| 10 | Trust Series MLCC 2006-1, Merrill Lynch )
| | Mortgage Investors Trust Mortgage Loan )
| 11 | Asset-Backed Certificates, Series 2006-HE1, )
| | Morgan Stanley ABS Capital I Inc. Trust 2005- )
| 12 | WMC2, Morgan Stanley ABS Capital I Inc. )
| 13 | Trust 2005-WMC3, Morgan Stanley ABS )
| | Capital I Inc. Trust 2005-WMC4, Morgan )
| 14 | Stanley ABS Capital I Inc. Trust 2006-WMC1, )
| 15 | MSCC HELOC Trust 2007-1, National City )
| | Mortgage Capital Trust 2008-1, Option One )
| 16 | Mortgage Loan Trust 2003-5, Option One )
| | Mortgage Loan Trust 2003-6, Option One )
| 17 | Mortgage Loan Trust 2005-3, Option One )
| 18 | Mortgage Loan Trust 2005-4, Option One )
| | Mortgage Loan Trust 2006-1, Option One )
| 19 | Mortgage Loan Trust 2007-1, Option One )
| 20 | Mortgage Loan Trust 2007-3, Option One )
| | Mortgage Loan Trust 2007-4, Option One )
| 21 | Mortgage Loan Trust 2007-5, Option One )
| | Mortgage Loan Trust 2007-6, Option One )
| 22 | Mortgage Loan Trust 2007CP1, Option One )
| 23 | Mortgage Loan Trust 2007-FXD2, Park Place )
| | Securities, Inc., Asset-Backed Pass-Through )
| 24 | Certificates, Series 2004-MCW1, Park Place )
| | Securities, Inc., Asset-Backed Pass-Through )
| 25 | Certificates, Series 2004-WHQ1, Park Place )
| 26 | Securities, Inc., Asset-Backed Pass-Through )
| | Certificates, Series 2004-WHQ2, Park Place )
| 27 | Securities, Inc., Asset-Backed Pass-Through )
| | Certificates, Series 2005-WCH1, Park Place )
| 28 | Securities, Inc., Asset-Backed Pass-Through )

| | |
|---|---|
| 1 | Certificates, Series 2005-WCW2, Park Place ) |
| 2 | Securities, Inc., Asset-Backed Pass-Through ) Certificates, Series 2005-WCW2, Park Place ) |
| 3 | Securities, Inc., Asset-Backed Pass-Through ) Certificates, Series 2005-WHQ1, Park Place ) |
| 4 | Securities, Inc., Asset-Backed Pass-Through ) Certificates, Series 2005-WHQ3, Park Place ) |
| 5 | Securities, Inc., Asset-Backed Pass-Through ) Certificates, Series 2005-WHQ4, RESI Finance ) |
| 6 | Limited Partnership 2003-B, RESI Finance ) |
| 7 | Limited Partnership 2003-C, RESI Finance ) Limited Partnership 2003-CB1, RESI Finance ) |
| 8 | Limited Partnership 2003-D, RESI Finance ) |
| 9 | Limited Partnership 2004-B, RESI Finance ) Limited Partnership 2004-C, RESI Finance ) |
| 10 | Limited Partnership 2005-A, RESI Finance ) |
| 11 | Limited Partnership 2005-B, RESI Finance ) Limited Partnership 2005-C, RESI Finance ) |
| 12 | Limited Partnership 2005-D, RESI Finance ) Limited Partnership 2006-A, RMAC Pass- ) |
| 13 | Through Trust, Series 2010-A, Securitized ) Asset Backed Receivables LLC Trust 2006- ) |
| 14 | HE1, Securitized Asset Backed Receivables ) |
| 15 | LLC Trust 2006-HE2, SABR Mortgage Loan ) 2008-1 Grantor Trust, Structured Asset ) |
| 16 | Investment Loan Trust 2003-BC12, Structured ) |
| 17 | Asset Mortgage Investments II Trust 2007- ) AR4, Structured Adjustable Rate Mortgage ) |
| 18 | Loan Trust, Series 2004-10, Structured ) Adjustable Rate Mortgage Loan Trust, Series ) |
| 19 | 2004-16, Structured Adjustable Rate Mortgage ) |
| 20 | Loan Trust, Series 2004-18, Structured ) Adjustable Rate Mortgage Loan Trust, Series ) |
| 21 | 2004-9XS, Structured Adjustable Rate ) Mortgage Loan Trust, Series 2005-12, ) |
| 22 | Structured Adjustable Rate Mortgage Loan ) |
| 23 | Trust, Series 2005-17, Structured Adjustable ) Rate Mortgage Loan Trust, Series 2007-3, ) |
| 24 | Structured Adjustable Rate Mortgage Loan ) Trust, Series 2007-4, Structured Asset ) |
| 25 | Securities Corporation Pass-Through ) |
| 26 | Certificates, Series 2002-AL1, Structured Asset ) Securities Corporation Mortgage Pass-Through ) |
| 27 | Certificates, Series 2003-15A, Structured Asset ) Securities Corporation Mortgage Pass-Through ) |
| 28 | Certificates, Series 2003-26A, Structured Asset ) |

1    Securities Corporation Mortgage Loan Trust
     2006-OPT1, Structured Asset Securities Corp.
2    2007-BC1, SASI Finance Limited Partnership
     2006-A, Southern Pacific Secured Assets Corp.,
3    Mortgage Loan Asset-Backed Pass-Through
4    Certificates, Series 1998-2, Soundview Home
     Loan Trust 2007-OPT1, Soundview Home Loan
5    Trust 2007-OPTS, Terwin Mortgage Trust,
     Series TMTS 2003-8HE, WaMu Mortgage
6    Pass-Through Certificates Series 2004-PR1
7    Trust, WaMu Mortgage Pass-Through
     Certificates Series 2004-PR2 Trust, WaMu
8    Mortgage Pass-Through Certificates Series
9    2005-PR1 Trust, WaMu Mortgage Pass-
     Through Certificates Series 2005-PR2 Trust,
10    WaMu Mortgage Pass-Through Certificates
     Series 2005-PR4 Trust, WaMu Mortgage Pass-
11    Through Certificates Series 2006-PR1 Trust,
12    WaMu Mortgage Pass-Through Certificates
     Series 2006-PR2 Trust, WaMu Mortgage Pass-
13    Through Certificates Series 2006-PR3 Trust,
     Waterfall Victoria Mortgage Trust 2010-1;
14

15    **DEUTSCHE BANK NATIONAL TRUST**
     **COMPANY,** *solely in its capacity as Trustee*
16    *for*
     Alliance Securities Corp. 2007-OA1,
17    Accredited Mortgage Loan Trust 2006-2,
     American Home Mortgage Investment Trust
18    2005-2, American Home Mortgage Investment
19    Trust 2005-3, American Home Mortgage
     Investment Trust 2006-1, American Home
20    Mortgage Assets Trust 2006-5, American Home
21    Mortgage Investment Trust 2007-1, American
     Home Mortgage Assets Trust 2007-1, American
22    Home Mortgage Assets Trust 2007-2, American
     Home Mortgage Assets Trust 2007-4, American
23    Home Mortgage Investment Trust 2007-SD2,
24    Ameriquest Mortgage Securities Inc. 2006-R1,
     Argent Securities Inc. 2004-W8, Argent
25    Securities Inc. 2005-W2, Argent Securities
     Trust 2006-W4, Argent Securities Trust 2006-
26    M1, Argent Securities Trust 2006-M2, Asset
27    Backed Securities Corporation Home Equity
     Loan Trust 2004-HE1, Barclays Capital Inc.,
28    BCAP LLC Trust 2007-AA1, Carrington

| 1 | Mortgage Loan Trust 2005-NC4, Carrington | ) |
| 2 | Mortgage Loan Trust 2005-NC5, Encore Credit | ) |
| 2 | Receivables Trust 2005-3, Downey Savings and | ) |
| 3 | Loan Association Mortgage Loan Trust 2004- | ) |
| 3 | AR2, Downey Savings and Loan Association | ) |
| 4 | Mortgage Loan Trust 2005-AR3, Soundview | ) |
| 5 | Home Equity Loan Trust 2005-OPT4, First | ) |
| 5 | Franklin Mortgage Loan Trust 2005-FFH3, | ) |
| 6 | HarborView Mortgage Loan Trust 2006-14, | ) |
| 6 | Downey Savings and Loan Association | ) |
| 7 | Mortgage Loan Trust 2006-AR1, Fremont | ) |
| 8 | Home Loan Trust 2006-3, HarborView | ) |
| 8 | Mortgage Loan Trust 2006-3, Soundview Home | ) |
| 9 | Equity Loan Trust 2006-OPT5, Soundview | ) |
| 9 | Home Loan Trust 2007-WMC1, Downey | ) |
| 10 | Savings and Loan Association Mortgage Loan | ) |
| 11 | Trust 2007-AR1, HarborView Mortgage Loan | ) |
| 11 | Trust 2007-4, HarborView Mortgage Loan | ) |
| 12 | Trust 2007-7, GSAA Home Equity Trust 2007- | ) |
| 13 | 4, GSAA Home Equity Trust 2007-6, GSR | ) |
| 13 | Mortgage Loan Trust 2007-AR2, GSR | ) |
| 14 | Mortgage Loan Trust 2007-OA2, STARM | ) |
| 15 | Mortgage Loan Trust 2007-4, HSI Asset | ) |
| 15 | Securitization Corporation Trust 2005-OPT1, | ) |
| 16 | HSI Asset Securitization Corporation Trust | ) |
| 17 | 2006-OPT1, HSI Asset Securitization | ) |
| 17 | Corporation Trust 2006-OPT2, HSI Asset | ) |
| 18 | Securitization Corporation Trust 2007-NC1, | ) |
| 19 | HSI Asset Securitization Corporation Trust | ) |
| 19 | 2007-WF1, HSI Asset Securitization | ) |
| 20 | Corporation Trust 2007-HE1, Impac CMB | ) |
| 21 | Trust 2005-5, Impac Secured Assets Corp. | ) |
| 21 | 2006-3, Impac Secured Assets Corp. 2006-5, | ) |
| 22 | Impac Secured Assets Corp. 2007-1, Impac | ) |
| 22 | Secured Assets Corp. 2007-2, IndyMac | ) |
| 23 | Residential Asset Securities Trust (RAST) | ) |
| 23 | 2004-A5, IndyMac INDX Mortgage Loan Trust | ) |
| 24 | 2005-AR1, IndyMac INDX Mortgage Loan | ) |
| 25 | Trust 2005-AR8, IndyMac INDX Mortgage | ) |
| 25 | Loan Trust 2005-AR12, IndyMac INDX | ) |
| 26 | Mortgage Loan Trust 2005-AR13, IndyMac | ) |
| 26 | INDX Mortgage Loan Trust 2005-AR14, | ) |
| 27 | IndyMac INDX Mortgage Loan Trust 2005- | ) |
| 27 | AR25, IndyMac INDA Mortgage Loan Trust | ) |
| 28 | 2006-AR2, IndyMac INDX Mortgage Loan | ) |
| 28 | Trust 2006-AR6, IndyMac INDX Mortgage | ) |

1 Loan Trust 2006-AR14, IndyMac INDX
2 Mortgage Loan Trust 2006-AR29, IndyMac
  INDA Mortgage Loan Trust 2006-AR3,
3 IndyMac Residential Asset Securities Trust
  (RAST) 2007-A3, IndyMac INDX Mortgage
4 Loan Trust 2007-AR5, IndyMac INDX
5 Mortgage Loan Trust 2007-AR211P, IndyMac
  INDA Mortgage Loan Trust 2007-AR1,
6 IndyMac INDA Mortgage Loan Trust 2007-
  AR8, IndyMac INDX Mortgage Loan Trust
7 2007-FLX1, IndyMac INDX Mortgage Loan
  Trust 2007-FLX6, J.P. Morgan Mortgage
8 Acquisition Trust 2007-CH3, J.P. Morgan
9 Mortgage Acquisition Trust 2007-CH5, Long
  Beach Mortgage Loan Trust 2005-WL1, Long
10 Beach Mortgage Loan Trust 2005-WL2, Long
11 Beach Mortgage Loan Trust 2006-6, Long
  Beach Mortgage Loan Trust 2006-7, Long
12 Beach Mortgage Loan Trust 2006-8, Long
13 Beach Mortgage Loan Trust 2006-10, Long
  Beach Mortgage Loan Trust 2006-WL1, Long
14 Beach Mortgage Loan Trust 2006-WL2,
15 Mortgage IT Trust 2005-3, Morgan Stanley
  ABS Capital I Trust 2004-NC7, Morgan
16 Stanley ABS Capital I Trust 2004-HE8, Morgan
  Stanley ABS Capital I Trust 2006-NC3,
17 Morgan Stanley ABS Capital I Trust 2006-
18 NC5, Morgan Stanley ABS Capital I Trust
  2006-HE5, Morgan Stanley ABS Capital I Trust
19 2006-HE7, Morgan Stanley ABS Capital I Trust
  2006-HE8, Morgan Stanley ABS Capital I Trust
20 2006-WMC2, Morgan Stanley Home Equity
21 Loan Trust 2006-1, Morgan Stanley Home
  Equity Loan Trust 2006-2, Morgan Stanley
22 ABS Capital I Trust 2007-NC4, Morgan
  Stanley ABS Capital I Trust 2007-HE7, New
23 Century Home Equity Loan Trust 2005-4, New
24 Century Home Equity Loan Trust 2005-B, New
  Century Home Equity Loan Trust 2005-D,
25 Novastar Mortgage Funding Trust 2007-1,
26 Saxon Asset Securities Trust 2007-2, Thornburg
  Mortgage Securities Trust 2004-4, WaMu
27 Mortgage Pass- Through Certificates, Series
  2004-AR6, WaMu Mortgage Pass-Through
28 Certificates, Series 2005-AR6, WaMu
  Mortgage Pass- Through Certificates, Series

| | |
|---|---|
| 1 | 2005-AR11, WaMu Mortgage Pass-Through ) |
| 2 | Certificates, Series 2005-AR12, WaMu )<br>Mortgage Pass- Through Certificates, Series ) |
| 3 | 2005-AR13, WaMu Mortgage Pass-Through )<br>Certificates, Series 2005-AR15, WaMu ) |
| 4 | Mortgage Pass-Through Certificates, WMALT )<br>Series 2006-AR1, Washington Mutual ) |
| 5 | Mortgage Pass-Through Certificates, WMALT )<br>Series 2006-AR5, WaMu Asset-Backed ) |
| 6 | Certificates 2007-HE; and ) |

1  2005-AR11, WaMu Mortgage Pass-Through
2  Certificates, Series 2005-AR12, WaMu
   Mortgage Pass- Through Certificates, Series
3  2005-AR13, WaMu Mortgage Pass-Through
   Certificates, Series 2005-AR15, WaMu
4  Mortgage Pass-Through Certificates, WMALT
   Series 2006-AR1, Washington Mutual
5  Mortgage Pass-Through Certificates, WMALT
   Series 2006-AR5, WaMu Asset-Backed
6  Certificates 2007-HE; and

7

8  **DEUTSCHE BANK TRUST COMPANY
   AMERICAS**, *solely in its capacity as Trustee
9  for*
   Residential Accredit Loans Inc. 2005-QA10,
10 Residential Accredit Loans Inc. 2006-QO2,
   Residential Accredit Loans Inc. 2006-QO3,
11 Residential Accredit Loans Inc. 2006-QO4,
   Residential Accredit Loans Inc. 2006-QO6,
12 Residential Accredit Loans Inc. 2006-QO10,
   Residential Accredit Loans Inc. 2006-QS3,
13 Residential Accredit Loans Inc. 2006-QS10,
14 Residential Accredit Loans Inc. 2006-QS17,
   Residential Accredit Loans Inc. 2007-QA3,
15 Residential Accredit Loans Inc. 2007-QO1,
16 Residential Accredit Loans Inc. 2007-QO4,
   Residential Accredit Loans Inc. 2007-QO5,
17 Residential Accredit Loans Inc. 2007-QS3,
   Residential Funding Mortgage Securities I
18 2007-S4, Saxon Asset Securities Trust 2003-3,
19 Saxon Asset Securities Trust 2006-3;

20                  Plaintiffs,

21        v.

22 CITY OF RICHMOND, CALIFORNIA, a
23 municipality; and MORTGAGE
   RESOLUTION PARTNERS LLC;
24
                   Defendants.
25

26

27

28

**INTRODUCTION**

1.      Plaintiffs serve as trustees for hundreds of residential mortgage-backed securitization ("RMBS") trusts (the "RMBS Trusts" or the "Trusts") that hold mortgage loans that are targeted by an elaborate profit-driven scheme being implemented by Defendant City of Richmond, California ("Richmond" or the "City") and its partner Defendant Mortgage Resolution Partners LLC ("MRP"), a for-profit California investment firm.  Richmond and MRP seek to impermissibly use Richmond's power of eminent domain to seize certain mortgage loans located outside of Richmond in order to generate profits for Richmond, MRP, and MRP's investors (the "Richmond Seizure Program" or the "Program").  If Defendants' unconstitutional scheme is permitted to go forward, the RMBS Trusts and their beneficiaries, the investors in certificates issued by the RMBS Trusts (also referred to as "certificateholders") – which include a vast number of public and private pension plans, college savings plans, 401(k) plans, insurance companies, mutual funds, university endowments, and government-sponsored enterprises – would suffer severe irreparable economic harm, as would hundreds of other similarly situated RMBS trusts and their beneficiaries, and potentially the entire U.S. mortgage industry.  Accordingly, Plaintiffs seek declaratory and injunctive relief declaring that the Richmond Seizure Program violates the United States Constitution, the California Constitution, and other state laws, and enjoining Defendants from implementing the Program.

2.      Defendants Richmond and MRP have entered into an agreement, pursuant to which Defendants will use Richmond's eminent domain power primarily to seize *performing* mortgage loans – owned by RMBS trusts located outside of Richmond for the benefit of their certificateholders – at steeply discounted prices, typically 80% of the value of the home or less, rather than the outstanding loan amount owed by the borrowers.  Upon information and belief, MRP then plans to refinance those loans with new federally insured loans in amounts substantially above the amounts paid by Richmond to seize the original loan. According to MRP's published statements, this profit strategy would generate profits of up to 20% for MRP and its investors.  Richmond would be paid a portion of the profits for allowing MRP to use Richmond's eminent domain powers in furtherance of MRP's strategy, and select

1    Richmond homeowners would receive a windfall by having their debt permanently discharged

2    because they meet a borrowing profile that is profitable to Richmond and MRP.

3         3.    The Program is a profit-driven strategy designed to enrich Richmond, a

4    private investment firm (MRP) and its financial backers, and select Richmond homeowners, at

5    the expense of private-label RMBS trusts located outside of Richmond and the beneficiaries of

6    those trusts. Such a program does not involve a legitimate "public use" for which the

7    government's eminent domain power is expressly reserved. Additionally, the entire business

8    model that drives the profits generated by the Program is predicated on paying for the seized

9    performing loans at artificially low prices that are substantially less than the loan's actual value.

10   Thus, the Richmond Seizure Program would, if allowed to proceed, result in huge losses to the

11   Trusts and their beneficiaries and violate the constitutional requirement of "just compensation"

12   for any taking.

13        4.    Moreover, implementing the Richmond Seizure Program would result in

14   a massive transfer of wealth from the beneficial owners of the mortgage loans targeted by the

15   Program (who are all located outside of Richmond and the vast majority of whom are located

16   outside of California) to a few preferred private parties, and would threaten to severely disrupt

17   the United States mortgage industry – a major sector of interstate commerce. Thus, the Program

18   also violates state and federal constitutional prohibitions against the extraterritorial reach of

19   Richmond's regulatory authority.

20        5.    Richmond and MRP seek to disguise the Program as a legitimate public

21   use of eminent domain power by asserting that they are aiming to seize "underwater" mortgages

22   (i.e., those where the value of the home is less than the outstanding principal amount of the

23   mortgage), which they claim will prevent future defaults and foreclosures in Richmond, and

24   therefore prevent their attendant consequences of home abandonment, blight, and economic

25   depression. But that characterization is a mere facade, as the Program principally targets

26   performing loans – i.e., the loans of homeowners who have been making their monthly

27   payments for years despite being "underwater," and who have good credit ratings, as opposed to

28   those loans that are in default or at serious risk of default. The Program targets performing

1  loans *because they are not at serious risk of default* and therefore can be easily re-financed with

2  a new Federal Housing Authority ("FHA") insured loan for an amount significantly greater than

3  the price paid by Richmond to seize the original loan. Thus, contrary to Defendants' assertions,

4  the vast majority of the loans at issue are not at imminent risk of default, and the homeowners in

5  question are not at risk of having their loans foreclosed and having to move out of their homes.

6  Indeed, it is the relative safety of these loans that allows the Defendants to generate the huge

7  profits they seek, which is the actual purpose of the Program.

8        6.     Federal agencies have expressed serious concerns about the

9  constitutionality of the Program and its potential impacts on the U.S. mortgage industry if it is

10 allowed to go forward. In a public statement dated August 9, 2012, the Federal Housing

11 Finance Administration ("FHFA"), the conservator of Fannie Mae and Freddie Mac (the two

12 Government–Sponsored Enterprises ("GSEs") that are among the largest investors in RMBS

13 trusts), stated that "FHFA has significant concerns about the use of eminent domain to revise

14 existing financial contracts" and that "resulting losses from such a program would represent a

15 cost ultimately borne by taxpayers" and would have "a chilling effect on the extension of credit

16 to borrowers seeking to become homeowners and on investors that support the housing market."

17 77 FR 47652 (August 9, 2012). FHFA noted that "[a]mong questions raised regarding the

18 proposed use of eminent domain are the constitutionality of such use," "the effects on holders of

19 existing securities," "the impact on millions of negotiated and performing mortgage contracts,"

20 and "critical issues surrounding the valuation by local governments of complex contractual

21 arrangements that are traded in national and international markets." *Id.*

22       7.     Likewise, the U.S. House of Representatives, House Financial Services

23 Committee, recently issued a draft reform bill, one of the stated purposes of which is: "To

24 combat constitutionally-suspect 'eminent domain' schemes by local municipalities to seize

25 mortgages out of legally binding securities for purposes of rewriting their terms, prohibit the

26 GSEs from purchasing or guaranteeing loans originated in municipalities where such practices

27 have been employed during the last ten years." Executive Summary of the Protecting American

28

1    Homeowners (PATH) Act, July 11, 2013, available at

2    http://financialservices.house.gov/news/documentsingle.aspx?DocumentID=342165, at 2.

3    8.    The concerns expressed by FHFA and by the House Financial Services

4    Committee are well founded. The Program violates numerous provisions of the United States

5    Constitution, the California Constitution, and California state law. Defendants' own public

6    statements concerning the purpose of the Program and the details of how it would be used to

7    target performing loans and then flip them to generate profits for MRP confirm that it would

8    violate the "public use" and "just compensation," requirements of the "Takings Clause" of the

9    U.S. and California Constitutions. U.S. Const. amend. V; Cal. Const. art. I, § 1. Moreover,

10   because the mortgage loans that would be seized are notes held in locations outside of

11   Richmond by non-Richmond creditors, the Program would also violate the Takings Clause and

12   California statutory prohibitions against extraterritorial seizures. The implementation of the

13   Program should be enjoined for those reasons.

14   9.    Additionally, the Program, if fully implemented, would have a significant

15   impact on interstate commerce, and therefore would violate the U.S. Constitution's Commerce

16   Clause and Contract Clause in a number of ways.

17   10.    First, the Program would violate the dormant Commerce Clause, which

18   prevents local governments from discriminating against out-of-state investors or otherwise

19   erecting barriers to interstate commerce to benefit in-state economic interests. As noted above,

20   Richmond, MRP, and MRP's financial backers would realize huge profits from this scheme by

21   sharing in the spread between the price at which the homeowner's current mortgage loan is

22   seized and the revenue gained by Richmond/MRP by giving the homeowner a new smaller

23   mortgage loan and then selling that loan to a government-backed securitized pool. The select

24   Richmond homeowners chosen to participate in the Program – because they meet a borrowing

25   profile that would be profitable to Richmond and MRP – also would profit by having their

26   underwater loans and mortgage debts extinguished and replaced with newly refinanced loans.

27   But these economic benefits to a relatively small group of investors and Richmond homeowners

28   would come at the expense of RMBS Trusts located outside of Richmond, and ultimately their

1   certificateholders. These RMBS Trusts and their certificateholders would experience significant

2   losses as a result of each loan seized: losses of approximately the unpaid principal balance of

3   the seized loans or more, minus the price paid by Richmond for the seizure. Such losses could

4   amount to many tens of millions of dollars. This transfer of wealth from the beneficiaries of

5   RMBS Trusts, who in most cases are located entirely outside of California, to Richmond and

6   MRP, not only violates the Commerce Clause of the U.S. Constitution; it also violates the

7   Contract Clause of the U.S. Constitution, which prohibits a local government from abrogating

8   debts of local residents held by creditors.

9   11.   Second, while the actual benefits of the Program to Richmond as a whole

10  are questionable (as the Program primarily targets performing loans at low risk of default and

11  has the potential to harm the community by limiting available future mortgage financing), the

12  potential negative effects of the Richmond Seizure Program on the national mortgage industry

13  would be significant and widespread. The number of loans meeting the MRP profile in

14  Richmond alone – approximately 1,000 to 2,000 mortgage loans – would cause many tens of

15  millions of dollars in losses, potentially $200 million or more if the Program is allowed to go

16  forward. If Richmond were allowed to proceed, other local governments would follow suit,

17  with the result that these damages across RMBS trusts would exceed billions of dollars. Upon

18  information and belief, several other local governments – including, among others, the

19  municipalities of North Las Vegas, Nevada; El Monte, California; La Puente, California; San

20  Joaquin, California; Orange Cove, California; Newark, New Jersey; and Seattle, Washington –

21  are seriously considering the Program or have already engaged MRP or otherwise taken steps

22  toward implementing the Program. This wealth transfer from the RMBS Trusts and their

23  beneficiaries to MRP, local governments, and select homeowners, would seriously adversely

24  impact the national housing market.

25  12.   Richmond would advance its local concerns at the expense of an entire

26  sector of interstate commerce that is critical to the health of the national economy. The Program

27  would severely disrupt the interstate market for mortgage-backed securities, which, in turn, is an

28  essential part of the home loan industry that enables a large percentage of Americans to realize

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                13
Case No.

1   the dream of owning their own homes. Lenders enter into mortgage loans, and those loans are

2   conveyed to RMBS trusts in interstate commerce, with the expectation that a large percentage of

3   homeowners will stay in their homes and continue to pay their mortgages or pay them off early

4   at full value, even as the housing market goes through cycles. These expectations are based on

5   careful analysis of historical payment trends. The Program being carried out in Richmond, by

6   itself, poses a direct threat to the economic expectations and underpinnings of the RMBS

7   market, but the threat is even more dire when coupled with the prospect that other cities around

8   the Nation would enter into similar agreements with MRP. If even the highest performing

9   mortgage loans are at risk of being seized at substantial discounts from face value whenever the

10  housing market enters a downward cycle, then the market will reflect that risk by sharply

11  reducing the price at which secondary-market buyers will be willing to purchase mortgage loans

12  in general. If the value of loans on the secondary market plummets, then lending banks likely

13  will reflect that change by offering new loans on more onerous terms than those currently

14  offered. And such more demanding terms will exclude many would-be home purchasers from

15  the market. Thus, by participating in the Program, Richmond would be using its sovereign

16  powers in a manner that effectively compels lenders to alter the terms of credit they offer to

17  account for greater risk. It is beyond question that Richmond could not directly adopt

18  regulations governing the interstate market in home mortgage loans that would have so

19  devastating an effect on the Nation's economy, and it cannot do so indirectly, under the guise of

20  "taking" the contract rights that are at the core of this important sector of interstate commerce.

21          13.     The beneficiaries of the RMBS Trusts include state and local pension

22  plans, 401(k) plans, college savings plans, insurance companies, mutual funds, university

23  endowments, and government sponsored enterprises. The economic harm would extend to

24  those entities and ultimately to their individual participants, including a vast number of

25  individual retirees nationwide.

26          14.     At the very least, the Program, if permitted to go forward, would have a

27  serious negative effect on the housing market and the local economy of Richmond. Among

28  other things, lenders will take into account Richmond's capricious use of eminent domain

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                              **14**
Case No.

1   powers to seize performing mortgage loans by reducing the available residential mortgage loan

2   credit to Richmond borrowers and increasing interest rates for residential mortgage loans. The

3   Program provides a windfall to a select group of Richmond residents who are paying their

4   mortgages, but harms the residential real estate market in Richmond across the board, and

5   effectively appropriates assets from, among others, a vast number of individual retirees

6   nationwide whose retirement vehicles are beneficiaries of RMBS trusts.

7          15.    As is noted above, the Plaintiffs are the trustees for the RMBS Trusts

8   (also listed on Schedules A-C hereto), which hold mortgage loans of homeowners in Richmond

9   that are being targeted by the Program. Plaintiffs request declaratory and injunctive relief

10  against Defendants' implementation of the Program. Moreover, because Defendants have taken

11  substantial steps toward implementing the Program, including sending offer letters to the

12  Plaintiffs and loan servicers for the RMBS Trusts to acquire the loans and publicly declaring

13  their intentions to soon begin seizing mortgage loans using Richmond's eminent domain

14  powers, Defendants should be preliminarily enjoined from implementing the Program, which

15  would be exceedingly difficult, if not impossible, to unwind after it has begun.

16                         **THE PARTIES**

17  **A.    Plaintiffs**

18         16.    Plaintiff Wells Fargo Bank, National Association ("Wells Fargo"), as

19  trustee for each of the RMBS Trusts listed on Schedule A hereto, is a national banking

20  association organized under the laws of the United States with its main office in South Dakota

21  and its principal place of trust administration in Maryland. Plaintiff Deutsche Bank National

22  Trust Company ("DBNTC"), as trustee for the RMBS trusts listed on Schedule B hereto, is a

23  national banking association organized to carry on the business of a limited purpose trust

24  company under the laws of the United States with its main office in Los Angeles, California,

25  and its principal place of trust administration in Santa Ana, California. Plaintiff Deutsche Bank

26  Trust Company Americas ("DBTCA"), as trustee for the RMBS Trusts listed on Schedule C

27  hereto, is a New York Banking Corporation organized and existing under New York law with

28  its principal place of business and its principal place of trust administration in New York.

17.     None of Wells Fargo, DBTCA, or DBNTC is incorporated in California or otherwise organized under the laws of California.  None of the Trustees is headquartered in Richmond, or has any corporate trust services office or employees in Richmond.  Of the three Plaintiff trustees, only DBNTC has a principal place of corporate trust administration in California.

18.     The Plaintiffs serve as trustees for the RMBS Trusts, which hold mortgage loans targeted by the Richmond Seizure Program due to their geographic location and loan profile.  The beneficiaries or certificateholders of the RMBS Trusts include a variety of institutional investors investing in the Trusts for their own accounts and on behalf of clients, including federal, state and local pension plans, 401(k) plans, college savings plans, insurance companies, mutual funds, university endowments and other institutional or individual investors.

19.     Although, as of the time of filing of this Complaint, Plaintiffs do not know all of the loans the Program will target, loans of the type being targeted by the Richmond Seizure Program are held in approximately 1,100 RMBS trusts, including the Trusts listed on Schedules A-C hereto.

20.     The physical notes evidencing the targeted mortgage loans held by the Trusts all are located outside of Richmond, and in most cases, are located outside of California.

21.     The certificateholders or beneficial owners of the Trusts are located across the country and the world.

**B.     Defendants**

22.     The Defendants – including MRP, a San Francisco-based investment firm – are located in California.

23.     Defendant MRP is a limited liability company registered under the laws of Delaware, and its registered agent for service of process in Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware, 19801.  It is headquartered in San Francisco, California.

24.     MRP is a privately-owned, for-profit company that seeks to partner with local governments to seize certain residential mortgage loans under the power of eminent

1   domain and to then restructure those loans.  On information and belief, MRP has no other

2   business operations.

3       25.  To date, MRP has attempted to partner with numerous municipalities in

4   California and other states to implement its program.  While several of these municipalities have

5   taken steps towards implementing MRP's program, Richmond is believed to be furthest along.

6       26.  MRP proposes to manage and facilitate the loan restructuring process,

7   including (a) raising funds to finance the seizures of the mortgage loans; (b) identifying

8   mortgage loans to be acquired through eminent domain; and (c) arranging for the refinancing of

9   the seized loans.  MRP and its investors would profit handsomely from this arrangement with

10  municipalities.  MRP would receive a $4,500 fee for each loan seized and refinanced.  In

11  addition, on information and belief, MRP's investors would receive the profit spread between

12  the seizure price and the price at which the new loan to the homeowner is refinanced and sold to

13  a securitized pool, net of MRP's fee, the fee paid the City of Richmond, and any expenses

14  incurred with the seizure of the loan that MRP has agreed to pay.

15      27.  On or about April 2, 2013, Richmond, through its City Council and upon

16  the recommendation of its City Manager, voted to enter into an "Advisory Services Agreement"

17  with MRP, under which MRP would advise Richmond about avenues of mortgage relief for

18  Richmond homeowners, including the possibility of acquiring existing mortgage loans through

19  eminent domain.  It is not clear whether this is the only written agreement between Richmond

20  and MRP or if there are other undisclosed oral or written arrangements or understandings

21  between them.

22      28.  Defendant City of Richmond, a municipality, is located in Contra Costa

23  County in the State of California.

24      **JURISDICTION**

25      29.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331

26  (federal question jurisdiction) and 1343(a)(3) and (4) (jurisdiction over actions for violations of

27  constitutional and federal rights secured by 42 U.S.C. § 1983), and over Plaintiffs' declaratory

28  relief causes of action under 28 U.S.C. §§ 2201 and 2202.  Plaintiffs' state law claims are so

1 related to their federal law claims that they form part of the same case or controversy.

2 Accordingly, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant

3 to 28 U.S.C. § 1367(a).

4        30.    This Court has personal jurisdiction over Defendant Richmond, as a

5 municipality located in this judicial district. The Court also has personal jurisdiction over

6 Richmond because Plaintiffs' claims arise out of actions taken by Richmond in this judicial

7 district.

8        31.    The Court has personal jurisdiction over Defendant MRP, because MRP

9 is an investment firm doing business in this judicial district, and Plaintiffs' claims arise out of

10 MRP's transaction of business in this judicial district.

11 **VENUE**

12        32.    Venue is proper in this judicial district based on 28 U.S.C. § 1391(b).

13 Defendant Richmond resides in this district, Defendant MRP conducts business in this judicial

14 district, and a substantial part of the events or omissions giving rise to the claims asserted herein

15 occurred in this district.

16 **INTRADISTRICT ASSIGNMENT**

17        33.    Pursuant to Civil Local Rules 3-2(c) and 3-2(d), this action is properly

18 assigned to either the San Francisco or Oakland Division of this Court, because a substantial

19 part of the events giving rise to the claims asserted herein occurred in Contra Costa County

20 (where Richmond is located) and the County of San Francisco (where MRP is headquartered).

21 **FACTUAL BACKGROUND**

22 **I.**    **Richmond and MRP's Profit Scheme**

23        34.    Defendants Richmond and MRP seek to enrich themselves through a

24 profit-driven scheme under which Richmond would use its eminent domain powers, and the

25 threat of eminent domain litigation, primarily to seize performing residential mortgage loans

26 owned by outside-of-Richmond RMBS Trusts and their beneficiaries at steeply and unjustifiably

27 discounted prices that do not reflect the current value of the loans, and then refinance those

28

**1** loans with new federally insured loans for amounts substantially above the amounts paid by

**2** Richmond to seize the homeowners' existing loans.

**3** 35. Richmond and MRP would profit by sharing in the spread between the

**4** price paid by Richmond to seize the loans and the proceeds received by Richmond (through

**5** MRP) for selling the new refinanced loans to the homeowners to a new securitized pool. The

**6** outside-of-Richmond RMBS Trusts whose mortgage loans would be seized under this Program

**7** would lose significant value – potentially hundreds of thousands of dollars on some seized loans

**8** – causing substantial harm to the Trusts and their certificateholders. Thus, the Program amounts

**9** to a seizure and transfer of wealth from private parties outside of Richmond, on the one hand, to

**10** other private parties, on the other hand, with Richmond receiving a small cut of the profits as its

**11** fee for renting out its eminent domain powers.

**12** **A. The Richmond Seizure Program's Targeting of Performing Loans**

**13** 36. The Program primarily targets, for eminent domain seizure, mortgage

**14** loans that meet a specific profile: (a) performing loans (meaning the borrower is not in default);

**15** (b) that are underwater (meaning that the loan value is worth more than the underlying home

**16** value); and (c) that are held by "private-label" securitization trusts (meaning that the trusts are

**17** sponsored by a private entity, rather than by a government-sponsored enterprise). [1]

**18** 37. The Program seeks to cherry-pick loans held by borrowers with the best

**19** credit ratings. In MRP's own words, it seeks loans that are "relatively current (not in default),"

**20** and only from "*borrowers who appear likely to repay their loans*." Exhibit A (MRP

**21** Homeownership Protection Program Presentation) at 9 (emphasis added). Thus, as MRP

**22** admits, the Program does not target loans for which there is a serious risk of default (much less

**23** a serious risk of foreclosure).

**24** 38. The reasons why MRP is targeting performing loans with low risks of

**25** default are obvious and implicit in the MRP business model. Under that model, a loan seizure

---

**26** [1] The Program has been described in several public sources, including in presentations by MRP
**27** to Richmond and others, attached hereto as Exhibits A (MRP Homeownership Protection
Program Presentation), B (MRP FAQ Sheet), C (Richmond CARES Presentation), and D (North
**28** Las Vegas CARES Presentation).

1    cannot be profitable unless the seized loan can be refinanced. Without such refinancing, the
2    amount paid to compensate the targeted RMBS Trust and its certificateholders for the eminent
3    domain seizure would be unreimbursed (and the City would remain the de facto holder of the
4    seized mortgage loan). Thus, the Program necessarily targets homeowners who can qualify for
5    new loans with good credit ratings that could be sold to a new securitized trust guaranteed by
6    the Federal Housing Administration ("FHA").

7           39.    To put it simply, MRP cannot realize the huge profits it seeks on the
8    backend of its strategy unless it targets performing homeowners with good credit ratings and
9    repayment histories. Otherwise, MRP will not be able to sell the new loan to a securitized pool
10   and obtain the revenue from that sale that provides MRP with the profit spread for this scheme.

11          40.    For similar strategic reasons, the Program targets loans held only by
12   private-label RMBS trusts, which are located outside of Richmond. On information and belief,
13   MRP believes the RMBS Trusts are too dispersed, and their certificateholders too dispersed, to
14   coordinate any meaningful resistance to MRP's scheme.

15          41.    The Program, by contrast, avoids seizing loans held by trusts sponsored
16   and guaranteed by Freddie Mac or Fannie Mae, in order to avoid provoking the ire of the federal
17   government. It similarly avoids seizing loans held directly by banks.

18          42.    In addition, MRP and Richmond attempt to justify the Program as
19   correcting what they claim to be a market inefficiency that exists with respect to loans held in
20   private-label RMBS Trusts: that the governing documents of some RMBS trusts prohibit the
21   loan servicers for the Trusts from permanently reducing a borrower's principal balance. *See,*
22   *e.g.*, Exhibit C (Richmond CARES Presentation), at 5.

23          43.    Finally, while the Program targets "underwater" loans, to purportedly
24   avoid foreclosures and their attendant economic costs, this justification is a false pretense for the
25   Program's money-making scheme. The performing loans targeted by the Program are unlikely
26   to go into default, let alone foreclosure, and the targeted homeowners are not about to abandon
27   or be forced out of their homes.

28

**B.    The Seizure and Refinancing of the Targeted Loans**

44.    Under the Program, once a loan is selected, Richmond will attempt to seize the loan through eminent domain powers for approximately 80% or less of the underlying *home value*. Because these are underwater loans (i.e., those with home values below the outstanding principal balance of the mortgage), a payment of 80% of the home value is far lower than the unpaid principal balance of the loan.

45.    Because the mortgage loans targeted by Richmond are performing and have a low risk of default, and (as is described below) generally cannot legally be sold out of the RMBS Trusts, those loans are properly valued at an amount worth substantially above the underlying current home value. A proper valuation of the loans would take into account their remaining principal and interest payments. The actual value of such loans would be the loan's unpaid principal balance, which for most of the targeted loans far exceeds 80% of the home's current value.

46.    Additionally, it is unclear that the Program will even assess the current value of the underlying home at a fair market value for purposes of pricing its compensation for the seizure. Because Defendants are incentivized to pay as low a seizure price as possible, the Program could value the underlying home at an artificial or deflated price, leading to an even lower seizure price.

47.    On information and belief, once Defendants secure the loan at a steeply discounted price, they then intend to replace it with a new loan to be sold into a FHA securitized pool in an amount equal to approximately 95% of the underlying home value. Richmond, MRP, and their investors and partners thus would instantly profit by sharing in the spread between the 80% seizure price and the 95% refinancing price.

48.    In an example provided by MRP, an underwater loan on a home worth $200,000 would be seized by eminent domain for $160,000 (or 80% of the home's value), and then refinanced into a new FHA loan for $190,000 (or 95% of the home's value). The $30,000 spread between the seizure price and the refinancing price would be divided (after expenses) among Richmond, MRP, and MRP's investors.

1    49.    In this example, Richmond would receive a flat fee of 5% of the

2    refinancing value (or $9,500), MRP would receive a flat fee of $4,500 for each loan seizure, and

3    MRP's investors would receive the remainder of the spread between the seizure price and the

4    refinancing price. *See* Ex. C hereto.  MRP may also be entitled to additional compensation in

5    connection with the Program, including fees for arranging the financing for the seizure and/or in

6    connection with the refinancing.

7    50.    MRP has claimed that the loans the Program seeks to target do actually

8    trade, and one can pull the trading histories and determine that, for example, a performing

9    $300,000 loan on a $200,000 house is worth about 80% of the value of the house.  But this is

10   inaccurate.  There is no trading market for performing underwater loans held by private-label

11   RMBS trusts.  Indeed, the Trusts are structured under federal tax laws as "real estate mortgage

12   investment conduits," or "REMICs," and, as such, are prohibited from selling performing loans.

13   Regardless, the value of such performing loans to the RMBS Trusts is clearly not the current

14   value of the underlying home.

15   51.    Additionally, the entire Program is premised on undercompensating the

16   owners of the loans.  It could not function in any other way, because the Program is profitable

17   for its participants only because the loans are seized for heavily discounted prices and are then

18   refinanced with a new loan purportedly worth more than the amount for which the homeowner's

19   existing loan was seized.  The new loan can be  sold to a new securitized pool, creating a profit

20   spread.  So compensation for the seized loans under the Program must, *ipso facto*, be at an

21   artificially deflated value – and hardly the "just" compensation that is constitutionally required.

22   52.    In fact, not only is the 80% price not a fair value for a performing

23   underwater loan with a low risk of default owned by an RMBS Trust, it would not even be a fair

24   price for Richmond loans not part of RMBS Trusts that are in default or foreclosure.  On

25   information and belief, *defaulted* residential mortgage loans available for sale have recently

26   traded at far above 80% of the underlying home value.

27

28

C.     The Program Will Have a Minimal Impact on Richmond's Foreclosure Rate

53.     MRP and the City attempt to justify the Program as a proper use of the City's eminent domain powers by asserting that the seizure of underwater mortgage loans will prevent defaults and foreclosures in Richmond, and thus reduce the economic fallout from the mortgage crisis, which began in 2008. Additionally, Richmond and MRP have touted the Program as fixing a "traditional" type of "market failure": the inability of borrowers to obtain a reduction in the principal balance of loans held by private-label RMBS trusts.

54.     For example, Richmond claims that the Program will reduce foreclosures in Richmond, create "more stable neighborhoods," add "more money in our local economy to stimulate community wealth," and save homeowners money on their mortgage payments and put that money in "homeowners' pockets" to spend on local businesses. Likewise, the Program would purportedly "preserv[e] home ownership, restor[e] homeowner equity and stabiliz[e] the communities' housing market and economy by allowing many homeowners to remain in their homes." Exhibit E (MRP Advisory Services Agreement) at 1. MRP claims that the homes that would be seized under the Program are "highly likely" to be foreclosed upon.

55.     But such purported justifications for the Program are inconsistent with the Program's business model, which, as noted above, primarily targets performing loans that are not at serious risk of default, let alone foreclosure.

56.     These are loans where the borrowers have not gone into foreclosure or otherwise walked away from their mortgages throughout a serious economic downturn that started in 2008. The likelihood that such borrowers would default and be foreclosed upon now, after weathering a years-long financial storm, with property values on the rise nationwide (including in California), is minimal. With real estate prices in California having risen significantly in the past year and expected to increase in the next 12 months, homeowners who have performed their mortgage loan contracts for years have no reason to suddenly walk away from their homes.

57.     The actual reality in Richmond contradicts the parade of horribles – of widespread defaults, foreclosures, home abandonments, blight and economic depression – that

1    MRP and Richmond claim will occur if they are not allowed to seize performing underwater

2    loans and refinance them for their own profit.

3           58.    For example, MRP claims that *50% of the private label mortgages in*

4    *Richmond will go into foreclosure*, and that "[t]hese foreclosures will cost Richmond $25

5    million." Exhibit C (Richmond CARES Presentation) at 2. This is a gross exaggeration that is

6    completely inconsistent with historical trends and experts' predictions for what will occur in the

7    future.

8           59.    The probability that a performing loan being targeted by Richmond and

9    MRP will go into default over the next year is exceptionally low, and any such default would

10   almost certainly be due to a change in economic circumstances of the borrower, like the

11   unexpected loss of a job, and not due to a decision by the homeowner to abandon their home

12   because it is currently underwater. Any loan that were to go into default in Richmond in the

13   next year would most likely qualify to obtain a modification or other type of work-out, and

14   would not be foreclosed upon. Indeed, on information and belief, a significant percentage of the

15   Richmond loans being targeted by the Program have already been modified or refinanced since

16   2008. Under current California law, lenders are required to attempt to negotiate a modification

17   with homeowners before they can resort to foreclosure. In the rare case where a modification or

18   work-out cannot be done, it currently takes a minimum of one year in California before any

19   defaulting loan can be foreclosed upon.

20          60.    Thus, the Richmond Seizure Program would have little or no effect on the

21   foreclosure rate in Richmond, and would instead cause substantial economic harm in Richmond

22   and beyond.

23   **D.    MRP and The City Have Taken Substantial Steps Towards Implementing**
           **the Program**
24

25          61.    To date, several other municipalities (in California and other states) have

26   contemplated entering into a partnership with MRP to implement its Program.

27          62.    MRP first targeted municipalities in California as potential partners for its

28   Program. The California local governments of San Bernardino County and the Cities of

1    Fontana and Ontario were the first to consider the Program. They formed a Joint Powers

2    Authority ("JPA") to study the issue. After more than seven months of extensive review, the

3    JPA Board voted unanimously on January 24, 2013 not to consider any proposals that involved

4    the use of eminent domain.

5           63.    At the time, JPA Board Chairman Greg Devereaux publicly remarked that

6    the JPA Board's decision was informed by the fact that experts warned that the use of eminent

7    domain would destabilize an already weak local housing market and worsen the mortgage crisis,

8    and that few local homeowners and other stakeholders expressed support for the use of eminent

9    domain, with many affirmatively opposing such a strategy.

10          64.    Although, to Plaintiffs' knowledge, no loans have yet been seized by

11   Richmond, Defendants have taken substantial steps toward implementing the Program and

12   seizing the loans. In April 2013, Richmond entered into an "Advisory Services Agreement"

13   with MRP, which apparently is the operative agreement between Richmond and MRP with

14   respect to the Program.

15          65.    On multiple occasions over the past months, the Mayor of Richmond or

16   other Richmond officials have publicly discussed Richmond's implementation of the Program,

17   including confirming that the City Council entered into a partnership with MRP to implement

18   the Program and discussing MRP and Richmond's readiness to begin implementing the

19   Program.

20          66.    On or about July 31, 2013, Richmond sent letters to the Plaintiffs and

21   other trustees and loan servicers making offers to purchase loans held in RMBS trusts, which

22   offers are a prerequisite under California eminent domain law before a local government can

23   seize property. The offer letters purported to attach a list of 624 mortgage loans held by various

24   RMBS trusts (including many held by the RMBS Trusts for which Plaintiffs serve as trustees)

25   that Defendants offered to acquire, "at the present time." Upon information and belief,

26   approximately two-thirds of the loans on this list are performing, thus indicating that the

27   Program seeks to target performing loans. It is unclear whether Richmond intends to seize the

28   nonperforming loans listed on the offer letters. The letters state that the offers are nonbinding

**1** on Richmond, and provide a deadline of August 13, 2013 for responses to the offers, after which

**2** Richmond may "decide[] to proceed with the acquisition of the loans through eminent domain."

**3** Upon information and belief, Richmond's offer letters constitute a first wave of offers, and if

**4** Defendants are successful in acquiring or seizing these loans, it is expected that they will

**5** attempt to acquire or seize many other loans that meet their targeted profile.

**6**        67.     If the offers to sell the loans are not accepted, Richmond could quickly

**7** seize possession of the loans. Richmond must first hold a condemnation hearing, and

**8** immediately thereafter could file an eminent domain lawsuit in California state court and use a

**9** California state law procedure known as a "Quick Take" to immediately obtain a court order

**10** giving Richmond possession of the property. MRP has indicated that the "Quick Take"

**11** procedure is a critical component of its scheme. *See* Exhibit B (MRP FAQ Sheet), at 3. Once

**12** Richmond receives possession of the loans, it could then extinguish, restructure, and refinance

**13** them, causing immediate and irreparable harm to the Trusts that will be exceedingly difficult, if

**14** not impossible, to unwind.

**15**        68.     Thus, there is a high likelihood that Defendants will soon exercise the

**16** City's eminent domain powers to seize possession of the mortgage loans under the Program.

**17** **II.     Implementation of the Richmond Seizure Program Would Result in Significant**
**         Economic Harm to Plaintiffs and Will Impact Interstate Commerce**

**18**

**19**     **A.     Economic Harm to the Trusts and their Beneficiaries**

**20**         **1.     Organization of the Trusts**

**21**        69.     Defendants intend to potentially target for seizure under the Program any

**22** performing loan secured by property in Richmond that is held by a "private label" RMBS trust.

**23** MRP has estimated that approximately 1,500 such mortgage loans exist in Richmond. *See*

**24** Exhibit C (Richmond CARES Presentation) at 2.

**25**        70.     The RMBS Trusts are investment vehicles created as part of the

**26** residential mortgage loan securitization process, whereby financial and economic risks are

**27** distributed by pooling mortgage loans and issuing securities or certificates for which the

**28** mortgages serve as collateral. Certificates of the RMBS Trusts are issued to certificateholders

1 on whose behalf Plaintiffs hold the mortgage loans. Under the typical governing documents for

2 the RMBS Trusts, the Plaintiffs, solely in their trustee capacity, hold legal title to the mortgage

3 loans on behalf of and for the benefit of the Trusts' certificateholders.

4       71.     The most common form of securitization of mortgage loans involves a

5 "sponsor" – an entity that acquires or originates the mortgage loans and initiates the

6 securitization. A "private label" securitization is one that is sponsored by a private entity, rather

7 than a GSE such as Fannie Mae or Freddie Mac.

8       72.     Sponsors do not always originate the mortgage loans themselves, but

9 frequently acquire the mortgage loans from loan originators or others that have title to the loans.

10 For a loan to be conveyed from the point of origination to an RMBS trust involves a complex

11 series of sales transactions that often occur across state lines.

12       73.     The prices paid for the mortgage loans that are deposited into the RMBS

13 Trusts are contingent on the quality and value of the mortgage loans. Economic and financial

14 risk are distributed because the pool of loans in an RMBS trust typically is geographically

15 diverse. Thus, the Trusts do not exclusively contain loans secured by California real property

16 (or exclusively loans from any other single state), but rather each Trust contains mortgage loans

17 secured by real property located in a variety of states and localities.

18       74.     The certificates issued by the Trusts represent beneficial ownership

19 interests in the principal and interest from the cash flow generated by the mortgage loan pool in

20 accordance with specific payment rules. The assets of the Trusts are serviced by "loan

21 servicers" whose responsibilities include collecting payments by borrowers and managing

22 borrower defaults.

23       75.     The certificates are purchased by investors – typically referred to as

24 "certificateholders" – who seek a particular risk profile of the Trust's mortgage loans. The

25 certificates in the Trusts typically are issued pursuant to offering memoranda, which explain the

26 general structure of the investment and the risks involved and contain detailed descriptions of

27 the collateral groups underlying the certificates.

28

1        76.     Pursuant to the governing documents for the Trusts, the performing loans

2   held by the Trusts generally cannot be sold. Therefore, there is no trading market for

3   performing private-label loans like those targeted by Richmond and MRP. Investors in RMBS

4   trusts expect those loans to perform until maturity, unless the loan is paid off by the borrower

5   early or goes into default.

6        **2.**     **Harm to the Trusts and their Beneficiaries**

7        77.     If implemented, the Richmond Seizure Program would cause significant

8   harm to the RMBS Trusts and their certificateholders, who ultimately bear the substantial harm

9   imposed by the Takings Program.

10        78.     First, the targeting of performing loans within the Trusts' portfolios

11   would, by itself, completely upend the purpose of the securitization process, which is based

12   upon loan diversification and on the stable and non-saleable nature of performing loans within

13   the pool.

14        79.     Second, the number of loans targeted in Richmond alone – hundreds of

15   mortgage loans – would cause tens of millions of dollars in losses to the RMBS Trusts for which

16   Plaintiffs serve as trustees, and other RMBS trusts holding those loans (with an average

17   estimated loss of approximately $100,000 to $200,000 per seized loan), potentially as high as

18   $66 million or more in losses to the Trusts for which the Plaintiffs are trustees, and $200 million

19   or more to all RMBS trusts. Indeed, upon information and belief, the first wave of 624 loans

20   targeted by Defendants could potentially cause losses to RMBS trusts holding those loans of

21   $90 million or more.

22        80.     Third, on information and belief, Richmond is a test case for the Program.

23   Many municipalities have been approached by MRP, but, upon information and belief,

24   Richmond has taken the most significant steps towards seizing loans under the Program. On

25   information and belief, those municipalities, and many others, are watching to see whether

26   Richmond is able to carry out its scheme. If even a few other municipalities of Richmond's size

27   implement the Program, then losses could range in the billions of dollars. If more than a few

28   implement the Program, losses could mount far higher. This widespread transfer of substantial

wealth from the RMBS Trusts and their certificateholders, on the one hand, to MRP, local governments, and select local homeowners, on the other hand, could destabilize the national housing market.

### B.     The Effect on Interstate Commerce and the National Housing Market

81.     The Program would also cause significant harm to interstate commerce and the national housing market.  In addition to the damages caused to RMBS Trusts and their beneficiaries by the seizure of performing residential mortgage loans at artificially low prices, the Program would have a chilling effect on the future extension of mortgage credit to homeowners.  Lenders would have reduced willingness to underwrite mortgages in Richmond or other municipalities in which they perceive a risk that similar programs will be implemented. To the extent lenders chose to continue lending in such municipalities at all, they necessarily would lower the loan-to-value (of the home) ratio at which they would lend, and charge a higher interest rate on the loans they do make, to take into account the new risk that the loan would be seized by eminent domain whenever the housing market enters a cyclical downturn.  Potential borrowers in those jurisdictions would therefore suffer by the tightening of credit in their communities.  With diminished access to credit, many prospective homeowners would be unable to obtain loans, and housing prices would fall across the board.

82.     Further, the Program would undermine investor confidence in the residential mortgage-backed securities market, and by extension, the national housing market and national economy.  The securitization market would be upended, as investors in residential mortgage-backed securities would be unable to adequately evaluate underlying mortgage pools that collateralize their investment, and prices for affected securities would decrease.   A broad range of investors hold interests in residential mortgage-backed securitizations as part of common diversification strategies.  Thus, the detrimental effects of a valuation crisis as to the securities evidencing those interests would flow through the national housing market, and likewise, the national economy.

83.     Likewise, industries dependent on a vibrant housing market and an active home lending environment would suffer, such as the home building, construction, and realty industries.

84.     In comments published in the Federal Register, 77 FR 47652 (August 9, 2012) discussing the "Use of Eminent Domain To Restructure Performing Loans," the FHFA recognized the harm that programs like the Richmond Seizure Program would cause.  Among other things, FHFA has explained that the GSEs, as well as the multiple Federal Home Loan Banks for which FHFA acts as a regulator, because they are substantial holders of RMBS, would be harmed, as well as the communities themselves that attempt to use eminent domain. According to FHFA:

> FHFA has significant concerns about the use of eminent domain to revise existing financial contracts and the alteration of the value of Enterprise or Bank securities holdings. In the case of the Enterprises, resulting losses from such a program would represent a cost ultimately borne by taxpayers. At the same time, FHFA has significant concerns with programs that could undermine and have a chilling effect on the extension of credit to borrowers seeking to become homeowners and on investors that support the housing market.
>
> FHFA has determined that action may be necessary on its part as conservator for the Enterprises and as regulator for the Banks to avoid a risk to safe and sound operations and to avoid taxpayer expense.
>
> Among questions raised regarding the proposed use of eminent domain are the constitutionality of such use; the application of federal and state consumer protection laws; the effects on holders of existing securities; the impact on millions of negotiated and performing mortgage contracts; the role of courts in administering or overseeing such a program, including available judicial resources; fees and costs attendant to such programs; and, in particular, critical issues surrounding the valuation by local governments of complex contractual arrangements that are traded in national and international markets.

85.     Likewise, the U.S. House of Representatives Financial Services Committee, which has oversight of Fannie Mae and Freddie Mac, recently issued a draft reform bill, a stated purpose of which is to implement the following reform: "To combat constitutionally-suspect 'eminent domain' schemes by local municipalities to seize mortgages out of legally binding securities for purposes of rewriting their terms, prohibit the GSEs from purchasing or guaranteeing loans originated in municipalities where such practices have been

1 | employed during the last ten years." Executive Summary of the Protecting American

2 | Homeowners (PATH) Act, July 11, 2013, at 2.

3 | 86.    The concerns expressed by the FHFA and the House Financial Services

4 | Committee are well-founded. Indeed, if fully implemented, the Program could have a

5 | devastating effect on interstate commerce, including on the mortgage-backed securities market

6 | and the national housing market, and would detrimentally affect both borrowers and lenders.

7 | **C.    The Damages to the City of Richmond and Its Homeowners**

8 | 87.    Richmond, and its citizens, would not be spared from the harm caused by

9 | Richmond's wrongful use of eminent domain powers to seize mortgage loans under the

10 | Program. Lenders would be less willing to write mortgages for Richmond citizens, and property

11 | values would plummet and homeownership rates would drop.

12 | 88.    The relatively small number of select Richmond homeowners who could

13 | receive a windfall under the Program by having their underwater mortgages refinanced will not

14 | offset the devastation to the local housing market and economy due to the Program's chilling

15 | effect on future mortgage credit.

16 | **III.    Injunctive Relief Is Necessary to Prevent the Immediate and Irreparable Harm**

17 | **That Will Occur if the Program Is Allowed to Go Forward**

18 | 89.    Defendants should be enjoined from implementing the Richmond Seizure

19 | Program. As demonstrated herein, the Program would cause significant and widespread

20 | economic harm, and, if carried out, the transactions that the Program contemplates will be

21 | exceedingly difficult, if not impossible, to unwind.

22 | 90.    Under the Program, once new loans are issued to refinance the original

23 | loans, they would be securitized: sold by Richmond/MRP to another residential mortgage loan

24 | pool backed by the FHA. Thus, to unwind these transactions would require extinguishing the

25 | new loan, thereby harming the FHA trust that holds that loan, and its certificateholders. The

26 | homeowner whose loan has been seized and refinanced would be put in a situation where their

27 | underwater mortgage has been extinguished, refinanced for a lower rate, and then reinstated

28 | again at the old rate and their new home equity from the refinancing taken away.

91.     Moreover, money damages would be inadequate to compensate the RMBS Trusts and their certificateholders for Defendants' wrongdoings. First, widespread seizure and extinguishment of the loans will, among other things, affect the credit rating of certain tranches of the Trusts' certificates, which could cause systemic problems for the mortgage-backed securities industry – including the RMBS Trusts and their certificateholders – that cannot be compensated by money damages.

92.     Second, it is unlikely that MRP or Richmond (which has obtained an indemnification from MRP for any liabilities arising from the Program) would have the financial means necessary to compensate the RMBS Trusts and their certificateholders for the potentially hundreds of millions of dollars in losses caused by the Program, in which case the Trusts and their beneficiaries will be left without recourse for their loss.

## JUSTICIABLE DISPUTE

93.     By reason of the foregoing, there now exists a justiciable dispute and controversy for which immediate relief is necessary.

94.     Accordingly, Plaintiffs seek injunctive and declaratory relief as set forth herein.

## CLAIMS FOR RELIEF

## COUNT I

**(VIOLATION OF THE "PUBLIC USE" REQUIREMENT OF THE TAKINGS CLAUSES OF THE U.S. AND CALIFORNIA CONSTITUTIONS AND CLAIM UNDER 42 U.S.C. § 1983)**

**(AGAINST ALL DEFENDANTS)**

95.     Plaintiffs repeat and reallege the allegations contained in each preceding paragraph as if fully set forth herein.

96.     The Fifth Amendment to the U.S. Constitution provides that "private property" shall not be "taken for public use, without just compensation" (the "Takings Clause"). This requirement is incorporated and made applicable to the states and their political subdivisions and actors by the Fourteenth Amendment of the U.S. Constitution.

97.     42 U.S.C. § 1983 provides that any person, acting under the color of state law, that subjects or causes to be subjected any citizen of the United States or other person within its jurisdiction to the deprivation of any rights, privileges, or immunities under the Constitution, shall be liable to the injured party in an action at law, suit in equity, or other proper proceeding for redress.

98.     California Constitution article I, § 19 provides that private property may be taken only for a "public use."

99.     The Richmond Seizure Program is carried out by Defendants under the color of state law.

100.    The Program violates the "public use" requirement of the Takings Clause of the Fifth and Fourteenth Amendments and of the California Constitution. The Program is not implemented for a public purpose, but rather for the purpose of seizing property from one set of private entities (the Trusts and their beneficiaries) to enrich MRP, a private investment firm, and its investors. The stated justifications for the Program – to reduce foreclosures and their attendant economic effects – are mere pretexts for this profit-driven scheme. Indeed, the fact that the Program principally targets performing loans shows that it is not designed to reduce foreclosures or their economic consequences, but rather to confer private benefits on a select set of individuals.

101.    In addition, the Program would not benefit Richmond's citizens as a whole, but would instead lead to windfalls for the select group of homeowners that meet a loan profile profitable to Defendants and their investors, to the detriment of all others. The Program expressly excludes many borrowers and principally targets performing mortgage loans that are not in default or foreclosure. If the Program is fully implemented and performing loans are seized for well-below their unpaid principal balance, and thus at significant losses to the Trusts holding those loans and their beneficiaries, future lenders will be unwilling to extend credit in Richmond at the current level, creating, at a minimum, a chilling effect on the local home lending environment. This will have severe consequences for current and prospective Richmond homeowners.

1           102.    None of the allegations in this Complaint should be construed in any way

2    as an attempt to threaten or restrain any of Defendants' constitutional rights of freedom of

3    speech or rights to petition government for the redress of grievances. Any allegations in this

4    Complaint that discuss statements made or actions taken by Defendants or any of their

5    representatives are included in this Complaint solely for the purposes of pleading a basis for

6    Plaintiffs' claims for relief (all of which are independent of Defendants' rights to free speech or

7    to petition government), including, among other things, by showing how the Richmond Seizure

8    Program works and identifying Defendants' purported and actual justifications for the Program

9    and intent to improperly use eminent domain powers. In short, the Complaint targets

10   Defendants' unconstitutional and unlawful use of eminent domain, not Defendants' statements

11   about it.

12          103.    Accordingly, Plaintiffs respectfully request that the Court issue a

13   judgment for declaratory and injunctive relief against Defendants, declaring that the

14   implementation of the Richmond Seizure Program would violate the Fifth and Fourteenth

15   Amendments of the U.S. Constitution and article I, § 19 of the California Constitution, and

16   permanently enjoining Defendants from implementing any aspect of the Program.

17   **COUNT II**

18   **(VIOLATION OF THE PROHIBITIONS AGAINST EXTRATERRITORIAL**
     **SEIZURES UNDER THE TAKINGS CLAUSES OF THE U.S. AND CALIFORNIA**
19   **CONSTITUTIONS AND THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND**
     **CLAIM UNDER 42 U.S.C. § 1983)**
20
     **(AGAINST ALL DEFENDANTS)**
21

22          104.    Plaintiffs repeat and reallege the allegations contained in each preceding

23   paragraph as if fully set forth herein.

24          105.    The Fifth Amendment to the U.S. Constitution prohibits a local

25   government from extraterritorially seizing property pursuant to eminent domain powers. This

26   requirement is incorporated and made applicable to the states and their political subdivisions

27   and actors by the Fourteenth Amendment of the U.S. Constitution.

28

**1**            106.    42 U.S.C. § 1983 provides that any person, acting under the color of state

**2**  law, that subjects or causes to be subjected any citizen of the United States or other person

**3**  within its jurisdiction to the deprivation of any rights, privileges, or immunities under the

**4**  Constitution, shall be liable to the injured party in an action at law, suit in equity, or other proper

**5**  proceeding for redress.

**6**            107.    Article I, § 1 of the California Constitution prohibits local governments

**7**  from extraterritorially seizing property pursuant to eminent domain powers.

**8**            108.    Under Cal. Civ. Pro. Code § 1240.050, a local public entity may acquire

**9**  by eminent domain only property located within its territorial limits. Under Cal. Civ. Pro. Code

**10**  § 1250.020, an eminent domain proceeding shall be commenced in the county in which the

**11**  property sought to be taken is located.

**12**            109.    The Richmond Seizure Program is carried out by Defendants under the

**13**  color of state law.

**14**            110.    Defendants' implementation of the Program violates prohibitions against

**15**  extraterritorial property seizures under the Fifth and Fourteenth Amendments of the U.S.

**16**  Constitution and Article I, § 1 of the California Constitution, and violates Cal. Civ. Pro. Code §

**17**  1240.050 and § 1250.020. The mortgage loans that Defendants target under the Program are not

**18**  located within the territorial borders of Richmond, California, but are held in Trusts located

**19**  outside of Richmond. Because the situs of a debt for eminent domain purposes is deemed to be

**20**  the location of the creditor, Defendants have no power to seize these outside-of-Richmond

**21**  debts.

**22**            111.    In addition, the notes evidencing the mortgage loans are physically held

**23**  by custodians in locations outside of Richmond. Thus, Defendants have no power to effect

**24**  extraterritorial seizures of those tangible instruments. Indeed, the many of the RMBS Trusts

**25**  holding Richmond loans and the notes evidencing those loans are not even located inside the

**26**  State of California.

**27**            112.    Accordingly, Plaintiffs respectfully request that the Court issue a

**28**  judgment for declaratory and injunctive relief against Defendants, declaring that the

1  implementation of the Richmond Seizure Program would violate the Fifth and Fourteenth

2  Amendments of the U.S. Constitution, article I, § 1 of the California Constitution, and Cal. Civ.

3  Pro. Code § 1240.050 and § 1250.020, and permanently enjoining Defendants from

4  implementing any aspect of the Program.

5  ## COUNT III

6  **(VIOLATION OF THE COMMERCE CLAUSE OF THE U.S. CONSTITUTION AND**
7  **CLAIM UNDER 42 U.S.C. § 1983)**

8  **(AGAINST ALL DEFENDANTS)**

9  113.     Plaintiffs repeat and reallege the allegations contained in each preceding

10  paragraph as if fully set forth herein.

11  114.     Article I, § 8, cl. 3 of the U.S. Constitution (the "Commerce Clause")

12  gives Congress the power to regulate commerce among the several states. Under the doctrine of

13  the "dormant Commerce Clause," states and their political subdivisions are prohibited from

14  taking action designed to benefit in-state economic interests by burdening out-of-state interests.

15  That doctrine prohibits direct regulation of interstate commerce by the states and their political

16  subdivisions, and permits incidental regulation only where the burden imposed on such

17  commerce is not excessive in comparison with the putative local benefits.

18  115.     42 U.S.C. § 1983 provides that any person, acting under the color of state

19  law, that subjects or causes to be subjected any citizen of the United States or other person

20  within its jurisdiction to the deprivation of any rights, privileges, or immunities under the

21  Constitution, shall be liable to the injured party in an action at law, suit in equity, or other proper

22  proceeding for redress.

23  116.     The Richmond Seizure Program is carried out by Defendants under the

24  color of state law.

25  117.     Defendants violate the Commerce Clause of the U.S. Constitution by

26  implementing the Program, which is designed to benefit certain local economic interests – i.e.,

27  those of a relatively small number of Richmond homeowners selected to participate in the

28  Program, and of the San Francisco-based investment firm MRP that would profit under the

**1**    Program – at the expense of out-of-Richmond and out-of-state interests, including the Trusts

**2**    that hold the mortgage loans targeted for seizure and the beneficiaries of those Trusts.

**3**            118.    In addition, the Program is a direct regulation of interstate commerce by

**4**    Richmond. The Program expressly targets for seizure private-label mortgage loans held by out-

**5**    of-Richmond and out-of-state Trusts and their beneficiaries, precisely because of Richmond's

**6**    belief that there is a "market failure" in this sector of the interstate economy. The Trusts are

**7**    investment vehicles designed to distribute economic and financial risk by holding a diversified

**8**    collateral base of mortgage loans, including loans that are diverse based on, among other

**9**    factors, their geographic and risk profiles. Thus, the Trusts do not hold only loans secured by

**10**    real property located in Richmond or California, but by real property located in a variety of

**11**    states and localities.

**12**            119.    Also, the private-label mortgage loans targeted by MRP were acquired by

**13**    a private sponsor, who securitized them in a private-label RMBS Trust, in which the loans are

**14**    serviced, and mortgage payments flow through the Trusts to be ultimately distributed to the

**15**    Trusts' certificateholders. Therefore, the Program would directly regulate an investment

**16**    structure that by its very nature depends on a pool of collateral located in different states, and on

**17**    the interstate flows of proceeds from homeowners, to loan servicers, to the Trusts, and then

**18**    ultimately to the Trusts' certificateholders.

**19**            120.    Furthermore, the residential mortgage-backed securities market is a

**20**    national industry that crosses state lines, with investors and other market participants located

**21**    throughout the country. The Program would significantly and directly regulate this market by

**22**    seizing its underlying assets, and not for a fair market value, but for steeply discounted

**23**    valuations unilaterally determined by the local government.

**24**            121.    Moreover, the burden imposed on interstate commerce by the Program

**25**    would be excessive, and would greatly outweigh any purported benefits to the Richmond

**26**    community. Among other things, the Program could cause hundreds of millions of dollars in

**27**    losses to the Trusts that hold the targeted mortgage loans and the beneficiaries of those Trusts.

**28**    It would also upend the heavily negotiated investment structures used across the national

1     residential mortgage backed securitization industry, diminish investor confidence in such

2     structures, and have a chilling effect on mortgage credit (in Richmond and elsewhere). In

3     addition, the purported benefits to Richmond – of reducing foreclosures and their local

4     consequences – are minimal or non-existent. The Program principally does not aim to seize

5     loans in default or at serious risk of default or foreclosure, but performing loans at low risk of

6     default, which would not even address the harms that it purports to prevent. The benefits to the

7     relatively small number of Richmond homeowners receiving a windfall under the Program

8     would not outweigh the harm that the Program would cause to the Trusts, their beneficiaries,

9     and others, on both a local and national scale.

10     122.     Accordingly, Plaintiffs respectfully request that the Court issue a

11     judgment for declaratory and injunctive relief against Defendants, declaring that the

12     implementation of the Richmond Seizure Program would violate the Commerce Clause of the

13     U.S. Constitution, and permanently enjoining Defendants from implementing any aspect of the

14     Program.

15     **COUNT IV**

16     **(VIOLATION OF THE CONTRACTS CLAUSE OF THE U.S. CONSTITUTION AND CLAIM UNDER 42 U.S.C. § 1983)**

17

18     **(AGAINST ALL DEFENDANTS)**

19     123.     Plaintiffs repeat and reallege the allegations contained in each preceding

20     paragraph as if fully set forth herein.

21     124.     Article I, § 10 of the U.S. Constitution – the "Contracts Clause" –

22     prohibits states from "impairing the Obligation of Contracts." The Contracts Clause prevents

23     states and their political subdivisions from passing any law that would abrogate debts of their

24     citizens, where that law would impair commercial intercourse and threaten the existence of

25     credit.

26     125.     42 U.S.C. § 1983 provides that any person, acting under the color of state

27     law, that subjects or causes to be subjected any citizen of the United States or other person

28     within its jurisdiction to the deprivation of any rights, privileges, or immunities under the

1  Constitution, shall be liable to the injured party in an action at law, suit in equity, or other proper

2  proceeding for redress.

3       126.    Defendants violate the Contracts Clause by implementing a scheme that

4  would severely impair the Trusts' contractual rights to receive full payments of unpaid principal

5  from borrowers. In exchange, the Program provides cash payments worth significantly less than

6  the rights abrogated by Defendants. The purpose of this significant impairment of contractual

7  rights is improper and without a legitimate public purpose or necessity: to abrogate debts held

8  by a small, select group of that jurisdiction's citizen while enriching a private investment firm

9  and its backers.

10      127.    In addition, the Program impairs commercial intercourse and threatens

11 the existence of credit for current and prospective homeowners, in Richmond and elsewhere in

12 California and throughout the country. In Richmond, the Program would have a chilling effect

13 on home lending, as lenders would be unable to quantify the risk of seizures into pricing for

14 future mortgage loans and would consequently reduce the availability of credit and negatively

15 impact the credit terms on the loans actually made going forward. That underwriting problem

16 would spread to any other jurisdictions that lenders believe are at risk of adopting MRP's

17 scheme, causing property values and homeownership rates to decrease.

18      128.    Accordingly, Plaintiffs respectfully request that the Court issue a

19 judgment for declaratory and injunctive relief against Defendants, declaring that the

20 implementation of the Richmond Seizure Program would violate the Contracts Clause of the

21 U.S. Constitution, and permanently enjoining Defendants from implementing any aspect of the

22 Program.

23

24

25

26

27

28

## COUNT V

### (VIOLATION OF THE "JUST COMPENSATION" REQUIREMENTS OF THE TAKINGS CLAUSE OF THE U.S. AND CALIFORNIA CONSTITUTIONS AND CLAIM UNDER 42 U.S.C. § 1983)

### (AGAINST ALL DEFENDANTS)

129.    Plaintiffs repeat and reallege the allegations contained in each preceding paragraph as if fully set forth herein.

130.    The Fifth Amendment to the U.S. Constitution provides that "private property" shall not be "taken for public use, without just compensation." This requirement is incorporated and made applicable to the states and their political subdivisions and actors by the Fourteenth Amendment of the U.S. Constitution.

131.    In addition, under the U.S. and California Constitutions, where only a portion of property is condemned (referred to as a "partial" taking), the measure of just compensation includes both the value of the thing condemned and the loss in value to the remaining, non-condemned portion of the property.

132.    42 U.S.C. § 1983 provides that any person, acting under the color of state law, that subjects or causes to be subjected any citizen of the United States or other person within its jurisdiction to the deprivation of any rights, privileges, or immunities under the Constitution, shall be liable to the injured party in an action at law, suit in equity, or other proper proceeding for redress.

133.    A property owner is entitled to just compensation for any taking under Article I, § 1 of the California Constitution. California Code of Civil Procedure § 1263.320 provides that the test for assessing "fair market value" for purposes of the "just compensation" requirement is the highest price that a hypothetical buyer and seller would agree to in the marketplace, assuming both were willing and able to complete the transaction but had no particular or urgent necessity to do so.

134.    The Richmond Seizure Program is carried out by Defendants under the color of state law.

1            135.     Defendants violate the just compensation requirements of the Takings

2   Clause of the U.S. Constitution and California Constitution, and also violate California statutory

3   law. The Program is a for-profit scheme that proposes seizing performing mortgage loans at

4   fractions of their unpaid principal balance, prices that are below the fair market value for even

5   loans that are in default. Thus, the Program would unjustly compensate the Trusts for the loan

6   seizures by seizing loans at prices far less than their actual or fair market values. This

7   unconstitutional feature of the Program is not merely a question of the valuation of a single

8   property, but instead is the central premise of the Program itself. Indeed, the Program is only

9   financially feasible, and profitable to Defendants and the Program's other participants, if loans

10   are seized at deeply discounted values and then refinanced at higher prices (with Defendants

11   profiting from the price spread).

12            136.     In addition, the Program violates the just compensation requirements of

13   the Takings Clause of the U.S. Constitution and California Constitution, and also violates

14   California statutory law, by constituting a "partial" taking of the Trusts' remaining assets for

15   which no compensation is provided. The loans targeted by the Program are held by the Trusts

16   as part of a pool consisting of numerous loans. The Program cherry-picks and seizes the most

17   profitable loans from that pool – i.e., performing loans – leaving the Trusts with a pool

18   containing a higher concentration of non-performing loans, thereby diminishing the value of the

19   Trusts' remaining, non-condemned assets.

20            137.     Accordingly, Plaintiffs respectfully request that the Court issue a

21   judgment for declaratory and injunctive relief against Defendants, declaring that the

22   implementation of the Richmond Seizure Program would violate the Takings Clause of the U.S.

23   Constitution and California Constitution, and permanently enjoining Defendants from

24   implementing any aspect of the Program.

25

26

27

28

## COUNT VI

### (VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE U.S. AND CALIFORNIA CONSTITUTIONS AND CLAIM UNDER 42 U.S.C. § 1983)

### (AGAINST ALL DEFENDANTS)

138. Plaintiffs repeat and reallege the allegations contained in each preceding paragraph as if fully set forth herein.

139. The Fourteenth Amendment to the U.S. Constitution provides that no state shall deny to any person within its jurisdiction equal protection of its laws (the "Equal Protection Clause"). The Equal Protection Clause prohibits states or their subdivisions from discriminating against similarly situated individuals, where the discrimination is not rationally related to a legitimate purpose.

140. 42 U.S.C. § 1983 provides that any person, acting under the color of state law, that subjects or causes to be subjected any citizen of the United States or other person within its jurisdiction to the deprivation of any rights, privileges, or immunities under the Constitution, shall be liable to the injured party in an action at law, suit in equity, or other proper proceeding for redress.

141. Article I, § 7 of the California Constitution provides that a person may not be denied equal protection of the laws.

142. The Richmond Seizure Program is carried out by Defendants under the color of state law.

143. Defendants violate the Equal Protection Clause of the U.S. and California Constitutions because the Program discriminates against certain holders of mortgage loans (including the Trusts), as well as certain classes of Richmond homeowners, and such discrimination is not rationally related to any legitimate purpose.

144. The Program is discriminatory because, among other reasons, it (a) solely targets loans held by private-label RMBS trusts, and does not target loans held by other holders, including GSE trusts or banks, (b) primarily targets performing loans, and primarily excludes defaulted loans, including loans in foreclosure, and (c) targets first-lien mortgages and not

**1**    second-lien mortgages. Defendants' purported justifications for the Program, of reducing

**2**    foreclosures and their attendant economic consequences (even if a legitimate purpose for the

**3**    abuse of eminent domain powers, which they are not), are in no way furthered by targeting

**4**    performing first-lien loans held in private-label RMBS trusts, to the exclusion of other loans,

**5**    such as defaulting loans or loans held by GSE trusts or banks.

**6**         145.    Additionally, under the Program, some few select Richmond homeowners

**7**    would benefit from the Program, whereas many more would be harmed by it. Some Richmond

**8**    homeowners would receive an unjustified windfall by having their loans refinanced because

**9**    they meet a borrowing profile profitable to Defendants, whereas no benefit would be bestowed

**10**    upon the other homeowners who are not eligible for refinancing. Indeed, the homeowners not

**11**    selected for the Program will suffer harm by, among other reasons, being subjected to the

**12**    chilling effect on credit in the Richmond community caused by Richmond's implementation of

**13**    an eminent domain program that arbitrarily seizes mortgage loans. There is no rational basis for

**14**    providing a windfall to select homeowners at the expense of other homeowners.

**15**         146.    The lack of a rational basis for Richmond's discrimination among

**16**    homeowners between those who will reap the windfall benefits of the Program and those who

**17**    will not is underscored by the fact that Richmond does not itself identify which loans will be

**18**    condemned. Rather, Richmond delegates this responsibility to MRP – a private, for-profit

**19**    investment firm – to identify which loans will best further its own purpose of enriching itself at

**20**    the expense of the Trusts and their beneficiaries.

**21**         147.    Accordingly, Plaintiffs respectfully request that the Court issue a

**22**    judgment for declaratory and injunctive relief against Defendants, declaring that the

**23**    implementation of the Richmond Seizure Program would violate the Equal Protection Clause of

**24**    the U.S. Constitution and California Constitution, and permanently enjoining Defendants from

**25**    implementing any aspect of the Program.

**26**

**27**

**28**

**COUNT VII**

**(PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DECLARATORY RELIEF)**

**(AGAINST ALL DEFENDANTS)**

148.    Plaintiffs repeat and reallege the allegations contained in each preceding paragraph as if fully set forth herein.

149.    Defendants have taken substantial steps toward seizing loans under the Richmond Seizure Program, and Plaintiffs have every reason to expect that such seizures are imminent. If those seizures occur, the Trusts will be irreparably harmed. As part of the Program, Defendants would restructure the seized mortgages and refinance them with new loans. The new loans would then be sold into new mortgage-backed securities pools. Securities would be issued based on these pools to investors, and the securities would trade. Those transactions will be exceedingly difficult, if not impossible, to unwind after the fact, and to do so could cause harm to a variety of parties, including the Trusts currently holding Richmond loans that are seized and the investors in those Trusts, the issuer of the new mortgage loan, the trust holding the new loan and the investors in that trust, and the homeowners whose loans are restructured and refinanced.

150.    Moreover, for all of the reasons discussed herein, Plaintiffs have a likelihood of success on the merits of their claims, and the balance of equities tips decidedly in favor of granting temporary relief to Plaintiffs. There will be no serious harm to Defendants caused by a delay in implementing the Program if it is preliminarily enjoined, as the Program targets loans of homeowners who are not in imminent danger of losing their homes if the Program is subject to a preliminary injunction. On the other hand, if implemented, the Program would have a chilling effect on the extension of credit to Richmond borrowers, along with consequential negative effects on Richmond's housing market and economy. Such effects could spread through California and the country, especially if other municipalities take steps toward implementing similar programs. Additionally, the Program would cause tens of millions of losses to the Trusts, and, if it spreads beyond Richmond, could have a destabilizing effect on the

mortgage-backed securities market, and the national housing market more broadly.  There is a significant public interest in enjoining the Program both permanently and preliminarily, while the serious issues of constitutionality and legality raised by this Complaint are decided.

151.    In addition, with respect to all of the claims for relief asserted in this Complaint, and for all of the reasons asserted herein, there is an actual controversy between Plaintiffs and Defendants sufficient for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

152.    Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief and declaratory relief restraining Defendants from implementing the Richmond Seizure Program and declaring the Program unlawful.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor on all claims asserted in the Complaint and that the Court:

A.    Declare that Defendants' implementation of the Richmond Seizure Program violates the Takings Clause of the Fifth and Fourteenth Amendments to the Constitution of the United States, and enjoin Defendants from implementing the Program on that basis;

B.    Declare that Defendants' implementation of the Richmond Seizure Program violates the Commerce Clause of the Constitution of the United States, and enjoin Defendants from implementing the Program on that basis;

C.    Declare that Defendants' implementation of the Richmond Seizure Program violates the Contracts Clause of the Constitution of the United States, and enjoin Defendants from implementing the Program on that basis;

D.    Declare that Defendants' implementation of the Richmond Seizure Program violates the Equal Protection Clause of the Constitution of the United States, and enjoin Defendants from implementing the Program on that basis;

E.    Declare that Defendants' implementation of the Richmond Seizure Program violates Article I, § 19 of the Constitution of the State of California, and enjoin Defendants from implementing the Program on that basis;

F.    Declare that Defendants' implementation of the Richmond Seizure Program violates Article I, § 7 of the Constitution of the State of California, and enjoin Defendants from implementing the Program on that basis;

G.    Declare that Defendants' implementation of the Richmond Seizure Program violates Cal. Civ. Pro. Code § 1263.320, and enjoin Defendants from implementing the Program on that basis;

H.    Declare that Defendants' implementation of the Richmond Seizure Program violates Cal. Civ. Pro. Code § 1240.050, and enjoin Defendants from implementing the Program on that basis;

1           I.      Declare that Defendants' Implementation of the Richmond Seizure

2 Program constitutes a violation of 42 U.S.C. § 1983, and enjoin Defendants from implementing

3 the Program on that basis;

4           J.      Issue preliminary and permanent injunctions restraining Defendants, their

5 officers, employees, agents, successors, and assigns from implementing the Richmond Seizure

6 Program;

7           K.      Award to Plaintiffs the costs and expenses of suit and counsel fees

8 pursuant to 42 U.S.C. § 1988;

9           L.      Award to Plaintiffs such other and further relief as this Court may deem

10 just and proper.

11

12                                         Respectfully submitted,

13

14 August 7, 2013                         By

15                                   **ROPES & GRAY LLP**

16                                   Attorneys for Plaintiffs

17                                   Rocky C. Tsai (SBN 221452)
                                (rocky.tsai@ropesgray.com)

18                                 **ROPES & GRAY LLP**
                                Three Embarcadero Center

19                                 San Francisco, CA 94111-4006

20                                 Telephone: (415) 315-6300
                                Facsimile: (415) 315-6350

21

22

23

24

25

26

27

28

1   Thomas O. Jacob (SBN 125665)
    tojacob@wellsfargo.com
2   **WELLS FARGO & COMPANY**
    Office of General Counsel
3   45 Fremont Street, Twenty-Sixth Floor
    MAC A0194-266
4   San Francisco, CA 94105
    Telephone: (415) 396-4425
5   Facsimile: (415) 975-7864

6   *Attorney for Wells Fargo Bank*

    John C. Ertman
    (john.ertman@ropesgray.com)
    (Pro hac vice applications pending)
    Lee S. Gayer
    (lee.gayer@ropesgray.com)
    Evan P. Lestelle
    (evan.lestelle@ropesgray.com)
    **ROPES & GRAY LLP**
    1211 Avenue of the Americas
    New York, NY 10036-8704
    Telephone: (212) 596-9000
    Facsimile: (212) 596-9090

7
8   Douglas H. Hallward-Driemeier
    (douglas.hallward-driemeier@ropesgray.com)
9   (Pro hac vice application pending)
    **ROPES & GRAY LLP**
    One Metro Center
10  700 12th Street, NW
    Suite 900
11  Washington, DC 20005-3948
    Phone: 202-508-4600

12  Daniel V. McCaughey
    (daniel.mccaughey@ropesgray.com)
13  Nick W. Rose
    (nick.rose@ropesgray.com)
14  **ROPES & GRAY LLP**
    800 Boylston St.
15  Boston, MA
    Phone: 617-951-7000
16
17
18
19
20
21
22
23
24
25
26
27
28

## Schedule A
## Wells Fargo Bank, National Association

| | |
|---|---|
| ABFC 2002-OPT1 Trust | ABFC 2005-OPT1 Trust |
| ABFC 2006-OPT1 Trust | Asset Backed Securities Corporation Home Equity Loan Trust, Series 2003-HE6 |
| Asset Backed Securities Corporation Home Equity Loan Trust, Series 2004-HE2 | Asset Backed Securities Corporation Home Equity Loan Trust, Series AMQ 2007-HE2 |
| Banc of America Funding 2005-B Trust | Banc of America Funding 2005-G Trust |
| Banc of America Funding 2006-E Trust | Banc of America Funding 2007-E Trust |
| BCAP LLC TRUST 2006-AA1 | BNC Mortgage Loan Trust 2007-4 |
| Banc of America Alternative Loan Trust 2003-8 | Banc of America Alternative Loan Trust 2006-5 |
| Banc of America Alternative Loan Trust 2003-10 | Banc of America Alternative Loan Trust 2003-11 |
| Banc of America Alternative Loan Trust 2003-4 | Banc of America Alternative Loan Trust 2003-5 |
| Banc of America Alternative Loan Trust 2003-6 | Banc of America Alternative Loan Trust 2003-8 |
| Banc of America Alternative Loan Trust 2003-9 | Banc of America Alternative Loan Trust 2004-1 |
| Banc of America Alternative Loan Trust 2004-11 | Banc of America Alternative Loan Trust 2004-6 |
| Banc of America Alternative Loan Trust 2004-7 | Banc of America Alternative Loan Trust 2005-6 |
| Banc of America Alternative Loan Trust 2005-7 | Banc of America Alternative Loan Trust 2006-2 |
| Banc of America Alternative Loan Trust 2006-3 | Banc of America Alternative Loan Trust 2006-5 |
| Banc of America Alternative Loan Trust 2006-7 | Banc of America Mortgage 2003-6 Trust |
| Banc of America Mortgage 2003-D Trust | Banc of America Mortgage 2003-H Trust |
| Banc of America Mortgage 2003-K Trust | Banc of America Mortgage Trust 2004-11 |
| Banc of America Mortgage Trust 2004-6 | Banc of America Mortgage Trust 2004-8 |
| Banc of America Mortgage Trust 2004-9 | Banc of America Mortgage 2004-B Trust |
| Banc of America Mortgage 2004-C Trust | Banc of America Mortgage 2004-D Trust |
| Banc of America Mortgage 2004-I Trust | Banc of America Mortgage 2004-K Trust |
| Banc of America Mortgage 2004-L Trust | Banc of America Mortgage Trust 2005-10 |

| | |
|---|---|
| Banc of America Mortgage Trust 2005-11 | Banc of America Mortgage Trust 2005-4 |
| Banc of America Mortgage Trust 2005-7 | Banc of America Mortgage 2005-A Trust |
| Banc of America Mortgage 2005-E Trust | Banc of America Mortgage 2005-J Trust |
| Banc of America Mortgage 2007-1 Trust | Banc of America Mortgage 2007-2 Trust |
| Banc of America Mortgage 2004-J Trust | Banc of America Mortgage 2005-D Trust |
| Banc of America Mortgage 2005-E Trust | Banc of America Mortgage 2007-3 Trust |
| Bear Stearns Asset Backed Securities, Inc. 2000-2 | Bear Stearns Mortgage Funding Trust 2006-AR1 |
| Bear Stearns Mortgage Funding Trust 2006-AR2 | Bear Stearns Mortgage Funding Trust 2006-AR3 |
| Bear Stearns Mortgage Funding Trust 2006-AR4 | Bear Stearns Mortgage Funding Trust 2006-AR5 |
| Bear Stearns Mortgage Funding Trust 2007-AR1 | Bear Stearns Mortgage Funding Trust 2007-AR2 |
| Bear Stearns Mortgage Funding Trust 2007-AR3 | Bear Stearns Mortgage Funding Trust 2007-AR4 |
| Bear Stearns Mortgage Funding Trust 2007-AR5 | Bear Stearns ARM Trust 2007-3 |
| Carrington Mortgage Loan Trust, Series 2006-FRE2 | Carrington Mortgage Loan Trust, Series 2006-NC2 |
| Carrington Mortgage Loan Trust, Series 2006-NC3 | Carrington Mortgage Loan Trust, Series 2006-NC3 |
| Carrington Mortgage Loan Trust, Series 2006-NC5 | Carrington Mortgage Loan Trust, Series 2006-OPT1 |
| Carrington Mortgage Loan Trust, Series 2006-RFC1 | First Franklin Mortgage Loan Trust 2004-FF11 |
| First Franklin Mortgage Loan Trust 2006-FF15 | Freddie Mac Securities REMIC Trust 2005-S001 |
| GMACM Home Equity Loan Trust 2003-HE2 | GreenPoint MTA Trust 2005-AR3 |
| GreenPoint Mortgage Funding Trust 2005-AR4 | GreenPoint Mortgage Funding Trust 2005-AR5 |
| GreenPoint Mortgage Funding Trust 2006-AR1 | GreenPoint Mortgage Funding Trust 2006-AR2 |
| GreenPoint Mortgage Funding Trust 2006-AR3 | HarborView Mortgage Loan Trust 2006-10 |
| HarborView Mortgage Loan Trust 2006-12 | HarborView Mortgage Loan Trust 2007-1 |
| HarborView Mortgage Loan Trust 2007-3 | Impac CMB Trust Series 2004-11 |
| Impac CMB Trust Series 2004-6 | Impac CMB Trust Series 2005-6 |
| Irwin Home Equity Loan Trust 2007-1 | Impac Secured Assets Corp., Mortgage Pass- Through Certificates, Series 2005-2 |
| Lehman Mortgage Trust 2006-9 | Lehman Mortgage Trust 2007-4 |

| | |
|---|---|
| MASTR Asset Backed Securities Trust 2003-OPT2 | MASTR Asset Backed Securities Trust 2007-NCW |
| Merrill Lynch Mortgage Investors Trust, Series 2004-WMC5 | Merrill Lynch Mortgage Investors Trust, Series 2005-WMC2 |
| Merrill Lynch Mortgage Investors Trust Series MLCC 2004-B | Merrill Lynch Mortgage Investors Trust Series MLCC 2006-1 |
| Merrill Lynch Mortgage Investors Trust Mortgage Loan Asset-Backed Certificates, Series 2006-HE1 | Morgan Stanley ABS Capital I Inc. Trust 2005-WMC2 |
| Morgan Stanley ABS Capital I Inc. Trust 2005-WMC3 | Morgan Stanley ABS Capital I Inc. Trust 2005-WMC4 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-WMC1 | MSCC HELOC Trust 2007-1 |
| National City Mortgage Capital Trust 2008-1 | Option One Mortgage Loan Trust 2003-5 |
| Option One Mortgage Loan Trust 2003-6 | Option One Mortgage Loan Trust 2005-3 |
| Option One Mortgage Loan Trust 2005-4 | Option One Mortgage Loan Trust 2006-1 |
| Option One Mortgage Loan Trust 2007-1 | Option One Mortgage Loan Trust 2007-3 |
| Option One Mortgage Loan Trust 2007-4 | Option One Mortgage Loan Trust 2007-5 |
| Option One Mortgage Loan Trust 2007-6 | Option One Mortgage Loan Trust 2007CP1 |
| Option One Mortgage Loan Trust 2007-FXD2 | Park Place Securities, Inc. Asset-Backed Pass-Through Certificates, Series 2004-MCW1 |
| Park Place Securities, Inc., Asset-Backed Pass-Through Certificates, Series 2004-WHQ1 | Park Place Securities, Inc., Asset-Backed Pass-Through Certificates, Series 2004-WHQ2 |
| Park Place Securities, Inc., Asset-Backed Pass-Through Certificates, Series 2005-WCH1 | Park Place Securities, Inc., Asset-Backed Pass-Through Certificates, Series 2005-WCW2 |
| Park Place Securities, Inc., Asset-Backed Pass-Through Certificates, Series 2005-WCW2 | Park Place Securities, Inc., Asset-Backed Pass-Through Certificates, Series 2005-WHQ1 |
| Park Place Securities, Inc., Asset-Backed Pass-Through Certificates, Series 2005-WHQ3 | Park Place Securities, Inc., Asset-Backed Pass-Through Certificates, Series 2005-WHQ4 |
| RESI Finance Limited Partnership 2003-B | RESI Finance Limited Partnership 2003-C |
| RESI Finance Limited Partnership 2003-CB1 | RESI Finance Limited Partnership 2003-D |
| RESI Finance Limited Partnership 2004-B | RESI Finance Limited Partnership 2004-C |
| RESI Finance Limited Partnership 2005-A | RESI Finance Limited Partnership 2005-B |
| RESI Finance Limited Partnership 2005-C | RESI Finance Limited Partnership 2005-D |

SCHEDULE A
Case No.

| RESI Finance Limited Partnership 2006-A | RMAC Pass-Through Trust, Series 2010-A |
|---|---|
| Securitized Asset Backed Receivables LLC Trust 2006-HE1 | Securitized Asset Backed Receivables LLC Trust 2006-HE2 |
| SABR Mortgage Loan 2008-1 Grantor Trust | Structured Asset Investment Loan Trust 2003-BC12 |
| Structured Asset Mortgage Investments II Trust 2007-AR4 | Structured Adjustable Rate Mortgage Loan Trust, Series 2004-10 |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2004-16 | Structured Adjustable Rate Mortgage Loan Trust, Series 2004-18 |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2004-9XS | Structured Adjustable Rate Mortgage Loan Trust, Series 2005-12 |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2005-17 | Structured Adjustable Rate Mortgage Loan Trust, Series 2007-3 |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2007-4 | Structured Asset Securities Corporation Pass-Through Certificates, Series 2002-AL1 |
| Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2003-15A | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2003-26A |
| Structured Asset Securities Corporation Mortgage Loan Trust 2006-OPT1 | Structured Asset Securities Corp. 2007-BC1 |
| SASI Finance Limited Partnership 2006-A | Southern Pacific Secured Assets Corp. |
| Mortgage Loan Asset-Backed Pass-Through Certificates, Series 1998-2 | Soundview Home Loan Trust 2007-OPT1 |
| Soundview Home Loan Trust 2007-OPT5 | Terwin Mortgage Trust, Series TMTS 2003-8HE |
| WaMu Mortgage Pass-Through Certificates Series 2004-PR1 Trust | WaMu Mortgage Pass-Through Certificates Series 2004-PR2 Trust |
| WaMu Mortgage Pass-Through Certificates Series 2005-PR1 Trust | WaMu Mortgage Pass-Through Certificates Series 2005-PR2 Trust |
| WaMu Mortgage Pass-Through Certificates Series 2005-PR4 Trust | WaMu Mortgage Pass-Through Certificates Series 2006-PR1 Trust |
| WaMu Mortgage Pass-Through Certificates Series 2006-PR2 Trust | WaMu Mortgage Pass-Through Certificates Series 2006-PR3 Trust |
| Waterfall Victoria Mortgage Trust 2010-1 | |

## Schedule B
## Deutsche Bank National Trust Company

| | |
|---|---|
| Alliance Securities Corp. 2007-OA1 | Accredited Mortgage Loan Trust 2006-2 |
| American Home Mortgage Investment Trust 2005-2 | American Home Mortgage Investment Trust 2005-3 |
| American Home Mortgage Investment Trust 2006-1 | American Home Mortgage Assets Trust 2006-5 |
| American Home Mortgage Investment Trust 2007-1 | American Home Mortgage Assets Trust 2007-1 |
| American Home Mortgage Assets Trust 2007-2 | American Home Mortgage Assets Trust 2007-4 |
| American Home Mortgage Investment Trust 2007-SD2 | Ameriquest Mortgage Securities Inc. 2006-R1 |
| Argent Securities Inc. 2004-W8 | Argent Securities Inc. 2005-W2 |
| Argent Securities Trust 2006-W4 | Argent Securities Trust 2006-M1 |
| Argent Securities Trust 2006-M2 | Asset Backed Securities Corporation Home Equity Loan Trust 2004-HE1 |
| Barclays Capital, Inc. | BCAP LLC Trust 2007-AA1 |
| Carrington Mortgage Loan Trust 2005-NC4 | Carrington Mortgage Loan Trust 2005-NC5 |
| Encore Credit Receivables Trust 2005-3 | Downey Savings and Loan Association Mortgage Loan Trust 2004-AR2 |
| Downey Savings and Loan Association Mortgage Loan Trust 2005-AR3 | Soundview Home Equity Loan Trust 2005-OPT4 |
| First Franklin Mortgage Loan Trust 2005-FFH3 | HarborView Mortgage Loan Trust 2006-14 |
| Downey Savings and Loan Association Mortgage Loan Trust 2006-AR1 | Fremont Home Loan Trust 2006-3 |
| HarborView Mortgage Loan Trust 2006-3 | Soundview Home Equity Loan Trust 2006-OPT5 |
| Soundview Home Loan Trust 2007-WMC1 | Downey Savings and Loan Association Mortgage Loan Trust 2007-AR1 |
| HarborView Mortgage Loan Trust 2007-4 | HarborView Mortgage Loan Trust 2007-7 |
| GSAA Home Equity Trust 2007-4 | GSAA Home Equity Trust 2007-6 |
| GSR Mortgage Loan Trust 2007-AR2 | GSR Mortgage Loan Trust 2007-OA2 |
| STARM Mortgage Loan Trust 2007-4 | HSI Asset Securitization Corporation Trust 2005-OPT1 |

| | |
|---|---|
| HSI Asset Securitization Corporation Trust 2006-OPT1 | HSI Asset Securitization Corporation Trust 2006-OPT2 |
| HSI Asset Securitization Corporation Trust 2007-NC1 | HSI Asset Securitization Corporation Trust 2007-WF1 |
| HSI Asset Securitization Corporation Trust 2007-HE1 | Impac CMB Trust 2005-5 |
| Impac Secured Assets Corp. 2006-3 | Impac Secured Assets Corp. 2006-5 |
| Impac Secured Assets Corp. 2007-1 | Impac Secured Assets Corp. 2007-2 |
| IndyMac Residential Asset Securities Trust (RAST) 2004-A5 | IndyMac INDX Mortgage Loan Trust 2005-AR1 |
| IndyMac INDX Mortgage Loan Trust 2005-AR8 | IndyMac INDX Mortgage Loan Trust 2005-AR12 |
| IndyMac INDX Mortgage Loan Trust 2005-AR13 | IndyMac INDX Mortgage Loan Trust 2005-AR14 |
| IndyMac INDX Mortgage Loan Trust 2005-AR25 | IndyMac INDA Mortgage Loan Trust 2006-AR2 |
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | IndyMac INDX Mortgage Loan Trust 2006-AR14 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | IndyMac INDA Mortgage Loan Trust 2006-AR3 |
| IndyMac Residential Asset Securities Trust (RAST) 2007-A3 | IndyMac INDX Mortgage Loan Trust 2007-AR5 |
| IndyMac INDX Mortgage Loan Trust 2007-AR21IP | IndyMac INDA Mortgage Loan Trust 2007-AR1 |
| IndyMac INDA Mortgage Loan Trust 2007-AR8 | IndyMac INDX Mortgage Loan Trust 2007-FLX1 |
| IndyMac INDX Mortgage Loan Trust 2007-FLX6 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | Long Beach Mortgage Loan Trust 2005-WL1 |
| Long Beach Mortgage Loan Trust 2005-WL2 | Long Beach Mortgage Loan Trust 2006-6 |
| Long Beach Mortgage Loan Trust 2006-7 | Long Beach Mortgage Loan Trust 2006-8 |
| Long Beach Mortgage Loan Trust 2006-10 | Long Beach Mortgage Loan Trust 2006-WL1 |
| Long Beach Mortgage Loan Trust 2006-WL2 | Mortgage IT Trust 2005-3 |
| Morgan Stanley ABS Capital I Trust 2004-NC7 | Morgan Stanley ABS Capital I Trust 2004-HE8 |
| Morgan Stanley ABS Capital I Trust 2006-NC3 | Morgan Stanley ABS Capital I Trust 2006-NC5 |
| Morgan Stanley ABS Capital I Trust 2006-HE5 | Morgan Stanley ABS Capital I Trust 2006-HE7 |
| Morgan Stanley ABS Capital I Trust 2006-HE8 | Morgan Stanley ABS Capital I Trust 2006-WMC2 |
| Morgan Stanley Home Equity Loan Trust 2006-1 | Morgan Stanley Home Equity Loan Trust 2006-2 |

SCHEDULE B
Case No.

| | |
|---|---|
| Morgan Stanley ABS Capital I Trust 2007-NC4 | Morgan Stanley ABS Capital I Trust 2007-HE7 |
| New Century Home Equity Loan Trust 2005-4 | New Century Home Equity Loan Trust 2005-B |
| New Century Home Equity Loan Trust 2005-D | Novastar Mortgage Funding Trust 2007-1 |
| Saxon Asset Securities Trust 2007-2 | Thornburg Mortgage Securities Trust 2004-4 |
| WaMu Mortgage Pass- Through Certificates, Series 2004-AR6 | WaMu Mortgage Pass-Through Certificates, Series 2005-AR6 |
| WaMu Mortgage Pass- Through Certificates, Series 2005-AR11 | WaMu Mortgage Pass-Through Certificates, Series 2005-AR12 |
| WaMu Mortgage Pass- Through Certificates, Series 2005-AR13 | WaMu Mortgage Pass-Through Certificates, Series 2005-AR15 |
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2006-AR1 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 |
| WaMu Asset-Backed Certificates 2007-HE | |

## Schedule C
## Deutsche Bank Trust Company Americas

Residential Accredit Loans Inc. 2005-QA10

Residential Accredit Loans Inc. 2006-QO2

Residential Accredit Loans Inc. 2006-QO3

Residential Accredit Loans Inc. 2006-QO4

Residential Accredit Loans Inc. 2006-QO6

Residential Accredit Loans Inc. 2006-QO10

Residential Accredit Loans Inc. 2006-QS3

Residential Accredit Loans Inc. 2006-QS10

Residential Accredit Loans Inc. 2006-QS17

Residential Accredit Loans Inc. 2007-QA3

Residential Accredit Loans Inc. 2007-QO1

Residential Accredit Loans Inc. 2007-QO4

Residential Accredit Loans Inc. 2007-QO5

Residential Accredit Loans Inc. 2007-QS3

Residential Funding Mortgage Securities I 2007-S4

Saxon Asset Securities Trust 2003-3

Saxon Asset Securities Trust 2006-3

# EXHIBIT A



# Homeownership Protection Program

## A Solution to a Critical Problem

Mortgage Resolution
**PARTNERS**

# Homeownership Protection Program

This presentation has been prepared for discussion purposes only and does not constitute a legally binding commitment or obligation of any of the referenced entities herein to enter into the transactions described. The terms and conditions outlined herein are not a comprehensive statement of the applicable terms and conditions that would be contained in the definitive documentation for the transactions contemplated herein. This presentation should not be deemed a comprehensive disclosure of risks or other implications of the transactions discussed herein.

A program term sheet and FAQ is intended to be part of this presentation and contains additional information.

2

Mortgage Resolution
**PARTNERS**

# The Real State of U.S. Housing Today

Home prices continue to deteriorate, jeopardizing mortgage loans and homeowners

- In June of 2006, U.S. residential housing prices hit their peak. Now, nearly six years later, the market is once again at a record post-2006 low (down 33.8% from peak as of year-end 2011).

- Over 22% of the 52.5 million U.S. homes that are mortgaged had "underwater" mortgage loans at the beginning of 2012.

- Such mortgages are generally concentrated in states that experienced acute housing price increases during the bubble -- Arizona, California, Florida and Nevada, to name but a few.

- After short-lived and shallow periods of home price appreciation in mid 2010 and again in 2011, recent pricing trends have turned decidedly negative (the S&P Case Shiller 20 City Index is down 7.5% nationwide from its previous post-crash high in May of 2010).

- The National Association of Realtors, in its December 2011 survey, found that foreclosure sales averaged a discount of 22% compared with non-distressed home sales (up from 20% a year earlier). Short sales, with the cooperation of the lender, averaged 13% below market value. RealtyTrac found even larger differences in 2011.

- **Despite hopes to the contrary, the situation is not materially improving.**

Mortgage Resolution [a]
**PARTNERS**

# The Homeownership Protection Program Will Help End this National Nightmare

Empowering communities to do what Washington and the private sector have been unable to

- The Program employs the ultimate right of local communities and governments – *through the constitutionally guaranteed power of eminent domain* – to retake control over the welfare of their neighborhoods and their fiscal solvency.

- Organized by Mortgage Resolution Partners – in public/private ventures with cities and counties that have been most affected by the mortgage and housing crisis – the Program will force lenders to surrender their mortgage loans to governments for full and fair value as determined by local courts in condemnation proceedings.

- As the current fair market value of such mortgage loans is considerably less than the face amount thereof, governments will be able to restructure the mortgage loans acquired though eminent domain and refinance severely underwater homeowners (with the ability and creditworthiness to make payments on their restructured loans) into new loans to be sold to large, private sector investors as FHA GinnieMae securities.

- **No taxpayer funds will be used in connection with the Program and the Program requires no state or federal legislation, or administrative action.**

4

Mortgage Resolution
**PARTNERS**

# Communities are the Principal Drivers of the Homeownership Protection Program

## Municipalities have enormous incentives to adopt and execute the Program

- Defaulted mortgages are typically associated with the cessation of real estate tax payments and other ratable and usage charges payable to localities. This stresses local budgets and financing.

- Throughout the mortgage crisis, underwater loans have demonstrated high default levels – regardless of other borrower circumstances. This tendency poses a threat to areas continuing to see price depreciation.

- Large volumes of defaulted mortgages result in neighborhood blight, abandonment, unkempt property and transience. These factors exacerbate the already compromised housing economics in affected areas and accelerate price depreciation.

- Municipal, county and state governments, and agencies, have a public interest in halting defaults and consequent neighborhood deterioration.

- **The Program provides a practical and efficient solution to this intractable dilemma.**

Mortgage Resolution
**P A R T N E R S**

5

# A Grass Roots Crisis That Demands a Solution

## The impact on cities must be resolved locally as broader national policies have proven inadequate

- Post-crash, cities and towns have suffered greatly, often in seldom understood ways:

- For example, when a foreclosed home is sold by a lender in foreclosure, the home's respective tax assessment is permanently reset in many communities.

  o Consider, for example, a home that was purchased for $400,000 with a $360,000 mortgage and has a current tax assessment of the purchase price.

    *If that home sells in foreclosure for $200,000, its tax assessment is reset, and can only increase by a small amount each year in many communities. The rate of increase may be tied to inflation, which erodes tax revenues until the home is again sold.*

  o Conversely, consider what would happen if the same homeowner refinanced the mortgage and (quite reasonably) contested its real estate tax assessment.

    *The home's assessment may be reduced to $200,000, but the assessment could float freely back up to $400,000 as markets recover. Of course, once the assessment reaches $400,000, the rate of increase will be limited on an annual basis in many communities.*

6

Mortgage Resolution
**PARTNERS**