# A Half-Decade of Partial Mortgage Resolution Solutions have Come up Short

## Why does the mortgage crisis still burden the U.S., given the plethora of other programs to end it?

- Private- and government-sponsored modification programs generally have not worked because they do not emphasize significant principal reduction. Overall, fewer than 50% of the 2.26 million mortgages modified from 2008 – 2011 were current at year-end 2011. The majority of modifications have merely capitalized missed payments or reduced monthly payments by less than 10%.

- While encouraging lenders and servicers to pursue loan modifications in lieu of foreclosure, government programs (together with aftermath of the late 2010 "document-gate" foreclosure scandal) have curtailed the pace of foreclosures and liquidations. As a result, Q3 2011 saw a backlog of 394,000 repossessed homes awaiting liquidation, plus an additional 2.86 million homes securing mortgages that were 12 months or more delinquent, for a total "shadow inventory" of homes well down the foreclosure pipeline of 3.25 million. This excludes another approximately 1.4 million loans that are between 60 days and 11 months delinquent.

- As of January 2012, based on current default rates for various categories of loans, Amherst Securities estimated that between 7.4 million and 9.4 million additional home mortgage loans are in danger of defaulting over the next six years, assuming no further price declines or changes to interest rates.

7

Mortgage Resolution
**PARTNERS**

# A Half-Decade of Partial Mortgage Resolution Solutions have Come up Short (cont'd)

## Systemic problems in the housing and mortgage industries have diluted other solutions' effectiveness

- At its post-bubble peak, the excess inventory of vacant housing rose to nearly 2.1 million units. That number has declined somewhat – particularly in the case of rental housing. Legacy excess unutilized vacant housing remains at over one million units.

- $873 billion of 2nd lien/HELOC (Home Equity Lines of Credit) mortgage loans exist behind a large portion of the most heavily underwater first mortgage loans. This has made resolution of underwater first mortgages by methods other than foreclosure and liquidation nearly impossible; second mortgage lenders (most of which are large banks) are not willing to offer proportionate relief, despite their subordinate lien status.

- Ironically, many borrowers continue to pay their second-lien lenders even as they are in default on their first mortgage, in order to maintain revolving lines of credit.

- **The $1.1 trillion of remaining "private-label" residential mortgage backed securities pose extraordinary additional problems by virtue of contractual documentation that never envisioned a housing price meltdown. Servicers are paralyzed by restrictive servicing contracts generally forbidding loan sales and limiting loan modifications. With shrinking margins and continued risks of litigation, servicers act only when forced to.**

8

Mortgage Resolution
**PARTNERS**

# The Homeownership Protection Program: A Practical Solution that Works

## Why will the Program succeed where other solutions have failed?

- The Program operates at at the local level to acquire underwater mortgages through *eminent domain*, which is a public – not a private – right.

- Mortgage Resolution Partners (MRP) acts as manager and forms partnerships with local governments to facilitate the eminent domain and mortgage restructuring process.

  - MRP coordinates with local officials to identify subject mortgages and refine program structure.
  - MRP and third-parties preliminarily screens for loans qualifying for modification and refinancing.
  - MRP earns a fair, flat and transparent per-loan fee for its services.

- Not all borrowers will qualify for Program. Only borrowers who appear likely to repay their loans will be accepted. The Program will initially acquire loans that are (i) significantly underwater and (ii) relatively current (not in default)—emphasizing loans held by private-label securitization trusts.

- Loans and liens will be acquired through eminent domain at *fair value*, which is expected to be <u>less</u> than the market value of the home.

- **The Program will partner with institutional investors that fund the condemnation action in order to obtain access to attractively priced, GinnieMae-backed mortgage securities that will result from the restructuring and refinancing of the mortgages acquired under the Program. Investors will approve acquired mortgage pools and will earn all payments received on the acquired mortgages prior the re-securitization thereof.**

Mortgage Resolution
**P A R T N E R S**

9

# The Program Begins Where it is Most Urgently Needed – The State of California

## A $5 billion, initial series to kickoff an up-to-$500 billion, 3,000,000-home, multi-state effort.

- California has one of the highest percentages and the highest dollar amount of at-risk loans. It is a natural and efficient first state for the program.

- California legal precedent and political posture favor the Program and constitute an ideal proving ground.

- Counties and cities should have the authority under California and Federal law to acquire by eminent domain residential mortgage loans secured by real property when the debtor and the secured property are within its jurisdiction.

- A consortium of the county and city governments in San Bernardino County, California (the largest county in the United States, outside of Alaska) is promulgating a "Joint Powers Authority" to undertake the first series of the Program together with MRP.

- The Program has obtained supporting legal opinions of national counsel specializing in constitutional law and financial regulation. At the California and local level, the Program relies on firms with expertise and experience in local eminent domain law and litigation. San Bernardino County has conducted its own legal review before proceeding with the Program.

**In addition, Robert Hockett, Cornell University Law School Professor of Financial and Economic Law has authored a <u>memorandum of law and white paper</u> on the issue of public taking of mortgage loans and liens for the purposes of the Program.**

10

Mortgage Resolution
**P A R T N E R S**

# The Program's "Five Stages of Relief"

The Program's five stages for resolving underwater mortgages at the local level



I. Pre-screening and Evaluation of Publically and Privately Available City Mortgage Data. The municipality Informs qualifying borrowers

II. Investor funds compensation escrow and municipality files eminent domain lawsuit.

III. Trustee / mortgagee transfers whole loan to municipality. Whole loan is held by document custodian.

iv. Loan is Restructured

V. Loan becomes part of a GNMA security

Mortgage Resolution PARTNERS

11

# A Step-by-Step Analysis of the Program's Operational Methodology

## Transaction Activity

## Investor Collateral

Manager City Select Underwater Mortgagors



Pre-screening and Evaluation of Publicly and Privately Available City Mortgage Data

Manager/Investor Selects List of Target Mortgages

Pre-funding Tranche Commitment



Investors Fund Compensation Escrow (and MRP Fee)

City Commences "Quick Take" Condemnation Proceeding

Court Sets Prelim. Compensation and Orders Mortgagee to Surrender Loan

Compensation Escrow Receipt



Trustee/Mortgagee Transfers Loan to Municipality for Cash Consideration



Remaining Valuation Reserve Retained by City Until Final Value Determination

Subsequent Valuation Trial

Whole Loans and Reserve Cash



Manager Initiates Refi Process with Gov't Approved Vendor




Loan Principal Reduced and Refinanced with New Gov't Insured Mortgage



Investor Funds Closing Fees/Expenses

Refinanced Whole Loan and Reserve Cash



Conveyance of Refinanced Loans Authorized by Investor in Exchange for GNMA RMBS at Premium

Valuation Reserve Distributed to Mortgagees or Pre-designated Charity upon Court Order








GNMA RMBS

12

Mortgage Resolution
**PARTNERS**

# Program Contacts

**Steven Gluckstern (Mortgage Resolution Partners, LLC)**
sgluckstern@mortgageresolutionpartners.com
917 561 6503 (m)
415 678 5134 (o)

**Donald H. Putnam (Mortgage Resolution Partners, LLC)**
dputnam@mortgageresolutionpartners.com
415 350 5266 (m)
415 677 5898 (o)

**Daniel Alpert (Westwood Capital, LLC)**
dalpert@westwoodcapital.com
917 453 6640 (m)
212 953 6448 (o)

**Len Blum (Westwood Capital, LLC)**
lblum@westwoodcapital.com
917 699 3597 (m)
212 972 2455 (o)

13

Mortgage Resolution
**PARTNERS**

# EXHIBIT B

Mortgage Resolution
**P A R T N E R S**

## FREQUENTLY ASKED QUESTIONS

# TABLE OF CONTENTS

SECTION ONE: LEGAL ................................................................................................ 2

SECTION TWO: FAIRNESS................................................................................................5

SECTION THREE: BUSINESS............................................................ ......................6

SECTION FOUR: ECONOMICS...........................................................................................9

SECTION FIVE: GOVERNMENT.........................................................................................10

SECTION SIX: ORGANIZATION/FOUNDERS.................................................................. 12

**Frequently Asked Questions**

**SECTION ONE: LEGAL**

**1. Doesn't eminent domain only apply to real estate?** No. The power of eminent domain applies to every kind of property, including real estate (like land), tangible personal property (like goods), and intangible personal property (like loans).

**2. Can the government condemn property by eminent domain and transfer it to a private person to use to earn a profit?** Yes, in California and many other states, as long as the government finds that the private use may serve a public interest. Governments do so all the time, selling condemned property to developers who profit from building offices, shopping malls, or housing. In fact, in limited cases a government can even authorize private parties to directly exercise eminent domain to acquire property for their business use without any government involvement at all.

**3. Are borrowers morally and legally obligated to pay the entire balance of their purchase money mortgage?** No, particularly in California. Reckless lending standards in the past have caused real estate bubbles and crashes resulting in defaults that have harmed homeowners, destroyed the local economy and overwhelmed the state judicial system. As a consequence, California has deliberately allocated purchase money mortgage loan risk to the lender by enacting laws that allow a borrower to walk away from a purchase money home loan and effectively limit the lender's remedy to foreclosing on the home. This is a fundamental public policy in California and a fundamental part of the homeowner's bargain in taking out a purchase money home loan. Lenders are fully aware of their share of the risk of making a purchase money home loan in California.

**4. Can the government acquire performing loans, or only defaulted loans?** As long as it is acting to further a public purpose, a government can acquire any kind of loan including performing, delinquent or defaulted loans. A government can purchase underwater performing loans to further a number of purposes -- negative equity is the single greatest predictor of future default, and it creates harm even absent default (including reduced homeowner investment in property maintenance and dislocation in the local property sales market because of restrictions on short sales).

**5. What makes you trust the legal advice you have received?** Mortgage Resolution Partners (MRP) has received the advice of counsel with national or statewide reputations for excellence and expertise in litigation, eminent domain law and constitutional law. Both clients and other lawyers regularly select the same counsel to handle cases raising eminent domain, constitutional and public policy issues, and we have great confidence in their advice. Ultimately, each city will rely on its own legal review before proceeding with eminent domain actions.

**6. What rights will the homeowners have when you provide notice?** Homeowners will have the same rights and the same obligations that they have now under their loan agreements. This program simply changes the owner of their loan, not the terms of the loan. But more importantly, they will gain an opportunity -- the opportunity to work with a new loan holder that is not bound by the limitations of any securitization contract and lacks the conflicts of interest that current loan servicers have. Also, current plans provide for the homeowners to opt in to the MRP program on a

voluntary basis.

**7. What rights will the loan owners have?** The trusts that currently hold the mortgage loans will have the right to receive the fair market value of the loans. This includes the right to a trial to determine the fair value of the loans if the trusts disagree with our valuation.

**8. What about second mortgage holders?** We expect to negotiate directly with holders of second loans, or use eminent domain to acquire those loans, in order to comprehensively deal with the homeowner's total mortgage debt. If a second loan has significant value because it is full recourse it may be necessary to acquire only the mortgage lien or a lesser interest in the loan. Unlike existing lenders, we will be able to deal with all loans encumbering a property comprehensively at the fair value of each.

**9. Why do you need eminent domain? Why don't you just buy loans in the market?** Private securitization trusts hold approximately $1.4 trillion of loans; we could offer to buy their underwater loans, but their trust agreements forbid them to voluntarily sell the loans. Eminent domain allows us to purchase those loans as well as related second mortgage loans if the holders of the seconds are also unable (or unwilling) to sell. Eminent domain is a way to successfully consolidate ownership of a homeowner's mortgage loans in the hands of someone with the economic incentive and freedom to modify or otherwise resolve the loans.

**10. How do you plan to address the legal backlash that could occur?** California has a well defined judicial process for adjudicating eminent domain actions and gives them priority in court. Loan owners (or Servicers on their behalf) might litigate the right to purchase the loans and the amount of compensation due. We are confident that the communities have the authority to purchase the loans, and we will provide resources to defend against any legal challenge to that right. We will stand willing to negotiate over price with the goal of reaching agreement on fair value. Absent agreement, there will be a final jury determination of fair value in the condemnation action.

**11. Isn't there a legal step where judges must agree to the eminent domain plea? What if they don't?** As long as the community has the authority, as confirmed by the court, to purchase the loan and pays fair value, the court must permit the acquisition. There is a process under which the community may request the court's permission to purchase the loan first and finally determine fair value later (a "quick take"). We expect that the quick take will be a necessary component of the plan.

**12. Who really owns the loans?** Securitization trusts typically hold the first mortgage loans that will be purchased by eminent domain. A variety of investors including hedge funds and mutual funds own interests in the trusts and thus the ultimate right to payments for the loans. Third party banks service the loans, and third party trustees monitor the servicers. Banks typically hold for their own account the second mortgage loans.

**13. Who goes to court?** Assuming the purchase requires court action, the communities will go to court, as will the securitization trust and holder of the second mortgage loan.

**14. What happens if they question your valuation of the loan?** The trust or bank may seek a higher valuation in the legal proceeding. They and we will provide evidence of value; initially the judge, and ultimately the jury, will determine fair value.

**15. How will you deal with missing notes, incomplete records in MERS, and similar mistakes that create havoc in the foreclosure process?** Many loan originators and servicers lost important documents or failed to record transfers in their haste to securitize and re-securitize loans. Borrowers rarely deny that they owe their debts; they just need to be sure that they pay the right person, and courts need to be sure that anyone who tries to foreclose actually has the right to do so. Eminent domain resolves these issues. It transfers complete ownership of the loan to the city, regardless of missing paperwork. Anyone who claims to own the loan can prove it in the action and receive the proceeds. Eminent domain settles once and for all who owns the loan (the city) and who has the right to receive payment. Clearing up the paperwork disaster is not a purpose of our program, but it is a fortunate side benefit.

Frequently Asked Questions

## SECTION TWO: FAIRNESS

**1. Is your program a giveaway to the undeserving who borrowed more than they should have to purchase houses they never should have owned?** No. Everyone in California has the opportunity to purchase a home by borrowing from a lender who is willing to take a loss if home prices decline by more than the homeowner's down payment (see Legal FAQ 3 above). The lender willingly takes the risk when making the loan, and the fair market value of the loan reflects that risk. By purchasing the loan at fair value, we give the lender the benefit of its bargain. By doing an economically rational modification or other resolution with the homeowner, we respect the homeowner's benefit of his or her bargain.

**2. Regardless of the legal niceties, is it just wrong and a moral hazard to let these homeowners stay in their homes?** No. We protect our neighbors' homes, even allowing them to keep the equity in their homes while canceling their debts in bankruptcy, because it is the right thing for them and the right thing for us. We do not put our neighbors into debtor's prison, or make them homeless unnecessarily. America is facing an economic crisis and the solution requires practical action that keeps people in their homes. We are all in this together, for our neighborhoods, our states and our nation. The real moral hazard is that the system is forcing homeowners to default in order to achieve rational solutions.

**3. Won't those who don't qualify think this is unfair?** As with many societal issues that have challenged us in the past, solutions do not always provide a direct benefit to everyone. In this case, success will benefit even those who do not qualify by stabilizing home values, restoring neighborhoods and promoting the local economy. Together with the state and the participating communities we will actively address public concerns and educate the public on the benefits to all of stemming the default crisis.

**SECTION THREE: BUSINESS**

**1. What is the fair market value of a loan, and how will you determine it?**  Fair market value is the price that a willing buyer would pay a willing seller, neither under any compulsion to transact. Similar sales of troubled loans in the secondary market exist and are good evidence of fair value. These sales occur at a significant discount to the fair value of the home because of the foreclosure discount -- the market's recognition of the cost in time, money and effort to foreclose on the homeowner and thereafter to maintain and sell the property.  We will use these market data points and supplemental methods including discounted cash flow modeling.

**2. How will MRP make money?**  MRP will partner with communities to purchase all loans (or interests in seconds) encumbering a property through eminent domain at fair value, which will be significantly less than the fair value of the home.  We will then proactively work with borrowers to modify or refinance the loans, or possibly take other action (such as a deed in lieu of foreclosure and rent-back or a short sale).  Current plans provide for MRP to charge a simple, fair, and transparent flat fee (paid for by investors) for its services.

**3. Why hasn't anyone else tried this, or have they?**  Governments have used eminent domain in the past to address housing dislocations.  For example, Hawaii used a statewide program of eminent domain to purchase homes from landlords to sell to tenants when concentrated land ownership had made it difficult for people to buy their own homes.  Some have advocated using eminent domain to purchase mortgage loans in the current crisis, including people in the home building, government and academic communities.  MRP has simply taken up the idea and run with it because we believe that it is a positive solution to this crisis, particularly for securitized mortgage loans.

**4. What other solutions are being offered?  Are they working?  What makes this proposal any better?**  There are a number of government programs designed to encourage loan modifications.  However, these apparently do not provide sufficient incentives for securitized loan servicers who bear the cost and the risk of modifying a loan, with the trust investors reaping the benefits of a successful modification.  Moreover, the existing programs do not adequately deal with conflicts of interest among servicers, securitization trust investors, and second mortgage holders.  As a result, few modifications have occurred, and most have been unsuccessful, particularly for securitized loans.  Our proposal is better because we will cause the purchase of all loans encumbering a home, with the freedom to effect any modification, including write-downs.

**5. How does this affect the borrower's credit?**  The effect on a borrower's credit will depend upon the resolution of the mortgage loan that he or she agrees to.  We expect that the effect will be no worse than it would be without eminent domain and will be better for the borrower if MRP is able to affect a refinancing or a modification that the existing servicer would not have permitted.

**6. How will this help home values, or will it?**  We expect that the program will stabilize home prices by reducing defaults and the resulting forced sales of homes and by reducing the overhang of future expected foreclosures.

**7. Do you really believe this is going to work?** Yes, so much so that we have personally risked our time, our money and our reputations to get this program up and running.

**8. Why California?** California has one of the highest percentages of at-risk loans and the highest dollar amount of at-risk loans of any state. It is a natural and efficient first state for the program. We expect to expand the program to other states once it is up and running.

**9. How will you choose the mortgages?** We will partner with committed local governments that have a sufficient volume of at-risk loans to allow us to make significant investments and make a meaningful difference to the community. The local government offices will help to identify which areas we assist, and each potential mortgage will then go through the regular underwriting and eligibility process.

**10. What are your plans after the California pilot? Other cities? Other states?** We plan to expand beyond the pilot, both in California and in other states. There is much opportunity both in-state and out-of-state to build on the program's potential value.

**11. How many borrowers have second mortgages (like HELOCs), and how will you handle them?** We expect that a significant percentage of borrowers will have second mortgages. We expect to reduce or eliminate the balance of the homeowner's second mortgage loan at the same time as the first, either in a voluntary transaction with the holder of the second or (if necessary) by purchasing it through eminent domain.

**12. What reactions do you expect from the major bank servicers?** We expect the servicers to initially oppose the program. However, we hope that they will come to recognize that the program is the best way to resolve the troubled loans in the securitization trusts for the benefit of all parties involved in the trust, including the trust investors, the trustee, and the servicer.

**13. Who will underwrite the new loans -- MRP, third parties, or both?** Both. MRP will determine the underwriting criteria for selecting loans based on the requirements of third party lenders, Fannie Mae, Freddie Mac, the FHA, and other parties who will ultimately acquire, refinance or guarantee the loans. We expect to work with third party mortgage professionals in each participating community to underwrite the new loans. This will bring local expertise to the underwriting process and support to the local economy.

**14. Won't you have to lend to unqualified borrowers in order to keep people in their homes? How will you manage credit risk?** We will not refinance or modify loans for borrowers who do not qualify. We will manage credit risk through underwriting to the requirements of third party lenders and guarantors, who will provide the ultimate take-out for the loans. We may offer other resolutions for homeowners who no longer qualify for loans, such as expedited consideration of proposed short sales and accepting a deed in lieu of foreclosure and potentially renting the home back to them (via an appropriate partner). In addition, a portion of the returns will be dedicated to communities, which may use the funds to finance community housing or other needs.

**15. How will you deal with competition from the major banks once you announce your program?** We believe that city and state governments may be unwilling to work with major banks or other potential competitors because of their or their affiliates' roles in creating or prolonging the mortgage crisis. Other companies could in time create similar mortgage resolution businesses. However, the inventory of distressed mortgage loans is unfortunately so great and so widespread that there is room and need for other companies to operate in the space without adversely affecting our business model.

**16. Will you partner with existing lenders? Why or why not?** We expect to work with selected existing lenders as well as independent real estate professionals to refinance the homeowner's loans.

**17. What criteria will you use to select loans to acquire?** We will work with each government agency to determine the criteria that best meet the community's needs – with the goal of keeping homeowners in their homes. We expect initially to acquire loans that are significantly underwater, but which are current (not in default). Subsequently, we may expand the program to acquire loans that are in default, but where the homeowner can afford a refinanced loan with a reduced principal amount.

**18. If you are successful in modifying loans and reducing principal, won't the homeowner be taxed on the reduction?** Through 2012, both federal and California laws forgive the tax for debt used to purchase or improve the home. If the borrower used the proceeds for other purposes, like buying a boat, then the reduction may be taxable. Even after 2012, debt forgiveness generally may not be taxable to the extent the borrower's total debt exceeded total assets, which we expect will be the case for many homeowner participants. The program will be voluntary for homeowners, so they will determine whether to participate based on their own circumstances, including their own tax position. MRP will not provide tax advice, and will urge potential participants to seek such advice.

**19. How long will this take?** We expect a period of 4 to 12 months from the beginning of the borrowers' opt-in period until completion of loan refinancing.

**20. We've seen what outsourcing did to loan modification programs with the big banks. If you are going to outsource, how can you ensure quality?** Many of the problems with outsourcing have come from conflicts of interest that the large bank servicers have. They bear the high costs of servicing troubled loans and negotiating modifications, but they do not get the benefits of a successful modification. This has led them to outsource to firms that will foreclose as quickly and cheaply as possible. We intend that our program's investors will acquire all of a homeowner's mortgage loans and bear the risk and returns of restructuring the loans, so our program will not have this conflict of interest. We will closely monitor all service providers because it is in our interest for them to do their jobs right.

## SECTION FOUR: ECONOMICS

**1. How can the loan purchasers earn a profit if they pay fair value for a loan – and won't the trusts have a free look back to demand more compensation in court?** MRP and the loan purchasers can pay fair value and still earn a profit because they will take the risks and earn the returns of acquiring underwater loans and then refinancing them. Many investment funds purchase distressed whole loans from bank portfolios in consensual transactions and then profit by working them out; we expect our loan purchasers to pay the same price that they do. We will seek to provide appropriate reserves for look back risk based on the court's ultimate determination.

**2. How will MRP make money?** MRP intends to earn fees that are simple and transparent based in part on its success in obtaining control over and modifying or otherwise resolving the loans.

**3. Will you share profits with the communities?** We expect to contribute to the communities (or not-for-profit organizations) a fixed amount per loan acquired, which may support community housing needs.

**4. How have you structured this to create the various profit margins you will need? Who pays for the legal fees?** The structure of the loan acquisitions and the expected loan resolutions will create the necessary profit margins to pay for program costs, including funding costs and legal fees.

## SECTION FIVE: GOVERNMENT

**1. Eminent domain is already so controversial. Are you concerned about how this will be perceived?** Eminent domain is controversial when it displaces homeowners to help unrelated investors. The program will use eminent domain to help homeowners, and we expect it to show that local governments are part of the solution, not part of the problem.

**2. What about the bigger picture? Isn't this going one step further to disempower private businesses and empower the government?** No. Eminent domain is an inherent power of American governments, one that they have used throughout our nation's history. It is such a fundamental part of government that the US Constitution expressly permits it, as long as the government has a public purpose and pays fair value for the property. Moreover, the government entities will not enter the mortgage loan business or displace any mortgage companies.

**3. Is there an ulterior political motive here?** No. Eminent domain is a governmental action to achieve governmental objectives, and the objectives are clear -- to reduce the harm that the residential home loan crisis is causing our communities, to stabilize neighborhoods, and to support local economic activity.

**4. I read something in the WSJ about a program that President Obama was considering. Is this it?** No. Our program is a local one controlled by local city and county governments, supported by private investment funds.

**5. How will this affect property taxes?** By resolving underwater loans more efficiently with fewer foreclosure sales, we expect the program to stabilize the property tax base and to help collect delinquent property taxes.

**6. If this is such a good solution, why didn't the government do this instead of the bank bailouts?** Our program addresses a different problem and offers a different solution. The federal government acted to prevent a national financial collapse; that problem required a national solution at a scale that only the federal government could provide. The residential mortgage loan crisis affects individual communities differently and requires a local solution. We can implement the solution on a local scale, funded with private capital.

**7. Will participating cities be blackballed?** We regard it as unlikely that lending institutions would "redline" or "blackball" a city for exercising a sovereign right. Banks are in the business of making interest margin, and we believe that they will seek to do so wherever the opportunity arises. Punishing communities is not good for business. Also, there are legal strictures that may prevent such retaliation (such as the Community Reinvestment Act).

**8. How have you planned to budget for all of the legal costs that will come out of this? Especially for the participating municipalities, how will you put their fears at rest regarding this?** We have budgeted for extensive legal fees. MRP's financial model provides that

funding sources and the margins from the loan acquisitions and refinancings will directly pay all legal costs of condemnation and valuation actions.

**9.  What liability do the participating municipalities have?** The participating governments or joint powers authorities will be liable to pay the fair value of the loans as well as certain legal costs and fees.  MRP and its funding sources will pay for these costs as described in the answer to FAQ 8.

## SECTION SIX: ORGANIZATION/FOUNDERS

**1. Who is MRP?** MRP is the manager of this resolution program. It will obtain the funding to pay for the acquired loans, and it will manage the process of resolving the loans.

**2. Where will your corporate offices and operations be based?** MRP's offices and operations are based in San Francisco. As we implement the program we will work with the independent real estate service community in each participating community, which should contribute to the local economy. MRP may open additional offices in other cities and states as the program expands.

**3. Who is Gordian Sword and what role does it play?** Gordian Sword is the company that the program's founders set up to help create the program and to manage Mortgage Resolution Partners.

**4. Why LLCs?** Limited liability companies are a typical form of organization for investment and investment management businesses. They operate with the flexibility of partnerships while providing all investors with limited liability like shareholders in a corporation.

# EXHIBIT C

# Richmond CARES

## *Community Action to Restore Equity and Stability*

Saving Homes, Saving Cities

Solving the Mortgage Crisis Locally

Mortgage Resolution
P A R T N E R S

## Summary

- An average foreclosure costs the local government $19,277 (HUD)

- An average foreclosure costs adjacent neighbors $14,531 (HUD)

- 1,468 first mortgages in Richmond are in Private Label Securities

- 734 of these will be foreclosed (Fannie Mae estimate)

- These foreclosures will cost Richmond $25 million

- Reducing principal to below home values will stop foreclosures

- Richmond has the power to reduce principal

- *No one else has any incentive to prevent foreclosures*

- Mortgage Resolution Partners can help

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

2

Mortgage Resolution
P A R T N E R S

# The Cost of a Foreclosure*

Local Governments          $19,227

- Lost Property Taxes
- Unpaid Utility Bills
- Property Upkeep
- Policing
- Legal costs, building inspections
- Demand for social services

Borrowers                  $10,300**

Close Neighbors            $14,531***

*HUD Economic Impact Analysis of the FHA Refinance Program for Borrowers in Negative Equity Position
**Household moving costs, legal fees and administrative charges
***Negative impact on the property value of close neighbors

3

Mortgage Resolution
P A R T N E R S

# Richmond Foreclosures

Cost of Foreclosures

| Housing | # of Units* | Private Label Mortgages | Future Foreclosures Of Private Label Mortgages** | Richmond | Adjacent Neighbors |
|---------|-------------|------------------------|------------------------------------------------|----------|-------------------|
| Owner-occupied | 18,659 | 1,468 | 734 | $14 million | $11 million |
| Renter-occupied | 17,434 | | | | |

**Fannie Mae Predicts that 50% of PLS Will Result in Foreclosures

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

*Source: 2010 Census
** Source: Fannie Mae 2011 10k

4

Mortgage Resolution
P A R T N E R S

Problem → Mortgages Held In Private Label Securities

- 4.5 million loans placed in securities not guaranteed by U.S. Government
- Loans not eligible for 15 federal programs created since the housing crash
- Loans are much more likely to be underwater.
- Riskier loans created in 2004 to 2007 helped create housing boom
- Have not been originated since 2007
- *Securities prohibit principal reduction*

"If we are going to stabilize the housing market, we have to address" PLS loans.

*Federal Housing Finance Agency 2009*

Result → Fannie Predicts that 50% of PLS Will Result in Foreclosures

Mortgage Resolution
P A R T N E R S

# The Solution – Principal Reduction

"Most economists see principal reductions as central to preventing foreclosures." *Alan Blinder, former Vice Chairman at the Federal Reserve (Oct. 20, 2011)*

"Government should reduce mortgage principal when it exceeds 110 percent of the home value." *Martin S. Feldstein, former Chairman of the Council of Economic Advisers under President Reagan (Oct. 12, 2011)*

"Surely there is a strong case for experimentation with principal reduction strategies at the local level." *Lawrence Summers, former Treasury Secretary under President Clinton and former Economic Adviser under President Obama (Oct. 24, 2011)*

Example: JP Morgan Chase and Bank of America unilaterally reduce principal on option ARM portfolio loans in order to reduce defaults and losses

**Principal reduction will prevent future defaults and foreclosures**

Mortgage Resolution
P A R T N E R S

# Why Does Principal Reduction Help?

This is an illustrative example for the level of benefits that participating families may realize. Communities benefit from greatly reduced probability of foreclosure.

|  | Original Loan | Today | After Program |
|---|---|---|---|
| Home Value | $400,000 | $200,000 | $200,000 |
| Mortgage Balance | $320,000 | 300,000 | $190,000 |
| Home Equity | $80,000 | ($100,000) | $10,000 |
| Loan to Value Ratio (LTV) | 80% | 150% | 95% |
| Monthly Payment | $1,798 | $1,798 | $907 |

*Assumes a 6%, 30 year, fully amortizing mortgage is refinanced by a 4%, 30 year, fully amortizing mortgage. Some loan programs may also require insurance, which may add $175 per to the After Program monthly payment.*

Probability of Default Drops from ~80% to ~7.5% (FHA actuarial assumption, 95%LTV)

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 201| San Francisco, CA 94111 | 415.795.2032

7

Mortgage Resolution
P A R T N E R S

## Method of PLS Principal Reduction → Communities Take Action

Securitization agreements and tax laws prohibit the sale of PLS mortgages except when the mortgages are condemned

Local government, using their constitutional power of eminent domain, can purchase PLS mortgages when public purpose exists by paying fair value

Then local governments can reduce the principal balance on the condemned PLS mortgages, thereby reducing underwater PLS in their community

Governments Can Use Eminent Domain To Avoid Unnecessary Foreclosures

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 201| San Francisco, CA 94111 | 415.795.2032

Mortgage Resolution
P A R T N E R S

# Who Supports the Program?

Broad community-focused support for the program

- AFSCME
- Americans for Financial Reform
- Center for Popular Democracy
- National Community Reinvestment Coalition
- Federal Banking Regulators

Representing

- 1.6 million state and local government employees
- 600 local housing focused organizations
- 250 national, state and local groups working on financial industry reform

**Program Addresses Concerns Of Local Homeowners And Community-focused Organizations**

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

9

Mortgage Resolution
**P A R T N E R S**

# MRP is a Community Advisory Firm

MRP clients are state, county, and city governments that purchase underwater PLS mortgages and resolve them to the benefit of their communities. In order, MRP provides, under an advisory contract with the community, the following services:

- Identify and value PLS mortgages

- Educate the community

- Arrange acquisition financing

- Advise community in filing eminent domain motion

    Demonstrate the public purpose

    Determine fair market value of mortgages

- Arrange servicing of acquired mortgages

- Arrange resolution of acquired mortgages

**MRP Provides These Services No Cost To Cities or Homeowners**

# Communities That Have Engaged MRP

- El Monte, CA
- La Puente, CA
- San Joaquin, CA
- Orange Cove, CA

MRP is in active discussions with these communities and many more

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2041 San Francisco, CA 94111 | 415.795.2032

11

Mortgage Resolution
**P A R T N E R S**

# Next Steps

1. The City retains MRP at no cost per the terms of the MRP Advisory Agreement as modified by the City and agreed to by MRP.

2. The City is in control, at each step in the process the City has the option to terminate the Agreement and must approve the next step before it is taken.

3. The City does not pay any costs of the program.

4. Nothing in the Agreement obligates the City to file an eminent domain motion.

Mortgage Resolution
**P A R T N E R S**

## Key Steps To The MRP Process

1. The City hires MRP at no cost per the terms of the MRP Advisory Agreement as modified by the City and agreed to by MRP. At each step in the process the City has the option to terminate the Agreement and must approve the next step before it is taken. The City does not pay any costs of the program. Nothing in the Agreement obligates the City to file an eminent domain motion.

2. The City pre approves all communications with the homeowners and the community.

3. Before or after the City files an eminent domain motion the Homeowner may opt out of the program and their mortgage will be dropped from the motion before it is purchased.

4. Qualified homeowners who opt into the program may elect to refinance for less than the current value of their home.

5. Qualified homeowners who opt into the program may elect to sell their home in full satisfaction of their mortgage and lease back their home with an option to purchase it in the future.

6. Homeowners who opt into the program, but do not qualify for a refinance or a lease will be dropped from the eminent domain motion before their mortgage is purchased.

13



Step 1. City Controls The Process

Mortgage Resolution
P A R T N E R S

Mortgage Resolution
**PARTNERS**

Step 2. Home Owner May Opt Out



City

MRP/Local Realtors

Home Owner

**Start:**
City Files Eminent
Domain Motion –
May be consensual

City approves
homeowner
presentation
materials

Presents program
to homeowners

Interested?
no → Dropped From Motion
yes

Qualifies for refi?
yes → To Refinance Option
no

Qualifies For Lease?
yes → To Lease Option
no → Dropped From Motion



Step 3: Lease/Purchase Solution

Mortgage Resolution PARTNERS

**PLS Trustee**

Receives $160,000 Agreed Upon Fair Market Value of Underwater PLS Mortgage

Delivers Underwater PLS Mortgage

**Funder**

Funds $160,000 Loan Acquisition Price

Pays $3,260 of other expenses

Pays $4,500 to MRP

**City**

Obtains Order For Possession of Mortgage

Invests $9,500 to stabilize local housing

Applies for CalHFA Grant

**Mortgage Servicer/ Title Company**

Holds Underwater PLS Mortgage For City/Funder

Receives $190,000

Underwater Mortgage Paid Off

Sends $9,500 to City (5%)

Sends $4,750 to Realtor representing Seller (2.5%)

Sends $175,750 to Funder

**Home Buyer**

Signs Lease, Buys Home When City Owns PLS Mortgage

Sends $190,000 home purchase price to servicer

Credits a portion of rent to tenant's purchase account

**Home Owner**

Selects a Local Realtor as advisor

Start: Home Owner Opts For Lease/Purchase

Signs a market rate lease with an option to purchase. Sells home to buyer.

Pays rent

May buy home or continues to rent

16

Step 3: Refinance Solution

Mortgage Resolution
**PARTNERS**



17

Follow the Money

Mortgage Resolution PARTNERS

| Sale and Leaseback Solution | Who Pays? | When? | Who is Paid? | Cash Flow | MRP Cash Balance | Funder Cash Balance |
|---|---|---|---|---|---|---|
| Legal Expenses | MRP | Before eminent domain motion is filed | Atty's selected by City | (300) | (300) | |
| 50% of MRP Fee | Funder | Eminent domain motion filed | MRP | (2,250) | 1,950 | (2,250) |
| Legal Expenses | Funder | After eminent domain motion is filed, prior to possession being awarded | Atty's selected by City | (1,700) | 250 | |
| Fair Value Paid For Loan | Funder | Possession of mortgage awarded to city | PLS Trust | (160,000) | | (162,250) |
| Real Estate Commission | Home Buyer | Home sold | Realtors selected by home owner | (4,750) | | |
| Closing Costs | Home Buyer | Home sold | Vendors selected by home owner/realtor | (2,000) | | |
| Home Sales Proceeds | Home Buyer | Home Sold | Funder | 183,250 | | 21,000 |
| Community Housing Reserve | Funder | Home Sold | City | (9,500) | | 11,500 |
| 50% of MRP Fee | Funder | Home Sold | MRP | (2,250) | 2,500 | 9,250 |
| Investment Banking Fee | Funder | Home Sold | MRP's investment bank | (560) | | 8,690 |
| Reimbursement of MRP Advances | Funder | Home Sold | MRP | (2,000) | 4,500 | 6,690 |

| Refinance Solution | Who Pays? | When? | Who is Paid? | Cash Flow | MRP Cash Balance | Funder Cash Balance |
|---|---|---|---|---|---|---|
| Legal Expenses | MRP | Before eminent domain motion is filed | Atty's selected by City | (300) | (300) | |
| Homeowner Education | MRP | Before eminent domain motion is filed | Vendor approved by City | (300) | (600) | |
| 50% of MRP Fee | Funder | Eminent domain motion filed | MRP | (2,250) | 1,650 | (2,250) |
| Legal Expenses | MRP | After eminent domain motion is filed, prior to possession being awarded | Atty's selected by City | (1,650) | - | |
| Homeowner Education | MRP | After eminent domain motion is filed, prior to possession being awarded | Vendor approved by City | (300) | (300) | |
| Fair Value Paid For Loan | Funder | Possession of mortgage awarded to city | PLS Trust | (160,000) | | (162,250) |
| Mortgage Servicing | Funder | After possession of mortgage by city until resolution | Servicer of underwater mortgage | (100) | | (162,350) |
| Refinance Proceeds | FHA Lender | Refinance Completed | Funder | 190,000 | | 27,650 |
| Community Housing Reserve | Funder | Refinance Completed | City | (9,500) | | 18,150 |
| 50% of MRP Fee | Funder | Refinance Completed | MRP | (2,250) | 1,950 | 15,900 |
| Investment Banking Fee | Funder | Refinance Completed | MRP's investment bank | (560) | | 15,340 |
| Reimbursement of MRP Advances | Funder | Refinance Completed | MRP | (2,550) | 4,500 | 12,790 |

# EXHIBIT D

# North Las Vegas CARES

## Community Action to Restore Equity and Stability



Mortgage Resolution
P A R T N E R S

## Summary

- North Las Vegas: ground zero for the foreclosure crisis.

- An average foreclosure costs local government, borrower and neighbors $43,000

- Reducing principal will stop foreclosures

- North Las Vegas can reduce principal on local loans, prevent foreclosures, and keep families in their homes

- *No one else has any incentive to prevent foreclosures*

- Mortgage Resolution Partners can help

Mortgage Resolution
P A R T N E R S

# North Las Vegas – Ground Zero for the Crisis

- All mortgage loans in North Las Vegas: 75% underwater

- Target mortgage loans in North Las Vegas: 94% underwater



■ Underwater

▩ Above water

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 201 | San Francisco, CA 94111 | 415.795.2032

Mortgage Resolution
P A R T N E R S

## Severity of Problem – How Underwater Are the Loans?



more underwater

**100%** &gt; **200%**

**89030 Zip Code**

Distribution of underwater loans by
percentage of home value

**Loans are not just underwater – they are in the deep end**

Mortgage Resolution
P A R T N E R S

# The Cost of a Foreclosure*

Local Governments        $19,227

- Lost Property Taxes
- Unpaid Utility Bills
- Property Upkeep
- Policing
- Legal costs, building inspections
- Demand for social services

Borrowers        $10,300**

Close Neighbors        $14,531***

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 201| San Francisco, CA 94111 | 415.795.2032

*HUD Economic Impact Analysis of the FHA Refinance Program for Borrowers in Negative Equity Position
**Household moving costs, legal fees and administrative charges
***Negative impact on the property value of close neighbors

Mortgage Resolution
P A R T N E R S

## The Solution – Principal Reduction

"Most economists see principal reductions as central to preventing foreclosures." *Alan Blinder, former Vice Chairman at the Federal Reserve (Oct. 20, 2011)*

"Government should reduce mortgage principal when it exceeds 110 percent of the home value." *Martin S. Feldstein, former Chairman of the Council of Economic Advisers under President Reagan (Oct. 12, 2011)*

"Surely there is a strong case for experimentation with principal reduction strategies at the local level." *Lawrence Summers, former Treasury Secretary under President Clinton and former Economic Adviser under President Obama (Oct. 24, 2011)*

Example: JP Morgan Chase and Bank of America unilaterally reduce principal on option ARM portfolio loans in order to  reduce defaults and losses

**Principal reduction will prevent future defaults and foreclosures**

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 201| San Francisco, CA 94111 | 415.795.2032

6

Mortgage Resolution
P A R T N E R S

# Who Supports Principal Reduction?

Broad community-focused support for the program

- Culinary Workers Union Local 226, Nevada
- SEIU Local 1107, Nevada
- AFSCME, National
- Americans for Financial Reform, National
- Center for Popular Democracy, National
- National Community Reinvestment Coalition, National
- Federal Banking Regulators

Representing

- 1.6 million state and local government employees
- 600 local housing focused organizations
- 250 national, state and local groups working on financial industry reform

**Program Addresses Concerns Of Local Homeowners And Community-focused Organizations**

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

7

Mortgage Resolution
P A R T N E R S

Problem → Mortgages Held In Private Label Securitizations

- 5 million loans that Wall Street placed in securities not guaranteed by U.S. government

- Loans not eligible for 15 federal programs created since the housing crash

- Loans are much more likely to be underwater

- Loans are six times more likely to default than federally guaranteed loans (Financial Crisis Inquiry Commission report)

- Riskier loans created in 2004 to 2007 helped create housing boom

- *Securities effectively prohibit principal reduction*

"If we are going to stabilize the housing market, we have to address" PLS loans.
*Federal Housing Finance Agency 2009*

Result → Fannie Predicts that 50% of these Loans Will Result in Foreclosures

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

8

Mortgage Resolution
P A R T N E R S

# Future North Las Vegas Foreclosures

| | Minimum Future Foreclosures Of Private Label Mortgages* | Minimum Local Cost of PLS Foreclosures | |
| --- | --- | --- | --- |
| Private Label Mortgages | | North Las Vegas | Adjacent Neighbors |
| 5,052 | 2,526 | $49 million | $34 million |

*Fannie Mae Predicts that 50% of PLS Will Result in Foreclosures

* Source: Fannie Mae 2011 10k

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

9

Mortgage Resolution
P A R T N E R S

# Why Does Principal Reduction Help?

This is an illustrative example for the level of benefits that participating families may realize. Communities benefit from greatly reduced probability of foreclosure.

|  | Original Loan | Today | After Program |
|---|---|---|---|
| Home Value | $400,000 | $200,000 | $200,000 |
| Mortgage Balance | $320,000 | 300,000 | $190,000 |
| Home Equity | $80,000 | ($100,000) | $10,000 |
| Loan to Value Ratio (LTV) | 80% | 150% | 95% |
| Monthly Payment | $1,798 | $1,798 | $907 |

*Assumes a 6%, 30 year, fully amortizing mortgage is refinanced by a 4%, 30 year, fully amortizing mortgage. Some loan programs may also require insurance, which may add $175 per to the After Program monthly payment.*

Reducing principal significantly reduces likelihood of default

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 201| San Francisco, CA 94111 | 415.795.2032

Mortgage Resolution
PARTNERS

Method of Principal Reduction →
North Las Vegas Takes Action

Many underwater mortgages are worth less than the home securing the mortgage. For example a $300,000 mortgage on a $200,000 home is often valued by the market at less than $200,000.

These are the mortgages that can be purchased.

North Las Vegas can purchase these loans using private funding then reduce the principal balance on the underwater mortgages, thereby reducing foreclosures in the community

Government Can Avoid Unnecessary Foreclosures

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 201| San Francisco, CA 94111 | 415.795.2032

11

Mortgage Resolution
P A R T N E R S

# Next Steps

1. North Las Vegas engages MRP at no cost to assess the mortgage crisis locally.

2. During the assessment period MRP will:

   ▪ Identify underwater mortgage loans suitable for principal reduction.

   ▪ Represent the City before holders of the loans to discuss possible consensual purchases of the loans.

   ▪ Report back to the City to present recommendations for action.

3. At each step in the process the City has the option to terminate the Agreement and must approve the next step before it is taken.

4. The City does not pay any costs of the program. Nothing in the Agreement obligates the City to take any action.

12

# North Las Vegas CARES

## Community Action to Restore Equity and Stability



# EXHIBIT E

## ADVISORY SERVICES AGREEMENT

This Advisory Services Agreement ("Agreement") is entered into by and between Mortgage Resolution Partners LLC, a Delaware limited liability company ("MRP") and the City of Richmond, a municipal corporation and charter city (the "City") and is effective as of ⟍May 2⟍_____, 2013 (the "Effective Date").

### RECITALS

A.    MRP is a community advisory firm advising public agencies on ways to assist the agency in reducing the impact of the mortgage crisis with its communities including, if necessary, by acquiring mortgage loans through the use of eminent domain, in order to restructure or refinance the loans and thereby preserving home ownership, restoring homeowner equity and stabilizing the communities' housing market and economy by allowing many homeowners to remain in their homes.

B.    America in general and the City in particular are each experiencing an historic home mortgage crisis and as a result of the home mortgage crisis, many homeowners in the City have lost significant portions of their disposable income, and some have been unable to make timely mortgage payments on their homes. This has resulted in unprecedented rates of default and foreclosure, loss of homeowner equity, loss of family wealth, and even loss of shelter for some families. The home mortgage crisis has resulted in other adverse impacts within the City such as job losses, reductions in income, consumer demand, and investment, a spiraling reduction in property values, a reduction in property and payroll tax revenues, vandalism, abandoned homes and a general decline in the economy and the quality of life for residents. Restructuring or refinancing mortgage loans will benefit the City's residents by preserving home ownership; restoring homeowner equity; and likely also increasing income, property values, consumer demand, investment, and property and payroll tax revenue.

C.    The City is interested in retaining MRP to act as its advisor to assist the City in exploring potential solutions to the mortgage crisis; to assist the City by negotiating on the City's behalf with entities which will provide the necessary funding to the City in order to allow the City to acquire loans; and to assist the City in negotiating contracts with third parties including owners of loans, attorneys, lenders, data companies, other government agencies and others as necessary to implement a program or programs to benefit the City's residents.

NOW THEREFORE, in consideration of the foregoing, MRP and the City agree as follows:

1.    PURPOSE. The purpose of this Agreement is to enable the City and MRP to work together to assess and implement a program or programs designed to ease the impacts of the mortgage crisis on the residents of the City.

2.      SERVICES. MRP agrees to provide the following services ("Services"), and the City
authorizes MRP to represent the City as described:

        (a)     to advise the City on various alternatives in order to provide assistance to its
residents who are burdened with mortgage loans including assessing the possibility and benefits
of the formation of a joint powers authority;

        (b)     to identify and negotiate with companies acceptable to the City, in City's sole and
absolute discretion, to lend funds to the City on a fully secured, non-recourse basis if such funds
are required in order to provide the necessary relief;

        (c)     to provide extensive legal research acquired by MRP on all aspects of the
acquisition and refinancing of mortgage loans including each of the legal steps necessary to
implement the necessary programs;

        (d)     to identify and negotiate with law firms acceptable to the City, in City's sole and
absolute discretion, to work with the City to implement the programs which the City elects to
implement;

        (e)     to negotiate with other local, state and federal governments and agencies as
necessary to implement programs chosen by the City;

        (f)     to negotiate on behalf of the City with the holders of mortgage loans secured by
property owned by residents of the City (and with trustees, servicers, investors and other parties
having a relationship with the holders of the loans);

        (g)     to work with the City to identify mortgage loans to target based upon the City's
criteria;

        (h)     to negotiate on behalf of the City with any other third party as necessary to
implement programs which the City elects to implement; and

        (i)     to work with the City to establish education and communication programs to
address residents' questions about a program or programs the City implements.

        Provided, however, MRP shall not take action or implement programs or tasks set forth in
subsection (b), (d), (e), (f) and (h) hereof without the express written consent of City in advance,
which consent may be withheld in the City's sole and absolute discretion. Provided further,
however, in no event shall MRP have the authority to enter into any contracts on behalf of the
City.

3.      COMPENSATION. As its sole and exclusive compensation for the performance of the
Services (the "Advisory Fee"), MRP shall receive the sum of $4,500 per loan for each loan
ultimately acquired by the City or otherwise resolved in a manner which results in the
restructuring or refinancing of a loan through a program implemented by the City. The Advisory
Fee shall be paid only through the programs implemented by the City and shall not be paid
directly by the City. City shall not be responsible for any cost or expense arising out of or related
to this Agreement or any program or programs the City implements.

4.     ASSIGNMENT. MRP shall not have the right to assign and/or delegate its duties
hereunder without the prior written consent of City, which consent may be withheld in the City's
sole and absolute discretion.

5.     COOPERATION. Each party agrees to cooperate to carry out the purpose of this
Agreement and to perform all acts and execute all documents reasonably required to institute the
programs chosen by the City pursuant to the terms of this Agreement or as are or may become
necessary or convenient to effectuate and carry out this Agreement.

6.     RELATIONSHIP OF PARTIES. The relationship of MRP to the City shall at all times
be that of an independent contractor. MRP expressly acknowledges and agrees that it does not
have the authority to bind the City by contract or otherwise.

7.     TERM. This Agreement shall be in effect for a period of one (1) year from the Effective
Date and will be renewed automatically for successive terms of one (1) year each unless either
party gives notice to the other at least sixty (60) days prior to the termination of any term. Upon
any such termination, this Agreement shall be null and void and of no further force or effect,
except as to those provisions which expressly survive the termination of the Agreement.

8.     INDEMNITY.

       (a)     Except to the extent caused by the sole active negligence or willful misconduct of
City, City and City's representatives shall not be liable for any liability, penalties, costs, losses,
damages, expenses, causes of action, claims or judgments, including attorney's fees and other
defense costs (collectively, "Claims"), resulting from injury to or death sustained by any person,
or damage to property of any kind, or any other injury or damage whatsoever, which Claims
arise out of or are in any way connected with this Agreement or any programs or tasks
implemented pursuant to this Agreement.

       (b)     Except to the extent caused by the sole active negligence or willful misconduct of
City, MRP shall indemnify, protect, defend and hold the City and its representatives, harmless of
and from any and all Claims arising out of or in any way related to or resulting directly or
indirectly from (i) this Agreement, (ii) the programs or tasks implemented pursuant to this
Agreement, (iii) any failure to comply with any applicable law, and (iv) any default or breach by
MRP in the performance of any obligation of MRP under this Agreement.

       (c)     The provisions of this Section 8 shall survive the expiration or sooner termination
of this Agreement.

9.     INSURANCE. Upon receiving approval from the City to take action or implement
programs or tasks set forth in subsection (b) of Section 2, MRP, at its own cost and expense,
shall provide and maintain insurance coverage as required in Exhibit A, "City of Richmond
Insurance Requirements – Type II: Professional Services". MRP shall submit current certificates
of insurance for the policies required in this Section 9 before taking action or implementing any
programs or tasks set forth in subsections (b), (d), (e), (f) and (h) of Section 2.

-3-

10.    GENERAL PROVISIONS.

(a)    Execution. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original. A signature transmitted via scanning and emailing or facsimile shall have the same effect as an original signature.

(b)    Modification of Agreement. This Agreement may be modified only by a writing signed by MRP and the City.

(c)    Entire Agreement. This Agreement together with any Nondisclosure and/or Common Interest Agreements entered into between the parties either prior or subsequent to the Effective Date constitute the entire understanding and agreement between the parties concerning this subject matter.

(d)    Severability. If a court of competent jurisdiction finds or rules that any provision of this Agreement is invalid, void, or unenforceable, the provisions of the Agreement not so adjudged shall remain in full force and effect. The invalidity in whole or in part of any provision of this Agreement shall not void or affect the validity of any other provision of this Agreement.

(e)    Governing Law. This Agreement is governed by and shall be interpreted according to the laws of the State of California. This Agreement is made in Contra Costa County, California, and any action relating to this Agreement shall be instituted and prosecuted in the courts of Contra Costa County, California.

(f)    Waiver of Breach. No waiver of breach of any term or provision of this Agreement shall be construed to be, or shall be, a waiver of any other breach of this Agreement.

(g)    Arms-Length Transaction. This Agreement is a product of arms-length negotiations and each party has had an opportunity to receive independent legal advice from attorneys of its own choosing. Thus, neither party can claim that any ambiguities in any term of this Agreement should be construed against any other party.

(h)    No Third Party Beneficiaries. This Agreement will not confer any rights or remedies upon any person other than the parties hereto and their permitted successors and permitted assigns.

11.    NOTICES. All notices under this Agreement shall be in writing and shall be transmitted by personal delivery or reputable overnight courier service such as FedEx to the parties at the following addresses:

-4-

MRP:                                          The City:
Mortgage Resolution Partners, LLC             450 Civic Center Plaza
33 Pier South Embarcadero, Suite 201          Richmond, CA 94804
San Francisco, CA 94111                       Attn: City Manager
Attn: CEO

                                              With copy to:

                                              450 Civic Center Plaza
                                              Richmond, CA 94804
                                              Attn: City Attorney

      Such notice shall be deemed given upon personal delivery to the appropriate address or on the next business day if sent by overnight courier service.


      WHEREFORE, the parties indicate by their signatures below their entry into this legally-binding Agreement.

The City

                        7/26/13
              (signature)                 (date)

Name (printed):     WILLIAM A. LINDSAY

Mailing address:    450 CIVIC CENTER PLAZA

Telephone no.:     510-620-6512

E-mail address:    Bill_lindsay@ci.richmond.ca.us

Date of Signing:    July 15, 2013

Attest

City Clerk

Approved as to form:

City Attorney

Mortgage Resolution Partners LLC

| | |
|---|---|
| Representative: | (signature)      7-25-13 (date) |
| Name (printed): | Graham Williams |
| Mailing address: | 33 Pier South Embarcadero, Suite 201, San Francisco, CA 94111 |
| Telephone no.: | 415-795-2032  97(-/77( |
| E-mail address: | gwilliams@mortgageresolutionpartners.com |
| Date of Signing: | 7-25-13 |

-6-

Exhibit A
Insurance Requirements

## City of Richmond - Insurance Requirements - Type 2: Professional Services

In all instances where CONTRACTOR or its representatives will provide professional services *(architects, engineers, construction management, counselors, medical professionals, hospitals, clinics, attorneys, consultants, accountants, etc.)* to the City of Richmond (City), the City requires the following MINIMUM insurance requirements and limits.

CONTRACTOR shall procure and maintain for the duration of the contract, agreement, or other order for work, services or supplies, insurance against claims for injuries to persons or damages to property which may arise from or in connection with the performance of the work hereunder and the results of that work by the CONTRACTOR, its agents, representatives, employees or subcontractors. **Maintenance of proper insurance coverage is a material element of the contract. Failure to maintain or renew coverage or to provide evidence of renewal may be treated by the City as a material breach of contract.**

CONTRACTOR agrees that in the event of loss due to any of the perils for which it has agreed to provide Commercial General Liability insurance, CONTRACTOR shall look solely to its insurance for recovery. CONTRACTOR hereby grants to CITY, on behalf of any insurer providing Commercial General Liability insurance to either CONTRACTOR or CITY with respect to the services of CONSULTANT herein, a waiver of any right to subrogation which any such insurer of said CONTRACTOR may acquire against the CITY by virtue of the payment of any loss under such insurance.

Original, signed certificates and original, separate policy endorsements, naming the City as an additional insured for general liability coverage, as well as a waiver of subrogation for Workers' Compensation insurance, shall be received and approved by the City **before any work may begin.** However, failure to do so shall not operate as a waiver of these insurance requirements.

City reserves the right to modify or require additional coverages for specific risk exposures depending on scope of CONTRACTORS work.

Minimum coverage is detailed below. The policy limits of coverage shall be made available to the full limits of the policy. The minimum limits stated herein shall not serve to reduce the policy limits of coverage of CONTRACTOR.

---

**Minimum Scope of Insurance** – the following forms shall be provided and coverage shall be at least as broad as the following:

1. Insurance Services Office Commercial General Liability coverage (ISO Occurrence Form CG 0001), and including coverage for bodily and personal injury, property damage, and products and completed operations (if applicable).
2. Insurance Services Office Automobile Liability coverage (ISO Form CA 0001, Code 1, Any Auto).
3. Original and Separate Additional Insured Endorsement for General Liability (ISO Form CG 20 10 11/85 or its equivalent) with primary and non-contributory language.
4. Workers' Compensation Insurance as required by the State of California including Employer's Liability coverage.
5. Original and Separate Waiver of Subrogation for Workers' Compensation insurance.
6. Professional Liability or Errors & Omissions Liability Insurance appropriate to the CONTRACTOR's profession (if required.)

---

| Required Coverage | Minimum Limits |
|---|---|
| Workers' Compensation and Employers' Liability | Statutory limits as required by the State of California including $1 million Employers' Liability per accident, per employee for bodily injury or disease. If CONTRACTOR is self-insured, provide a certificate of Permission to Self-Insure, signed by the California Department of Industrial Relations and Self-Insurance. If contractor is a sole proprietor (has no employees) than contractor must sign "Contractor Release of Liability" found at: *http://www.ci.richmond.ca.us/index.aspx?nid=61.* |
| General Liability  *(primary and excess limits combined)* | **$2,000,000** per occurrence for bodily injury, personal injury and property damage. If the policy includes a general aggregate, either the general aggregate shall apply separately to this project, service or location or the **minimum required aggregate limit shall be twice the per occurrence limit ($4 million aggregate limit).** Policy shall be endorsed to name the City of Richmond as an additional insured per the conditions detailed below. |

*Type 2 – Page 1 of 3*

___ Exhibit A

## City of Richmond – Insurance Requirements – Type 2: Professional Services

| | |
|---|---|
| Automobile Liability | **$1,000,000** per occurrence for bodily injury and property damage. |
| Professional Liability or Errors & Omissions Liability –<br><br>*Required for all professionals including architects, engineers, consultants, construction management, counselors, medical professionals, hospitals, clinics, attorneys and accountants, & other consultants as may be required by the City.* | **$3,000,000** per occurrence |

| Required Policy Conditions | |
|---|---|
| Additional Insured Endorsement | Applicable to General Liability coverage.<br><br>The City of Richmond, its officers, officials, employees, agents and volunteers are to be named as additional insureds for all liability arising out of the operations by or on behalf of the named insured including bodily injury, deaths and property damage or destruction arising in any respect directly or indirectly in the performance of this contract.<br><br>*ISO form CG 20 10 (11/85) or its equivalent is required. If the Contractor is supplying their product or providing a service then the endorsement must not exclude products and completed operations coverage. If it does, then CG 20 37 (10/01) is also required. SAMPLE Endorsements can be found at http://www.ci.richmond.ca.us/index.aspx?nid=61.* |
| Primary and Noncontributory | The contractor's insurance coverage must be primary coverage as it pertains to the City, its officers, officials, employees, agents and volunteers. Any insurance or self insurance maintained by the City is wholly separate from the insurance of the contractor and in no way relieves the contractor from its responsibility to provide insurance. |
| Waiver of Subrogation Endorsement Form | Contractor's insurer will provide a Waiver of Subrogation in favor of the City for Workers' Compensation Insurance during the life of this contract. SAMPLE Endorsements can be found at *http://www.ci.richmond.ca.us/index.aspx?nid=61.* |
| Deductibles and Self-Insured Retentions | Any deductible or self-insured retention must be declared to and approved by the City. At the option of the City either the insurer shall reduce or eliminate such deductibles or self-insured retention as respects the City or the CONTRACTOR shall procure a financial guarantee in an amount equal to the deductible or self-insured retention guaranteeing payment of losses and related investigations, claims administration and defense expenses.<br><br>Contractor is responsible for satisfaction of the deductible and/or self-insured retention for each loss. |
| A. M. Best Rating | A:VII or Better. If the A.M. Best Rating falls below the required rating, CONTRACTOR must replace coverage immediately and provide notice to City. |

**Umbrella/Excess Liability Policies**
If an Umbrella or Excess Liability Policy is used to meet the liability limits, coverage shall be as broad as specified for underlying coverage's and cover those insured in the underlying policies.

*Type 2 – Page 2 of 3*

___ **Exhibit A**

## City of Richmond - Insurance Requirements - Type 2: Professional Services

**Claims-Made Policies**

If any insurance policy is written on a claims-made form: 1) the retroactive date must be shown, and must be before the date of the contract or the beginning of contract work. 2) Insurance must be maintained and evidence of insurance must be provided for at least five (5) years after completion of the contract of work. 3) If coverage is canceled or non-renewed, and not replaced with another claims-made policy form with a retroactive date prior to the contract effective date, the Contractor must purchase an extended period coverage for a minimum of five (5) years after completion of contract work.

**Subcontractors**

CONTRACTOR shall include all subcontractors as insured under its policies or shall furnish to the City for review and approval, separate certificates and endorsements for each subcontractor. All coverage for subcontractors shall be subject to all of the requirements stated herein.

CONTRACTOR agrees to defend and indemnify the City of Richmond for any damage resulting to it from failure of either CONTRACTOR or any subcontractor to take out or maintain the required insurance policies. The fact that insurance is obtained by CONTRACTOR, and/or CONTRACTOR's subcontractors, will not be deemed to release or diminish the liability of CONTRACTOR, including, without limitation, liability under the indemnity provisions of this contract. Damages recoverable by CITY from CONTRACTOR or any third party will not be limited by the amount of the required insurance coverage.

**Verification of Coverage**

All original certificates and endorsements shall be received and approved by the City *before work may begin.* The City of Richmond reserves the right to require complete, certified copies of all required insurance policies including endorsements affecting the coverage at any time.

**Original insurance certificates and required policy endorsements shall be mailed or delivered to the Designated Project Manager for the City of Richmond.**

Insurance certificates and endorsements may be faxed to the Designated Project Manger. However, CONTRACTOR must mail the original certificates and endorsements to Designated Project Manager once faxed.

**Continuous Coverage**

CONTRACTOR shall maintain the required insurance for the life of the contract. Should the CONTRACTOR cease to have insurance as required during this time, all work by the CONTRACTOR pursuant to this agreement shall cease until insurance acceptable to the City is provided. In the event that CONTRACTOR fails to comply with the City's insurance requirements, the City may take such action as it deems necessary to protect the City's interests. Such action may include but is not limited to termination of the contract, withholding of payments, or other actions as the City deems appropriate.

If services or the scope of work extend beyond the expiration dates of the required insurance policies initially approved by the City, CONTRACTOR must provide updated certificates and endorsements indicating that the required coverage, terms and conditions are still in place. **Renewal certificates and updated endorsements shall be mailed to the Designated Project Manager.**

**Cancellation**

CONTRACTOR shall ensure that coverage shall not be cancelled, reduced or otherwise materially changed except after thirty (30) days' prior written notice has been given to the City.

**Reporting Requirements**

Any failure to comply with reporting or other provisions of the policies including breaches of warranties shall not affect coverage provided to the City, its officers, officials, employees or volunteers.

**Consistent with Public Policy**

The insuring provisions, insofar as they may be judged to be against public policy shall be void and unenforceable only to the minimum extent necessary so that the remaining terms and provisions herein may be consistent with public policy and thus enforceable.

Revised: September 2011