ROCKY C. TSAI (SBN 221452)
(rocky.tsai@ropesgray.com)
**ROPES & GRAY LLP**
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315-6300
Facsimile: (415) 315-6350

Attorneys for Plaintiffs Wells Fargo Bank, N.A., as Trustee *et al.*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF RICHMOND, CALIFORNIA, a municipality, and MORTGAGE RESOLUTION PARTNERS LLC; <br><br> Defendants. | Case No. CV-13-3663-CRB <br><br> **DECLARATION OF DAVID STEVENS** <br><br> Date:  September 13, 2013 <br> Time:  10:00 a.m. <br> Judge: Hon. Charles R. Breyer |

Declaration of David Stevens; Case No. CV-13-3663-CRB

I, David Stevens hereby declare, pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the United States, that the following is true and correct:

1. I have been in the housing and mortgage finance business for more than 30 years. I am currently the President and CEO for the Mortgage Bankers Association, and in my career I have held senior management positions for:

   a. large federally insured depository institutions engaged in both portfolio lending and in mortgage acquisition and securitization;

   b. the Federal Home Loan Mortgage Corporation, a federally chartered buyer of home mortgages and issuer of mortgage backed securities; and

   c. a private-held real estate brokerage company with a home lending subsidiary.

2. In 2009 I was appointed by President Obama and confirmed by the Senate to serve as the Federal Housing Administration (FHA) Commissioner and Assistant Secretary for Housing in the U.S. Department of Housing and Urban Development.

3. It is based on this broad and deep experience that I offer this affidavit regarding the serious adverse impact that the proposed use of eminent domain by the City of Richmond, California, to seize performing mortgage assets from investors will have on local and national housing markets. The opinions offered here are also based on my understanding, based on available information, of the eminent domain program for seizing mortgage assets under consideration in Richmond, California.

4. In my opinion, the implementation of an eminent domain program whereby the city extinguishes mortgage contracts with compensation to the holders of those mortgages based on the current, lower home value will cause irreparable harm to current homeowners and prospective homebuyers in Richmond and in housing markets across the country. If it is demonstrated that any local government can simply intervene and abrogate a private lending contract, the uncertainty that will be introduced into the mortgage system and housing market will impact lending everywhere in the U.S.

5. This Declaration is divided into three sections. The first section addresses how the use of eminent domain to seize loans where the borrower is "underwater" (owes more than the

1

Declaration of David Stevens; Case No. CV-13-3663-CRB

collateral property may be worth) fundamentally alters the basic risks involved in home mortgage transactions. The second section deals with the impact of this change on the property holders in Richmond. The third section deals with the impact on the rest of the nation.

## I. EMINENT DOMAIN FUNDAMENTALLY CHANGES THE MORTGAGE TRANSACTION

6. The proposed use of eminent domain fundamentally changes the economic risks between lender and borrower in the basic home mortgage transaction. The mortgage contract is first and foremost a loan to an individual with an unconditional promise by that individual to repay the loan. Neither the obligation to lend nor the obligation to repay in full is conditioned in any way on the future value of the house or any other set of circumstances. While the house secures the loan, it is strictly a secondary source of repayment, meaning that if and only if the borrower defaults, then the lender looks to the value of the house to recover the unpaid principal on the loan. This is the fundamental difference between asset-based lending where liquidation of the collateral is the primary source of repayment of the loan (not the income and creditworthiness of the borrower), and mortgage lending where the house serves only as additional collateral for the general obligation of the individual.[1]

7. Under current mortgage contracts, the lender or investor bears the "credit risk" of the borrower being able make payments on the loan, and only looks to the collateral value of the home in the event of default. The borrower bears the risk and the benefits of any changes in the value of the house. All of the credit models look to a borrower's past credit history and current income as indicators of the future ability to repay the loan. While lenders get an appraisal on a home, that appraisal is an investor requirement used to assess the value of the property at the time the loan is made to determine if the value is sufficient to support the loan in the event of default.[2]

---

[1] An example of asset-based lending is Accounts Receivable financing, where a loan is extended against the value of a borrowers' accounts receivable and is repaid as the borrower collects from its customers. In this case, the accounts receivable are the primary source of repayment, not the business borrower's net income.

[2] The Uniform Residential Appraisal Report (URAR), which is used in the majority of home mortgage transactions in the country, states that implicit in the definition of market value "is the consummation of a sale as of specified date." Further, the URAR requires the appraiser to attest that "my (our) opinion of market value, as defined, of the real property that is the subject of this report is $[AMOUNT OF SALE] as of [DATE], which is the date of inspection and the effective date of this appraisal."

8. Lenders and investors make no attempt to estimate the future value of the property because they take on the risk of a decline in value if and only if the borrower defaults. The current system works because it aligns the incentives of the borrower, the lender and the mortgage investor. The borrower has all of the potential gain in the home's value in exchange for bearing any potential downside loss. Only if the borrower is unable to make the payments on the loan does the lender/investor bear any downside risk of a decline in value. The borrower has the incentive to make the best selection of a home based on the attributes that are important to that borrower and for the potential gain in value of the home. The borrower has a strong incentive to maintain the property and make continued investments that increase its value.

9. The prospect of the seizure of underwater mortgages through eminent domain – with compensation based on the current, lower homevalue – completely changes the structure of who bears what risks. If lenders and investors are subject to eminent domain proceedings on mortgages that are deemed to be "underwater," they are exposed not only to default risk, but also to "market risk" – the risk of a drop in the value of the home even if the borrower is current on the loan and able to make future payments. Moreover, under the structure of the eminent domain proposals in Richmond and elsewhere, this is a one-sided risk – if home values decline, lenders and investors are exposed, but if prices rise, only the borrower benefits. The asymmetry of risks caused by eminent domain will have adverse implications in communities that attempt to exercise this power and beyond.

10. In communities that adopt eminent domain programs to restore equity to underwater borrowers, lenders and investors will be exposed to the risk this power will be used whenever home prices decline by even modest amounts, locking-in an assured loss even where the borrower has the ability to pay under the mortgage contract. This is a risk that is not addressed in current mortgage contracts. However, should communities like Richmond begin to use eminent domain as a way to insulate homeowners against declining home values, lenders and investors will need to price this new risk into mortgage rates and factor it into underwriting standards going forward. The implications of these market responses are significant for both Richmond and the national mortgage housing markets.

## II. NEGATIVE IMPACT ON HOMEOWNERS IN RICHMOND, CALIFORNIA

11. If the Richmond city council's eminent domain action is allowed to proceed, I believe there will be an immediate and long lasting negative effect on property values throughout the city, including the values of homes owned free and clear. The negative price effects will be driven by the need for lenders and investors to re-evaluate the risks of all *prospective* lending activity in the city to capture both the credit risk of the individual borrower, and now the market risk of a possible eminent domain action due to declining home values in Richmond.

12. The risk exposure to mortgage lenders and investors in Richmond is far greater than they would face from normal defaults. The two elements that drive losses are the default rate and the loss rate in the event of default. The loss in the event of default is normally the difference between the loan amount and the value of the house, plus legal, maintenance and carrying costs on the home, including unpaid property taxes. In a hypothetical example, if the estimated default rate for loans made in Richmond is 5 percent, and the projected losses in the event of default are 40 percent, the expected loss on a pool of loans in Richmond would be 2 percent (5% x 40% = 2%). This is the exposure that lenders, issuers of mortgage backed securities, and investors manage today through pricing and underwriting standards in the absence of eminent domain risk.

13. What makes this eminent domain proposal so harmful is that it would expose lenders and investors to additional price-decline risk on every new loan that is made in Richmond. In the hypothetical example above, mortgage holders would be exposed to 2% default risk on loans in Richmond, PLUS the market risk on the 95% of loans they would make where the borrowers are expected to be current. The amount of market risk will depend on expectations about local economic and housing market conditions, and expectations about future home prices.

14. But these are long-tailed risks with imprecise calculations, so lenders will likely look to recent history and current conditions. A recent *San Francisco Chronicle* article citing data from Zillow estimates that 47% of homes in Richmond with a mortgage were underwater at the end of 2012, with total negative equity of $728 million.[3] This is risk that was not embedded in lenders' and

---

[3] Carolyn Said, "A Rescue for Richmond's Underwater Mortgages?" S.F. Chron., June 16, 2013, available at http://www.sfchronicle.com/bayarea/article/A-rescue-for-Richmond-s-underwater-mortgages-4603273.php (accessed on July 21, 2013).

investors' pricing or underwriting of mortgages in Richmond. This is likely what lenders will look at to assess the risks of lending in an eminent domain community going forward.

15. Basic economics tells us that lenders will have to factor this risk into any new lending activity in Richmond. Based on my experience in the industry, this new risk likely will be addressed by lenders in two forms: higher interest rates and higher down payment requirements. Higher rates will compensate lenders for taking on both the credit risk and now market risk resulting from the loan being exposed to market risk via eminent domain. Higher down payments will reduce lender and investor exposure to eminent domain risk by providing a much deeper initial equity cushion from the borrower's own funds. It is my view that lenders and investors will use a combination of higher rates and down payments to mitigate the significant new risks arising from eminent domain.

16. If Richmond were to adopt the eminent domain program, it would further exacerbate the negative equity situation the city is already experiencing. Higher interest rates and higher down payment requirements will make housing in Richmond less affordable, reducing demand and putting even further downward pressure on home prices. First-time homebuyers – the critical bottom rung of the housing ladder – will be particularly unable to afford the higher interest rates and/or the steep down payment. In addition, retirees who own their homes free and clear but want or need to move will find fewer borrowers able to afford to purchase their homes. With the pool of potential buyers limited to those with substantial cash down payments or able to pay higher rates, the drop in demand relative to supply will cause home values to fall for all homeowners.

17. In short, the proposed eminent domain program will help *only* the initial beneficiaries, while making it more difficult for prospective homebuyers to buy a home, and exposing existing homeowners to significant downward pressure on their home values.

### III. NEGATIVE IMPACT ON THE REST OF NATION

18. The impact of the Richmond eminent domain program will not be limited to residents of the City. The consequences of this action are likely to be felt across the nation. The lessons most recently learned from the housing meltdown – that home price declines can occur on a nationwide basis and are not confined to small local or regional economies – remain fresh in the mind of

mortgage industry. The industry today is in a heightened state of sensitivity to new or evolving risks that must be priced and managed.

19. If the City of Richmond proceeds with its eminent domain plan, it significantly raises the risks that other municipalities and states will follow. In fact, the consultants that designed the Richmond program have been marketing the program to numerous state, county, and local governments around the country.

20. As noted previously, the eminent domain proposal fundamentally shifts the responsibilities and roles of borrowers and lenders by changing the nature of the mortgage transaction. The impact of eminent domain risk will ripple through the real estate market for years, largely in the form of higher down payments and higher interest rates to price-in the new market risk. Some jurisdictions with still-struggling housing markets may see lenders exit altogether out of fear or uncertainty about the possibility of eminent domain programs being adopted, making it nearly impossible to reverse the price trend.

21. The most immediate lender response will be to demand higher down payments. If the lender or investor is going to face the possibility of being forced to write down a mortgage because the price of the home has fallen below the outstanding balance of the mortgage, the lender will act to minimize that possibility by having the largest difference between the mortgage and the home price when the loan is made. Simply put, that means higher down payments.

22. For government-supported programs like FHA and the government-sponsored enterprises (the "GSEs") that focus on low down payment lending, the government will need to decide whether eminent domain risk exposes the taxpayer to excessive risks that will require the government to restrict its activities. The government must choose between abandoning low down payment programs or putting far more risk on the taxpayers than current credit models can reliably predict. As a former FHA Commissioner, my policy recommendation would be to prohibit FHA financing in eminent domain communities, to which I testified before the House Financial Services Committee earlier this year.[4]

---

[4] "Sustainable Housing Finance: Perspectives on Reforming FHA," Before the House Financial Services Committee, Subcommittee on Housing and Insurance (Apr. 10, 2013).

Declaration of David Stevens; Case No. CV-13-3663-CRB

23. What is important is that these higher down payment requirements will not just be put in place in communities like Richmond that adopt eminent domain seizures. They will likely be put into place anywhere there is the possibility that a local government will take it upon itself to abrogate mortgage contracts entered into years earlier. The risk of future ill-advised actions by local governments is not something that lenders are able to build into credit models.

24. Lenders would also act to reduce their exposure to potential home price declines by avoiding altogether those areas most likely to experience economic declines or high home price volatility. For example, lending for new home construction and condos would be significantly impacted because new supply could have the effect of depressing prices. The biggest risk in any new home development is in the first few homes built. Also, inner city neighborhoods where, in many cases, homes are already selling for below replacement value and where any economic shock is likely to produce large price declines would also be impacted. In addition, lenders would be more likely to avoid rural areas where the demand and supply of homes is much thinner and a paucity of transitions often make it difficult to determine what market prices are.

## IV. CONCLUSION

25. In summary, by shifting the risk of a decline in home values from owners to lenders in ways that lenders have never faced before, this eminent domain proposal will change the economics of mortgage lending for the worse in ways that are easy to predict but difficult to precisely measure. That said, with more than $600 billion in negative equity in the current market nationwide, the magnitude of the risk that lenders and investors would need to consider is quite large.[5]

26. Based on my experience, I expect that the threat of eminent domain actions will cause many lenders and investors to increase down payment requirements. I also expect that lenders will shy away from taking on the risk of new housing developments, condo projects and lending in communities susceptible to price volatility. What is difficult to predict is how much mortgage rates will be impacted, particularly given the new federal limitations on risk-based pricing due to the

---

[5] CoreLogic Negative Equity Report, 4th Quarter, 2012, available at http://www.corelogic.com/research/negative-equity/corelogic-q4-2012-negative-equity-report.pdf.

7

Declaration of David Stevens; Case No. CV-13-3663-CRB

ROCKY C. TSAI (SBN 221452)
(rocky.tsai@ropesgray.com)
**ROPES & GRAY LLP**
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315-6300
Facsimile: (415) 315-6350

Attorneys for Plaintiffs Wells Fargo Bank, N.A., as Trustee *et al.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF RICHMOND, CALIFORNIA, a municipality, and MORTGAGE RESOLUTION PARTNERS LLC;<br><br>Defendants. | Case No. CV-13-3663-CRB<br><br>**DECLARATION OF DAVID STEVENS**<br><br>Date: September 13, 2013<br>Time: 10:00 a.m.<br>Judge: Hon. Charles R. Breyer |

I, David Stevens hereby declare, pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the United States, that the following is true and correct:

1. I have been in the housing and mortgage finance business for more than 30 years. I am currently the President and CEO for the Mortgage Bankers Association, and in my career I have held senior management positions for:

   a. large federally insured depository institutions engaged in both portfolio lending and in mortgage acquisition and securitization;

   b. the Federal Home Loan Mortgage Corporation, a federally chartered buyer of home mortgages and issuer of mortgage backed securities; and

   c. a private-held real estate brokerage company with a home lending subsidiary.

2. In 2009 I was appointed by President Obama and confirmed by the Senate to serve as the Federal Housing Administration (FHA) Commissioner and Assistant Secretary for Housing in the U.S. Department of Housing and Urban Development.

3. It is based on this broad and deep experience that I offer this affidavit regarding the serious adverse impact that the proposed use of eminent domain by the City of Richmond, California, to seize performing mortgage assets from investors will have on local and national housing markets. The opinions offered here are also based on my understanding, based on available information, of the eminent domain program for seizing mortgage assets under consideration in Richmond, California.

4. In my opinion, the implementation of an eminent domain program whereby the city extinguishes mortgage contracts with compensation to the holders of those mortgages based on the current, lower home value will cause irreparable harm to current homeowners and prospective homebuyers in Richmond and in housing markets across the country. If it is demonstrated that any local government can simply intervene and abrogate a private lending contract, the uncertainty that will be introduced into the mortgage system and housing market will impact lending everywhere in the U.S.

5. This Declaration is divided into three sections. The first section addresses how the use of eminent domain to seize loans where the borrower is "underwater" (owes more than the

---

1

Declaration of David Stevens; Case No. CV-13-3663-CRB


collateral property may be worth) fundamentally alters the basic risks involved in home mortgage transactions. The second section deals with the impact of this change on the property holders in Richmond. The third section deals with the impact on the rest of the nation.

## I. EMINENT DOMAIN FUNDAMENTALLY CHANGES THE MORTGAGE TRANSACTION

6. The proposed use of eminent domain fundamentally changes the economic risks between lender and borrower in the basic home mortgage transaction. The mortgage contract is first and foremost a loan to an individual with an unconditional promise by that individual to repay the loan. Neither the obligation to lend nor the obligation to repay in full is conditioned in any way on the future value of the house or any other set of circumstances. While the house secures the loan, it is strictly a secondary source of repayment, meaning that if and only if the borrower defaults, then the lender looks to the value of the house to recover the unpaid principal on the loan. This is the fundamental difference between asset-based lending where liquidation of the collateral is the primary source of repayment of the loan (not the income and creditworthiness of the borrower), and mortgage lending where the house serves only as additional collateral for the general obligation of the individual.[1]

7. Under current mortgage contracts, the lender or investor bears the "credit risk" of the borrower being able make payments on the loan, and only looks to the collateral value of the home in the event of default. The borrower bears the risk and the benefits of any changes in the value of the house. All of the credit models look to a borrower's past credit history and current income as indicators of the future ability to repay the loan. While lenders get an appraisal on a home, that appraisal is an investor requirement used to assess the value of the property at the time the loan is made to determine if the value is sufficient to support the loan in the event of default.[2]

---

[1] An example of asset-based lending is Accounts Receivable financing, where a loan is extended against the value of a borrowers' accounts receivable and is repaid as the borrower collects from its customers. In this case, the accounts receivable are the primary source of repayment, not the business borrower's net income.

[2] The Uniform Residential Appraisal Report (URAR), which is used in the majority of home mortgage transactions in the country, states that implicit in the definition of market value "is the consummation of a sale as of specified date." Further, the URAR requires the appraiser to attest that "my (our) opinion of market value, as defined, of the real property that is the subject of this report is $[AMOUNT OF SALE] as of [DATE], which is the date of inspection and the effective date of this appraisal."

8. Lenders and investors make no attempt to estimate the future value of the property because they take on the risk of a decline in value if and only if the borrower defaults. The current system works because it aligns the incentives of the borrower, the lender and the mortgage investor. The borrower has all of the potential gain in the home's value in exchange for bearing any potential downside loss. Only if the borrower is unable to make the payments on the loan does the lender/investor bear any downside risk of a decline in value. The borrower has the incentive to make the best selection of a home based on the attributes that are important to that borrower and for the potential gain in value of the home. The borrower has a strong incentive to maintain the property and make continued investments that increase its value.

9. The prospect of the seizure of underwater mortgages through eminent domain – with compensation based on the current, lower homevalue – completely changes the structure of who bears what risks. If lenders and investors are subject to eminent domain proceedings on mortgages that are deemed to be "underwater," they are exposed not only to default risk, but also to "market risk" – the risk of a drop in the value of the home even if the borrower is current on the loan and able to make future payments. Moreover, under the structure of the eminent domain proposals in Richmond and elsewhere, this is a one-sided risk – if home values decline, lenders and investors are exposed, but if prices rise, only the borrower benefits. The asymmetry of risks caused by eminent domain will have adverse implications in communities that attempt to exercise this power and beyond.

10. In communities that adopt eminent domain programs to restore equity to underwater borrowers, lenders and investors will be exposed to the risk this power will be used whenever home prices decline by even modest amounts, locking-in an assured loss even where the borrower has the ability to pay under the mortgage contract. This is a risk that is not addressed in current mortgage contracts. However, should communities like Richmond begin to use eminent domain as a way to insulate homeowners against declining home values, lenders and investors will need to price this new risk into mortgage rates and factor it into underwriting standards going forward. The implications of these market responses are significant for both Richmond and the national mortgage housing markets.

## II. NEGATIVE IMPACT ON HOMEOWNERS IN RICHMOND, CALIFORNIA

11. If the Richmond city council's eminent domain action is allowed to proceed, I believe there will be an immediate and long lasting negative effect on property values throughout the city, including the values of homes owned free and clear. The negative price effects will be driven by the need for lenders and investors to re-evaluate the risks of all *prospective* lending activity in the city to capture both the credit risk of the individual borrower, and now the market risk of a possible eminent domain action due to declining home values in Richmond.

12. The risk exposure to mortgage lenders and investors in Richmond is far greater than they would face from normal defaults. The two elements that drive losses are the default rate and the loss rate in the event of default. The loss in the event of default is normally the difference between the loan amount and the value of the house, plus legal, maintenance and carrying costs on the home, including unpaid property taxes. In a hypothetical example, if the estimated default rate for loans made in Richmond is 5 percent, and the projected losses in the event of default are 40 percent, the expected loss on a pool of loans in Richmond would be 2 percent (5% x 40% = 2%). This is the exposure that lenders, issuers of mortgage backed securities, and investors manage today through pricing and underwriting standards in the absence of eminent domain risk.

13. What makes this eminent domain proposal so harmful is that it would expose lenders and investors to additional price-decline risk on every new loan that is made in Richmond. In the hypothetical example above, mortgage holders would be exposed to 2% default risk on loans in Richmond, PLUS the market risk on the 95% of loans they would make where the borrowers are expected to be current. The amount of market risk will depend on expectations about local economic and housing market conditions, and expectations about future home prices.

14. But these are long-tailed risks with imprecise calculations, so lenders will likely look to recent history and current conditions. A recent *San Francisco Chronicle* article citing data from Zillow estimates that 47% of homes in Richmond with a mortgage were underwater at the end of 2012, with total negative equity of $728 million.[3] This is risk that was not embedded in lenders' and

---

[3] Carolyn Said, "A Rescue for Richmond's Underwater Mortgages?" S.F. Chron., June 16, 2013, available at http://www.sfchronicle.com/bayarea/article/A-rescue-for-Richmond-s-underwater-mortgages-4603273.php (accessed on July 21, 2013).

4

Declaration of David Stevens; Case No. CV-13-3663-CRB

investors' pricing or underwriting of mortgages in Richmond. This is likely what lenders will look at to assess the risks of lending in an eminent domain community going forward.

15. Basic economics tells us that lenders will have to factor this risk into any new lending activity in Richmond. Based on my experience in the industry, this new risk likely will be addressed by lenders in two forms: higher interest rates and higher down payment requirements. Higher rates will compensate lenders for taking on both the credit risk and now market risk resulting from the loan being exposed to market risk via eminent domain. Higher down payments will reduce lender and investor exposure to eminent domain risk by providing a much deeper initial equity cushion from the borrower's own funds. It is my view that lenders and investors will use a combination of higher rates and down payments to mitigate the significant new risks arising from eminent domain.

16. If Richmond were to adopt the eminent domain program, it would further exacerbate the negative equity situation the city is already experiencing. Higher interest rates and higher down payment requirements will make housing in Richmond less affordable, reducing demand and putting even further downward pressure on home prices. First-time homebuyers – the critical bottom rung of the housing ladder – will be particularly unable to afford the higher interest rates and/or the steep down payment. In addition, retirees who own their homes free and clear but want or need to move will find fewer borrowers able to afford to purchase their homes. With the pool of potential buyers limited to those with substantial cash down payments or able to pay higher rates, the drop in demand relative to supply will cause home values to fall for all homeowners.

17. In short, the proposed eminent domain program will help _only_ the initial beneficiaries, while making it more difficult for prospective homebuyers to buy a home, and exposing existing homeowners to significant downward pressure on their home values.

### III. NEGATIVE IMPACT ON THE REST OF NATION

18. The impact of the Richmond eminent domain program will not be limited to residents of the City. The consequences of this action are likely to be felt across the nation. The lessons most recently learned from the housing meltdown – that home price declines can occur on a nationwide basis and are not confined to small local or regional economies – remain fresh in the mind of

Declaration of David Stevens; Case No. CV-13-3663-CRB

mortgage industry. The industry today is in a heightened state of sensitivity to new or evolving risks that must be priced and managed.

19. If the City of Richmond proceeds with its eminent domain plan, it significantly raises the risks that other municipalities and states will follow. In fact, the consultants that designed the Richmond program have been marketing the program to numerous state, county, and local governments around the country.

20. As noted previously, the eminent domain proposal fundamentally shifts the responsibilities and roles of borrowers and lenders by changing the nature of the mortgage transaction. The impact of eminent domain risk will ripple through the real estate market for years, largely in the form of higher down payments and higher interest rates to price-in the new market risk. Some jurisdictions with still-struggling housing markets may see lenders exit altogether out of fear or uncertainty about the possibility of eminent domain programs being adopted, making it nearly impossible to reverse the price trend.

21. The most immediate lender response will be to demand higher down payments. If the lender or investor is going to face the possibility of being forced to write down a mortgage because the price of the home has fallen below the outstanding balance of the mortgage, the lender will act to minimize that possibility by having the largest difference between the mortgage and the home price when the loan is made. Simply put, that means higher down payments.

22. For government-supported programs like FHA and the government-sponsored enterprises (the "GSEs") that focus on low down payment lending, the government will need to decide whether eminent domain risk exposes the taxpayer to excessive risks that will require the government to restrict its activities. The government must choose between abandoning low down payment programs or putting far more risk on the taxpayers than current credit models can reliably predict. As a former FHA Commissioner, my policy recommendation would be to prohibit FHA financing in eminent domain communities, to which I testified before the House Financial Services Committee earlier this year.[4]

---

[4] "Sustainable Housing Finance: Perspectives on Reforming FHA," Before the House Financial Services Committee, Subcommitee on Housing and Insurance (Apr. 10, 2013).

6

Declaration of David Stevens; Case No. CV-13-3663-CRB

23. What is important is that these higher down payment requirements will not just be put in place in communities like Richmond that adopt eminent domain seizures. They will likely be put into place anywhere there is the possibility that a local government will take it upon itself to abrogate mortgage contracts entered into years earlier. The risk of future ill-advised actions by local governments is not something that lenders are able to build into credit models.

24. Lenders would also act to reduce their exposure to potential home price declines by avoiding altogether those areas most likely to experience economic declines or high home price volatility. For example, lending for new home construction and condos would be significantly impacted because new supply could have the effect of depressing prices. The biggest risk in any new home development is in the first few homes built. Also, inner city neighborhoods where, in many cases, homes are already selling for below replacement value and where any economic shock is likely to produce large price declines would also be impacted. In addition, lenders would be more likely to avoid rural areas where the demand and supply of homes is much thinner and a paucity of transitions often make it difficult to determine what market prices are.

## IV. CONCLUSION

25. In summary, by shifting the risk of a decline in home values from owners to lenders in ways that lenders have never faced before, this eminent domain proposal will change the economics of mortgage lending for the worse in ways that are easy to predict but difficult to precisely measure. That said, with more than $600 billion in negative equity in the current market nationwide, the magnitude of the risk that lenders and investors would need to consider is quite large.[5]

26. Based on my experience, I expect that the threat of eminent domain actions will cause many lenders and investors to increase down payment requirements. I also expect that lenders will shy away from taking on the risk of new housing developments, condo projects and lending in communities susceptible to price volatility. What is difficult to predict is how much mortgage rates will be impacted, particularly given the new federal limitations on risk-based pricing due to the

---

[5] CoreLogic Negative Equity Report, 4th Quarter, 2012, available at http://www.corelogic.com/research/negative-equity/corelogic-q4-2012-negative-equity-report.pdf.

Qualified Mortgage definition, and how lenders and investors will view home price risk relative to down payment requirements across different markets. Therefore, it is important to understand that short term expediency for a small number of borrowers could lead to longer term problems and costs for the entire housing market.

27.     On a closing note, I, along with many others in Washington, D.C., have been working hard to reduce the size of the government footprint in mortgage lending and to bring more private capital back into the mortgage market and reduce the risk to the taxpayers. If private investors see that local governments can step in, change the rules, and cause these kinds of losses, private capital will flee mortgages. We would be left with only government programs but, given my experience in running a government lending program, I find it unlikely that the government programs would be remain unchanged in the face of the threat of eminent domain action.

By my signature below, I represent that this affidavit is my true and correct opinion as of the date it was written.

I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct. Executed on _August 6, 2013_, at _Washington, DC_.

DAVID STEVENS

---

Declaration of David Stevens

8