ROCKY C. TSAI (SBN 221452)
(rocky.tsai@ropesgray.com)
**ROPES & GRAY LLP**
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315-6300
Facsimile: (415) 315-6350

Attorneys for Plaintiffs Wells Fargo Bank, N.A.,
as Trustee, *et al.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee, *et al.* | Case No. CV-13-3663-CRB |
| Plaintiffs, | **DECLARATION OF PHILLIP R. BURNAMAN, II** |
| v. | Date:        September 13, 2013 |
| CITY OF RICHMOND, CALIFORNIA, a municipality, and MORTGAGE RESOLUTION PARTNERS LLC; | Time:        10:00 a.m.<br>Judge:       Hon. Charles R. Breyer |
| Defendants. | |

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

1    I, Phillip R. Burnaman, II, hereby declare, pursuant to 28 U.S.C. § 1746 and under penalty of

2  perjury under the laws of the United States, that the following is true and correct:

3    I am a Managing Director of GreensLedge Group, LLC an investment banking and advisory

4  firm with offices in New York, London and Tokyo.  At GreensLedge, I provide investment banking

5  and advisory services regarding structured finance, primarily residential and commercial mortgage

6  origination, securitization, and servicing. In addition, I provide litigation support and expert witness

7  services to clients and advise on bankruptcy, restructuring and capital markets activities within my

8  areas of expertise, which include mortgage finance, homebuilding, commercial banking, financial

9  guaranty and mortgage insurance, securities trading, portfolio management, and risk management.

10                        I.        QUALIFICATIONS

11    1.      I have over thirty years of experience in mortgage and structured finance. I began my

12  career in finance in 1983 at EF Hutton & Company, where I built and analyzed residential mortgage

13  cash flow models and assisted with mortgage securitizations as an investment banker – analyzing

14  collateral, negotiating transactions with counterparties/ratings agencies, working with counsel on

15  transaction documentation, and providing the bond sales group with information for their clients. In

16  1986, along with my superiors from EF Hutton, I joined a start-up financial guarantor, Financial

17  Security Assurance (FSA, now a part of Assured Guaranty), where I developed business

18  opportunities for the application of financial guaranty insurance to residential and commercial

19  mortgage finance.  While at FSA, I was also deeply involved in the expansion of securitization

20  technology to the mortgage finance market in the U.K., translating many of the principles from U.S.

21  Residential Mortgage Backed Securities ("RMBS") to that developing market. In 1990, I joined

22  Citigroup Securities where I was responsible for the acquisition of over $700 million of residential,

23  commercial and consumer loans portfolios from the Resolution Trust Corporation.

24    2.      In 1994, I joined ING Bank, NV as a portfolio manager, with responsibility for a

25  portfolio of $500 million of RMBS, Commercial Mortgage Backed Securities ("CMBS") and

26  distressed real estate debt. As a buy-side portfolio manager at ING, I reviewed RMBS and CMBS

27  transactions for their suitability as investments for my portfolio which was highly-focused on credit-

28  sensitive investments.   At ING, my responsibilities increased significantly and by 2004 I was

1   responsible for all of the bank's proprietary trading businesses worldwide, encompassing over $14

2   billion of investments and 75 professionals in six offices around the world.  Included in my

3   responsibilities for ING was a proprietary RMBS portfolio of approximately $4 billion, over $1

4   billion of CMBS, and direct credit management of over $7 billion of Collateralized Loan Obligation

5   ("CLO") issues. I advised ING's executive board (Board of Directors) on significant risk issues.   I

6   resigned from ING in 2004 to co-found NewStar Financial, a publicly-traded finance company

7   where I was head of the ABS/structured products group – with loans and investments in prime, Alt-

8   A, sub-prime residential mortgages, CMBS and CLOs, amongst other assets. NewStar divested the

9   majority of its $500 million structured finance portfolio in July of 2007 and I left the company in

10  December of that year.

11          3.       In 2008, I focused on advisory work for a publicly-traded homebuilder based in

12  Irvine, California, where I had served as a Director for ten years and was Chairman of the Board and

13  the Audit Committee as well as the designated Audit Committee SEC financial expert.  I also

14  provided consulting services for a large, private Midwestern life insurance company with a $5

15  billion investment portfolio, including RMBS and numerous structured finance investments. By

16  2009, I had formed a partnership to provide financial advisory and litigation support services in my

17  areas of expertise; that partnership was Murray & Burnaman LLC. In 2012, I joined some former

18  colleagues at GreensLedge Group to continue my advisory practice and work on capital markets

19  activities in residential and commercial mortgages. GreensLedge currently provides investment

20  banking services to several smaller residential and commercial mortgage originators.

21          4.       I am currently a member of the Mortgage Bankers Association (MBA), The

22  American Bankruptcy Institute (ABI), and the Turnaround Management Association (TMA). I am a

23  former member of the American Securitization Forum (ASF), the Urban Land Institute (ULI), and I

24  was a founding governor of the Commercial Real Estate Finance Council (CREFC). I have spoken to

25  numerous industry groups on issues related to mortgage finance, securitization, and financial

26  guaranty insurance, including CREFC, ASF, MBA, Moody's, Standard & Poor's and Fitch Ratings.

27

28

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

1     5.     I graduated from Harvard College in 1981 with an AB in economics. In 1985, I

2  earned an MBA from NYU's Stern School of Business Administration with a concentration in

3  Finance.  I currently hold a Series 7 license from FINRA. My *résumé* is appended as Appendix A.

## II.    THE RICHMOND TAKINGS PROGRAM

5     6.     The City of Richmond California together with Mortgage Resolution Partners

6  ("MRP") have adopted a program (the "Takings Program"), which uses the power of eminent

7  domain  to seize "underwater" mortgages from Private Label Securitizations ("PLS").  As explained

8  more fully below, a PLS is a type of RMBS that is issued by private mortgage securitization trusts,

9  in contrast to those RMBS created through government-sponsored entities ("GSEs")—such as

10  FNMA or FHLMC--or government guaranteed entities, such as GNMA (see paragraph s 12-13).

11  Public documents explaining the Takings Program indicate that MRP claims that underwater

12  mortgages in PLS cannot otherwise be modified, that most mortgage market participants support

13  such a scheme, and that the costs of such a plan are modest (although when setting out the costs of

14  foreclosure, MRP neglects to note the losses incurred by certificateholders).  As a result, the Takings

15  Program proposes using seizure by eminent domain to write down the unpaid principal balance

16  forcibly for mortgages on properties with negative equity as the means to permit borrowers to

17  refinance their mortgages, create equity in their homes, and purportedly improve the local housing

18  market.

19     7.     The assumptions underlying the Takings Program are flawed and in many instances

20  untrue, including the causes and consequences of foreclosure, as I will demonstrate below. As a

21  result, I believe the conclusions regarding the benefits of the program and the program's impact on

22  mortgage market participants, as asserted by Richmond, are incorrect.

23     8.     Contrary to the program literature, loan servicers can and do modify loans when

24  borrowers are in financial distress, and loans in PLS have been modified and continue to be

25  modified.[1]

---

[1] See Amherst Non-Agency Mortgage Market Monitor, June 2013 p. 63 and see Appendix F for a summary of servicer modifications to date.

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

9.      Moreover, and also contrary to the program's assumptions, because the program will have a negative effect on local, regional and national mortgage markets, participants in the economically important mortgage industry are appropriately concerned regarding Richmond's plan because it has the potential to radically curtail mortgage finance in Richmond and other localities.[2]

10.      Finally the costs of the Takings Program are enormous, notwithstanding that it begins on a comparably small scale. This program will negatively impact both the local property market and the national property market.  Richmond and MRP claim that eminent domain seizures are the only way to resolve the problems created by negative homeowner equity.  That is incorrect and, far from being a solution, the Takings Program's plan to seize mortgages with negative equity has the potential to change radically the U.S. residential mortgage market and cause billions of dollars of losses to investors, homeowners, and others with exposure to the residential housing markets.  Ultimately this plan will not benefit homeowners and municipalities or solve the mortgage crisis, but instead will harm the U.S. mortgage markets and generate losses to PLS certificateholders that they would not otherwise incur.

## III.     MORTGAGE SECURITIZATION TRANSACTIONS

### A.  Historical Background

11.      Historically, mortgage loans were originated and held by local financial institutions, regional banks, insurance companies, and certain government agencies. In the post-World War II through Baby Boom eras, as home ownership increased and transaction volumes rose, bankers developed new sources of capital to finance residential housing and new methods of loan origination to increase efficiency. Capital providers became more centralized and geographically distanced from the collateral itself.

12.      In 1968, the restructuring of the Federal National Mortgage Association "FNMA" into FNMA and the Government National Mortgage Association ("GNMA") set the stage for the first mortgage securities, which were issued by GNMA and the Federal Home Loan Mortgage

---

[2] See bill reintroduced by Representative John Campbell (R-CA) "The Defending American Taxpayers from Abusive Government Takings Act" that will prevent the GSEs (defined below) from lending in communities that exercise Eminent Domain seizures.
http://www.campbell.house.gov/index.php?option=com_content&view=article&id=3432%3Arelease-campbell-reintroduces-bill-to-protect-taxpayers-from-eminent-domain-schemes&catid=41%3Apress-releases&Itemid=300032

1    Corporation ("FHLMC")[3] in the early 1970's in the form of simple pass-through securities issues.

2    These securitizations efficiently processed the sale of mortgage assets to unaffiliated third party

3    purchasers in the form of a non-recourse transaction.

4          13.      While pass-through securities were an improvement over the trading of pools of

5    whole loans, they still exposed investors to the pre-payment risks and maturity characteristics of

6    whole loans. In 1983, FNMA issued the first collateralized mortgage obligation ("CMO"), which

7    broke the security into different tranches, each with a different claim on principal repayment, which

8    allowed investors to have a choice of prepayment risk on the security they purchased. The Tax

9    Reform Act of 1986 created the Real Estate Mortgage Investment Conduit ("REMIC"), which

10    codified the rules on the issuance of CMOs. The REMIC rules permitted RMBS to be tranched for

11    credit risk and simplified the tax treatment which permitted the PLS market to accelerate. The legal,

12    tax, and accounting structure of a PLS transaction work together to effect the transfer of the right and

13    title to the mortgage portfolio along with the risks and benefits of ownership of the mortgage loans

14    to the PLS investors or "certificateholders."

15          14.      Structural requirements of RMBS dictate that servicers are generally not permitted to

16    make modifications to performing loans. Modifying a performing loan would be considered

17    inconsistent with how a servicer manages his own collateral and contrary to maximizing the value of

18    the loan. Moreover such modification could run counter to the REMIC regulations. For example,

19    modifying a performing loan could be construed as a prohibited transaction.[4]

20          15.      For loans which did not conform to the requirements of the GSEs, PLS trust were

21    developed to allow mortgage loan originators to directly securitize their loans to investors. While

22    the first PLS was issued by Bank of America in 1977, the market only became significant in the

23    1990s, as non-bank originators of non-conforming loans began to use PLSs as an efficient way to

24    permanently finance their loan production.

25

26

27    [3] GNMA is a wholly-owned government corporation inside the Department of Housing and Urban Development and benefits from the full faith and credit of the federal government. FHLMC was set up as a competitor to FNMA.

28    [4] For example, reducing the principal of a performing loan that was paying as agreed could cause the mortgage loan to lose its status as a "Qualified Loan" under the REMIC regulations and as a result be subject to a 100% tax.

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

16.     The expansion of the PLS market over the past four decades created significant benefits to the public by increasing the availability of mortgage financing and lowering mortgage interest rates.  Intermediaries became increasingly important in the operation of the mortgage finance system.  Increased specialization in the mortgage finance industry, from mortgage banks, to warehouse lenders, to servicers and securitization trustees, allowed the market for the origination and financing of mortgage credit to become more efficient and ultimately provide a lower cost of financing to homebuyers.

17.     The total household mortgage debt in the United States today is approximately $8.6 trillion dollars.[5]  Of this total, nearly $8.1 trillion mortgage loans are financed for their term through a securitization process which creates RMBS. At June 1, 2013 the amount of outstanding RMBS issued as PLS is $864 billion[6], with approximately $7.3 trillion being either issued by, or guaranteed by, the U.S. Government or GSEs.[7]

**B.     Organization of PLS Trusts**

18.     The primary parties in a PLS transaction are the loan originator or aggregator, the sponsor, the loan servicer, the securitization trustee, and the certificateholders.  In order to qualify as a bankruptcy-remote, special purpose vehicle, the issuer of the certificates is a passive trust which has a contractual relationship to the servicer and the trustee.  The primary contract which defines these relationships in a mortgage securitization is usually called the Pooling and Servicing Agreement ("PSA").

19.     The process of mortgage securitization begins with the origination of mortgage loans and the aggregation of geographically diverse loans with similar structural characteristics (the securitization collateral) into mortgage pools. Apart from individual borrower credit quality, the diversity of mortgage loans from a geographic perspective has always been an important component of the credit analysis of PLSs.[8]  Prior to the present housing crisis there had never been a nationwide

---

[5] Federal Reserve Bank of New York, Quarterly Report on Household Debt and Credit, May 2013 p.3.

[6] Amherst Non-Agency Mortgage Market Monitor, June 2013 p. 3.

[7] see http://www.sifma.org/research/statistics.aspx, U.S. Mortgage-related Securities Outstanding

[8] See S&P Criteria, Francis Parisi, RMBS Structured Finance, RMBS, Methodology and Assumptions for Rating U.S. RMBS Prime, Alternative-A, and Subprime Loans paragraph 62, page 23 on geographic diversity.

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

decline in home prices since the 1930's.  Regional declines (Texas in the mid-1980s, New England in the late 1980s, and California in the early 1990s) were phenomena that could be ameliorated by ensuring that mortgage pools contained loans which were spread around the country and not concentrated in one state or region.  The cherry picking of loans as in the Takings Program will impair PLSs beyond the immediate effect of the losses realized by the PLS trusts, by selectively eliminating regions or cities from a portfolio and thus concentrating the credit risk in the pool of remaining loans.

20.     All standard PLS issues are structured to meet ratings agency criteria, conform to IRS regulations[9] in order to secure favorable tax treatment, and comply with securities laws.[10]

21.     The sponsor acquires mortgages from one or more originators, who made the original loans to home buyers.  The sponsor transfers the portfolio of mortgage loans to the securitization trust, with certain representations and warranties. The loan servicer is responsible for ongoing contact with the borrower, subject to the requirements of the PSA. The trustee has limited powers set out in the PSA to protect the rights of the certificateholders, who are the beneficial owners of the mortgage collateral.[11]

22.     The most active participant in the PLS is the servicer. A servicer's primary function is to serve as point of contact between the borrower and the securitization trust.  The loan servicer is the key, and usually the only, contact with the borrower. The servicer sends out monthly statements to the borrower, collects loan payments, and may divide a mortgage loan payment into component parts, such as interest, principal, fees and escrow payments. Should a borrower fail to make a payment when required under its loan agreement, the servicer usually takes a series of actions with the goal of encouraging the borrower to make up the delinquent payment and to continue making its loan payments.[12]

---

[9] For example the REMIC regulations impose a 100% tax on "Prohibited Transactions" which includes the sale of mortgages subject to certain conditions (see **26 USC § 860F** ).

[10] See for example, the Securities Act of 1933, Sec. 10 "Information Required in Prospectus."

[11] Frank J. Fabozzi & Vinod Kothari, Introduction to Securitization (2008), 143.

[12] Fabozzi, 123.

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

23.    While each servicer is required to perform under federal and state debt collection and consumer protection laws, and has its own internal policies, procedures, and systems, its actions and obligations in a PLS are contractually defined in the PSA.  Apart from its ministerial obligations, the servicer's primary role is to maximize the cash flows to the trust from the mortgage by getting delinquent borrowers to become current in their payments, by modifying the terms of the loans if necessary to permit the borrowers to become current, or as a last resort, by commencing foreclosure proceedings against the defaulting borrower if that would yield a better outcome than a modification. PSAs give discretion to the servicer in the way it performs its duties, and as such, payment collection, loan modification and property disposition procedures will vary between different servicers.  Generally, the PSA obligates the servicer to service the loans in the Trust in the same manner as which they would service loans in their own portfolio.[13]

## C.    Loss Mitigation and Loan Modification

24.    Servicers go to great lengths to maintain contact with borrowers who are delinquent or have defaulted on their payment obligations. When servicers deal with delinquent borrowers, making "right-party" contact (defined as establishing contact with the mortgage obligor) is often difficult. Having opted to stop making payments on a significant contractual debt, many borrowers become elusive to debt collection efforts. In my experience, most servicers have comprehensive telephone, email and internet "white pages" and employ sophisticated skip-tracing techniques in order to make "right-party" contact to begin the enforcement of the loan agreement.[14]

25.    Servicers seek to manage the borrower into a state of loan re-performance (defined as making up delinquent loan payments and recommencing regular loan payments) in a variety of ways. Often, a servicer will provide credit counseling services where representatives of the servicer work with the borrower and generate a complete picture of the borrower's fiscal situation that can be considered by both the borrower and the servicer. For example, the counselor might suggest alternatives to the borrower, such as amending household budgets.

---

[13] Servicing Agreement, WFMBS 2007-15, Section 2.2.1.

[14] "Servicer Differences Matter" Barclays Capital Securitized Research, December 9, 2011.

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

26.     Should counseling the borrower fail to return the loan to performing status, the servicer often attempts to modify the terms of the loan in order to increase its affordability to the borrower.  One way to improve affordability is by lowering the interest rate on the loan which would reduce the required monthly payment.  Borrowers may miss several payments due to an unforeseen event (such as bills due to an illness) and have the capacity to resume payments, but cannot make up the arrears.  In this case the servicer may capitalize the missed payments (add them to the unpaid principal balance) and return the loan to current status.  Finally, forgiveness of principal may be possible. These avenues toward re-performance are increasingly encouraged by lenders and enforced by the government through regulation and enforcement, including the National Mortgage Settlement of April 5, 2012 ("NMS"),[15]  and substantial federal regulations regarding mortgage lending and servicing.[16]  Generally, a servicer will elect to modify a loan if it believes that such modification is likely to maximize the value of the loan.[17] In a PLS transaction, it is generally better to keep a loan paying some current principal and interest than to have it default and be liquidated, as the portfolio risk model is based on individual cash flows providing risk diversification to the entire trust.[18]  In many PSAs the servicer has express authority to modify a loan that is in default or is expected (by the servicer) to go into default. Attached as Appendix B is an example of a PSA from New Century Home Equity Loan Trust 2004-2 (see Article III, Section 3.07 on Loan Modifications), which provides as follows:

"Notwithstanding the foregoing, in the event that any Mortgage Loan is in default or, in the judgment of the Master Servicer, such default is reasonably foreseeable, the Master Servicer, consistent with the standards set forth in Section 3.01, may also waive, modify or vary any term of such Mortgage Loan (including modifications that would change the Mortgage Rate,

---

[15] Notably the NMS requires servicers to provide modifications in the form of $17 billion of mortgage principal relief or permit borrowers with negative equity to refinance at current rates.  See NMS executive summary and http://www.nationalmortgagesettlement.com

[16]  See Consumer Financial Protection Bureau website, http://www.consumerfinance.gov/regulations/2013-real-estate-settlement-procedures-act-regulation-x-and-truth-in-lending-act-regulation-z-mortgage-servicing-final-rules/ .

[17] Meaning that the present value of all expected future payments on the modified loan would exceed the present value of the expected net recovery that could be realized through a foreclosure.

[18] The costs incurred in foreclosure due to unpaid property taxes, deferred maintenance, and legal expenses quickly outweigh the cost of a loan modification.

9

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

forgive the payment of principal or interest or extend the final maturity date of such Mortgage Loan), accept payment from the related Mortgagor of an amount less than the Stated Principal Balance in final satisfaction of such Mortgage Loan (such payment, a "Short Pay-off"), or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any Mortgagor."

27.    To date, substantial levels of modification have been performed.  Across Prime, Option Arm and Alt-A loans, over 1.8 million loans have been modified nationwide with an unpaid principal balance of $550 billion.  On average, principal modifications have reduced the current loan to value ratio to 82% from 113%.[19]

28.    If a modification option is not viable, the servicer may then consider other loss mitigation alternatives where the borrower voluntarily exits the home but without the associated costs and effort of a foreclosure. In a short sale, the borrower is permitted to sell the home for a price less than the mortgage balance and the servicer agrees to accept the sale proceeds as satisfaction for the debt.  Alternatively the servicer may take title to the property in exchange for extinguishing the debt (a "deed-in-lieu of foreclosure" settlement).  As with modifications, the decision to approve a short sale or deed-in-lieu would depend on whether the expected voluntary liquidation value exceeds the expected return through a foreclosure sale.  These consensual settlements are often desirable because they can expedite the resolution process and avoid the time and expense of foreclosure. These settlements are equivalent to a reduction of principal modification combined with a prepayment of the loan.

**D.    Foreclosure Process**

29.    Only after repeated and unsuccessful attempts to return a loan to performing status or to find an appropriate loss mitigation alternative, would the servicer initiate the foreclosure process. Failing to convince a delinquent borrower to cooperate, the servicer's foreclosure process begins in accordance with procedures that will vary based upon applicable law and the servicer's policies and procedures. The ultimate resolution is the forced sale of the underlying property and the return of either the net sale proceeds (in the case of a successful third party bid) or the property title (if the

---

[19] See Amherst Non-Agency Mortgage Market Monitor, June 2013, p.63.

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

1    PLS trust is the successful bidder) to the owner of the loan. There are many costs associated with the

2    foreclosure process and the process differs (sometimes meaningfully) amongst different

3    jurisdictions.

4            30.    In addition to the legal and administrative costs of enforcing the lender's rights and

5    lien, protection of the value of the property requires the ongoing payment of property taxes, the

6    expense of maintaining the property, improvements that will maximize sale value, and the carriage

7    of insurance on the property (defined as "Protective Advances"). Generally, the servicer is required

8    to advance the funds required to cover these costs during the period between delinquency and

9    completion of the property disposition.

10           31.    In the event that the lender becomes the property owner, the collateral is referred to as

11   real estate owned ("REO") and the expenses of the property are borne by the

12   PLS trust/owner.

13           32.    In the state of California, the average length of time from when a loan is seriously

14   delinquent (60+ days) to the time the loan is liquidated in foreclosure is 27 months.[20]

15

16                        **IV.    INVESTMENT CONSIDERATIONS**

17   **A.    Investment Factors**

18           33.    In my experience, PLS investors, in considering an investment in a PLS trust,

19   typically evaluate a variety of quantitative factors such as expected maturities, credit spread levels,

20   subordination levels and other objective criteria.  In addition, prudent investors would consider a

21   variety of other, potentially more subjective or qualitative factors before making an investment

22   decision in a specific PLS transaction, including: the mortgage collateral, the loan originator, the

23   loan servicer, the trustee, and the agent/banker. Of course market conditions, unemployment, the

24   state of the housing market and a perspective on the broader economy also merit consideration

25   before investing. The PLS purchaser would normally evaluate all the information contained in the

26   offering documents, the credibility of the originator, the credibility of the servicer, any opinion of

27   ratings agencies and other broker-dealers, and most importantly the buyer's own analysis of the

28   _____

[20] CoreLogic data, average for the last three months.

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

1   collateral.[21]  PLS investors have not historically considered the possibility of significant losses being

2   imposed upon them by municipal governmental action.

3          34.     The Takings Program has garnered attention from both trade press and mainstream

4   media sources.[22]  Although industry sources and financial media suggest that loan originators and

5   investors have become aware of the issues, in my opinion, this risk is not yet "priced-in" to the yield

6   that PLS investors require.

7          35.     Investors in PLSs include insurance companies, mutual funds, banks, exchange

8   traded-funds (ETFs), pension funds, credit unions, hedge funds and individual investors. Insurance

9   companies, including MetLife, Prudential and Lincoln National, currently hold over $110 billion of

10  PLS,[23] while many pension funds also invest in PLS trusts, either directly or through money

11  managers.[24]  Many (if not most) Americans with insurance, retirement benefits or invested assets

12  will have some interest in PLSs, or in the performance of the PLS marketplace, given its size and

13  historical importance.  Mortgage securitization pools or PLS deals usually contain thousands of

14  loans which are geographically dispersed. Generally a PLS transaction involves the acquisition of

15  1,000 to 3,000 individual mortgages at inception, though some may be as small as 300 or as large as

16  45,000.[25]  The PLS certificates trade in a secondary market with limited degrees of liquidity and

17  transaction volumes.

18  **B.     Lack of Defined Marketplace**

19         36.     Individual seasoned[26] mortgage loans do not have a marketplace or transaction

20  volumes. By definition any trading in such loans would be inefficient. To my knowledge and belief,

21  individual seasoned mortgage loans have only changed hands occasionally, and under extraordinary

22  circumstances. There is no discernible "market price" for individual seasoned mortgage loans,

---

[21] See Fabozzi, Frank J. et al. (1997) "A Credit Intensive Approach to Analyzing Whole Loan CMOs" (pp. 177-192), New Hope, PA: Frank Fabozzi Associates.

[22] Nick Timiraos, *Eminent Domain Mortgage Plan Gets Fresh Look in Several Cities* Wall Street Journal, June 20, 2013.

[23] National Association of Insurance Commissioners & the Center for Insurance Policy and Research, "Capital Markets Special Report, July 2013

[24] CALPERS directly holds over $200 million of PLS as of its June 2012 Annual Investment Report.

[25] CoreLogic data, PLSs since 2000.  90% of trusts had between 750 and 6,750 loans at inception.

[26] Seasoned in this context meaning 36 months or older.

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

contrary to the assumption of the Takings Program. There is an illiquid and opportunistic market for portfolios of *non-performing* loans in existence today. These are generally loans that are being sold by large whole loan investors for strategic reasons or by a government regulator as liquidator of a failed institution. Because the market for these pools of loans is inefficient, any pricing analysis of these pools is necessarily idiosyncratic and imprecise. Similarly, portfolios of *seasoned performing* whole loans are occasionally bought and sold today, but no truly efficient market for those portfolios currently exists since sales into securitizations dominate the market and these trades are driven by *ad hoc* factors such as the strategic repositioning of a financial institution due to a merger/acquisition or the "clean-up call" associated with an aged PLS trust.[27] [28]

37.     PLS trusts are passive entities that are designed to hold mortgages to maturity. PLS trusts do not have the ability to dispose of collateral, except under the limited circumstances permitted by the REMIC (tax) regulations.[29] Because mortgage securitization trusts are designed to buy and hold collateral to maturity and pass through mortgage payments received to certificateholders, there is no concept of "salability" defined in any of their transaction documents. Mortgage securitization trusts do not measure, estimate, or utilize any "market value" measured by a hypothetical price at which their mortgages might sell on the open market, since they generally do not sell their mortgages, and since there is no open market. Instead, they only measure the value of their assets based on the unpaid principal balance of the loans.

38.     Similarly, the monthly remittance reports are produced by the servicer for purposes of demonstrating the performance of the trusts' assets. The remittance reports show the cash flows received by the trust and the performance status of the mortgage, but contain no reporting on any hypothetical "market value" of the collateral pool. The metrics that would enable an independent

---

[27] Generally PSAs and REMIC regulations allow for a trust to be collapsed and its remaining mortgage loan collateral sold, when 90% of its original principal balance has been realized. This is referred to as the 10% "clean-up call".

[28] In contrast there is a liquid market for "in-the-pipeline" or to-be-funded residential mortgage whole loans. This is an active one, primarily for GSE eligible loans which, at this writing, account for over 90% of RMBS trading volume. These are referred to as To Be Announced ("TBAs" see Vickery and Wright FRBNY Policy Review May 2013)

[29] Dispositions are limited to (i) the substitution of a qualified replacement mortgage for a qualified mortgage (or the repurchase in lieu of substitution of a defective obligation), (ii) a disposition incident to the foreclosure, default, or imminent default of the mortgage, (iii) the bankruptcy or insolvency of the REMIC, or (iv) a qualified liquidation (i.e. a clean-up call).

13

1    third party to assess the market price or salability of the specific loans are not provided in the

2    trustee's remittance report.

### V.    POTENTIAL HARM ARISING FROM THE TAKINGS PROGRAM

4        39.    The Takings Program will have an explicit cost that will be borne by

5    certificateholders in several PLS transactions, notwithstanding claims by Richmond and MRP that

6    this exercise is "costless."

7        40.    With access to industry mortgage data I have estimated the cost of the Takings

8    Program.  Using the CoreLogic Private Label Securities database and the CoreLogic Home Price

9    Indices[30], I have identified 1,732 loans secured by a first lien in Richmond whose balances exceed

10   the collateral property value yet the borrowers continue to make their payments.  These loans are

11   currently owned by 1,099 individual securitization trusts which I have listed in Appendix C.

12       41.    The CoreLogic data shows that as of June 1, 2013, the Current Balance of these loans

13   is approximately $681 million. The average loan amount is $393,000.

14       42.    Using data available to the public and standard industry methodology, I calculated the

15   value of the collateral securing the loans in the trusts. This value is approximately $537 million or

16   $144 million less than the outstanding mortgage amounts. In other words, the negative equity in

17   these loans is $144 million.

18       43.    Richmond and MRP, according to information describing the Takings Program,

19   would propose to pay a 20% discount to the underlying properties current market value of $537

20   million, or a total $430 million, were it to seize all the mortgage loans that meet its stated criteria.

21       44.    If Richmond were to seize all the performing, underwater loans secured by homes in

22   Richmond, it would pay $430 million in cash consideration to the PLS trusts in exchange for $681

23   million of unpaid principal balance loans.  Thus, these transactions would discount the principal

24   balance of these specific mortgages by $246 million immediately, permanently and without any

25   recourse, causing a realized loss of $246 million which would flow through the capital structure and

26

27

---

28   [30] CoreLogic is a leading provider of consumer, financial and property information.  Their data bases contain more than 147 million property records covering virtually the entire U.S. population.

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

1    be borne by the certificateholders—not the lenders, not the servicers, not the trustees—but the

2    investors in the certificates themselves.

3         45.    The Takings Program would create chaos for the affected trusts and their investors.

4    The trusts would not only lose the cash flow from the mortgage loans, but would also be exposed to

5    uncertain timing as to payment of the price offered by Richmond.  If a seized loan could not be

6    refinanced and was later returned to a trust, investors would be faced with volatile valuation issues.

7    Once refinanced, it would be a practical impossibility to recover the written down portion of the

8    principal balance from the homeowner, or to return the original loan to its trust if the Takings

9    Program were found to be illegal.   Once initiated the process could not be undone, the bell could

10   not be unrung.

11        46.    If the Takings Program were replicated across the U.S., it would result in realized

12   damages in excess of $200 billion incurred by PLS certificateholders.[31]

13

14                   VI.    CONSEQUENCES OF FORCED SALES

15        47.    Beyond the actual losses incurred by the certificateholders due to the seizure of their

16   collateral, the impact of this application of eminent domain will reverberate across the U.S. financial

17   markets, with serious negative consequences.  Once the full implication of this exogenous event is

18   digested by the market, PLS participants will estimate the impact of other communities doing the

19   same thing in short order. In my opinion and belief this will create negative effects for all PLS

20   securities, not just the PLS securities issued by the 1,099 trusts that will be directly impacted by

21   Richmond's actions.  In my opinion, all PLSs  would quickly be re-priced by the market and lose

22   market value in an aggregate amount at least equal to the potential losses from eminent domain

23   seizures, which could be billions, as I calculate below.

24        48.    Currently certificateholders are exposed to property market value only when a

25   borrower defaults and the trust receives the proceeds of a foreclosure sale of the house in place of the

26   balance of the borrower's loan.  Under the Takings Program, certificateholders will have default

27

28   [31] MRP Presentation on the Takings Program forecasts that it could be applicable to 3 million mortgage loans with an
     aggregate principal balance of $500 billion.

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

1    risk, plus the risk that performing loans can be called away at a loss based on changes in the market

2    values of properties regardless of the borrower's financial situation.

3        49.    In addition to an immediate re-pricing due to the direct loss caused by MRP's and

4    Richmond's actions, the seizure of mortgages would adversely impact liquidity for PLS

5    certificateholders.  The PLS market would price in the risk of this new and direct exposure to risk

6    from changes in the market value of underlying properties.

7        50.    The increased risks that certificateholders face will have the effect of reducing

8    demand for PLSs while increasing the interest rate required by the market (i.e. certificateholders

9    will demand higher returns on PLSs to compensate for the increased risk).  Ultimately this reduction

10   in demand coupled with higher interest rate requirements will increase mortgage rates and lower

11   house prices, exaggerating the negative equity problem.

12       51.    Indeed, this may already be occurring.  In a May 10, 2013 research report, J.P.

13   Morgan reports "hearing that lenders may be pricing in potential legal risks such as eminent domain

14   when looking at California. Consequently, we can observe a sizable dispersion in jumbo rates by

15   geography."[32]  Sizeable dispersion means that citizens of certain municipalities are being charged

16   higher mortgage interest rates due to the prospective action of Richmond.

17       52.    The actions of Richmond have the potential to eviscerate the PLS market, a funding

18   source that has permitted millions of Americans to become homeowners.   In 2004 the new-issue

19   PLS market was $200 billion, in 2012 the new issue market was $12 billion. Given year to date PLS

20   issuance of $13 billion[33] it is expected that 2013 total new issue volume will be $25 to $30 billion or

21   more. Introduction of an external risk like the one intended by Richmond would have a chilling

22   effect on the recovery of the PLS market.

23

24           **VII.    FALSE ASSUMPTIONS USED BY RICHMOND**

25   **A.    The Estimated Rate of Defaults is exaggerated and Unsupportable**

26

27   _____

     [32] "Introducing the Non-agency New Issue Jumbo Model" J.P. Morgan US Fixed Income Strategy, May 10, 2013.

28   [33]SIFMA see http://www.sifma.org/research/statistics.aspx

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

53. Richmond assumes that 50% of the performing, underwater mortgage loans targeted by the Program will default in the future. This is an unreasonable and unsupportable assumption at this writing.[34] In my experience and belief, based upon analysis I have performed using industry standard benchmarks, I estimate that less than 6.1%, or fewer than 106 of the performing, underwater loans I have identified above, will default in the next 12 months.[35]

**B.    The Program Will not Materially Reduce Defaults**

54. Moreover, the Takings Program will not materially reduce defaults. Among the population of mortgages with LTV's in excess of 100%, borrowers who have been paying their mortgage loans, and who comprise the majority of those targeted by the Takings Program, are unlikely to be the source of defaults in the existing PLS. Even if Richmond and MRP include some percentage of non-performing loans in the Program, as they have recently stated that they might do, the Program is still unlikely to materially reduce default rates because the overwhelming majority of targeted loans are currently performing.

55. This transfer of performing loans out of the trust will negatively impact the composition of the trust as a whole. It is well established that prepayments can result in adverse credit selection in mortgage pools, whereby the most credit-worthy borrowers remove themselves from the pool when they have an opportunity to refinance their loans. When a borrower refinances, the trust at least receives the unpaid principal balance on the loan in exchange for losing the creditworthy borrower. Under the Program, however, the "prepayments" at amounts well under the unpaid principal balance result in losses to the certificateholders.

**C.    Negative Equity Does Not Necessarily Lead to Default**

---

[34] Such a default assumption might have been in the range of reasonableness in 2007 when the financial crisis began. As reported in the Wall Street Journal, RBS research analysts have determined that of the Richmond loans which were current in 2011, only 2% have gone through foreclosure, and 7% are past due 90 days or longer on their payments. See Nick Timiraos and Al Yoon, "California City readies Controversial Loan-Seizure Program" Wall Street Journal July 31, 2013.

[35] Standard mortgage industry analysis forecasts likely default rates based upon the monthly frequency with which a given set of loans transition from current to past due and past due to foreclosure or re-performance ("roll rates"). Using current roll rates for the trusts to extrapolate performance for the loans secured by first liens in Richmond over the remaining life of the loans results in an estimate of lifetime collateral defaults.

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

56.     Numerous studies have been performed to develop a model of mortgage default. Borrowers are generally assumed to be rational actors and the evidence supports this.[36] Most borrowers who have positive equity in their homes will try to preserve it, if by no other means than by selling their home and using the proceeds to repay the mortgage loan.   Generally negative equity is viewed as one, but only one, of several necessary conditions that must exist in order to induce a borrower to walk away from his mortgage and default.[37] Richmond assumes that negative equity will always lead to a default, foreclosure and property diminution/abandonment, but these assumptions are incorrect and unsupportable.

57.     Negative equity is not always a sufficient condition to presage default because default is not a costless process for the borrower.  Default on the loan impairs the borrower's credit rating making future credit harder to get and more expensive if it is even available at all.[38]  Moving has its own costs.  In addition to intangibles, sentimental value or sweat equity in the property will be lost.  Moreover, for as long as the borrower continues to pay, the borrower retains the benefit of the home potentially appreciating in value in the future.[39] In fact, studies have estimated that borrowers will not walk away until their home has lost over 60% of its value.[40]  Other studies have noted that once negative equity occurs, an additional shock – such as loss of income or liquidity – is required in order to trigger default.[41]

58.     As I show Appendix D, over the past year housing prices in Richmond have risen 21.5% and are expected to continue to rise.   Zillow estimates a 10.3% increase in home values in Richmond over the next year.[42]  As a result of these increases, over 90% of loans secured by a first

---

[36] See Barjari 2008 or Ghent & Kudlyak 2010.

[37] An economically rational borrower would be better off selling the property and repaying the mortgage and avoiding the negative credit effects and costs of foreclosure, if there was equity in the property.

[38] It is unknown what impact participating in MRP's program will have on a borrower's credit rating.

[39] See Foote, Gerardi, Willen 2008

[40] See Bhutta, Dokko and Shan, 2010  They estimate that the median borrower will not walk away until negative equity exceeds 62%.

[41] See Campbell and Cocco, 2012

[42] www.zillow.com  Zillow maintains a database on more than 110 million properties in the U.S.

---

18

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

1    lien in Richmond have equity above the threshold where the median homeowner would walk away.[43]

2    This fact only reinforces that the Takings Program is a transfer of wealth, whereby the risk (and

3    actuality) of home price declines is given to the trusts, while the homeowner now has all of the

4    benefit of future home price appreciation.

5    **D.    The Richmond Loans May Be Eligible For Modification**

6         59.     Servicers are incentivized to work with borrowers who are troubled. Servicers will

7    modify loans—the pace and progress of loan modification is readily discernible from the loan level

8    data I have examined relating to Richmond mortgage market.

9         60.     The Takings Program claims that the underwater loans in Richmond are not eligible

10    for modifications.  The data I have reviewed does not support this assertion.  As shown in Appendix

11    E, interest rates for the mortgages in Richmond have generally declined since the beginning of 2008.

12    While the interest rate of adjustable rate mortgages will move with the prevailing benchmark interest

13    rate, a fixed rate loan is set for the life of the loan.  As seen in Appendix E, since the middle of 2009,

14    the average interest rate of the fixed rate loans has steadily decreased.  This can only be due to a

15    continuing loan modification program and is clear evidence that servicers are working with

16    borrowers in Richmond to help them manage their housing costs. As I set out in the first section, this

17    is the function and proper role of the servicer.  Of the population of underwater fixed rate mortgage

18    loans in Richmond owned by PLS, 30% have had their interest rate reduced through a modification.

19    As of July 31, 2013, RBS research analysts estimate that 42% of 1,099 currently performing

20    mortgage loans in Richmond that are held by PLS trusts have been modified, [44]

21         61.     The chart in Appendix E also shows a sharp reduction in both the Fixed and

22    Adjustable rate mortgage's interest rates in the middle of 2009.  In other words, the data

---

[43] Current market values were calculated using CoreLogic's HPI Combined Attached & detached, Distressed & non-Distressed Housing Price Indices.

[44] See Nick Timiraos and Al Yoon, "California City readies Controversial Loan-Seizure Program" Wall Street Journal July 31, 2013.  "Roughly half of those modifications included some form or principal forgiveness or principal forbearance, where borrowers don't have to make payments on a portion of the loan (even though it hasn't been wiped out). On average, around 35% of the loan balances had been deferred or forgiven, representing $137,000 per loan. These modifications reduced average monthly payments by 37%, to $1,137, from $1,794. Other modifications included some kind of interest rate reduction or term extension, resulting in an average interest rate of 2.93%, from 6.12%, and average monthly payments that fell by one third, to $1,409 from $2,092."

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

1   demonstrates that at a time when the Richmond housing market reached its lowest point, these

2   borrowers were able to get their mortgage rates reduced.  The claim by Richmond that borrowers

3   with negative equity are unable to modify their loans is false.

4          **VIII.    NEGATIVE EFFECTS TO CITIZENS, INDUSTRY AND ECONOMY**

5          62.    It is likely that if Richmond is allowed to seize performing mortgages based upon

6   negative equity in the property, lenders will be disinclined to make new mortgage loans due to the

7   increased risk.  Even if the local mortgage market continues to exist for Richmond's homeowners (or

8   potential homeowners) the cost of mortgage finance will surely increase due to the higher risks faced

9   by lenders. As a result, home prices will fall.

10         63.    At the first seizure, the national mortgage market will take notice.  In my opinion

11  there will be an immediate and chilling effect on mortgage rates, mortgage availability, and

12  investment activity in the marketplace.

13         64.    All PLS certificates will suffer a diminution of value. This market value decline will

14  adversely affect savers, pension funds, insurance companies, as well as FNMA and FHLMC.

15         65.     Furthermore the loss of value caused by the seizure is not a zero sum game.  The

16  benefit of the refinancing is realized by the borrower only over the life of the loan, while the pain of

17  the loss is recognized by the certificateholder immediately.  If the certificateholder were a corporate

18  pension fund, its unfunded pension liabilities would increase, reducing profits, lowering the stock

19  price, and impairing the ability of the firm to invest in its business, slowing the national economic

20  recovery.  If the certificateholder were a public pension fund, services would need to be reduced or

21  taxes increased to make up the short-fall, in either case resulting in a drag on the economy.  Similar

22  effects would befall the individual investor if the certificates were owned by, for example, a fund

23  that was part of a 401(k) retirement account.

24         66.    As I have detailed above in paragraph 43, my calculations show that the program

25  would result in $246 million in losses from the loans in Richmond, CA alone.  If this same action

26  were applied in all of California, I estimate the losses would reach $23 billion.  If applied

27  nationwide, my preliminary estimate is $58 billion.

28

Declaration of Phillip R. Burnaman, II; Case No. CV-13-3663-CRB

1   difficult to quantify precisely, these negative trends will harm the economy as a whole and combined

2   with higher mortgage costs will lead to more borrowers with negative equity and create new

3   opportunities for the Program to be implemented— a very different feedback loop than the one being

4   presented by Richmond and MRP.

5

6                              **IX.    CONCLUSION**

7        68.        The eminent domain seizure of mortgage loans that the city of Richmond will

8   implement with the help of MRP represents a serious threat to the U.S. mortgage market.  The injury

9   to the PLS trusts, their certificateholders, savers and investors is significant.  The injury to others

10  dependent on the housing and mortgage industry is equally significant and is potentially devastating.

11  The benefits of the Program would be realized by a few and the costs would be borne by many—

12  individual investors and pension plan participants to name but two.

13

14       By my signature below, I represent that this affidavit is my true and correct opinion as of the

15       date it was written.

16

17

18       I declare under penalty of perjury under the laws of the United States, that the foregoing is

19       true and correct.  Executed on *August 6th 2013*      , at *New York, NY*.

20

21

22

23                                            PHILLIP R BURNAMAN, II

24

25

26

27

28

                                        21

Declaration of Phillip R. Burnaman, II