ROCKY C. TSAI (SBN 221452)
(rocky.tsai@ropesgray.com)
**ROPES & GRAY LLP**
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315-6300
Facsimile: (415) 315-6350

Attorneys for Plaintiffs Wells Fargo Bank,
N.A., as Trustee, *et al.*

**ADDITIONAL COUNSEL LISTED
ON SIGNATURE PAGE**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee, *et al.*,<br><br>       Plaintiffs,<br><br>    v.<br><br>CITY OF RICHMOND, CALIFORNIA, a municipality, and MORTGAGE RESOLUTION PARTNERS LLC,<br><br>       Defendants. | Case No. CV-13-3663-CRB<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' EX PARTE MOTION TO STRIKE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>ACCOMPANYING PAPERS:  Declaration of John C. Ertman, Esq.<br><br>Honorable Charles R. Breyer |

Plaintiffs submit this Memorandum in opposition to Defendants' *ex parte* motion to strike Plaintiffs' Motion for Preliminary Injunction ("PI Motion") from the Court's calendar on the grounds that the PI Motion is not ripe for review by this Court.

### Introduction

The PI Motion seeks to preliminarily enjoin Defendants City of Richmond ("Richmond") and Mortgage Resolution Partners LLC ("MRP") from further implementing their unprecedented and unconstitutional plan to generate profits for MRP and its investors by seizing certain targeted mortgage loans from residential mortgage-backed securitization ("RMBS") trusts (the "Trusts") through Richmond's eminent domain power (the "Loan Seizure Program" or "Program").  On the same day that Plaintiffs filed the PI Motion, counsel for Plaintiffs sent a letter to Defendants requesting that they agree to stay further implementation of the Program pending this Court's adjudication of the serious constitutional challenges raised in the PI Motion.  *See* Accompanying Declaration of John C. Ertman ("Ertman Decl.) Ex. K.  In a series of meet and confer telephone conferences, Defendants' counsel made clear that not only would Defendants not agree to suspend the Program pending adjudication of the PI Motion, but they specifically would not agree to hold off on initiating state court eminent domain proceedings in which they could quickly seize loans by utilizing California's "Quick Take" procedure, which is one of the central elements of the Richmond Seizure Program. Ertman Decl. ¶ 20.

Having refused to voluntarily stay the imminent threat of loan seizures while the PI Motion is pending, Defendants now, under the guise of an *ex parte* procedural motion, seek to remove the PI Motion from the Court's calendar altogether, arguing that the PI Motion is not "ripe" for review. Def. Mem. at 1.  Defendants' *ex parte* Motion is both procedurally improper and substantively without merit, and should be summarily denied.

### Defendants' Ex Parte Application Is Not Properly Before the Court

As a threshold matter, Defendants' *ex parte* Motion violates the Local Rules and the Court's Standing Order regarding *ex parte* applications.  Civil Local Rule 7-10, entitled "*Ex Parte* Motions" provides that a party may file an *ex parte* motion "only if a statute, Federal Rule, local rule or Standing Order authorizes the filing of an *ex parte* motion in the circumstances and the party has

1  complied with the applicable provisions allowing the party to approach the Court on an *ex parte*

2  basis.  The motion must include a citation to the statute, rule or order which permits the use of an *ex*

3  *parte* motion to obtain the relief sought."

4          Here, Defendants purport to bring their *ex parte* Motion pursuant to this Court's Standing

5  Order No. 4 (Def. Mem. at 1), which provides that parties seeking to "continue hearings, request

6  special status conferences, modify briefing schedules, or make *other procedural changes* shall

7  submit a signed stipulation and proposed order, or, if stipulation is not possible, an *ex parte*

8  application in writing." (emphasis added).

9          By arguing that the PI Motion is not ripe and therefore should be stricken without

10  consideration, Defendants seek substantive relief, not procedural relief; they essentially request that

11  the PI Motion be denied on the merits on an *ex parte* basis.  Defendants' *ex parte* Motion is thus

12  beyond the limited scope of Civil Local Rule 7-10 and this Court's Standing Order No. 4, and should

13  be rejected on that basis alone.  To the extent Defendants believe they have a valid ripeness

14  argument, they should raise that argument in opposition to Plaintiffs' PI Motion, so that Plaintiffs

15  have an opportunity to respond to their argument, and the Court can consider the issue on a complete

16  record.  The Court's *ex parte* procedure is not designed to afford the Court a full opportunity to

17  consider and rule upon such weighty issues, and the Court should deny Defendants' Motion as

18  procedurally improper.  *See Anderson Props. v. Dante*, No. 13-00218 (JGB), 2013 U.S. Dist. LEXIS

19  25562, at *1 (C.D. Cal. Feb. 21, 2013) (criticizing party for bringing substantive *ex parte* motion and

20  holding that motion should be heard pursuant to "regular noticed motion procedures").

21                          **There Is No Basis to Strike the PI Motion**

22          Defendants argue that Plaintiffs' PI Motion should be stricken because it is too speculative

23  and rests upon "contingent future events":  in particular, the issuance of a resolution of necessity by

24  Richmond's City Council.  Although an *ex parte* motion is not an appropriate vehicle for raising this

25  substantive "ripeness" argument (and Plaintiffs will, of course, respond to this argument and any

26  other arguments Defendants raise in opposition to the PI Motion in the normal course), Plaintiffs will

27  note here that counsel's suggestion that Defendants *might not go forward* with their Program is itself

28  entirely speculative.  Indeed, as discussed in more detail below, Defendants already have taken

1  substantial steps in implementing the Program in accordance with their pre-determined plan, and

2  have refused to halt any aspect of the Program while the PI Motion is being litigated.

3  Where, as here, an eminent domain program will inevitably cause harm to the property

4  owner, the owner does "not have to await the consummation of threatened injury to obtain

5  preventive relief." *Regional Railroad Reorganization Act Cases*, 419 U.S. 102, 142 (1974)*; see also*

6  *Employers Ins. Of Wausau v. Fox Entm't Grp., Inc.*, 522 F.3d 271, 278 (2d Cir. 2008) ("That the

7  liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action.

8  Rather, courts should focus on the practical likelihood that the contingencies will occur.").

9  Indeed, numerous federal courts have adjudicated claims for declaratory and injunctive relief

10 regarding the unconstitutionality of private takings claims where some of the formal steps required

11 to implement the seizure had not yet occurred.  In *Hawaii Housing Authority v. Midkiff*, 467 U.S.

12 229 (1984), a leading case on the exercise of eminent domain, the suit for injunctive relief was filed

13 in federal court once the parties were required to engage in an arbitration process – akin to

14 "negotiation" that Richmond claims to be pursuing through its offer letters in this case – even though

15 the arbitration had not commenced and subsequent steps of the takings process were yet to occur, yet

16 at no level of the federal judiciary was the ripeness of the plaintiffs' suit questioned.  *Id.* at 235; *see*

17 *also Cottonwood Christian Center v. Cypress Redevelopment Authority*, 218 F.Supp.2d 1203, 1214

18 (C.D. Cal. 2002) (district court granted a preliminary injunction for violations of the public use

19 clause, among other statutory claims, in a case for declaratory and injunctive relief filed months

20 before the city ultimately resolved to take the land in question as required under California law).

21 There is no requirement that a party await the outcome of the specific steps of state or local eminent

22 domain procedures before seeking injunctive relief for private takings in federal court.  *See*

23 *Armendariz v. Penman*, 75 F.3d 1311, 1321, n. 5 (9th Cir. 1996).

24 Here, Defendants' own actions and public statements confirm their intent to proceed with the

25 seizure of loans through eminent domain, despite the fact that over the past several months

26 Defendants have been repeatedly advised as to the unlawfulness of the Program and of the

27 devastating harm the Program would cause, not only to the RMBS trusts that hold the mortgage

28 loans targeted for eminent domain seizure, but also across the local and national mortgage and

housing markets.  Accordingly, the PI Motion is not barred by the fact that Richmond has not yet issued a resolution on public necessity.

The plan to seize loans in Richmond through eminent domain is not, as Defendants suggest, "purely hypothetical" (Ertman Decl. Ex. L at 3), but has been in place for at least several months, and Richmond has already taken several concrete steps to implement the Loan Seizure Program.  In April 2013, the City Manager of Richmond formally recommended that the City Council enter into a partnership with MRP so that MRP could advise Richmond "on the acquisition of mortgage loans through the use of eminent domain."  Declaration of John Ertman ("Ertman PI Decl."), Dkt. 9, Ex. H at 1.

That same month, Richmond's City Council deliberated the proposal at a public hearing, where it expressly discussed that loans would be seized by eminent domain, and formally voted (6-0, with one member absent) to authorize the implementation of the Loan Seizure Program.  *See* Ertman Decl. ¶¶ 4, 6 (the City Manager explained that, under the Program, if there was not a "negotiated purchase" of a targeted mortgage, "the City would be asked to use eminent domain to acquire the mortgage.").  After the hearing, Richmond executed a formal Advisory Services Agreement with MRP, which expressly provides that MRP will advise Richmond on "acquiring mortgage loans through the use of eminent domain."  *See* Ertman Decl. ¶ 5.

In the months surrounding the City Council's vote to approve the Program, Richmond was the target of significant lobbying efforts against implementation of the Program, where the same constitutional and other legal concerns raised in Plaintiffs' Complaint and PI Motion were addressed to Richmond.  *See, e.g.*, Ertman Decl. Ex. A (March 13, 2013 letter from trade association to the Mayor of Richmond discussing legal concerns and harm caused by implementation of the Program to association's members and others, and attaching a legal memorandum discussing the illegality of the program).

When presented with those arguments, Richmond and MRP repeatedly refused to back down, instead insisting that they would carry out their plan to seize loans under eminent domain.  For example, in an op-ed, the Mayor of Richmond – who also serves on Richmond's City Council – declared that "[w]e are not backing down" from "[t]he same Wall Street banks that targeted our

communities with predatory loans [that] are now trying to scare and bully us . . . We have a local solution to a national crisis Wall Street created."  Ertman Decl. Ex. D (June 17 op-ed in San Francisco Chronicle).

On July 31, 2013, as part of the rolling out of the Loan Seizure Program, Richmond issued offer letters to trustees and servicers with respect to a first wave of 624 targeted loans.  *See* Ertman PI Decl. Ex. A; Declaration of Kevin Trogdon ("Trogdon Decl."), Dkt. 12, Ex. B; Declaration of Ronaldo Reyes ("Reyes Decl."), Dkt. 13,  Ex. 1.  This is a prerequisite step before property can be seized under California eminent domain law.  *See* Cal. Gov. Code § 7267.2 (prior to adopting a resolution of necessity, "the public entity shall establish an amount that it believes to be just compensation therefor, and shall make an offer to the owner or owners of record to acquire the property for the full amount so established").  Those offer letters offered to acquire the loans from the trusts at deeply discounted prices, and advised that Richmond could seize the targeted loans under eminent domain if the offers were not accepted.  *See* Ertman PI Decl. Ex. A at 2 ("in the event that negotiations fail to result in agreement," Richmond could "decide[] to proceed with the acquisition of the Loans through eminent domain"); Trogdon Decl. Ex. B at 2; Reyes Decl. Ex. 1 at 2.  The offer letters provided a deadline for responses to the offers of August 13, 2013: three days ago.  And as Defendants know, at least some of the trustees, including the Plaintiff Trustees here, have already responded to the offer letters with written rejections.  *See* Ertman Decl. Ex. J.

Significantly, initial analysis of the loans that are the subject of the offer letters confirm that the majority (approximately two-thirds) are performing loans, and thus fit the profile of loans that meet MRP's criteria for inclusion in the Program (because only such performing loans can qualify for refinancing and can be flipped for a profit).  *See* Trogdon Decl. ¶ 14.  Moreover, as noted above, because the trusts in which the loans are held are organized as Real Estate Mortgage Investment Conduits, or "REMICs", they are prohibited from selling the loans to Richmond, a fact the Defendants have openly acknowledged.  *See* Ertman Decl. Ex. I (MRP FAQ Sheet), at 3 ("Private securitization trusts hold approximately $ 1.4 trillion of loans; we could offer to buy their underwater loans, but their trust agreements forbid them to voluntarily sell the loans.").

1    Thus, there is no purpose for issuing offer letters to purchase these performing loans, except

2 the statutory prerequisite for seizing them pursuant to the Program, as threatened in the "offer"

3 letters themselves, and Defendants' assertion in their Motion that they are simply seeking to acquire

4 the loans right now only on a "voluntary" basis is belied by their own statements to the contrary.

5 Defendants' mischaracterization of the true purpose of the offer letters is further evidence that they

6 are not being forthcoming with Plaintiffs, or with the Court, and further supports the need for

7 injunctive relief.

8    Even in the days since this action was filed, Defendants have publicly expressed their

9 intention to seize mortgage loans under eminent domain. *See, e.g.*, Ertman Decl. Ex. G (Mayor

10 "sa[id] she's not deterred from moving ahead with the city's plan to forcibly purchase mortgages

11 from bondholders using the city's power of eminent domain despite a court challenge and the

12 possibility of additional action by a federal regulator."); Ex. F (emailed statement to Bloomberg in

13 which Mayor wrote: "The banks and financial institutions are not helping. . . . Their greed caused the

14 problem and they have no solution for cities like Richmond. . . . Cities like Richmond have a right

15 and obligation to utilize such a program for the public benefit."). On the very day that Plaintiffs

16 filed this motion, Richmond's Mayor publicly declared that "I am absolutely not backing down"

17 from the Program. *Id.* Ex. H (Mayor of Richmond "said that the city will not be dissuaded from its

18 plan to use eminent domain to seize underwater mortgages.")

19    In light of the express statements made by Richmond and MRP, there is no question that

20 Plaintiffs intend to proceed with the Program and, in accordance with their pre-determined plan,

21 quickly commence state court proceedings in which they can utilize a "Quick Take" procedure to

22 quickly seize possession of the targeted loans. Once a loan is seized it becomes difficult, if not

23 impossible, for the loans to be restored to the RMBS trusts from which they were taken. Thus, by

24 proceeding in this fashion, Defendants can effectively frustrate the ability of Plaintiffs to obtain full

25 and effective injunctive relief from this Court. Defendants' intentions are only confirmed by their

26 rejection of Plaintiffs' proposal to stay implementation of the Program pending adjudication of the

27 constitutional challenges now before the Court.

28

Because there is a "practical likelihood" that the Program will be implemented, Plaintiffs' PI Motion is unquestionably ripe for adjudication.  *See Employers Ins.*, 522 F.3d at 278 ("[t]hat the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action. Rather, courts should focus on the practical likelihood that the contingencies will occur.").

There are several additional reasons that the PI Motion is ripe for consideration now.  The PI Motion, which violates numerous constitutional proscriptions of a categorical and threshold nature, does not depend upon the specifics of how Richmond will effectuate its Loan Seizure Program, or the compensation it offers.  First, all of the loans targeted by Defendants, and all of the RMBS trusts that hold them, are located outside of Richmond (most are outside of California), and Richmond already has sent offer letters to Plaintiffs and other trustees offering to acquire the loans under threat of eminent domain seizure.  This extraterritorial attempt to pursue out-of-Richmond property is real, not hypothetical, and is in blatant violation of the due process requirements of the U.S. and California Constitutions, and is already causing harm to Plaintiffs by forcing them to protect themselves in court from a jurisdictionally baseless extraterritorial seizure program.  These geographic realities also mean that the Program will necessarily impact commercial transactions across state lines, in violation of the Dormant Commerce Clause.  Nothing decided at a necessity hearing could possibly alter these constitutional infirmities.  Thus, these unconstitutional and illegal aspects of the Program are ripe for review now.

Furthermore, Plaintiffs have submitted evidence that the Richmond Seizure Program already is causing economic harm, and imminently threatens to cause even more harm, both to the Trusts and their beneficiaries, and to the mortgage lending market more generally.  As discussed in Plaintiffs' PI Motion, Defendants plan to strip more than $200 million of valuable assets away from RMBS trusts on an expedited basis.  The record also shows that the Defendants' initiation and continued pursuit of the Program has already begun to harm the national mortgage lending market.  As some market analysts have observed, the threat of mortgage loan seizures by eminent domain has already caused "sizable dispersion in jumbo [mortgage] rates," thereby penalizing home buyers with higher interest rates as a result of the Defendants' actions to date.  *See* Decl. of Phillip Burnaman, Dkt. 11, at ¶ 51 (citing May

10, 2013 J.P. Morgan research report).  As set forth in Plaintiffs' PI Motion, the imminent harm to the national economy will be even greater if the Program is allowed to continue.

### Conclusion

In light of the foregoing, Defendants' purported solution – that they will agree to provide Plaintiffs 15 days notice prior to proceeding to a necessity hearing in which to seek judicial relief – is illusory and irrelevant.  Indeed, it is ironic that Defendants assert in one part of their Motion that it will take them significantly more time to respond fully to the PI Motion than a 30-day briefing schedule allows, and have requested a 30-day delay of the hearing on that basis, yet at the same time Plaintiffs suggest that the PI Motion be indefinitely postponed and rescheduled on an emergency basis to be fully briefed and adjudicated in 15 days once the hearing on necessity is noticed.  Such a schedule is unrealistic and betrays that Defendants' true purpose is to frustrate this Court's jurisdiction over Plaintiffs' federal constitutional claims.

If Defendants have a genuine desire to proceed in an efficient and organized manner, then they should agree to stay further implementation of the Program pending the Court's adjudication of this matter, and the parties, with the approval of the Court, can set a reasonable schedule.  Although Defendants have steadfastly refused all requests to stay implementation of the Program, the Plaintiffs would be willing to postpone the scheduled September 13, 2013 hearing on the PI Motion if the Defendants agree not to schedule and give any notice of a necessity hearing on the Loan Seizure Program until after the conclusion of the PI Hearing.  Otherwise the Plaintiffs respectfully request that the PI Motion be heard on September 13 as scheduled, or on a mutually agreeable date before then to accommodate Defendants' counsel's vacation schedule.


DATED:  August 16, 2013

          Respectfully submitted,


          By: /s/ Rocky C. Tsai

          _____

1   Thomas O. Jacob (SBN 125665)
    tojacob@wellsfargo.com
2   **WELLS FARGO & COMPANY**
    Office of General Counsel
3   45 Fremont Street, Twenty-Sixth Floor
    MAC A0194-266
4   San Francisco, CA 94105
    Telephone:  (415) 396-4425
5   Facsimile:   (415) 975-7864

6   *Attorney for Wells Fargo Bank*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROPES & GRAY LLP

Attorneys for Plaintiffs

Rocky C. Tsai (SBN 221452)
(rocky.tsai@ropesgray.com)
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315-6300
Facsimile: (415) 315-6350

John C. Ertman
(john.ertman@ropesgray.com)
(admitted pro hac vice)
Lee S. Gayer
(lee.gayer@ropesgray.com)
Evan P. Lestelle
(evan.lestelle@ropesgray.com)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

Douglas H. Hallward-Driemeier
(douglas.hallward-driemeier@ropesgray.com)
(admitted pro hac vice)
ROPES & GRAY LLP
One Metro Center
700 12th Street, NW
Suite 900
Washington, DC 20005-3948
Phone: 202-508-4600

Daniel V. McCaughey
(daniel.mccaughey@ropesgray.com)
Nick W. Rose
(nick.rose@ropesgray.com)
ROPES & GRAY LLP
800 Boylston St.
Boston, MA
Phone: 617-951-7000

9