# EXHIBIT A



asset management group

March 13, 2013

The Honorable Gayle McLaughlin
City of Richmond
Mayor's Office
450 Civic Center Plaza
Richmond, CA 94804

Dear Mayor McLaughlin:

I write in regards to discussions the Richmond City Council has recently undertaken pertaining to a plan developed by Mortgage Resolution Partners (MRP) that has been purported to be a solution to issues associated with foreclosures and underwater homeowners.

I have been closely following issues involving the use of eminent domain to seize mortgage loans, including the plans set forth by MRP. Mortgage Resolution Partners may profess that their plans have no cost, but this is incorrect. Before going too far down the eminent domain path, I would encourage you to have further discussions to better understand the full scope and potential harmful impacts of these programs on your residents.

My organization, the Securities Industry and Financial Markets Association (SIFMA)[1], represents the interests of hundreds of investors and other financial market participants, who may be directly targeted by the proponents of these plans. The investors we represent manage the retirement and other savings of millions of every day working citizens; they invest for municipal pension plans, state employees, teachers, and all other working savers. We believe that these savings should not be diminished so that private sector third parties can profit from schemes to seize the property of others.

We are also significantly concerned that the plans that have been put forth have serious legal defects, will be subject to challenge, and will require expensive and time consuming litigation. In this regard, I have attached a memorandum that was prepared for us by a noted constitutional scholar at the law firm O'Melveny and Myers when the eminent domain issue was first raised in San Bernardino County, California earlier this year.

Finally, we also believe that the execution of these plans to use eminent domain will result in a serious contraction of credit availability, as lenders and secondary market sources of funding react

---

[1] The Securities Industry and Financial Markets Association (SIFMA) brings together the shared interests of hundreds of securities firms, banks and asset managers. SIFMA's mission is to support a strong financial industry, investor opportunity, capital formation, job creation and economic growth, while building trust and confidence in the financial markets. SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of the Global Financial Markets Association (GFMA). For more information, visit http://www.sifma.org.

**New York** | Washington

120 Broadway, 35th Floor | New York, NY 10271-0080 | P: 212.313.1200 | F: 212.313.1301
www.sifma.org

with defensive, very stringent underwriting criteria. This could make it much more difficult for people in your community to obtain new mortgages or to refinance existing mortgages.

I would be pleased to discuss these issues with you at greater length. We believe that there are better approaches to dealing with these problems, and we encourage you to engage in a dialogue with all interested parties, including those who originate and fund mortgage lending, to ensure that the right path is chosen. Please do not hesitate to contact me at 212-313-1389 or tcameron@sifma.org.

Sincerely,

Timothy Cameron, Esq.
Managing Director, Asset Management Group


Attachment



# MEMORANDUM

| | |
|---|---|
| TO: | Securities Industry and Financial Markets Association |
| FROM: | Walter Dellinger, Jonathan Hacker, and Matthew Close |
| DATE: | July 16, 2012 |
| SUBJECT: | **San Bernardino Eminent Domain Proposal** |

## INTRODUCTION AND SUMMARY

This memorandum analyzes what appears to be a wholly unprecedented proposal for the use of eminent domain authority by San Bernardino County and the Cities of Fontana and Ontario. Under this proposal, these government entities have already formed a Joint Powers Agency ("JPA") empowered to seize certain residential mortgage loans currently held by private securitization trusts and transfer those loans to other private lenders, who would refinance them at a significant discount and then resecuritize them in a new private trust.

The details of the scheme are reflected in materials published by an investment group called Mortgage Resolution Partners ("MRP"), the entity that would obtain initial financing for the loans' seizure and would administer the resecuritization of the loans. *See* MRP, Homeownership Protection Program: A Solution to a Critical Problem, *available at* http://online.wsj.com/public/resources/documents/EMINENT-powerpoint.pdf (visited July 16, 2012). The proposal is also elaborated in a Memorandum drafted by Cornell Law School Professor Robert Hockett. *See* Robert Hockett, *Breaking the Mortgage Debt Impasse: Municipal Condemnation Proceedings and Public/Private Partnerships for Mortgage Loan Modification, Value Preservation, and Local Economic Recovery* ("Hockett Memo"), *available at* http://online.wsj.com/public/resources/documents/EMINENT-legal-brief.pdf (visited July 16, 2012). The analysis in this Memorandum is based on our understanding of the mortgage seizure scheme proposed by MRP ("MRP proposal") as it is described in those and other publicly available materials. Particular concerns or conclusions may not apply, or may be altered, if the proposal changes upon further public discussion.

As currently conceived, the MRP proposal suffers from multiple apparent legal and procedural defects, including defects arising under the U.S. Constitution and the California Constitution and under the laws of California and San Bernardino County governing the exercise of eminent domain authority. In light of these defects, we believe the MRP proposal is unlikely to survive a judicial challenge. At a minimum, it is almost certain to be tied up for years in litigation, exposing the government entities to enormous transaction costs, potentially including opposing counsel's fees if the challenge is successful.

The apparent defects include the following:

- The MRP proposal is subject to challenge as an impermissible "Taking" of private property under the U.S. Constitution and California Constitution on at least two grounds.



*First*, existing noteholders could contend that the mortgage loans are not being taken for a legitimate "Public Use," as required for a permissible taking of private property. The asserted objective of the proposal is to enhance the County's economy by reducing homeowners' debt, but no precedent of the U.S. Supreme Court or the California Supreme Court allows a local government to seize private property and redistribute it to others for the general purpose of improving local economic conditions. The closest precedent involves a property transfer made as one part of a broader, integrated urban planning program, which is very much unlike the transfer plan proposed here.

*Second*, the MRP proposal appears to contemplate compensating existing lenders for the seized loans at a level that is by definition less than fair market value ("FMV") and thus will not constitute "Just Compensation," as also required for a lawful taking. The MRP proposal would seize only "performing" loans, i.e., loans in which the debtors are current on their payments, but that are secured by property currently worth less than the outstanding loan balance. The MRP proposal assumes that *all* such loans will eventually default, and, according to published reports, proposes to compensate noteholders at approximately 75-80% of the value of the home (and hence an even lower percentage of the face value of the loan). But the data do not support the assumption underlying that significant discount. In fact, loans still performing after many months generally do *not* default. If the performing loans subject to seizure are valued in accordance with their actual expected payment value, however, the economic assumptions underlying the MRP proposal do not work—neither the JPA nor the new private lenders will obtain the significant profit on refinanced and resold loans they are expecting. The MRP proposal, in other words, only works if existing holders of notes on performing loans receive less than the fair market value of those notes, which means the proposal may violate the Takings Clause on its face.

- The MRP proposal could be challenged as a violation of the Contracts Clause of the U.S. Constitution. The Framers added that Clause because states in the post-Revolutionary War period were doing very much what the MRP proposal contemplates, i.e., relieving local residents of foreign debts to improve local economic conditions at the expense of foreign creditors. While U.S. Supreme Court authority allows states to alter contractual debts in certain circumstances, the Court has never authorized states to abrogate debts outright and transfer them to another creditor.

- The MRP proposal may impermissibly burden interstate commerce in violation of the U.S. Constitution's Commerce Clause. The MRP proposal would interfere with interstate commerce because the JPA would seize notes currently held outside California and integral to a complex nationwide market.

- The MRP proposal appears to contravene the San Bernardino County Charter (which restricts the JPA's authority under the state "common powers" rule), because the Charter was amended by county voters to prevent the use of eminent



        domain to take property from one private party, without consent, for the purpose of conveying that property to another.

- Finally, the legal structure of the MRP proposal would expose the JPA, its participating municipalities, and taxpayers to potentially enormous liability to existing note holders if courts recognize—as they likely will—the correct market value of performing loans. The proposed structure carefully protects MRP and new lenders from those liabilities, ensuring that existing note holders' only recourse is against the government entities.

These apparent defects are elaborated in the analysis that follows.

## ANALYSIS

### I. THE MRP PROPOSAL IS SUBJECT TO CHALLENGE AS AN IMPERMISSIBLE TAKING UNDER THE FEDERAL AND STATE CONSTITUTIONS

#### A. The Proposed Transfer Of Loans Would Likely Fail To Satisfy "Public Use" Requirements

The government may take property from private citizens only when the taking is for a "public use." U.S. Const. amend. V; Cal. Const. art. I, § 19. This requirement reflects the fundamental rule that "the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, even though A is paid just compensation." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005); *see Calder v. Bull*, 3 U.S. (1 Dall.) 386, 388 (1798). Although the U.S. Supreme Court in *Kelo* rejected a categorical rule prohibiting all "one-to-one transfers of property" from one private party to another, the Court emphasized that such transfers "certainly raise a suspicion that a private purpose [is] afoot." *Kelo*, 545 U.S. at 487.

The public purpose ostensibly justifying the "one-to-one transfer" in the MRP proposal is mitigating and reversing economic degradation in San Bernardino County. Hockett Memo at 4, 49-54. Even accepting for the moment the premise that the scheme will work as planned (rather than backfiring by increasing lending costs for County homeowners), the reasoning is circular: because the public at large will benefit from reduced debt among local homeowners, the logic goes, forcibly seizing and reducing that debt necessarily serves a public purpose. But the same could be said of almost any government property redistribution scheme. Under the reasoning supporting the MRP proposal, a government could simply condemn all the property of the richest local citizen, sell it, and distribute the proceeds to poorer residents. No precedent of the U.S. Supreme Court or California Supreme Court supports such an open-ended conception of the "public use" for which property lawfully may be taken.

The closest precedent is the controversial *Kelo* decision, but that decision does not authorize the MRP proposal. A narrow five-Justice majority in that case did uphold a one-to-one property transfer from local homeowners to Pfizer Corp., which was planning to build a major research facility on the property. But the challenged transfer was just one part of a "comprehensive" economic development plan being pursued by the city that, like traditional "exercises in urban planning and development," sought to "coordinate a variety of commercial,



residential, and recreational uses of land." 545 U.S. at 483-84; *see id.* at 473-75. By contrast, a "one-to-one transfer of property" that is "executed outside the confines of an integrated development plan" would raise more serious public-use concerns. *Id.* at 486-87; *see also id.* at 493 (Kennedy, J., concurring). Here, by contrast, the one-to-one property transfer is not just one component of an integrated program to develop and improve one specific area of the city—the systematic transfer of property from A to B is the *scheme itself*. It would be as if the City of New London in *Kelo* had no plan other than to transfer the land of various private homeowners to large companies on the theory that the companies would make more productive use of it and hence pay higher taxes. Even if that were true in fact, the *Kelo* majority specifically rejected the suggestion that its holding meant that such a transfer would necessarily satisfy the "public use" requirement. *Id.* at 486-87.

The MRP proposal is, in short, unlike an integrated plan to develop a specific area of the city. The public purpose and benefits of such a development plan are direct and obvious. Here the public benefits would be incidental and attenuated, if indeed they exist at all. Notably, the MRP proposal specifically is *not* addressed to defaulted or even delinquent loans, where the property at issue might be subject to a present or imminent threat of blight. MRP, Homeownership Protection Program, *supra*, at 9; *see also* MRP, Frequently Asked Questions, at 2-4, *available at* http://online.wsj.com/public/resources/documents/EMINENT-faqs.pdf (visited July 16, 2012). The proposal instead is limited to *performing* loans—those much less likely ever to default—on the theory that forcibly transferring and discounting them now will reduce the risk that they *could* default and lead to *future* blight. But in a case cited by the *Kelo* majority, a California federal court (in the judicial district that includes San Bernardino County) held that such a theory will not satisfy the public use requirement. *See 99 Cents Only Stores v. Lancaster Redev. Agency*, 237 F. Supp. 2d 1123, 1129 (C.D. Cal. 2001), *cited in Kelo*, 545 U.S. at 487. In *99 Cents*, the city attempted to condemn property owned by a discount outlet so it could be transferred to a bigger, fancier retailer. The city argued that the transfer served a public purpose because it would keep the larger retailer within the city's boundaries and thereby prevent future blight. *Id.* at 1130. The court rejected that contention, finding no authority for the "novel legal proposition that the prevention of 'future blight' is a legitimate public use." *Id.* If preventing "future blight" were a legitimate public purpose, government could "condemn any property because no site can ever be truly free from blight because blight remains ever latent, ready to surface at any time." *Id.* That analysis is especially applicable here, given that the MRP proposal targets only performing notes, i.e., notes *not* likely to result in the blight that is proffered as a justification for the taking.

The MRP proposal is also unlike an integrated urban planning program in that the comprehensive nature of such a program makes it less likely the program was designed to "confer benefits on particular, favored private entities . . . with only incidental or pretextual public benefits." *Kelo*, 545 U.S. at 490 (Kennedy, J., concurring); *see id.* at 493. Here the opposite seems true: the MRP proposal on its face seems designed specifically to confer a benefit on MRP (given the fees it is supposed to accrue), selected homeowners (who receive lower mortgage balances), and new lenders (who will receive only performing loans, leaving all delinquent and defaulted loans with existing noteholders), with the public receiving only the incidental benefit of possibly avoiding whatever future blight might have been caused by the



failure of those few performing loans that actually defaulted.  Thus, unlike a comprehensive economic development plan, the MRP proposal is the kind of program that should "raise a suspicion that a private purpose [i]s afoot."  *Kelo*, 545 U.S. at 487.

The analysis thus far has assumed that the MRP proposal will work roughly as intended—even if it does, the one-to-one transfer of loans does not satisfy the public use requirement.  But it bears emphasis that the proposal seems unlikely to accomplish its promised benefits for county residents.  *See MHC Fin., Ltd. v. City of San Rafael*, 2008 WL 440282, *20-25 (N.D. Cal. Jan. 29, 2008) (striking down ordinance because in practice it failed to advance municipality's goals and exacerbated underlying problems).  On this point, California "takings" law is more demanding than its federal counterpart—in California, property cannot be taken for "public use" unless the property is necessary for that use and the plan provides the greatest public good and the least private injury of all potential options.  *See* Cal. Civ. Pro. Code § 1240.030; *SFPP, L.P. v. Burlington N. & Santa Fe Ry. Co.*, 121 Cal. App. 4th 452, 470-71 (2004).  It is hardly clear that seizure of performing loans is necessary to avoid blight, given that these borrowers have demonstrated that they will pay their mortgages even if their balances exceed the appraised value of their homes.  Nor is it necessary in the sense that no other options will avoid the undesired consequence—it seems clear that countless simpler measures involving tax or budgetary policy could be adopted to avoid blight that would be less intrusive to property interests.  *Cf. SFPP*, 121 Cal. App. 4th at 470-71 (upholding determination by referee that proposed pipeline did not meet necessity requirements because alternative line would have resulted in lesser injury); *City of Carlsbad v. Wight*, 221 Cal. App. 2d 756, 762 (1963) (concluding that project was not a public necessity in light of expert testimony about superior alternatives).

The MRP proposal not only appears unnecessary to avoid blight, but seems likely to raise other housing-related problems for county residents.  An analysis of the economic consequences of the program is beyond the scope of this legal memorandum, but certain concerns are self-evident.  As we understand it, potential lenders are already warning that if the County adopts the plan, the market will impose substantial costs on new loans to county residents, since such loans will be subject to the new and highly unusual uncertainty that they could be seized by the government at a very significant discount from face value *even when they are performing*.  Investors would be forced to revalue mortgage pools and the accompanying mortgage-backed securities based on the possibility of government seizure.  These losses would reduce access to credit for mortgage borrowers in the County by increasing interest rates on mortgages, perhaps substantially.  And reduced access to mortgages would reduce the demand for homes in the County, putting downward pressure on housing prices, thereby exacerbating—rather than the reversing—the foreclosure cycle ostensibly addressed by the MRP proposal.  Given the obvious potential for public harms resulting from the proposal, it will be difficult for the JPA and other entities to show that the loan transfers are necessary to achieve the promised benefits.



### B. The MRP Proposal Is Premised On Payment For Performing Loans That Is Less Than The Amount Likely To Be Deemed "Just Compensation" For Seizure Of Those Loans

Even if there is a legitimate public purpose for seizing and transferring performing loans, the federal and state constitutions require the government to pay existing noteholders "just compensation" for the loans. That means that the JPA would have to pay the owners of the notes enough to make them whole from the loss of the notes. *See United States v. Miller*, 317 U.S. 369, 373 (1943) ("The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken."); *Mt. San Jacinto Cmty. Coll. Dist. v. Super. Ct. of Riverside Cnty.*, 40 Cal. 4th 648, 653 (2007) ("The just compensation is aimed at making the landowner whole for a governmental taking or damage to the owner's property."). The most common test for assessing just compensation is "fair market value," *see Miller*, 317 U.S. 373-74, which under California law is what a hypothetical buyer and seller would agree to in the marketplace, assuming both were willing and able to complete the transaction but had "no particular or urgent necessity" to do so. Cal. Civ. Pro. Code § 520.10.

While MRP's proposal acknowledges that the proper standard is fair market value, the proposal is predicated on the critical assumption that the JPA will be able to buy the notes for significantly less than the face value of the loans. *See* MRP, Homeownership Protection Program, *supra*, at 4 (lenders will receive "considerably less than the face amount" of loans), 9 ("Loans and liens will be acquired through eminent domain at fair value, which is expected to be less than the market value of the home."). In its business model, MRP assumes that the JPA will be able to buy the notes at a "significant discount to the fair value of the home[s],"[1] reportedly telling investors to expect a purchase price between 75-80% of the homes' market value.[2] That approach, however, bears no apparent connection to the valuation of these performing loans and is highly unlikely to be accepted by courts as a proper measure of just compensation for seizure of the loans.

The fair market value of a loan necessarily focuses on the *value of the loan*, not simply on the value of the home that secures it. The value of a mortgage to the lender or owner of the loan depends largely on its performance (i.e., payment history) and interest rates, rather than on the appraised value of the real property being mortgaged. *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 596, 601-02 (1935) (finding Takings Clause violation where legislation permitted debtor mortgagees to purchase property at "appraised value" because that did not constitute just compensation). Because the JPA would purchase only performing notes with a history of payments, there is no basis for assuming the loan will default. *See*, *e.g.*, *Despite Home Value Gains, Underwater Homeowners Owe $1.2 Trillion More than Homes' Worth*, Marketwatch.com (May 24, 2012), *available at* http://www.marketwatch.com/story/despite-

---

[1] MRP, Frequently Asked Questions, *available at* http://online.wsj.com/public/resources/documents/EMINENT-faqs.pdf (visited July 16, 2012).

[2] Jody Shenn and John Gittelsohn, *Bondholders See Eminent Domain as State Attack: Mortgages*, Bloomberg (online), July 13, 2012, http://www.bloomberg.com/news/2012-07-13/bondholders-see-eminent-domain-as-state-attack-mortgages.html (visited July 16, 2012).



home-value-gains-underwater-homeowners-owe-12-trillion-more-than-homes-worth-2012-05-24 (visited July 16, 2012) (noting that "[f]oreclosure is not imminent for most underwater homeowners" and that "many homeowners in negative equity are not deeply underwater"). Indeed, the data show that a clear majority of loans that have been performing for years will *not* default. *See* Credit Suisse, *Global Securitized Products Weekly*, at 9-10 (July 12, 2012). Thus, the notes at issue are likely worth close to the present value of their outstanding balance and the sum of anticipated interest payments—not the current value of the underlying properties pledged as security.

The MRP proposal also assumes an across-the-board 20-25% "forfeiture discount" on the grounds that every home that is underwater would ultimately go through foreclosure, resulting in significant transaction costs that its proposal could help avoid. *See* MRP, Frequently Asked Questions, *supra*; Shenn and Gittelsohn, *Bondholders See Eminent Domain as State Attack*, *supra*. As just noted, however, a significant percentage of performing but underwater loans never default—homeowners continue to make payments on homes even when the mortgage balance exceeds the appraised value. The "forfeiture discount" is thus unsupported by the data pertinent to these loans.

The MRP proposal's approach to assessing fair market value also ignores how these particular notes are owned and used. The MRP proposal would establish fair market value by assuming that each note is owned in isolation. In fact, the notes have been pooled together in securitization trusts that hedge the risk associated with nonpayment or prepayment of any single loan. The trust structure enhances the value of each note in the trust by diversifying the risk of its default and reducing the economic loss to the owner should a given note stop performing. MRP does not deny the value of securitizing notes in a trust—to the contrary, MRP and its investors plan to securitize the restructured notes at the end of the process. Yet MRP proposes to establish fair market value for each note by ignoring its securitized structure and focusing on the appraised value of the residential property that secures it. That approach ignores the true market value of the note.

In addition, because MRP's proposal targets selected trust assets, it effectively operates as a "partial taking" of the trusts. *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) (finding partial taking under the Takings Clause where "the government condemns only a portion of the [property owner's] property"). Under federal and state law, "[w]here there is . . . a partial taking, compensation must be given for damage, if any, to the remaining property in addition to compensation for the taking." *San Diego Metro. Transit Dev. Bd. v. Cushman*, 53 Cal. App. 4th 918, 926 (1997). In other words, the JPA will be required not only to pay for the fair market value of each performing note (properly valued), but *also* to compensate each trust for the additional loss in value to the trust that remains. *See 4.0 Acres of Land*, 175 F.3d at 1139; *see also* Cal. Const. art I, § 19 ("Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."); Cal. Civ. Pro. Code § 1263.410 (providing for severance damages if "the property acquired is part of a larger parcel"). To calculate this damage, a court will look to "the diminution in the market value of the remaining portion of property." *Cushman*, 53 Cal. App. 4th at 926; *see 4.0 Acres of Land*, 175 F.3d at 1139 ("Where the taking is a partial taking, 'just compensation' is the difference between the fair market value of the whole parcel immediately



before the taking and the remainder after the taking."). Here, the damage to the remainder—the trust minus an entire category of its more valuable notes—would be significant. By stripping the trusts of certain performing notes, the MRP proposal would inflict substantial harm on the trusts overall, both by decreasing the number of loans upon which risk may be spread and by significantly increasing the proportion of nonperforming loans that remain. The difference between the compensation contemplated by the MRP proposal, and the compensation actually required by the Constitution and state law, is likely to be substantial.

## II. THE MRP PROPOSAL IS SUBJECT TO CHALLENGE AS A VIOLATION OF THE CONTRACTS CLAUSE OF THE U.S. CONSTITUTION

The Constitution bars states from "impairing the Obligation of Contracts." U.S. Const. Article I, § 10. The Framers added the Contracts Clause to the Constitution in response to efforts by states to relieve local residents from the burden of substantial debts in the aftermath of the Revolutionary War. Such laws provided immediate relief and may have been locally beneficial, but they severely undermined foreign confidence in U.S. debts generally and thereby threatened to undermine much needed trade and investment. Accordingly, the Contracts Clause was included specifically to bar states from abrogating debts in the service of their own perceived economic needs. *See* The Federalist No. 44 (James Madison); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 427-28 (1934); *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 354 (1827). The goal and effect of the MRP proposal is precisely the danger contemplated by the Contracts Clause: the abrogation of valid debts because a local jurisdiction desires to reduce the debt born by local residents.

In assessing whether the Contracts Clause has been violated, the first question is whether "the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). The U.S. Supreme Court has repeatedly held that laws abrogating or modifying debts are invalid under the Contracts Clause.[3] For instance, the Court held that a law that changed the terms of a mortgage contract to give the debtor additional rights "unquestionably impair[ed]" the contract. *Bronson v. Kinzie*, 42 U.S. (1 How.) 311, 319-20 (1843). Similarly, the Court has explained that when a debtor signed a promissory note, "[a]ny law which releases a part of this obligation, must, in the literal sense of the word, impair it." *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 197-98 (1819). MRP's proposal, which would completely extinguish existing noteholders' contractual rights, easily satisfies the first prong of the Contracts Clause inquiry.

The second prong is whether the state law advances a "significant and legitimate public purpose . . . such as the remedying of a broad and general social or economic problem . . . rather than providing a benefit to special interests." *Energy Reserves*, 459 U.S. at 412; *see Allied*

---

[3] *See*, *e.g.*, *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 15-16 (1823); *McCracken v. Hayward*, 43 U.S. (2 How.) 608, 612 (1844); *Gantly's Lessee v. Ewing*, 44 U.S. (3 How.) 707, 717 (1845); *Planters' Bank v. Sharp*, 47 U.S. (6 How.) 301, 330 (1848); *Howard v. Bugbee*, 65 U.S. (24 How.) 461, 464-65 (1861); *Barnitz v. Beverly*, 163 U.S. 118, 131-32 (1896); *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56, 60-61 (1935).



*Structural Steel*, 438 U.S. at 249 (laws must generally be "enacted to protect a broad societal interest rather than a narrow class"). For the reasons already discussed in respect to the Takings Clause, the courts will have serious doubts about whether MRP's proposal serves a legitimate and significant public purpose, as opposed to the special interests of MRP and its investors, as well as the narrow class of indebted homeowners with underwater but performing loans. Benefitting the latter group may appear to serve a more general social purpose, but the same would have been true of the post-Revolutionary War debt-abrogation laws to which the Contracts Clause was directed.

Finally, even if the MRP proposal were deemed to serve a legitimate and significant public interest, it must "be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 22 (1977); *see Energy Reserves*, 459 U.S. at 412. The MRP proposal goes well beyond imposing reasonable conditions. It does "not effect simply a temporary alteration of the contractual relationships of those within its coverage, but work[s] a severe, permanent, and immediate change in those relationships—irrevocably and retroactively." *Allied Structural Steel*, 438 U.S. at 250. Nor is the proposal "tailored appropriately" (*Energy Reserves*, 459 U.S. at 410 n.11) to prevent foreclosures or remedy blight—as already discussed, it targets only loans unlikely to result in default and ultimately in blight. Far more modest statutory amendments to mortgage contracts have been held to violate the Contracts Clause.[4]

### III. THE MRP PROPOSAL IS SUBJECT TO CHALLENGE UNDER THE DORMANT COMMERCE CLAUSE

The limits on state action imposed by the Constitution's Commerce Clause, U.S. Const. Art. I, § 8, cl. 3, restrict the use of eminent domain to take promissory notes from national securitized pools. The "dormant Commerce Clause" prohibits states—and their municipalities—from discriminating against out-of-state commerce or otherwise erecting barriers to interstate commerce. *See Healy v. Beer Institute*, 491 U.S. 324, 336 (1989); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); Felix Frankfurter, *The Commerce Clause under Marshall, Taney & Waite* 18 (1937); Laurence H. Tribe, 1 *American Constitutional Law* 1030 (3d ed. 2000). This means that they cannot directly regulate activities in other states, *see Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982) (plurality op.) ("The Commerce Clause . . . permits only incidental regulation of interstate commerce by the States; direct regulation is prohibited."), nor can they impose burdens on interstate commerce that clearly outweigh the local benefits of regulation, *see Pike*, 397 U.S. at 142 (exercise of state power affecting interstate commerce will be upheld only if it "regulates even-handedly to effectuate a legitimate local public interest, and its effects on

---

[4] *See*, *e.g.*, *Kavanaugh*, 295 U.S. at 60-61 (law establishing procedural barriers to effecting foreclosure and effectively extending time before which eviction could be complete); *Barnitz*, 163 U.S. at 131-32 (law extending time for redemption of premises sold under mortgage); *Planters' Bank*, 47 U.S. (6 How.) at 330 (law prohibiting banks from transferring mortgage notes); *Bronson*, 42 U.S. (1 How.) at 319-20 (law providing that equitable estate of mortgagor could not be extinguished for twelve months after sale on foreclosure and further preventing any sale unless two-thirds of appraised value of property should be bid therefor).



interstate commerce are only incidental . . . unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits"); *see also Am. Express Travel Related Services, Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 372 (3d Cir. 2012).  The dormant Commerce Clause bars the use of eminent domain when it would have significant interstate effects.  *See City of Oakland v. Oakland Raiders*, 174 Cal. App. 3d 414, 420 (1985).

The MRP proposal implicates dormant Commerce Clause concerns in at least two related respects.  First, the proposal would permit the JPA to seize notes held in trusts outside the state—a direct regulation of out-of-state property with a potentially "sweeping extraterritorial effect." *Edgar*, 457 U.S. at 642 (statute of Illinois regulating sale of stock in Illinois corporation prohibited under dormant Commerce Clause because physical shares were not in Illinois). Second, even to the extent the MRP proposal does not directly regulate out-of-state property, it unquestionably imposes major burdens on out-of-state property and transactions.  As explained above, *supra* at 7, securitizations operate by pooling together thousands of loans from across the country in a trust, diversifying the risk of default across a large pool of mortgages and spreading any losses from nonperforming notes.  Taking the performing loans out of the trust necessarily decreases its value dramatically.  And if the MRP proposal spreads beyond San Bernardino County, the entire market for securitization of mortgage loans could be upended, as investors would never know when a local government might try to seize desirable loans from a securitization trust.

In a similar situation, the California Court of Appeal held that a municipal eminent domain proceeding violated the dormant Commerce Clause when it sought to seize an intangible asset to further local economic goals.  *See Oakland Raiders*, 174 Cal. App. 3d at 420.  Even though the property at issue was an entirely in-state football franchise, the court concluded that condemnation of the property would significantly burden interstate commerce due to the "interdependent character" of the National Football League.  *Id.*  The court reasoned that even though the franchise itself was located in California, "each [NFL] member team is substantially dependent for its income on every other team." *Id.*  In addition, the court noted that a precedent permitting the use of eminent domain to acquire one team could "pervade" the league and disrupt its operation.  *Id.*

The same problems exist here:  the use of eminent domain to take performing notes from out-of-state securitization trusts significantly impacts the economic value of those trusts, which could be completely destroyed if other local jurisdictions adopted similar schemes.

## IV.  THE MRP PROPOSAL IS SUBJECT TO CHALLENGE UNDER CALIFORNIA STATE AND LOCAL LAWS GOVERNING LOCAL EXERCISE OF EMINENT DOMAIN POWER

### A.  The JPA's Power Is Limited By A San Bernardino County Prohibition On One-To-One Private Property Transfers

It is established under California law that the power exercised by a JPA "can be no greater than the powers shared by each of the agency's constituent members." *Robings v. Santa Monica Mountains Conservancy*, 188 Cal. App. 4th 952, 962 (2010) (describing the "'common powers' rule" applicable to joint power authorities); *see* Cal. Gov. Code § 6502 ("two or more



public agencies by agreement may jointly exercise any power common to the contracting parties").[5] This "common powers" rule applies to eminent domain. *Burbank-Glendale-Pasadena Airport Auth. v. Hensler*, 83 Cal. App. 4th 556, 564 (2000).

The JPA accordingly is subject to the restrictions of the Charter of San Bernardino County. And § 5 of that Charter bars a forced transfer of property from one private party to another: "The County may not exercise the power of eminent domain to acquire property from any private Owner thereof, without such Owner's consent, when the purpose of the acquisition is to convey the property so acquired to any private party." San Bernardino County Charter art. VI, § 5.[6]

This provision was adopted by county voters in direct response to the Supreme Court's decision in *Kelo*.[7] County voters thus decided that nonconsensual one-to-one property transfers would be categorically prohibited. MRP's proposal unambiguously falls within this prohibition—it would take thousands of securitized mortgage loans from private trusts, refinance them, and then convey the replacement loans to a new set of private trusts. *See* MRP, Homeownership Protection Program, *supra*, at 12. Because San Bernardino County itself would be barred from taking the promissory notes for this purpose, the JPA is barred as well.

**B.    The JPA Would Be Exercising Eminent Domain Power Over Promissory Notes That Are Physically Located Outside The JPA's Jurisdiction**

The MRP proposal would require the JPA to use eminent domain to seize property located outside its jurisdiction. It is inherent to the very concept of eminent domain, however, that a government jurisdiction may exercise authority only over property within its jurisdiction. *See* 1A-2 Nichols on Eminent Domain § 2.7 (2012) ("There is one limitation upon the power of eminent domain which depends upon no express constitutional provision. The powers of a sovereign state, however vast in their character and searching in their extent, are inherently limited to the subjects within the jurisdiction of the state."). California law has long recognized and codified the territorial limits of eminent domain. Except in specific and limited situations not relevant here, "[a] local public entity may acquire by eminent domain only property within its territorial limits," Cal. Civ. Pro. Code §1240.050, and an eminent domain proceeding "shall be commenced in the county in which the property sought to be taken is located," *id.* § 1250.020.

---

[5] The JPA Agreement itself provides that the JPA "shall have the powers common to the Parties to carry out the purposes set forth in this Agreement," including to "acquire by . . . eminent domain, or otherwise home loans." Section D.4.

[6] The section defines "Owner" in the vocabulary of real property interests—the traditional realm of eminent domain—but the MRP proposal assumes that local eminent domain authority is not limited to real property. Indeed, the MRP proposal itself relies on the "quick take" provision of state eminent domain law, which is similarly defined in terms of real property interests. *See* Cal. Code Civ. Pro. § 1255.410(b).

[7] *See* Dennis E. Wagner, Interim County Counsel, Measure "O" Impartial Analysis (2006), *available at* http://www.co.sanbernardino.ca.us/ROV/general_info/-pdf/MeasureOImpartialAnalysisfiller.pdf.



The MRP proposal disavows any attempt to seize homes or physical property located in San Bernardino County, but instead asserts eminent domain authority over the promissory notes themselves. *See* MRP, Homeownership Protection Program, *supra*, at 4; MRP, Frequently Asked Questions, *supra*, at 2-4. In almost all cases, however, the notes are not physically held in the County or even in the state—they have been sold and securitized, and now are held by document custodians for the securitizations in locations across the country. *See* SNR Denton, *Commentary on Transfers of Mortgage Loans to RMBS Securitization Trusts*, *available at* http://www.snrdenton.com/news__insights/alerts/commentary_on_transfers.aspx (visited July 16, 2012). And the trusts that own them likely operate under other states' laws. The notes thus may be beyond the reach of the JPA's powers of eminent domain. *See Mayor and City Council of Baltimore v. Baltimore Football Club Inc.*, 624 F. Supp. 278, 284-87 (D. Md. 1985). To the extent the notes constitute "property" subject to taking by a government, a California government entity should no more be able to confiscate notes held out of state than Los Angeles could confiscate a car parked in New Hampshire.

To be sure, local property is pledged as security for the notes, but it does not necessarily follow that the JPA's jurisdiction over that property would give the JPA jurisdiction over the notes themselves. *See id.* The rules adopted for a court's exercise of jurisdiction over property should not define the scope of a local government's power of eminent domain. Although California state law does create a binding link between a residential mortgage promissory note and the deed of trust provided as security, a state cannot create its own extraterritorial power simply because it links assets for other legal purposes. If California enacted a law that required a borrower to pledge all of its real property nationwide as security whenever a second mortgage was taken on a California residence, surely no one would contend that by binding all of the properties to securitize the second mortgage of the California residence, California now had eminent domain jurisdiction over those out-of-state properties. Given the sovereign nature of the eminent domain power, it seems clear that the state in which the promissory note is physically located would itself have eminent domain authority over that note. If so, it seems equally clear that California cannot make an equivalent claim to eminent domain jurisdiction over the same note.

## V. THE LEGAL STRUCTURE OF THE MRP PROPOSAL COULD RESULT IN CRIPPLING FINANCIAL LIABILITIES FOR THE LOCAL GOVERNMENTS AND THEIR TAXPAYERS

### A. The Eminent Domain Procedure Will Be Time-Consuming, Expensive, and Inefficient

The MRP proposal depends on limiting transaction costs to ensure profits for MRP and its investors, but the proposal does not address the costs that must be incurred to comply with California's eminent domain laws. For example, before eminent domain litigation can begin, the JPA must provide written notice to all the owners of the notes and hold hearings on the proposed seizures. Cal. Civ. Pro. Code § 1245.235. Because the loans at issue have been securitized, they are not owned by the originator, lender or loan servicer. Even the notice process, therefore, could be time-consuming and expensive.



In suggesting that the condemnation of thousands of securitized mortgage loans will be quick and relatively inexpensive, MRP's proposal relies heavily on the application of California's so-called "quick take" eminent domain procedure.  *See* MRP, Frequently Asked Questions, *supra*, at 3 ("We expect that the quick take will be a necessary component of the plan.").  This process, set forth in Cal. Civ. Pro. Code § 1255.410, allows "a condemning agency [to] take over condemned property prior to trial and judgment by depositing in court the 'probable compensation' as determined by appraisal and obtaining an 'order for possession.'"  *Redevelopment Agency v. Gilmore*, 38 Cal. 3d 790, 794-95 (1985); *see L.A. Cnty. Metro. Transp. Auth. v. Alameda Produce Mkt., LLC*, 52 Cal. 4th 1100, 1103-04 (2011) (referring to § 1255.410 as "California's 'quick-take' eminent domain procedure").  The "quick take" procedure imposes significant requirements the JPA will find difficult to meet, and exposes the municipalities to substantial liabilities if MRP's valuation assumptions are not adopted by courts.

To start, using the "quick take" provision requires "an overriding need for the plaintiff to possess the property prior to the issuance of final judgment."  Cal. Civ. Pro. Code § 1255.410(d)(2)(C).  The speculative assertion that certain performing loans may fall into default sometime in the future would hardly seem to qualify as an "overriding need" for immediate possession of the loans.  *Cf. L.A. Cnty. Metro. Trans. Auth.*, 52 Cal. 4th at 1104 (transit authority sought early possession of property in order to comply with federal consent decree).  The proponents of the MRP proposal have not identified any case holding that there is an immediate and "overriding need" based on potential harms that have not occurred and may never occur.

The "quick take" procedure also requires a finding that "[t]he hardship that the plaintiff will suffer if possession is denied or limited outweighs any hardship on the defendant . . . that would be caused by the granting of the order of possession."  Cal. Civ. Pro. Code § 1255.410(d)(2)(D).  It can hardly be said that the "danger" of continuing the status quo outweighs the disruptive impact that seizing these securitized loans would have on the trusts.  The targeted notes are performing.  The supposed purpose of the taking is to prevent *future* foreclosures.  The balance of hardships required by the "quick take" procedure does not favor the JPA.

Transaction costs escalate once the JPA must litigate the amount of just compensation owed to the trusts.  At that stage, California law provides that the government must provide a written expert appraisal that identifies specific details supporting the valuation of each loan.[8]

---

[8] Cal. Civ. Pro. Code § 1255.010(b) ("Before making a deposit under this section, the plaintiff shall have an expert qualified to express an opinion as to the value of the property (1) make an appraisal of the property and (2) prepare a written statement of, or summary of the basis for, the appraisal.  The statement or summary shall contain detail sufficient to indicate clearly the basis for the appraisal, including, but not limited to, all of the following information: (A) The date of valuation, highest and best use, and applicable zoning of the property, (B) The principal transactions, reproduction or replacement cost analysis, or capitalization analysis, supporting the appraisal, and (C) If the appraisal includes compensation for damages to the remainder, the compensation for the property and for damages to the remainder separately stated,



The MPA proposal apparently contemplates offering an appraisal not for the value of the notes, but for the specific home that secures each note the JPA wants to take. As previously discussed, an appraisal of the value of the *home* is not even a facial *attempt* to reasonably or accurately appraise the value of the *note*, especially a performing note held in a securitization trust. The appraisal requirement is one of the "procedural safeguards" to prevent abuse of eminent domain powers. *Mt. San Jacinto Comm. College*, 40 Cal. 4th at 660-61. If the JPA's appraisals are unreasonable estimates of the notes' fair market value, the JPA is potentially liable for defendants' litigation costs. Cal. Civ. Pro. Code § 1250.410(b). The JPA also must cover the reasonable cost (up to $5,000) for an independent appraisal if one is requested by the defendant. Cal. Civ. Pro. Code § 1263.025(a). When multiplied by the thousands of loans at issue in the MRP proposal, the foregoing transaction and litigation costs alone would be significant—much greater than the MRP proposal's proponents appear to appreciate.

Finally, the "quick take" procedure is not suited to the untested expansion of traditional eminent domain power proposed by MRP because it requires a court to find at the outset of the case that the public entity is "entitled to take the property by eminent domain"—a requirement that applies even when the motion is unopposed. Cal. Civ. Pro. Code § 1255.410(d)(1)(A).[9] As elaborated above, there are serious questions as to the constitutionality of the MRP proposal. Property owners are expressly authorized by law to challenge a "quick take" on any or all of these grounds, including whether the governing body abused its discretion in adopting the project (*id.* §§ 1245.255 & 1250.370(a)),[10] whether the court holds jurisdiction over the property (*id.* §§ 1250.360(e) & 1250.020), whether the taking is for a public use (*id.* § 1250.360(b)), whether the seized property will be used to support the stated purpose of the project (*id.* § 1250.360(c)), whether "public interest and necessity" require the project (*id.* § 1250.370(b)), and whether the proposed project is planned "in a manner that is most compatible with the greatest public good and the least private injury" (*id.* § 1250.360(c)). All of these issues would have to be resolved in the JPA's favor before a court could grant a "quick take." Cal. Civ. Pro. Code § 1255.410(d)(1)(A). And, in addition to all the transaction costs noted above, if the JPA loses this round of litigation over its right to take the loans, it is liable for the defendants' litigation costs. *Id.* § 1268.610.

---

and the calculations and a narrative explanation supporting the compensation, including any offsetting benefits.").

[9] The legislative committee comments to this section note "that the determination of the plaintiff's right to take the property by eminent domain is preliminary only," but courts are not likely to risk the pitfalls of breaking up the assets of a trust if there is a reasonable prospect the taking could be invalidated. *See* Cal. Civ. Pro. Code § 1268.620 (making a plaintiff liable for all proximate damages caused by the transfer of property if the taking is later rejected, in addition to requiring the return of the property).

[10] *See Redevelopment Agency v. Norm's Slauson*, 173 Cal. App. 3d 1121, 1127 (1985) (holding that an agency abused its discretion by committing to a project with outside developers in advance of a public hearing on the public interest in the project).



### B. The MRP Proposal Exposes Taxpayers And Municipalities To Staggering Financial Risks

Contrary to the suggestion that the MRP proposal would operate "at no cost to the public fisc," Hockett Memo at 3, the proposal would expose participating cities and counties to substantial liabilities. Indeed, if MRP's assumptions are wrong about the fair value of the notes and the amount of just compensation due to the trusts, its proposal could bankrupt municipalities.

The crux of the MRP proposal is using California's "quick take" eminent domain procedure to take control of the notes before the amount of just compensation owed to the trusts is finally decided by the courts. MRP, Frequently Asked Questions, *supra*, at 3 ("We expect that the quick take will be a necessary component of the plan."). Even if the JPA could take possession of the notes using new investor funding, the proposal clearly does not contemplate raising and holding in reserve until all litigation is concluded funds that are sufficient to compensate the trusts for the full value of the notes and the damage caused to the trusts' remaining assets by removing large numbers of performing loans from the securitized pool. If courts ultimately adopt fair market values for the notes that are substantially different than MRP's valuation, the JPA will be liable for paying the difference to the trusts. That amount, multiplied by thousands of loans, easily could result in hundreds of millions of dollars in liabilities. Nowhere does the MRP proposal provide for raising and keeping in reserve until litigation concludes an amount of money that is sufficient to cover this potential liability.

If the JPA does not have sufficient funds to pay its liabilities, the participating municipalities will be responsible for paying the just compensation owed to the trusts. The JPA's members may try to disclaim responsibility for these liabilities, but it is unlikely that courts will permit the municipalities to shield themselves in the event the JPA is insolvent. *See* Cal. Gov't Code § 895.2 ("Whenever any public entities enter into an agreement, they are jointly and severally liable upon any liability which is imposed by any law other than this chapter upon any one of the entities or upon any entity created by the agreement for injury caused by a negligent or wrongful act or omission occurring in the performance of such agreement."); *see also Rose v. State*, 19 Cal. 2d 713, 726 (1942) ("Counties, cities and other political subdivisions are held liable where they take property, not upon the ground that they are authorized by statute to be sued, but because of the constitutional provision requiring compensation to be made for such taking."); *Crane-McNab LLC v. County of Merced*, 2010 WL 4024936, at *8-9 (E.D. Cal. Oct. 13, 2010) (finding county to be proper defendant in action regarding allegations of property damage and taking by joint powers agency).[11] Whatever else is true of California procedure, the

---

[11] The decision to use the "quick take" procedure as part of the MRP proposal is quite significant. In normal eminent domain proceedings, the government does not take control or possession of the property until the litigation concludes and the amount of just compensation has been decided by the courts. Under these procedures, after the amount of compensation is decided the government can choose to abandon its condemnation efforts if it feels the fair value set by the court is too high. The option to abandon the taking if the price proves larger than anticipated does not exist under the MRP proposal because the notes will be extinguished and replaced with new, smaller notes, before the fair value litigation is resolved. The MRP proposal's use of the "quick take" procedure in this manner requires participating municipalities



"just compensation" requirement in the federal Takings Clause will ultimately require the government entities behind the JPA to satisfy these liabilities. Local governments cannot delegate their eminent domain power to a JPA in the manner proposed by MRP and then deny property owners just compensation.

\* \* \* \*

We hope you find this analysis helpful. We look forward to providing any additional assistance you require.

---

to gamble that MRP's assertions about fair value for the notes will be largely accepted by the courts.

- 16 -