# EXHIBIT I

# Mortgage Resolution PARTNERS

# FREQUENTLY ASKED QUESTIONS

## TABLE OF CONTENTS

SECTION ONE: LEGAL ................................................................................................ 2

SECTION TWO: FAIRNESS ......................................................................................... 5

SECTION THREE: BUSINESS .................................................................................... 6

SECTION FOUR: ECONOMICS ................................................................................... 9

SECTION FIVE: GOVERNMENT ............................................................................... 10

SECTION SIX: ORGANIZATION/FOUNDERS ......................................................... 12

**Frequently Asked Questions** 

**SECTION ONE: LEGAL**

**1.  Doesn't eminent domain only apply to real estate?**  No.  The power of eminent domain applies to every kind of property, including real estate (like land), tangible personal property (like goods), and intangible personal property (like loans).

**2.  Can the government condemn property by eminent domain and transfer it to a private person to use to earn a profit?**  Yes, in California and many other states, as long as the government finds that the private use may serve a public interest.  Governments do so all the time, selling condemned property to developers who profit from building offices, shopping malls, or housing.  In fact, in limited cases a government can even authorize private parties to directly exercise eminent domain to acquire property for their business use without any government involvement at all.

**3.  Are borrowers morally and legally obligated to pay the entire balance of their purchase money mortgage?**  No, particularly in California.  Reckless lending standards in the past have caused real estate bubbles and crashes resulting in defaults that have harmed homeowners, destroyed the local economy and overwhelmed the state judicial system.  As a consequence, California has deliberately allocated purchase money mortgage loan risk to the lender by enacting laws that allow a borrower to walk away from a purchase money home loan and effectively limit the lender's remedy to foreclosing on the home.  This is a fundamental public policy in California and a fundamental part of the homeowner's bargain in taking out a purchase money home loan.  Lenders are fully aware of their share of the risk of making a purchase money home loan in California.

**4.  Can the government acquire performing loans, or only defaulted loans?**  As long as it is acting to further a public purpose, a government can acquire any kind of loan including performing, delinquent or defaulted loans.  A government can purchase underwater performing loans to further a number of purposes -- negative equity is the single greatest predictor of future default, and it creates harm even absent default (including reduced homeowner investment in property maintenance and dislocation in the local property sales market because of restrictions on short sales).

**5.  What makes you trust the legal advice you have received?**  Mortgage Resolution Partners (MRP) has received the advice of counsel with national or statewide reputations for excellence and expertise in litigation, eminent domain law and constitutional law.  Both clients and other lawyers regularly select the same counsel to handle cases raising eminent domain, constitutional and public policy issues, and we have great confidence in their advice.   Ultimately, each city will rely on its own legal review before proceeding with eminent domain actions.

**6.  What rights will the homeowners have when you provide notice?**  Homeowners will have the same rights and the same obligations that they have now under their loan agreements. This program simply changes the owner of their loan, not the terms of the loan.  But more importantly, they will gain an opportunity -- the opportunity to work with a new loan holder that is not bound by the limitations of any securitization contract and lacks the conflicts of interest that current loan servicers have. Also, current plans provide for the homeowners to opt in to the MRP program on a

**Frequently Asked Questions**

voluntary basis.

**7.  What rights will the loan owners have?**  The trusts that currently hold the mortgage loans will have the right to receive the fair market value of the loans.  This includes the right to a trial to determine the fair value of the loans if the trusts disagree with our valuation.

**8.  What about second mortgage holders?**  We expect to negotiate directly with holders of second loans, or use eminent domain to acquire those loans, in order to comprehensively deal with the homeowner's total mortgage debt.  If a second loan has significant value because it is full recourse it may be necessary to acquire only the mortgage lien or a lesser interest in the loan.  Unlike existing lenders, we will be able to deal with all loans encumbering a property comprehensively at the fair value of each.

**9.  Why do you need eminent domain?  Why don't you just buy loans in the market?**  Private securitization trusts hold approximately $1.4 trillion of loans; we could offer to buy their underwater loans, but their trust agreements forbid them to voluntarily sell the loans.  Eminent domain allows us to purchase those loans as well as related second mortgage loans if the holders of the seconds are also unable (or unwilling) to sell.  Eminent domain is a way to successfully consolidate ownership of a homeowner's mortgage loans in the hands of someone with the economic incentive and freedom to modify or otherwise resolve the loans.

**10.  How do you plan to address the legal backlash that could occur?**  California has a well defined judicial process for adjudicating eminent domain actions and gives them priority in court.  Loan owners (or Servicers on their behalf) might litigate the right to purchase the loans and the amount of compensation due.  We are confident that the communities have the authority to purchase the loans, and we will provide resources to defend against any legal challenge to that right.  We will stand willing to negotiate over price with the goal of reaching agreement on fair value.  Absent agreement, there will be a final jury determination of fair value in the condemnation action.

**11.  Isn't there a legal step where judges must agree to the eminent domain plea?  What if they don't?**  As long as the community has the authority, as confirmed by the court, to purchase the loan and pays fair value, the court must permit the acquisition.  There is a process under which the community may request the court's permission to purchase the loan first and finally determine fair value later (a "quick take").  We expect that the quick take will be a necessary component of the plan.

**12.  Who really owns the loans?**  Securitization trusts typically hold the first mortgage loans that will be purchased by eminent domain.  A variety of investors including hedge funds and mutual funds own interests in the trusts and thus the ultimate right to payments for the loans. Third party banks service the loans, and third party trustees monitor the servicers.  Banks typically hold for their own account the second mortgage loans.

**13.  Who goes to court?**  Assuming the purchase requires court action, the communities will go to court, as will the securitization trust and holder of the second mortgage loan.

**14.  What happens if they question your valuation of the loan?**  The trust or bank may seek a higher valuation in the legal proceeding.  They and we will provide evidence of value; initially the judge, and ultimately the jury, will determine fair value.

**15.  How will you deal with missing notes, incomplete records in MERS, and similar mistakes that create havoc in the foreclosure process?**  Many loan originators and servicers lost important documents or failed to record transfers in their haste to securitize and re-securitize loans.  Borrowers rarely deny that they owe their debts; they just need to be sure that they pay the right person, and courts need to be sure that anyone who tries to foreclose actually has the right to do so.  Eminent domain resolves these issues.  It transfers complete ownership of the loan to the city, regardless of missing paperwork.  Anyone who claims to own the loan can prove it in the action and receive the proceeds.  Eminent domain settles once and for all who owns the loan (the city) and who has the right to receive payment.  Clearing up the paperwork disaster is not a purpose of our program, but it is a fortunate side benefit.

**Frequently Asked Questions** 

**SECTION TWO: FAIRNESS**

**1.  Is your program a giveaway to the undeserving who borrowed more than they should have to purchase houses they never should have owned?**  No.  Everyone in California has the opportunity to purchase a home by borrowing from a lender who is willing to take a loss if home prices decline by more than the homeowner's down payment (see Legal FAQ 3 above).   The lender willingly takes the risk when making the loan, and the fair market value of the loan reflects that risk.  By purchasing the loan at fair value, we give the lender the benefit of its bargain.  By doing an economically rational modification or other resolution with the homeowner, we respect the homeowner's benefit of his or her bargain.

**2.  Regardless of the legal niceties, is it just wrong and a moral hazard to let these homeowners stay in their homes?**  No.  We protect our neighbors' homes, even allowing them to keep the equity in their homes while canceling their debts in bankruptcy, because it is the right thing for them and the right thing for us.   We do not put our neighbors into debtor's prison, or make them homeless unnecessarily.  America is facing an economic crisis and the solution requires practical action that keeps people in their homes.  We are all in this together, for our neighborhoods, our states and our nation.  The real moral hazard is that the system is forcing homeowners to default in order to achieve rational solutions.

**3.   Won't those who don't qualify think this is unfair?**  As with many societal issues that have challenged us in the past, solutions do not always provide a direct benefit to everyone.  In this case, success will benefit even those who do not qualify by stabilizing home values, restoring neighborhoods and promoting the local economy.  Together with the state and the participating communities we will actively address public concerns and educate the public on the benefits to all of stemming the default crisis.

**Frequently Asked Questions** 

**SECTION THREE: BUSINESS**

**1.  What is the fair market value of a loan, and how will you determine it?**  Fair market value is the price that a willing buyer would pay a willing seller, neither under any compulsion to transact.  Similar sales of troubled loans in the secondary market exist and are good evidence of fair value.  These sales occur at a significant discount to the fair value of the home because of the foreclosure discount -- the market's recognition of the cost in time, money and effort to foreclose on the homeowner and thereafter to maintain and sell the property.  We will use these market data points and supplemental methods including discounted cash flow modeling.

**2.  How will MRP make money?**  MRP will partner with communities to purchase all loans (or interests in seconds) encumbering a property through eminent domain at fair value, which will be significantly less than the fair value of the home.  We will then proactively work with borrowers to modify or refinance the loans, or possibly take other action (such as a deed in lieu of foreclosure and rent-back or a short sale).  Current plans provide for MRP to charge a simple, fair, and transparent flat fee (paid for by investors) for its services.

**3.  Why hasn't anyone else tried this, or have they?**  Governments have used eminent domain in the past to address housing dislocations.  For example, Hawaii used a statewide program of eminent domain to purchase homes from landlords to sell to tenants when concentrated land ownership had made it difficult for people to buy their own homes.  Some have advocated using eminent domain to purchase mortgage loans in the current crisis, including people in the home building, government and academic communities.  MRP has simply taken up the idea and run with it because we believe that it is a positive solution to this crisis, particularly for securitized mortgage loans.

**4.  What other solutions are being offered?  Are they working?  What makes this proposal any better?**  There are a number of government programs designed to encourage loan modifications.  However, these apparently do not provide sufficient incentives for securitized loan servicers who bear the cost and the risk of modifying a loan, with the trust investors reaping the benefits of a successful modification.  Moreover, the existing programs do not adequately deal with conflicts of interest among servicers, securitization trust investors, and second mortgage holders.  As a result, few modifications have occurred, and most have been unsuccessful, particularly for securitized loans.  Our proposal is better because we will cause the purchase of all loans encumbering a home, with the freedom to effect any modification, including write-downs.

**5.  How does this affect the borrower's credit?**  The effect on a borrower's credit will depend upon the resolution of the mortgage loan that he or she agrees to.  We expect that the effect will be no worse than it would be without eminent domain and will be better for the borrower if MRP is able to affect a refinancing or a modification that the existing servicer would not have permitted.

**6.  How will this help home values, or will it?**  We expect that the program will stabilize home prices by reducing defaults and the resulting forced sales of homes and by reducing the overhang of future expected foreclosures.

**7. Do you really believe this is going to work?** Yes, so much so that we have personally risked our time, our money and our reputations to get this program up and running.

**8. Why California?** California has one of the highest percentages of at-risk loans and the highest dollar amount of at-risk loans of any state. It is a natural and efficient first state for the program. We expect to expand the program to other states once it is up and running.

**9. How will you choose the mortgages?** We will partner with committed local governments that have a sufficient volume of at-risk loans to allow us to make significant investments and make a meaningful difference to the community. The local government offices will help to identify which areas we assist, and each potential mortgage will then go through the regular underwriting and eligibility process.

**10. What are your plans after the California pilot? Other cities? Other states?** We plan to expand beyond the pilot, both in California and in other states. There is much opportunity both in-state and out-of-state to build on the program's potential value.

**11. How many borrowers have second mortgages (like HELOCs), and how will you handle them?** We expect that a significant percentage of borrowers will have second mortgages. We expect to reduce or eliminate the balance of the homeowner's second mortgage loan at the same time as the first, either in a voluntary transaction with the holder of the second or (if necessary) by purchasing it through eminent domain.

**12. What reactions do you expect from the major bank servicers?** We expect the servicers to initially oppose the program. However, we hope that they will come to recognize that the program is the best way to resolve the troubled loans in the securitization trusts for the benefit of all parties involved in the trust, including the trust investors, the trustee, and the servicer.

**13. Who will underwrite the new loans -- MRP, third parties, or both?** Both. MRP will determine the underwriting criteria for selecting loans based on the requirements of third party lenders, Fannie Mae, Freddie Mac, the FHA, and other parties who will ultimately acquire, refinance or guarantee the loans. We expect to work with third party mortgage professionals in each participating community to underwrite the new loans. This will bring local expertise to the underwriting process and support to the local economy.

**14. Won't you have to lend to unqualified borrowers in order to keep people in their homes? How will you manage credit risk?** We will not refinance or modify loans for borrowers who do not qualify. We will manage credit risk through underwriting to the requirements of third party lenders and guarantors, who will provide the ultimate take-out for the loans. We may offer other resolutions for homeowners who no longer qualify for loans, such as expedited consideration of proposed short sales and accepting a deed in lieu of foreclosure and potentially renting the home back to them (via an appropriate partner). In addition, a portion of the returns will be dedicated to communities, which may use the funds to finance community housing or other needs.

**15.  How will you deal with competition from the major banks once you announce your program?**  We believe that city and state governments may be unwilling to work with major banks or other potential competitors because of their or their affiliates' roles in creating or prolonging the mortgage crisis.  Other companies could in time create similar mortgage resolution businesses.  However, the inventory of distressed mortgage loans is unfortunately so great and so widespread that there is room and need for other companies to operate in the space without adversely affecting our business model.

**16.  Will you partner with existing lenders?  Why or why not?**  We expect to work with selected existing lenders as well as independent real estate professionals to refinance the homeowner's loans.

**17.  What criteria will you use to select loans to acquire?**  We will work with each government agency to determine the criteria that best meet the community's needs – with the goal of keeping homeowners in their homes.  We expect initially to acquire loans that are significantly underwater, but which are current (not in default).  Subsequently, we may expand the program to acquire loans that are in default, but where the homeowner can afford a refinanced loan with a reduced principal amount.

**18.  If you are successful in modifying loans and reducing principal, won't the homeowner be taxed on the reduction?**   Through 2012, both federal and California laws forgive the tax for debt used to purchase or improve the home.  If the borrower used the proceeds for other purposes, like buying a boat, then the reduction may be taxable.  Even after 2012, debt forgiveness generally may not be taxable to the extent the borrower's total debt exceeded total assets, which we expect will be the case for many homeowner participants.  The program will be voluntary for homeowners, so they will determine whether to participate based on their own circumstances, including their own tax position. MRP will not provide tax advice, and will urge potential participants to seek such advice.

**19.  How long will this take?**  We expect a period of 4 to 12 months from the beginning of the borrowers' opt-in period until completion of loan refinancing.

**20.  We've seen what outsourcing did to loan modification programs with the big banks.  If you are going to outsource, how can you ensure quality?**  Many of the problems with outsourcing have come from conflicts of interest that the large bank servicers have.  They bear the high costs of servicing troubled loans and negotiating modifications, but they do not get the benefits of a successful modification.  This has led them to outsource to firms that will foreclose as quickly and cheaply as possible.  We intend that our program's investors will acquire all of a homeowner's mortgage loans and bear the risk and returns of restructuring the loans, so our program will not have this conflict of interest.  We will closely monitor all service providers because it is in our interest for them to do their jobs right.

**SECTION FOUR: ECONOMICS**

**1.  How can the loan purchasers earn a profit if they pay fair value for a loan — and won't the trusts have a free look back to demand more compensation in court?**  MRP and the loan purchasers can pay fair value and still earn a profit because they will take the risks and earn the returns of acquiring underwater loans and then refinancing them.  Many investment funds purchase distressed whole loans from bank portfolios in consensual transactions and then profit by working them out; we expect our loan purchasers to pay the same price that they do.  We will seek to provide appropriate reserves for look back risk based on the court's ultimate determination.

**2.  How will MRP make money?**  MRP intends to earn fees that are simple and transparent based in part on its success in obtaining control over and modifying or otherwise resolving the loans.

**3. Will you share profits with the communities?**  We expect to contribute to the communities (or not-for-profit organizations) a fixed amount per loan acquired, which may support community housing  needs.

**4.  How have you structured this to create the various profit margins you will need?  Who pays for the legal fees?**  The structure of the loan acquisitions and the expected loan resolutions will create the necessary profit margins to pay for program costs, including funding costs and legal fees.

**SECTION FIVE: GOVERNMENT**

**1.  Eminent domain is already so controversial.  Are you concerned about how this will be perceived?**  Eminent domain is controversial when it displaces homeowners to help unrelated investors.  The program will use eminent domain to help homeowners, and we expect it to show that local governments are part of the solution, not part of the problem.

**2.  What about the bigger picture?  Isn't this going one step further to disempower private businesses and empower the government?**  No.  Eminent domain is an inherent power of American governments, one that they have used throughout our nation's history.  It is such a fundamental part of government that the US Constitution expressly permits it, as long as the government has a public purpose and pays fair value for the property.  Moreover, the government entities will not enter the mortgage loan business or displace any mortgage companies.

**3.  Is there an ulterior political motive here?**  No.  Eminent domain is a governmental action to achieve governmental objectives, and the objectives are clear -- to reduce the harm that the residential home loan crisis is causing our communities, to stabilize neighborhoods, and to support local economic activity.

**4.  I read something in the WSJ about a program that President Obama was considering.  Is this it?**  No.  Our program is a local one controlled by local city and county governments, supported by private investment funds.

**5.  How will this affect property taxes?**  By resolving underwater loans more efficiently with fewer foreclosure sales, we expect the program to stabilize the property tax base and to help collect delinquent property taxes.

**6.  If this is such a good solution, why didn't the government do this instead of the bank bailouts?**  Our program addresses a different problem and offers a different solution.  The federal government acted to prevent a national financial collapse; that problem required a national solution at a scale that only the federal government could provide.  The residential mortgage loan crisis affects individual communities differently and requires a local solution.  We can implement the solution on a local scale, funded with private capital.

**7.  Will participating cities be blackballed?**  We regard it as unlikely that lending institutions would "redline" or "blackball" a city for exercising a sovereign right.  Banks are in the business of making interest margin, and we believe that they will seek to do so wherever the opportunity arises.  Punishing communities is not good for business. Also, there are legal strictures that may prevent such retaliation (such as the Community Reinvestment Act).

**8.  How have you planned to budget for all of the legal costs that will come out of this?  Especially for the participating municipalities, how will you put their fears at rest regarding this?**  We have budgeted for extensive legal fees.  MRP's financial model provides that

funding sources and the margins from the loan acquisitions and refinancings will directly pay all legal costs of condemnation and valuation actions.

9.  **What liability do the participating municipalities have?** The participating governments or joint powers authorities will be liable to pay the fair value of the loans as well as certain legal costs and fees.  MRP and its funding sources will pay for these costs as described in the answer to FAQ 8.

**SECTION SIX: ORGANIZATION/FOUNDERS**

**1.  Who is MRP?**  MRP is the manager of this resolution program.  It will obtain the funding to pay for the acquired loans, and it will manage the process of resolving the loans.

**2.  Where will your corporate offices and operations be based?**  MRP's offices and operations are based in San Francisco.  As we implement the program we will work with the independent real estate service community in each participating community, which should contribute to the local economy.  MRP may open additional offices in other cities and states as the program expands.

**3.   Who is Gordian Sword and what role does it play?**  Gordian Sword is the company that the program's founders set up to help create the program and to manage Mortgage Resolution Partners.

**4.  Why LLCs?**  Limited liability companies are a typical form of organization for investment and investment management businesses.  They operate with the flexibility of partnerships while providing all investors with limited liability like shareholders in a corporation.