STEPHEN P. BERZON (SBN 46540)
SCOTT A. KRONLAND (SBN 171693)
JONATHAN WEISSGLASS (SBN 185008)
ERIC P. BROWN (SBN 284245)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
E-mail: sberzon@altber.com
        skronland@altber.com
        jweissglass@altber.com
        ebrown@altber.com

Attorneys for Defendants *City of Richmond* and
*Mortgage Resolution Partners LLC*

BRUCE REED GOODMILLER (SBN 121491)
City Attorney
CARLOS A. PRIVAT (SBN 197534)
Assistant City Attorney
CITY OF RICHMOND
450 Civic Center Plaza
Richmond, CA 94804
Telephone: (510) 620-6509
Facsimile: (510) 620-6518
E-mail: bruce_goodmiller@ci.richmond.ca.us
        carlos_privat@ci.richmond.ca.us

Attorneys for Defendant *City of Richmond*

WILLIAM A. FALIK (SBN 53499)
100 Tunnel Rd
Berkeley, CA 94705
Tel: (510) 540-5960
Fax: (510) 704-8803
E-mail: billfalik@gmail.com

Attorney for Defendant
*Mortgage Resolution Partners LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as Trustee, *et al.*,

            Plaintiffs,

        v.

CITY OF RICHMOND, CALIFORNIA, a
municipality, and MORTGAGE
RESOLUTION PARTNERS LLC,

            Defendants.

Case No. CV-13-3663-CRB

**DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION**

Date:      September 13, 2013
Time:      10:00 a.m.
Judge:     Honorable Charles R. Breyer
           Courtroom 6, 17th Floor

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

SUMMARY OF ARGUMENT ..................................................................................... vii

BACKGROUND ............................................................................................................ 1

    A.    The Underwater Mortgage Crisis in the City ....................................... 1

    B.    The City's Search for Solutions ........................................................... 2

    C.    California's Eminent Domain Law ....................................................... 4

    D.    The Banks' Lawsuit ............................................................................ 5

ARGUMENT .................................................................................................................. 5

    I.    The Court Lacks Jurisdiction To Hear The Banks' Claims .................... 5

    II.    The Banks Have Not Satisfied Any Of The Criteria For Obtaining
        A Preliminary Injunction ................................................................... 11

        A.    The Banks lack a probability of prevailing on claims that are
            not justiciable .............................................................................. 11

        B.    The Banks have not established irreparable harm ...................... 11

        C.    The people of the City of Richmond would suffer irreparable
            harm if the Court granted an injunction ..................................... 15

        D.    The public interest would be harmed if the Court stifled public
            debate and interfered with the operations of municipal
            government ................................................................................. 16

        E.    The Banks lack a probability of prevailing on the merits of
            their substantive legal arguments .............................................. 17

            1.    The loans are located within the City's jurisdiction
                for purposes of the City's eminent domain power ......................... 17

            2.    Condemnation of mortgage loans would be for public
                use ............................................................................................ 21

            3.    Condemnation of mortgage loans would not violate
                the Dormant Commerce Clause .................................................. 24

            4.    Condemnation would not violate the Contract Clause ................. 27

CONCLUSION ............................................................................................................ 27

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

### Federal Cases

4

*Abbott Labs. v. Gardner*,
5
    387 U.S. 136 (1967)…………………………………………………………………….9

6

*Aetna Life Ins. Co. v. Haworth*,
    300 U.S. 227 (1937) ...................................................................................... 5
7

*Alliance for the Wild Rockies v. Cottrell*,
8
    632 F.3d 1127 (9th Cir. 2011) .................................................................... 11

9

*Armendariz v. Penman*,
10
    75 F.3d 1311 (9th Cir. 1996) ...................................................................... 8

11

*Baldwin v. Missouri*,
    281 U.S. 586 (1930) .................................................................................. 21
12

*Berman v. Parker*,
13
    348 U.S. 26 (1954) ............................................................................. 22, 23

14

*Brown v. Kennedy*,
15
    82 U.S. 591 (1872) .............................................................................. x, 19

16

*C & A Carbone, Inc. v. Clarkstown*,
17
    511 U.S. 383 (1994) .................................................................................. 24

*Califano v. Sanders*,
18
    430 U.S. 99, 105 (1977)…………………………………………………………….9

19

*Carpenter v. Longan*,
20
    83 U.S. 271 (1872) .................................................................................... 18

21

*Chicago, Rock Isl. & Pac. Ry. Co. v. Sturm*,
    174 U.S. 710 (1899) .................................................................................. 20
22

*Cities Service Co. v. McGrath*,
23
    342 U.S. 330 (1952) .................................................................................. 19

24

*City of Cincinnati v. Louisville & Nashville Railroad Co.*,
    223 U.S. 390 (1912) .................................................................................. 27
25

*City of Los Angeles v. Lyons*,
26
    461 U.S. 95 (1983) .................................................................................... 10

27

*Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*,
28
    218 F. Supp. 2d 1203 (C.D. Cal. 2002) ...................................................... 8

ii

*Curry v. McCanless,*
    307 U.S. 357 (1939) .................................................................................21

*Delaware v. New York,*
    507 U.S. 490 (1993) .................................................................................20

*Employers Ins. of Wausau v. Fox Entm't Grp., Inc.,*
    522 F.3d 271 (2d Cir. 2008) .......................................................................8

*Harris v. Balk,*
    198 U.S. 215 (1905) ............................................................................x, 20

*Hawaii Housing Authority v. Midkiff,*
    467 U.S. 229 (1984) ...........................................................x, xi, 8, 22, 23, 27

*Kelo v. City of New London,*
    545 U.S. 469 (2005) .............................................................................22, 23

*Kirtland v. Hotchkiss,*
    100 U.S. 491, 498 (1879)………………………………………………………………….21

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) ...................................................................................5

*Lopez v. Candaele,*
    630 F.3d 775 (9th Cir. 2010) ....................................................................10

*Louisville Joint Stock Land Bank v. Radford,*
    295 U.S. 555 (1935) .................................................................................27

*M&A Gabaee v. Cmty. Redevelopment Agency of City of Los Angeles,*
    419 F.3d 1036 (9th Cir. 2005) ..............................................................ix, 12

*Menendez v. Faber, Coe & Gregg, Inc.,*
    345 F.Supp. 527 (S.D.N.Y. 1972) ............................................................21

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,*
    457 U.S. 423 (1982) ..........................................................................ix, 12, 13

*Miller v. United States,*
    78 U.S. 268 (1870) ...................................................................................19

*Minnesota v. Clover Leaf Creamery Co.,*
    449 U.S. 456 (1981) .................................................................................25

*Montara Water & Sanitary Dist. v. Cnty. of San Mateo,*
    598 F. Supp. 2d 1070 (N.D. Cal. 2009).................................................13

*Munaf v. Geren,*
    553 U.S. 674 (2008) .................................................................................11

*Nat'l Ass'n of Optometrists & Opticians v. Brown*,
    567 F.3d 521 (9th Cir. 2009) ......................................................................... 24

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
    682 F.3d 1144 (9th Cir. 2012) ....................................................................... 24

*Nat'l Collegiate Athletic Ass'n v. Miller*,
    10 F.3d 633 (9th Cir. 1993) ........................................................................... 24

*New Orleans Water Works Co. v. City of New Orleans*,
    164 U.S. 471 (1896) .......................................................... viii, x, 6, 9, 16

*Office Depot Inc. v. Zuccarini*,
    596 F.3d 696 (9th Cir. 2010) ......................................................................... 18

*Offield v. New York, New Haven & Hartford R.R. Co.*,
    203 U.S. 372 (1906) ............................................................................... x, 19

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) ...................................................................................... 25

*Regional Railroad Reorganization Act Cases*,
    419 U.S. 102 (1974) ........................................................................................ 8

*Silesian Am. Corp. v. Clark*,
    332 U.S. 469 (1947) ...................................................................................... 19

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) .......................................................................................... 5

*Texas v. New Jersey*,
    379 U.S. 674 (1965) ................................................................................. 20, 21

*Texas v. United States*,
    523 U.S. 296 (1998) ............................................................................... viii, 5

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) (en banc) .................................................. 5, 9

*U.S. Trust Co. of N.Y. v. New Jersey*,
    431 U.S. 1 (1977) .......................................................................................... 27

*Wendy's Int'l, Inc. v. City of Birmingham*,
    868 F.2d 433 (11th Cir. 1989) ........................................................................ 6

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................... 11, 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv

**California Cases**

*City and County of San Francisco v. Lux*,
    64 Cal. 481 (1884) ................................................................................21

*City of Oakland v. Oakland Raiders*,
    174 Cal.App.3d 414 (1985) ...................................................................xi, 25

*City of Oakland v. Oakland Raiders*,
    31 Cal.3d 656 (1982) .............................................................................18

*County of Ventura v. Channel Islands Marina, Inc.*,
    159 Cal.App.4th 615 (2008) ....................................................................22

*Hyde v. Mangan*,
    88 Cal. 319 (1891) ................................................................................18

*Johnston v. Wolf*,
    118 Cal.App. 388 (1931) ........................................................................19

*In re Marriage of Brown*,
    15 Cal.3d 838 (1976) .............................................................................17

*Pac. Decision Sciences Corp. v. Superior Court*,
    121 Cal.App.4th 1100 (2004) ..................................................................17

*Santa Cruz Cnty. Redevelopment Agency v. Izant*,
    37 Cal.App.4th 141 (1995) .......................................................................6

*Waite v. Waite*,
    6 Cal.3d 461 (1972) ………………………………………………………...17, 20

*Estate of Waits*,
    23 Cal.2d 676 (1944) .............................................................................17

**Federal Statutes**

42 U.S.C.,
    § 1988 ............................................................................................viii, 5

**California Statutes**

California Code of Civil Procedure,
    § 1230.020 ..........................................................................................4
    § 1240.030 ........................................................................................22
    § 1240.030(a) ....................................................................................22
    § 1240.050 ........................................................................................13
    § 1245.220 ...................................................................................vii, 4
    § 1245.230 ..............................................................................viii, 4, 21
    § 1245.235 ...............................................................................viii, 4

§ 1245.235(b)(2) .......................................................................................................... 12
§ 1245.235(b)(3) .......................................................................................................... 12
§ 1245.240 ............................................................................................................. viii, 4
§ 1245.250(a) ............................................................................................................... 22
§ 1245.255 ...................................................................................................................... 9
§ 1245.255(b) ............................................................................................................... 22
§ 1250.020 .................................................................................................................... 13
§ 1250.360(h) ........................................................................................................... 4, 12
§ 1255.410 ............................................................................................................ ix, 4, 13, 14
§ 1255.410(d)(2) ............................................................................................... 4, 13, 14
§ 1260.010 ...................................................................................................................... 4
§ 1263.010 *et seq.* ....................................................................................................... 14
§§ 1263.010-1265.420 .................................................................................................. 4
§ 1263.310 ...................................................................................................................... 4
§ 1263.320 .................................................................................................................... 13

California Civil Code,
       § 2936 ................................................................................................................... 18

California Gov't Code,
       § 7267.2(a)(2) ......................................................................................................... 3

California Health & Safety Code,
       § 50002 ................................................................................................................. 23

**United States Constitution**

Article III ...................................................................................................................passim

Amendment V ............................................................................................................... 22

**California Constitution**

Article I, § 1 ................................................................................................................. 13

Article I, § 7 ................................................................................................................. 13

Article I, § 19 .......................................................................................................... 13, 22

**Rules**

Fed. R. Civ. P. 12(h)(3) .................................................................................................. 5

**Other Authorities**

Robert Hockett, "Paying Paul and Robbing No One: An Eminent Domain Solution for
       Underwater Mortgage Debt," *Fed. Reserve Bank of N.Y.: Current Issues in
       Economics and Finance*, Vol. 19, Number 5 (2013), available at:
       http://www.newyorkfed.org/research/current_issues/ci19-5.pdf ........................... vii

# SUMMARY OF ARGUMENT

The collapse in housing prices brought on by the 2008 financial crisis devastated the City of Richmond (the "City").  Homes are worth less than half of their peak value and, in large areas of the City, more than half of "homeowners" are left with mortgage debt that far exceeds the value of the home.  Although some other parts of the country and Bay Area have experienced a substantial recovery in housing prices, no recovery sufficient to resolve the "underwater" mortgage loan problem is on the horizon in the City.  The underwater mortgage loans have led to a cycle of economic contraction, defaults, foreclosures, abandoned properties, vandalism, increased criminal activity, a drop in City property tax revenues, a decline in City services, and the deterioration of neighborhoods.  Like other cities in a similar position, the City is exploring potential solutions.

One potential solution is for the City itself to purchase underwater mortgage loans for their fair market value, using eminent domain powers if necessary, and then reduce the principal balances, keeping the current homeowners in their homes for the benefit of neighborhoods and the City as a whole.  Policy experts have been urging this type of "principal reduction" solution for years as the most viable option to save some cities from more years of stagnation and deterioration.[1]  Not surprisingly, some financial-industry interests are vehemently opposed to the idea, even though the government would have to pay just compensation.  They have mounted an aggressive campaign to discredit the idea and everyone associated with it.  This lawsuit is part of that campaign, intended to intimidate officials and community groups in the City and other localities considering similar proposals for addressing the underwater mortgage crisis.

The Richmond City Council has not adopted a resolution of necessity to authorize the use of eminent domain authority to acquire mortgage loans.  The City Manager is still exploring the possibility of acquiring loans through negotiations.  Under California law, "a public entity may not commence an eminent domain proceeding until its governing body has adopted a resolution of necessity."  Cal. Code Civ. Proc. §1245.220.  A resolution of necessity is a legislative act that must

---

[1] *See, e.g.*, Robert Hockett, "Paying Paul and Robbing No One: An Eminent Domain Solution for Underwater Mortgage Debt," *Fed. Reserve Bank of N.Y.: Current Issues in Economics and Finance*, Vol. 19, Number 5 (2013), available at: http://www.newyorkfed.org/research/current_issues/ci19-5.pdf.

1  be adopted by a supermajority vote, after advance notice to property owners and a public hearing,

2  and findings about the "public interest and necessity" for using eminent domain authority.  *Id.*

3  §§1245.230, 1245.235, 1245.240.

4      Nonetheless, Plaintiffs Wells Fargo Bank, National Association; Deutsche Bank National

5  Trust Company; and Deutsche Bank Trust Company Americas (collectively, the "Banks") filed this

6  lawsuit against the City and its advisor, Mortgage Resolution Partners LLC ("MRP"), seeking

7  declaratory and injunctive relief to prevent the City from exercising eminent domain authority to

8  condemn mortgage loans and demanding attorney's fees under 42 U.S.C. §1988.  The Banks

9  immediately moved for a preliminary injunction and refused to take their motion off calendar when

10  the City pointed out that its City Council had not adopted a resolution of necessity or even put one

11  on its agenda.

12      That being so, this case is just harassment.  The Banks' claims are not ripe, and none of the

13  preliminary injunction factors are met, so the Banks' motion should be denied.

14      1.    As a threshold matter, the jurisdiction of the federal courts is limited to deciding actual

15  cases and controversies.  "A claim is not ripe for adjudication if it rests upon contingent future

16  events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*,

17  523 U.S. 296, 300 (1998) (internal quotation marks omitted).  The City Council has not adopted a

18  resolution of necessity and may never do so, so this case is not ripe.  The Supreme Court

19  specifically held long ago in *New Orleans Water Works Co. v. City of New Orleans*, 164 U.S. 471

20  (1896), a case that remains good law, that federal courts may not interfere "by any order, or in any

21  mode" with a city council's authority to exercise its legislative powers *before* those powers have

22  been exercised, *id.* at 481.  Because the Court lacks subject matter jurisdiction, it cannot issue a

23  preliminary injunction.

24      2.    Even if the Court had subject matter jurisdiction, the Banks cannot establish any of

25  the four criteria for obtaining a preliminary injunction.

26      *First*, the Banks do not have a probability of prevailing on claims that are not justiciable.

27      *Second*, the Banks cannot show a likelihood of irreparable harm if a preliminary injunction

28  is denied.  They would not be obligated to participate in a City Council hearing on a (hypothetical)

proposed resolution of necessity; nor is participating in public debate irreparable harm.  Even if the City Council adopted a resolution of necessity, and the City immediately filed an eminent domain lawsuit, the Banks would not suffer irreparable harm.  The Banks could raise in that lawsuit every legal argument they seek to raise prematurely here.  The Supreme Court has rejected the contention that the state courts will not adequately protect constitutional rights.  *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982).  The Ninth Circuit has applied that holding specifically to California eminent domain proceedings.  *M&A Gabaee v. Cmty. Redevelopment Agency*, 419 F.3d 1036, 1039-41 (9th Cir. 2005).  Indeed, the many state-law issues the Banks raise in their complaint would be better addressed in state court and, if the Banks were correct in their legal analysis, would mean the federal constitutional issues never would be reached.

The Banks protest that California has a "quick-take" procedure.  But the procedure for "possession prior to judgment" requires a motion on at least 60 days notice, allows for opposition, and requires the state court to find that "[t]he plaintiff is entitled to take the property by eminent domain."  Cal. Code Civ. Proc. §1255.410.  The state court must also find that the plaintiff has deposited the full amount of probable just compensation and that the balance of hardships favors provisional relief.  *Id.*  Those are the issues the Banks wish to contest, and they could do so in state court.  The Banks' irreparable harm argument reduces to two propositions – both rejected by the Supreme Court – that it is irreparable harm to (1) have to raise defenses in state court and (2) receive just compensation in accordance with the U.S. and California constitutions.

In this regard, it cannot be gainsaid that, even if the Banks' defenses, including their constitutional objections, to eminent domain were rejected, the Banks still would not suffer any cognizable injury.  Investors do not have sentimental attachment to mortgage loans such that their loss cannot be compensated in money.  They are just an investment.  There is a market that sets a market price, and the property owner in an eminent domain lawsuit is entitled by law to receive the full fair market value of the property.  It cannot be irreparable harm for a plaintiff to receive everything to which the plaintiff is entitled.

*Third*, by contrast to the Banks, which are at no risk of irreparable harm, the people of the City of Richmond would suffer irreparable harm to their First Amendment rights, and their right to

1    self-government, if the Court intervened now at the Banks' request.  The City is attempting to deal

2    with a major problem that is causing deteriorating neighborhoods and a declining tax base.  If this

3    Court grants a preliminary injunction, the City would be forced to defend a hypothetical plan its

4    City Council never adopted, based on the Banks' mischaracterizations of that non-existent plan,

5    rather than conducting a duly noticed public hearing to build the legislative record to consider and

6    ultimately support a potential future resolution of necessity.

7        *Fourth*, a preliminary injunction unquestionably would harm the public interest by

8    enmeshing the federal courts in local, municipal legislative decisions, contrary to the clear

9    instructions of the Supreme Court.  *See New Orleans Water Works Co.*, 164 U.S. at 481 ("[T]he

10   courts will pass the line that separates judicial from legislative authority if by any order, or in any

11   mode, they assume to control the discretion with which municipal assemblies are invested when

12   deliberating upon . . . . ordinances proposed for their adoption.").

13       3.    Even if the Court could reach the merits of the Banks' substantive legal claims, the

14   Banks would not have any probability of success.  The Banks are mistaken about the law on each

15   of the four issues they raise.

16       The City certainly could exercise eminent domain authority to condemn loans when the

17   debtor and security property are located within the city.  There is no "extraterritoriality" problem.

18   *See, e.g., Harris v. Balk*, 198 U.S. 215, 221-24 (1905) (upholding garnishment of a debt owed to a

19   non-resident creditor and explaining that "[t]he obligation of the debtor to pay his debt clings to

20   and accompanies him"); *Brown v. Kennedy*, 82 U.S. 591 (1872) (upholding condemnation of a debt

21   and mortgage interest at the site of the debtor and security property even though the creditor, the

22   bond and the mortgage instrument were located outside the jurisdiction); *Offield v. New York, New*

23   *Haven & Hartford R.R. Co.*, 203 U.S. 372 (1906) (upholding use of eminent domain to condemn

24   stock issued by a domestic corporation even though the owners of the shares were located

25   elsewhere).

26       The hypothetical use of eminent domain to condemn mortgage loans as part of a public

27   program to reduce principal balances, avoid foreclosures, and stabilize neighborhoods would easily

28   satisfy the "public use" test.  *See Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 241 (1984)

1  ("where the exercise of the eminent domain power is rationally related to a conceivable public

2  purpose, the Court has *never* held a compensated taking to be proscribed by the Public Use Clause"

3  (emphasis added)).

4       There is no serious Dormant Commerce Clause issue here because the hypothetical exercise

5  of eminent domain authority would not involve any regulation of commerce.  Nor would it

6  discriminate against out-of-state investors; every investor would receive full fair market value, and

7  some investors would be Californians.  The case the Banks rely upon involved the attempted

8  condemnation of a sports franchise that was participating in an interstate football league that

9  functioned as a joint venture among the sports teams.  *See City of Oakland v. Oakland Raiders*, 174

10  Cal.App.3d 414 (1985).  That fact pattern has no similarity whatsoever to mortgage loans.

11       Finally, the Supreme Court already has rejected the argument that the use of eminent

12  domain violates the Contract Clause, ruling unanimously that the Contract Clause argument has

13  "no merit" because the "Clause has never been thought to protect against the exercise of the power

14  of eminent domain."  *Midkiff*, 467 U.S. at 243 n.6.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Opposition to Motion for Preliminary Injunction, Case No. CV-13-3663-CRB

# BACKGROUND

### A.    The Underwater Mortgage Crisis in the City

The City, a diverse, working-class city on the San Francisco bay, has been hit harder by the recent housing crisis than most other cities in the nation.  The median sale price of homes has declined from a peak of about $450,000 in January 2006 to about $220,000 today.  Declaration of City Manager William Lindsay ("Lindsay Dec.") ¶6.  As a result, many homeowners are now seriously "underwater" on their mortgages, meaning they owe banks or other financial institutions holding their mortgages much more than their homes are worth (which is also known as having "negative equity").  The City has one of the worst such situations in the country, with about 51% of homeowners underwater on their mortgages and the average underwater homeowner owing about 45% more than the home is worth.  *Id.* ¶¶7-8.

This situation has resulted in a large number of foreclosures – approximately 2,000 in the past three years.  *Id.* ¶9.  About 16% of homeowners with a mortgage in the City have suffered a foreclosure.  *Id.*  The City's research shows that a high percentage of underwater mortgages, particularly those in Private Label Securitization ("PLS") trusts, ultimately will wind up in foreclosure.  *Id*; *see also* Declaration of Robert Hockett ("Hockett Dec.") ¶16.[2]

The high concentration of underwater mortgage loans is holding down property values, which results in reduced property tax revenues, which results in reduced city services.  Lindsay Dec. ¶¶11-13; *see also* Hockett Dec. ¶6; Declaration of Peter Dreier ("Dreier Dec.") ¶8; Declaration of Reverend Marvin Webb ("Webb Dec.") ¶3.  Between 2007 and 2012, the City's property tax revenue declined by more than 14.5%.  In the fiscal year ending June 30, 2009, the City had about 950 people on staff; for the current fiscal year that number has declined to 786.  Lindsay Dec. ¶¶12-13.

Foreclosures have also led to problems associated with vacant homes, including neighborhood blight and illegal garbage dumping, crime, and the diversion of City resources.  *Id.*

---

[2] The term Private Label Securitization means that there is no backing from a government agency, like Ginnie Mae. The term Residential Mortgage-Backed Securities ("RMBS") means that the securitization trust holds residential mortgage loans, as opposed to other assets.  Declaration of Robert Hockett ("Hockett Dec.") ¶9 n.1.

¶14.  For example, in 2010 the City had to haul 295 tons of trash off of private property, a large portion of which was from vacant homes, and police and fire services have been forced to dedicate additional resources to neighborhoods that have suffered higher vacancy rates.  Lindsay Dec. ¶16.  The blight caused by vacancies demoralizes communities and discourages prospective homebuyers from moving into the City, which keeps property values down.  *Id.* ¶14.  The negative equity situation is also a drag on economic recovery.  Hockett Dec. ¶5.  The City's unemployment rate was about 11.9% in June 2013, considerably higher than the statewide unemployment rate.  Lindsay Dec. ¶5.

**B.    The City's Search for Solutions**

Like other similarly-situated cities, Richmond has been searching for local solutions to the local problems caused by a high concentration of underwater mortgage loans.  *Id.* ¶¶4, 17.  The federal government bailed out the big banks after the 2008 financial crisis, but not communities suffering from concentrated negative equity like the City.  Community groups, labor unions, and faith-based organizations are part of this effort to find solutions.[3]  One of the options that the City is considering is purchasing underwater mortgage loans so that the City can reduce principal, keep homeowners in their homes, and thereby protect neighborhoods and the City as a whole.  Lindsay Dec. ¶18.  The idea of using such a program to address the underwater mortgage crisis did not originate with City.  It has been discussed in academic and public policy circles for years.  Hockett Dec. ¶¶3, 15; Dreier Dec. ¶9

The City is focusing in particular on acquiring the most risky and toxic loans originated during the credit bubble, those originated for inclusion in private label securitization trusts, which have exacerbated the crisis because they are especially likely to end up in foreclosure.  Dreier Dec. ¶9; Hockett Dec. ¶12.  As compared to the 51% of all Richmond mortgages that are underwater, 67% of PLS trust loans from zip codes that include the City are underwater.  Lindsay Dec. ¶7.

---

[3] Community groups working with City officials on plans to address the underwater mortgage crisis include the Contra Costa Interfaith Community Supporting Organization, Communities for a Better Environment, United Food and Commercial Workers Local 5, Urban Tilth, Asian Pacific Environmental Network, Black Mobilization Organization, Education Richmond, Urban Habitat, Richmond Progressive Alliance, SEIU Local 1021, and the Alliance of Californians for Community Empowerment.  Webb Dec. ¶5.

1  Attempts to reduce mortgage principal balances have not succeeded for loans held in PLS trusts

2  because of the way the PLS trusts were structured.  Hockett Dec. ¶¶11-14.

3      In July 2013, the City Manager sent letters to the trustees and servicers of many PLS trusts

4  holding underwater mortgage loans in the City, seeking to initiate negotiations over the potential

5  purchase of these loans by the City.  Lindsay Dec. ¶19 & Exh. A.  These letters offered to purchase

6  each loan for its individual fair market value as determined in an independent appraisal, subject to

7  approval by the Richmond City Council.  *Id.* Exh. A.  In addition, the letters asked the recipient to

8  identify the party that it believed had authority to sell the loans if it did not believe itself to have

9  such authority.  *Id.*  The offer letters state that, "if for any reason you are not satisfied with this

10  offer of just compensation, and have relevant information you would like the City to consider,

11  please contact the undersigned."  *Id.*  The offer letters also state that "in the event that negotiations

12  fail to result in agreement, and the City decides to proceed with the acquisition of the Loans

13  through eminent domain, you would have the right to have the amount of just compensation to be

14  paid by the City for the Loans fixed by a court of law."  *Id.*

15      The offer letters were accompanied by an informational pamphlet describing the eminent

16  domain process in California, the inclusion of which is provided for by California law.  Cal. Gov't

17  Code §7267.2(a)(2).  The informational pamphlet explains that "[t]he City of Richmond, to the

18  greatest extent practicable, will make every reasonable effort to acquire your property by

19  negotiated purchase" and that, if negotiations fail, the City may decide to exercise its eminent

20  domain authority "or it may decide to abandon its intention to acquire the property."  Lindsay Dec.

21  Exh. B, at 5.  The pamphlet also explains that the exercise of eminent domain authority would

22  require the adoption of a resolution of necessity by the City Council and that property owners

23  would receive advance notice and an opportunity to object to the adoption of such a resolution.  *Id.*

24      Right now, the City is looking for a counterparty with which to negotiate about the

25  purchase of underwater mortgage loans and is willing to negotiate about price and other terms.

26  Lindsay Dec. ¶20.  The City has not made a decision whether to use eminent domain authority if

27  negotiations fail or about what loans should be included if eminent domain authority is exercised.

28  *Id.*  ¶¶4, 22.

Defendants' Opposition to Motion for Preliminary Injunction, Case No. CV-13-3663-CRB

1

### C.   California's Eminent Domain Law

2     "Except as otherwise specifically provided by statute, the power of eminent domain [in

3   California] may be exercised only as provided in [the State's Eminent Domain Law]."  Cal. Code

4   Civ. Proc. §1230.020.  Under the Eminent Domain Law, "a public entity may not commence an

5   eminent domain proceeding until its governing body has adopted a resolution of necessity."  *Id.*

6   §1245.220.   The adoption of a resolution of necessity requires advance notice to property owners,

7   who have the opportunity to object at a public hearing; specific findings of public interest and

8   necessity; and a two-thirds vote by the governing body.  *Id.* §§1245.230,1245.235, 1245.240.

9     If a public entity's governing board has adopted a resolution of necessity, the public entity

10   may commence an eminent domain proceeding by filing suit against the property owner.  *Id.*

11   §1245.220.  The property owner may defend the lawsuit by contesting the public entity's right to

12   take the property on any ground.  *Id.* §1250.360(h).  The property owner is entitled to receive just

13   compensation in exchange for the property; the Eminent Domain Law provides for a jury trial if

14   there are disputes about the calculation of just compensation; and eminent domain proceedings

15   "take precedence over all other civil actions in the matter of setting the same for hearing or trial in

16   order that such proceedings shall be quickly heard and determined."  *Id.* §1260.010; *see also id.* at

17   §1263.010-§1265.420.  "Just compensation" is defined generally to mean "the fair market value of

18   the property taken."  *Id.* §1263.310.

19     The Eminent Domain Law also has a procedure for "possession prior to judgment," which

20   requires a noticed motion by the plaintiff that the property owner may oppose.  *Id.* §1255.410.

21   The motion may be granted only if the trial court finds that "[t]he plaintiff is entitled to take the

22   property by eminent domain."  *Id.* §1255.410(d)(2)(A).  The trial court also must find that the

23   plaintiff has deposited with the court the full amount of probable just compensation and that "the

24   hardship that the plaintiff will suffer if possession is denied . . . outweighs any hardship on the

25   defendant . . . that would be caused by the granting of the order of possession."  *Id.*

26   §1255.410(d)(2)(B),(C),(D).

27

28

1  **D.**  **The Banks' Lawsuit**

2   The Richmond City Council has not adopted a resolution of necessity to authorize the use

3 of eminent domain authority with respect to mortgage loans, nor is a proposed resolution of

4 necessity even on the City Council's agenda.  Lindsay Dec. ¶¶4, 22.

5   Nonetheless, the Banks filed this action seeking declaratory and injunctive relief to prevent

6 the City from using its eminent domain authority to condemn mortgage loans in which they have

7 an interest and an award of attorney's fees under 42 U.S.C. §1988.  The Banks immediately moved

8 for a preliminary injunction.  Doc. 8.

9           **ARGUMENT**

10 **I.**  **The Court Lacks Jurisdiction To Hear The Banks' Claims**

11   Before turning to the Banks' preliminary injunction motion, the Court must address its own

12 subject matter jurisdiction.  "Without jurisdiction the court cannot proceed at all . . . [and] the only

13 function remaining to the court is that of announcing the fact and dismissing the cause."  *Steel Co.*

14 *v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (citation, internal quotation marks

15 omitted); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks

16 subject-matter jurisdiction, the court must dismiss the action.").  The plaintiff has the burden of

17 establishing subject matter jurisdiction.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375,

18 377 (1994).

19  **A.**  The jurisdiction of the federal courts under Article III is limited to deciding ripe

20 cases and controversies.  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th

21 Cir. 2000) (en banc).  "A claim is not ripe for adjudication if it rests upon contingent future events

22 that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S.

23 296, 300 (1998) (internal quotation marks omitted).  The Declaratory Judgment Act is not an

24 exemption from Article III's ripeness limitations.  *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227,

25 239-41 (1937).

26   The Banks' claims are the quintessential example of claims that are not Article III ripe.

27 The Banks ask the Court to decide whether it would be lawful for the City to exercise its eminent

28 domain power to acquire property in which the Banks assert an interest, but the City cannot

1  exercise that power unless its seven-member City Council adopts, by supermajority vote, a

2  resolution of necessity making certain statutorily required findings.  *See supra* at 4.   A resolution

3  of necessity might never be proposed; or it might not cover the particular loans at issue here; or

4  might be rejected by the City Council; or the City Council might send the whole idea back to staff

5  for further study and it might re-emerge in substantially different form.  Therefore, the case is not

6  ripe.  *See*, *e.g.*, *Wendy's Int'l, Inc. v. City of Birmingham*, 868 F.2d 433, 436 (11th Cir. 1989) (no

7  subject matter jurisdiction to issue a declaratory judgment about constitutionality of a taking that

8  might never occur; "appellants' suit necessarily is based upon the possibility of an occurrence

9  which may never come to pass . . . . there is as yet no controversy here ripe for adjudication").

10         Moreover, under California law, "the resolution of necessity is a legislative act."  *Santa*

11  *Cruz Cnty. Redevelopment Agency v. Izant*, 37 Cal.App.4th 141, 150 (1995).   The Supreme Court

12  held in *New Orleans Water Works Co. v. City of New Orleans*, 164 U.S. 471 (1896), that the

13  federal courts may not interfere "by any order, or in any mode" with a city council's authority to

14  exercise its legislative powers *before* those legislative powers have been exercised, repeating that

15  admonition several times in its decision.  *See*, *e.g.*, *id.* at 481 ("[A] court of equity cannot properly

16  interfere with, or in advance restrain, the discretion of a municipal body while it is in the exercise

17  of powers that are legislative in their character."); *id.* at 482 ("[w]e repeat that when the city

18  council shall pass an ordinance that infringes the rights of the plaintiff . . . . it will be time enough

19  for equity to interfere").

20         B.      The facts the Banks relied on in their opposition to the application to take the

21  preliminary injunction off calendar (Doc. 27) do not change the obvious conclusion that the Banks'

22  claims are not ripe.

23         Statements by the City's Mayor about an intent to exercise eminent domain authority in the

24  future are not a legal substitute for a resolution of necessity.  The Mayor, moreover, is just one vote

25  on the City Council, and the City Council would be required to hold a public hearing to consider

26  opposing viewpoints before voting on a resolution of necessity.  An assumption that the process is

27  meaningless would involve a lack of respect for the roles of other government officials.

28

The City Council's approval of an advisory agreement with MRP for advice regarding various methods of dealing with underwater mortgage loans in the City also does not substitute for the adoption of a resolution of necessity.  The agreement does not require the City to exercise eminent domain authority, and the agreement prohibits MRP from implementing any programs without the City's advance approval.  *See* Declaration of John C. Ertman, Exh. I, Advisory Services Agreement at sec. 2, para. 2 (Doc. 9-9).

Nor do the City Manager's offer letters seeking to purchase the mortgage loans make the case ripe.  The letters make plain that the City has *not* made a decision whether to exercise eminent domain authority if the offer is refused.  They state that, "in the event that negotiations fail to result in agreement, and the City *decides to* proceed with the acquisition of the Loans through eminent domain, you would have the right to have the amount of just compensation . . . fixed by a court of law."  Lindsay Dec. Exh. A (emphasis supplied).  The City Manager, moreover, does not have authority to commence an eminent domain action on his own initiative.

Nor are the Banks correct that the City Manager's decision to send the offer letters in the first place must mean the City already has decided to exercise eminent domain authority because the Banks (in their view) lack authority to sell mortgage loans.  The offer letters were sent to multiple trustees/servicers, cover both performing and non-performing loans, and ask the recipients to notify the City if a different party has authority to negotiate.  Lindsay Dec. ¶19 & Exh. A.  The City is willing to negotiate on price and other terms.  *Id.* ¶20.  Were the City ultimately to decide to proceed with an eminent domain action, California law unquestionably would require that decision to be made by the City Council through adoption of a formal resolution of necessity, after a public hearing.  *See supra* at 4.

C.    A brief review of the cases the Banks rely on in their opposition to the application to take the preliminary injunction off calendar (Doc. 27) confirms that the cases do not remotely support the proposition that a federal court may consider a challenge to the legality of a taking before the relevant government agency ever has authorized the taking of the plaintiff's property.  Nor do they address the fundamental separation-of-powers problem in a federal court considering the legality of a legislative act before the relevant legislative act has occurred.

In the *Regional Railroad Reorganization Act Cases*, 419 U.S. 102 (1974), Congress had adopted a statute, the Rail Act, that required conveyance of property, and the only uncertainty was when -- not whether, as here -- the challenged conveyance would occur.  The Supreme Court emphasized this repeatedly in explaining why the case was ripe.  *See id.* at 140 ("implementation of the Rail Act will now lead inexorably to the final conveyance"); *id.* at 141 ("the Special Court is mandated to order the conveyance . . . and is granted no discretion not to order the transfer"); *id.* at 143 ("occurrence of the conveyance . . . is in no way hypothetical or speculative"); *id.* ("injury is certainly impending") (internal quotation marks omitted).

In *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229 (1984), Hawaii had passed a statute authorizing the taking at issue, and the public agency "made the statutorily required finding that acquisition of appellees' lands would effectuate the public purposes of the Act" and "subsequently ordered appellees to submit to compulsory arbitration."  *Id.* at 234.  Here the City Council has not made the "statutorily required finding[s]" necessary to exercise eminent domain authority, and the Banks have not been ordered to do anything.

In *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203 (C.D. Cal. 2002), the plaintiff did not seek an injunction against a condemnation until after the relevant governing board had adopted a resolution of necessity.  The plaintiff had already sued the government to challenge a prior land-use permitting decision and amended its complaint after the adoption of the resolution of necessity to challenge the legality of the proposed taking.  *See* 218 F. Supp. 2d at 1214-15.

In *Armendariz v. Penman*, 75 F.3d 1311, 1321 (9th Cir. 1996), the plaintiffs alleged that the government's over-enforcement of its housing code, closure of their properties, and revocation of their certificates of occupancy amounted to an unconstitutional taking of their property, so the alleged taking already had occurred.

Finally, *Employers Ins. of Wausau v. Fox Entm't Grp., Inc.*, 522 F.3d 271 (2d Cir. 2008), had nothing to do with eminent domain or a challenge to government action.  It involved a dispute about coverage under an insurance policy that already existed.  The Second Circuit's reference to the likelihood that certain "contingencies" would occur was not an invitation for the federal courts

to make predictions about the likely outcomes of legislative processes and, on that basis, opine on the legality of bills not yet proposed, let alone passed.

D.     Even if this case were ripe in the Article III sense (which it obviously is not), the case still would fail the "prudential" component of the ripeness doctrine, which is guided by two overarching considerations: "'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Thomas*, 220 F.3d at 1141 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

Part of the very purpose of a formal resolution of necessity is make the issue whether eminent domain is lawful "fit[] for judicial decision," by identifying the exact property at issue, and setting out what the governing body has found to be the "public interest and necessity" for exercising eminent domain authority.  *See* Cal. Code Civ. Proc. §1245.255 (resolution of necessity is subject to judicial review).  Absent a resolution of necessity, a court could not even determine whether the particular loans in which the Banks assert an interest would be covered by an exercise of eminent domain authority; even if the City decided to exercise such authority, it might proceed in phases, and these loans might not be covered.  Nor could a court assess whether the use of eminent domain authority meets the "public use" test without the City Council's own findings as to the purpose of the taking.  Hearing a legal challenge now could embroil the federal courts and the City in speculative litigation about the legality of a plan the City Council never adopted, with much of that litigation devoted to disputes about the contents of the unapproved "plan" and the Banks' mischaracterizations of the non-existent "plan."

Likewise, there is no "hardship to the parties of withholding court consideration" because, unless and until a resolution of necessity is adopted, no eminent domain action can be commenced.  Judicial review can take place at that point, whether in federal or state court, and all the legal issues can be decided on a full record.  *See New Orleans Water Works Co. v. City of New Orleans*, 164 U.S. at 482 ("[w]e repeat that when the city council shall pass an ordinance that infringes the rights of the plaintiff . . . . it will be time enough for equity to interfere").

E.      The fundamental jurisdictional problem with the Banks' lawsuit can also be viewed as a lack of Article III standing.  *See Thomas*, 220 F.3d at 1138 (explaining the close relationship between standing and ripeness).  To establish standing, the "plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'"  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983); *see also Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (at the preliminary injunction stage, a plaintiff must establish an injury that is "actual or imminent, not conjectural or hypothetical" (citation, internal quotation marks omitted)).

The Banks contend they will be injured because their property will be taken in violation of the Constitution, but no taking can occur unless a resolution of necessity is adopted.  Whether to adopt such a resolution would be a legislative decision made by a supermajority of the City Council, following a public hearing.  As such, the constitutional injury the Banks claim is "conjectural" and "hypothetical."

The Banks protest that the City has taken "substantial steps" to implement what they call a "Seizure Program."  Doc. 27 at 3.  But, by the same logic, the federal government had taken "substantial steps" to implement a national health care "Program" long before Congress eventually passed legislation, including multiple town hall meetings, economic analyses, blue-ribbon commissions, etc., over the course of many years.  President Obama had even promised such a "Program" would come to fruition if he were elected.  Yet before Congress actually adopted (and the President signed) the necessary legislation, no one would have standing to challenge it because implementation was still "conjectural" and "hypothetical."

To the extent the Banks may be claiming they suffer an "injury in fact" from the City Manager's offer letter, which they characterize as "coercive" (Pls. PI Mot. (Doc. 8) at iii), the claim is meritless.  The City Manager's offer letter does not require the Banks to take any action, does not state that the City has decided to exercise eminent domain authority, and includes an informational pamphlet that explains that the City Manager would need permission from the City Council, through the adoption of a resolution of necessity, before initiating an eminent domain

1    action.  *See supra* at 3.  The Banks, moreover, contend they have no authority to sell the loans (Pls.

2    PI Mot. (Doc. 8) at 3), so the offer letter could not be coercing the Banks to sell the loans or to sell

3    at a lower price.  The Banks suffer no more harm than any other property owner that receives such

4    an offer letter, and they have no greater right than other property owners to advisory opinions from

5    the federal courts about the legality of hypothetical takings.

6    **II.    The Banks Have Not Satisfied Any Of The Criteria For Obtaining A Preliminary Injunction**

7           Even if the Court does not dismiss this entire case now for lack of subject matter

8    jurisdiction, the Banks certainly are not entitled to a preliminary injunction.  A preliminary

9    injunction is an "extraordinary and drastic remedy" that is never awarded as of right.  *Munaf v.*

10   *Geren,* 553 U.S. 674, 688-90 (2008) (citations and internal quotation marks omitted).  "A plaintiff

11   seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2]

12   that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance

13   of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. Natural*

14   *Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008).  The Banks have not established any of

15   these four mandatory criteria for obtaining a preliminary injunction.

16          **A.    The Banks lack a probability of prevailing on claims that are not justiciable**

17          As an initial matter, the Banks cannot establish a likelihood of success on their claims for

18   the threshold reason that they have not shown that the Court has jurisdiction to hear those claims.

19   *See supra* at 5-11.  We demonstrate below that the Banks' substantive defenses to a hypothetical

20   lawsuit to implement a hypothetical resolution of necessity are meritless, *see infra* at 17-27, but

21   this Court would never reach those issues because the Banks' claims are not justiciable.

22          **B.    The Banks have not established irreparable harm**

23          The Banks also are not entitled to a preliminary injunction because, "[u]nder *Winter*,

24   plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a

25   preliminary injunction."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.

26   2011) (emphasis in original) (explaining that *Winter* rejected the Ninth Circuit's prior practice of

27   allowing preliminary injunctions based on the mere "possibility" of irreparable harm).  The Banks

28   fail to establish that they will likely suffer irreparable harm absent a preliminary injunction.

1.      As an initial matter, the Banks cannot establish that the City Council will even consider a resolution of necessity that addresses the mortgage loans at issue.  No proposed resolution is on the City Council's agenda.  As the Banks concede, three other jurisdictions spent months reviewing the possibility of purchasing loans, including potentially by eminent domain, and ultimately decided not to proceed at the present time.  Complaint ¶62.  The Banks' proof of "likely" injury therefore fails at the outset.

A notice that the City Council intends to consider a proposed resolution of necessity, moreover, would not cause the Banks any cognizable harm.  Under California law, a property owner is given the opportunity to make objections to a proposed resolution of necessity, but the property owner is not required to take any action or to attend or participate in the City Council proceeding.  *See* Cal. Code Civ. Proc. §1245.235(b)(2), (3).  The City Council's public debate about the possible use of eminent domain authority would be a normal part of our democracy, not a constitutional "injury."

2.      The Banks apparently contend that they are threatened with irreparable harm in the absence of an injunction because the City might adopt a resolution of necessity and then might immediately file an eminent domain lawsuit.  But, if that occurred, the Banks could raise, as a defense to that lawsuit, *every* legal argument they seek to raise prematurely here.  *See*, *e.g.*, Cal. Code Civ. Proc. §1250.360(h) (allowing the property owner to contest the right to take on any ground provided by law); *see also M&A Gabaee v. Cmty. Redevelopment Agency of City of Los Angeles*, 419 F.3d 1036, 1039 n.2 (9th Cir. 2005) ("M&A will have an opportunity to litigate its constitutional claims in state court.  California law permits M&A to challenge the taking based not only on California state standards, but also on '[a]ny other ground provided by law.'  Cal. Code Civ. P. §1250.360(h).").

The Supreme Court already emphatically rejected the argument that having to litigate federal issues in state court is irreparable harm.  *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982) ("Minimal respect for the state processes, of course, precludes any *presumption* that the state courts will not safeguard federal constitutional rights.") (emphasis in original).  In *M&A Gabaee*, the Ninth Circuit held that the federal courts should abstain from

interfering with a California state court eminent domain proceeding because the state court would be able to fully protect the plaintiffs' asserted federal constitutional rights. 419 F.3d at 1039-41.

Not only would it be insulting to the state courts and contrary to Supreme Court precedent to hold that the Banks would suffer irreparable harm if required to litigate the very same claims in state court, but the state courts would be the much better forum for the Banks' claims. The Banks' Complaint asserts that a hypothetical resolution of necessity would violate multiple provisions of California state law and the State Constitution. Complaint ¶¶103, 112, 133, 137, 141 (alleging violations of article I, §§1, 7, and 19 of the California Constitution and California Code of Civil Procedure §§1240.050, 1250.020, and 1263.320). The state courts would be in the best position to address those claims and, if the Banks prevailed, the federal constitutional issues would never be reached.

3.       The Banks protest that California has a "quick-take" procedure that threatens their rights. But the California procedure for "possession prior to judgment" requires the plaintiff in an eminent domain action to file a motion with 60 days notice to the property owner, which the property owner may contest. *See* Cal. Code Civ. Proc. §1255.410. The state court cannot grant the motion unless it finds that "[t]he plaintiff *is entitled to take the property by eminent domain*." *Id.* §1255.410(d)(2)(A) (emphasis supplied); *see also Montara Water & Sanitary Dist. v. Cnty. of San Mateo*, 598 F. Supp. 2d 1070, 1077 (N.D. Cal. 2009) (explaining that the California Legislature recently revised the state law to require the trial court to adjudicate "any defenses to an eminent domain action" before a motion for possession prior to judgment may be granted). Thus, the Banks' claim that this procedure would result in an unconstitutional taking of their property depends entirely on the presumption that the state court would decide the right-to-take issues incorrectly. That is the presumption the U.S. Supreme Court rejected in *Middlesex* (among many other cases). In the unlikely event that occurred, moreover, the Banks would have the opportunity for redress in the state appellate courts and to seek review in the U.S. Supreme Court.

The "possession prior to judgment" procedure also requires the state court to find that the plaintiff has deposited with the court the full amount of probable just compensation and, even then, to consider whether "the hardship that the plaintiff will suffer if possession is denied . . . outweighs

13

1    any hardship on the defendant . . . that would be caused by the granting of the order of possession."

2    Cal. Code Civ. Proc. §1255.410(d)(2)(B), (C), (D).  Again the Banks' claim of irreparable harm

3    rests upon the presumption that the state courts would be inadequate to the task.

4          Equally to the point, *if* the City gave notice its City Council intended to consider a proposed

5    resolution of necessity, and *if* the City Council adopted such a resolution after a duly noticed public

6    hearing in which the Banks could participate, and *if* the City then filed an eminent domain lawsuit,

7    and *if* the City then filed a motion for "possession prior to judgment" rather than wait to deal with

8    the issues at trial, the Banks could *at that time* file a lawsuit in federal court and seek an injunction.

9    There are exceptions to the Anti-Injunction Act and to abstention doctrines if a plaintiff can show

10   that the state courts will fail to protect the plaintiff's constitutional rights.  The Banks would never

11   prevail in such a federal suit, but that is because the California state courts are adequate guardians

12   of constitutional rights, not because the Banks would be precluded from even filing such a lawsuit

13   when it was actually ripe and seeking federal intervention at that time.

14          4.       Finally, the Banks appear to argue that they would suffer irreparable harm because

15   they would be *undercompensated* in an eminent domain proceeding.  They allege that the City's

16   plan to restructure mortgage loans depends upon undercompensating them.  But that cannot be

17   right because the California eminent domain procedures ensure that the property owner *will* receive

18   "just compensation" within the meaning of the U.S. and California constitutions, including

19   discovery and a jury trial if necessary to resolve disputed issues of fact, and protection against a

20   grant of immediate possession if the court finds that the balance of the equities favors denying

21   immediate possession (*e.g.*, for the purported credit risk reasons of which the Banks complain).

22   Cal. Code Civ. Proc. §1255.410 & §1263.010 *et seq.*  The Banks will receive the adjudicated fair

23   market value of their mortgage loans.  The Banks' argument concerning the alleged irreparable

24   harm of receiving just compensation is essentially an argument that the U.S. and California

25   constitutions' measure of just compensation is unconstitutional, which is a legal non sequitur.

26          It bears emphasis that the Banks do not claim to have any sentimental attachment to the

27   mortgage loans at issue such that their loss cannot be compensated with money.  They are purely

28   financial assets.  The trusts for which the Banks serve as trustees receive cash in exchange for a

loan in the event of a foreclosure (most loans in California are non-recourse loans) or a short-sale. A taking by eminent domain would be no different.  Mortgage loans have a market value and, indeed, are much easier to value than many other assets.  *See* Hockett Dec. ¶¶8, 18; Dreier Dec. ¶¶10-12.

Contrary to the Banks' contention, a public program to purchase and restructure mortgage loans to reduce principal balances would *not* require shortchanging the trusts that hold the mortgage loans.  Hockett Dec. ¶18; Dreier Dec. ¶¶12-14.  If that were the basis for a program, then the program would never move forward, because the U.S. and California constitutions, and the California Eminent Domain Law, guarantee that the property owner must receive just compensation in the event of a taking.  Thus, if the City were to exercise its eminent domain authority, the owners of mortgage loans definitely will receive the loans' full fair market value. Having received the full measure of just compensation, the Banks will have no injury.

For this reason, it makes no sense for the Banks to criticize the City's offer to purchase the mortgage loans as too low.  In an eminent domain proceeding, the City could not unilaterally determine fair market value.  The City's offer also was based on an independent appraisal, and the City invited the Banks to submit additional information for the appraiser to consider and to discuss arrangements for a new appraisal if the Banks were not satisfied.  Lindsay Dec. ¶21 & Exh. A.  The Banks are refusing to negotiate, not the City.

### C. The people of the City of Richmond would suffer irreparable harm if the Court granted an injunction

In weighing whether to grant a preliminary injunction, a court must also consider the potential harm to the defendant.  *Winter*, 555 U.S. at 26.  Here the Banks ask the Court to preclude the City of Richmond from taking any further action to even consider purchasing mortgage loans by eminent domain.  That injunction would prevent the City from ever developing the legislative record that might (or might not) support the exercise of eminent domain authority in the future and the City Council from considering a resolution of necessity at a public hearing to gain input from all interested parties.  Such an injunction would be a direct infringement on the First Amendment

1  rights of City residents to petition their municipal government and the rights of City residents to

2  conduct their own affairs.

3       A preliminary injunction from this Court also would halt the efforts of City leaders and

4  community groups to find a solution to the real and serious problems the City and its residents are

5  experiencing due to the large concentration of underwater mortgage loans.  Those problems include

6  deteriorating neighborhoods, depressed property values, loss of property tax revenues, reductions

7  in city services, vacant houses, foreclosures, increased crime, etc.  *See supra* at 1-2.

8       The City's efforts to solve a serious problem would be delayed and redirected from normal

9  process of developing public policy to litigation in the federal courts, with the City forced to spend

10 its time and resources defending a "Seizure Program" (as pejoratively characterized by the Banks)

11 that the City Council has not even considered or adopted.  In the meanwhile, the City would be

12 denied the ability to consider the whole matter fully, with input from the public, determine which if

13 any program to adopt and then, if its City Council adopts a program, to defend the actual program

14 in court if necessary.  All of the continuing and ongoing harms from the underwater mortgage

15 crisis during this delay would be irreparable.

16   **D.    The public interest would be harmed if the Court stifled public debate and
              interfered with the operations of municipal government**

17

18       Finally, the court must consider the public interest in deciding whether to grant injunctive

19 relief.  The judgment made about the public interest in limiting the federal courts to deciding actual

20 "cases and controversies," rather than issuing advisory opinions, was that the potential benefits of

21 advisory opinions would be outweighed by the harm caused by enmeshing the federal judiciary in

22 the operations of the political branches.  The very type of premature injunction against future city

23 council action that is sought by the Banks in this action was rejected by the Supreme Court in *New

24 Orleans Water Works Co.* as not consistent with the proper role of the courts:

25       [T]he courts will pass the line that separates judicial from legislative authority if by
          any order, or in any mode, they assume to control the discretion with which
26       municipal assemblies are invested when deliberating upon the adoption or rejection
          of ordinances proposed for their adoption.  The passage of ordinances by such
27       bodies are legislative acts, which a court of equity will not enjoin.  If an ordinance
          be passed, and is invalid, the jurisdiction of the courts may then be invoked . . . .

28 164 U.S. at 481 (citations omitted).  *See also id.* at 482 ("The mischievous consequences that may

16

result from the attempt of courts of equity to control the proceedings of municipal bodies when engaged in the consideration of matters entirely legislative in their character, are too apparent to permit such judicial action . . . .").

Here, there can be no question that it is in the public interest to allow the City to explore possible solutions to a critical problem, to allow its governing body to decide whether to take legislative action to address that problem, and then allow the City to defend in court if necessary whatever solution the City actually adopts.

### E.   The Banks lack a probability of prevailing on the merits of their substantive legal arguments

Although the Court need not address the Banks' substantive legal claims on the merits to deny the preliminary injunction, we briefly address why the Banks have not established a probability of success on their hypothetical defenses to a hypothetical lawsuit to implement a hypothetical resolution of necessity.

### 1.   The loans are located within the City's jurisdiction for purposes of the City's eminent domain power

The Banks' threshold argument that the loans at issue are outside of the City's jurisdiction for purposes of the City's eminent domain power relies on inapposite authorities about escheat and taxation while failing to acknowledge the relevant line of cases.  For purposes of condemnation authority under both California law and the U.S. Constitution, the loans at issue here are located with the debtor and the security property.

The California Supreme Court has explained: "An intangible, unlike real or tangible personal property, has no physical characteristics that would serve as a basis for assigning it to a particular locality.  The location assigned to it depends on what action is to be taken with reference to it."  *Estate of Waits*, 23 Cal.2d 676, 680 (1944).  Therefore, the situs of the same type of intangible property may be different for different legal purposes.  *See, e.g.*, *Waite v. Waite*, 6 Cal.3d 461, 467 (1972) (for certain taxation purposes intangible property located with owner), *disapproved on other grounds by In re Marriage of Brown*, 15 Cal.3d 838, 851 n.14 (1976); *Waits*, 23 Cal.2d at 680 (for purpose of probate administration of a wrongful death claim, "a debt has its situs as the domicile of the debtor"); *Pac. Decision Sciences Corp. v. Superior Court*, 121

1   Cal.App.4th 1100, 1108 (2004) (for purpose of attaching money, "the debt or claim is usually

2   regarded as having a situs in any state in which personal jurisdiction of *the debtor* can be obtained"

3   (internal quotation marks omitted)).  Federal law takes a similar approach.  *See Office Depot Inc. v.*

4   *Zuccarini*, 596 F.3d 696, 702 (9th Cir. 2010) ("[T]he location of intangible property varies

5   depending on the purpose to be served.").

6        In *City of Oakland v. Oakland Raiders*, 31 Cal.3d 656 (1982), the California Supreme Court

7   considered the situs of an intangible asset – an NFL franchise – for the purpose of exercise of a

8   city's eminent domain authority.  The court applied a totality-of-the-circumstances test,

9   considering all of the contacts and relationships of the intangible property with a physical location.

10  It determined that the trial court erred in concluding that the franchise was not subject to the city's

11  eminent domain authority, and found that the city had made a prima facie showing that the

12  franchise was located within its jurisdiction.  *Id.* at 675.  Noting that its list of factors was not

13  exhaustive, the court explained: "Oakland is the principal place of business of the partnership.  It is

14  the designated NFL-authorized site for the team's 'home games.'  It is the primary locale of the

15  team's tangible personalty." *Id.* at 674.

16       Although a sports franchise presents a different range of considerations, the same totality-

17  of-the-circumstances analysis would apply here for purposes of California law.  A wide variety of

18  factors indicate that the location of a mortgage loan on an owner occupied residence for

19  condemnation purposes is the same as the location of the debtor and the security property.  In

20  particular: (1) the debtor is domiciled in the same location as the security (*i.e.* the home); (2) the

21  loans are secured by real property with a physical location, and the security interest would be

22  condemned with the loan;[4] (3) the security interests are recorded where the property is located; (4)

23  the creditor's remedies are based on the location of the real property; (5) the basis for the public

24  purpose for which the loans would be condemned is assisting residents in the condemnor's

---

[4] Under federal and California law, the two components of a mortgage loan are inextricably linked, and the transfer of the mortgage loan carries with it the security interest in the property. *See* Cal. Civ. Code. §2936 ("The assignment of a debt secured by mortgage carries with it the security."); *Carpenter v. Longan*, 83 U.S. 271, 274 (1872) ("The note and mortgage are inseparable."); *Hyde v. Mangan*, 88 Cal. 319, 327 (1891) ("The debt and security are inseparable; the mortgage alone is not a subject of transfer.").

18

jurisdiction; and (6) the information necessary to value the loans concerns the debtor and the security property, not the creditor.

This conclusion is also controlled by federal court decisions about the government seizure of intangible property, in which courts have consistently found that the jurisdiction in which the issuer or debtor is located has authority to seize stock or a debt obligation.  Indeed, the U.S. Supreme Court has held that a state has authority to use eminent domain power to condemn corporate stock – an intangible asset akin to the loans at issue here – of a company incorporated in that state.  *See Offield v. New York, New Haven & Hartford R.R. Co.*, 203 U.S. 372 (1906).  The Supreme Court's decision in *Brown v. Kennedy*, 82 U.S. 591 (1872), is particularly on point because it concerned the condemnation of a secured debt and the related mortgage interest.  The Court held that confiscation of the credit (*i.e.*, the debt claim) and the mortgage interest securing that credit at the place of the debtor and the security property was valid even though the creditor, the bond evidencing the debt, and the mortgage instrument were located out of the jurisdiction.  The Court explained that "attachment or seizure could be made without manual caption of the visible evidence of the credit," and concluded "the debt was effectively confiscated."  *Id.* at 599 (confiscation of assets of Confederate supporter);[5] *see also Cities Service Co. v. McGrath*, 342 U.S. 330 (1952) (holding that pursuant to the Trading With the Enemy Act the United States could seize debts owed by an obligor within the United States even though they were evidenced by bearer bonds outside of the United States); *Silesian Am. Corp. v. Clark*, 332 U.S. 469 (1947) (holding that the United States could seize shares of stock held by an enemy alien in a domestic corporation even though the stock certificates and owner were outside the jurisdiction); *Miller v. United States*, 78 U.S. 268, 294-98 (1870) (upholding the confiscation of a Confederate supporter's shares of stock by seizure at the corporation's domicile, effected by notice to the corporate officer, even though the shareholder was a non-resident).

---

[5] The situs of a debt does not follow the promissory note because such instruments evidence the borrower's obligation; they are not themselves the obligation.  *See Johnston v. Wolf*, 118 Cal.App. 388, 391 (1931) (noting the "well-recognized principle of law that a person does not lose his right to a debt by losing the instrument containing the statement of his right").

1    The conclusion is also controlled by federal and state authorities on garnishment, another

2    action in the nature of a proceeding *in rem*.  As with the condemnation of a loan, garnishment

3    involves a jurisdiction's assertion of authority to order a debt obligation to be paid to a third party

4    rather than the creditor.  The Supreme Court has referred to garnishment as a form of

5    "condemnation."  *Harris v. Balk*, 198 U.S. 215, 221-24 (1905), *overruled on other grounds by*

6    *Shaffer v. Heitner*, 433 U.S. 186 (1977).  It is well established that the jurisdiction in which the

7    debtor is located has authority to garnish the debt, even if the creditor is located outside the

8    jurisdiction.  *See, e.g., id.* at 222 (upholding the garnishment of a debt owed to a non-resident

9    creditor and explaining "[t]he obligation of the debtor to pay his debt clings to and accompanies

10   him"); *Chicago, Rock Isl. & Pac. Ry. Co. v. Sturm*, 174 U.S. 710, 716 (1899) ("[W]hatever of

11   substance there is must be with the debtor.  He, and he only, has something in his hands.  That

12   something is the *res*, and gives character to the action, as one in the nature of a proceeding *in*

13   *rem*"); *Waite*, 6 Cal.3d at 467-68 ("When, however, the issue . . . involves jurisdiction to compel

14   the obligor to pay one claimant and not a competing claimant, the debt or claim is usually regarded

15   as having a situs in any state in which personal jurisdiction of the debtor can be obtained." (internal

16   quotation marks omitted)).

17   Accordingly, the California Supreme Court's analysis in the eminent domain context, and

18   that developed by federal courts with respect to similar exercises of government authority over

19   intangible property, lead to the same conclusion: The mortgage loans incurred by Richmond

20   residents, and secured by real property in Richmond, are within the City's jurisdiction for purposes

21   of the City's eminent domain authority.

22   The escheat and taxation cases the Banks cite have no bearing here; they involve rules

23   adopted for reasons of administration, not the sovereign authority of the government to condemn

24   property.  In the escheat cases, *Delaware v. New York*, 507 U.S. 490 (1993), and *Texas v. New*

25   *Jersey*, 379 U.S. 674 (1965), the Supreme Court considered a situation in which several states had

26   competing claims to the same property and an administrative rule was necessary to fairly spread

27   unclaimed intangible property among the States.  In *Texas*, the Court acknowledged, "this case

28   could have been resolved otherwise, for the issue here is not controlled by statutory or

20

1  constitutional provisions or by past decisions, nor is it entirely one of logic.  It is fundamentally a

2  question of ease of administration and of equity."  379 U.S. at 683.  These decisions did not purport

3  to set forth a general rule for determining the situs of debt obligations outside of the escheat

4  context.  *See Menendez v. Faber, Coe & Gregg, Inc.*, 345 F.Supp. 527, 538 (S.D.N.Y. 1972) ("It is

5  clear . . . that the Court [in *Texas v. New Jersey*] did not lay down a general rule as to the situs of

6  debts and that the opinion rested on special considerations primarily applicable to escheat.").

7  Condemnation of these mortgage loans is different because it does not involve competing

8  jurisdictional claims to the same property, there is longstanding authority recognizing the right to

9  condemn such property at the place of the debtor and security property, and payment of "just

10  compensation" will satisfy the interests of the property owner.

11     The tax cases are also not on point because they too involve rules of administrability.  In

12  *Baldwin v. Missouri*, 281 U.S. 586 (1930), the Court explained that its holding as to the situs of the

13  debt was limited to the taxation context and that the debt may be deemed to be located elsewhere

14  for other purposes.  *Id.* at 592 ("That debt, although a species of intangible property, may, for

15  purposes of taxation, *if not for all others*, be regarded as situated at the domicile of the creditor."

16  (quoting *Kirtland v. Hotchkiss*, 100 U.S. 491, 498 (1879)) (emphasis added) (internal quotation

17  mark omitted)).  Moreover, as the Banks acknowledge, although only in a footnote, the very

18  proposition for which they cite *Baldwin* – that only the creditor's jurisdiction has the power to tax

19  intangible property – has been rejected by the Supreme Court.  *See Curry v. McCanless*, 307 U.S.

20  357, 368 (1939) ("there are many circumstances in which more than one state may have

21  jurisdiction to impose a tax and measure it by some or all of the taxpayer's intangibles").  *City and

22  County of San Francisco v. Lux*, 64 Cal. 481 (1884), cited by the Banks, also limits its statement on

23  this issue to the taxation context.  *Id.* at 484.

24          **2.      Condemnation of mortgage loans would be for public use**

25     The City has yet to adopt a resolution of necessity, which is required to include a statement

26  of the "public use for which the property is to be taken" and a declaration of the "public interest

27  and necessity" that require the condemnation.  Cal. Code Civ. Proc. §1245.230.  Nonetheless, the

28  Banks argue that any hypothetical condemnation of mortgage loans would not have a public

1    purpose.  Their position appears to be that the City should not be permitted to even attempt to

2    articulate the public purpose for any condemnation because there is no conceivable public purpose

3    that would meet constitutional requirements.  This argument is meritless.

4           Both the United States and California Constitutions provide that private property may be

5    taken for a "public use."  U.S. Const., amend. V; Cal. Const. art. I, § 19.  In *Kelo v. City of New*

6    *London*, 545 U.S. 469 (2005), the Supreme Court explained: "Without exception, our cases have

7    defined ["public use"] broadly, reflecting our longstanding policy of deference to legislative

8    judgment in this field."  *Id.* at 480.  The Court has also observed that, "where the exercise of the

9    eminent domain power is rationally related to a conceivable public purpose, the Court has *never*

10   held a compensated taking to be proscribed by the Public Use Clause."  *Midkiff*, 467 U.S. at 241

11   (emphasis added); *see also Berman v. Parker*, 348 U.S. 26, 32 (1954) ("Subject to constitutional

12   limitations, when the legislature has spoken, the public interest has been declared in terms well-

13   nigh conclusive.").[6]

14          Although the Banks argue that the City Council would be making a bad policy decision if it

15   decided to condemn mortgage loans, the courts do not second-guess the wisdom of specific

16   takings.  *See Kelo*, 545 U.S. at 487-88 (rejecting argument that there should be a "reasonable

17   certainty" that the expected public benefit from the taking will occur); *Midkiff*, 467 U.S. at 242

18   (that taking "may not be successful in achieving its intended goals" is irrelevant to the takings

19   analysis; question is solely whether the public entity "rationally could have believed that the

20   [taking] would promote its objective").

21          Likewise, although plaintiffs argue that the hypothetical condemnation at issue here would

22   benefit private parties (with rhetoric concerning MRP that is a complete distortion of the facts), this

23   _____

24          [6] In determining whether a proposed condemnation satisfies the public use requirement, California courts look to both California and federal cases.  *See County of Ventura v. Channel Islands Marina, Inc.*, 159 Cal.App.4th 615, 624 (2008).  California's eminent domain statute also includes provisions establishing the broad scope of legislative discretion in this area.  Except in the case of gross abuse of discretion, which would not apply to the carefully considered actions of a city, a resolution of necessity is conclusive as to the public interest requiring the condemnation. *See* Cal Code Civ. Proc. §1245.250(a) ("Except as otherwise provided by statute, a resolution of necessity adopted by the governing body of the public entity pursuant to this article conclusively establishes the matters referred to in Section 1240.030."), §1245.255(b) (gross abuse of discretion exception), §1240.030(a) (prerequisite that "[t]he public interest . . . require[s] the project").

1   is no obstacle to the exercise of eminent domain power as long as a public interest also is served.

2   In *Kelo*, the Supreme Court explained that "the government's pursuit of a public purpose will often

3   benefit private parties," 545 U.S. at 485, and acknowledged that a taking may be constitutional

4   even if the "most direct beneficiaries" of the taking are private parties, *id.* (quoting *Ruckelshaus v.*

5   *Monsanto Co.*, 467 U.S. 986, 1014 (1984)).  This is so because "[t]he public end may be as well or

6   better served through an agency of private enterprise than through a department of government – or

7   so the Congress might conclude." *Id.* at 486 (internal quotation marks omitted)).  Moreover,

8   California law specifies that housing is a vital public interest and both encourages and directs the

9   public and private sectors to cooperate in pursuing that interest, validating any public/private

10  venture that the City might choose to utilize.  *See* Cal. Health & Safety Code §50002.

11      The Banks also cannot possibly show that the reasons for the taking are just a pretext,

12  considering that the City Council has not yet articulated them.  The City also is not seeking to

13  benefit specific homeowners and has not committed to working with any specific group of

14  investors to refinance the loans.  Lindsay Dec. ¶23.  The City would consider financing proposals

15  from any source, including from the investors in PLS trusts.  *Id.*; *cf.* Hockett Dec. ¶15 (explaining

16  why the investors in PLS trusts would benefit from participating in an eminent domain plan).

17      Although any consideration of "public use" now is pure speculation, because the City

18  Council has not authorized the use of eminent domain and articulated the justification, there are

19  many legitimate public purposes that may be served by the exercise of eminent domain with

20  respect to underwater mortgage loans.  First, there is a recognized public interest in eliminating and

21  preventing blight.  *See Berman*, 348 U.S. at 32-36.  Given the harm that the City has already

22  suffered as a result of the mortgage crisis, *see, e.g.*, Lindsay Dec. ¶¶10-16, the City may determine

23  that acquiring underwater mortgage loans and reducing principal balances is necessary to stabilize

24  neighborhoods, prevent the abandonment of homes and resulting criminal activity, address the

25  collateral consequences of foreclosure for the City's property tax base and City services, and

26  prevent further deterioration of homes and neighborhoods.

27      There also is a public interest in eliminating the many dislocations in the local housing and

28  housing finance markets resulting from negative equity, including limitations on the ability to sell

23

and move and the inability to refinance at lower current interest rates.  *See Midkiff*, 467 U.S. at 232 (finding that condemnation of landlords' interest in real property and conveyance of property to tenants to "reduce the concentration of ownership of fees simple in the State" is a legitimate public purpose).

These are only some examples of the public purposes that might be served by the use of eminent domain, and other governmental entities and community groups are purchasing underwater loans to reduce principal to achieve precisely these public purposes.  Hockett Dec. ¶8. The City Council may determine that there are other public purposes served by condemnation of the loans at issue here, or that no such condemnation should occur.  The Court should not interfere with the City's democratic deliberative process.

### 3.   Condemnation of mortgage loans would not violate the Dormant Commerce Clause

As with the Banks' other arguments, the Court cannot fairly assess whether any condemnation of mortgage loans would violate the Dormant Commerce Clause until the City defines the scope of any such condemnation and articulates its purpose.  Nonetheless, it is apparent that any taking of mortgage loans by the City would not "discriminate against" interstate commerce or "favor[] in-state economic interests over out-of-state interests," which are the primary concerns of the Dormant Commerce Clause.  *Nat'l Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993) (citing *Healy v. Beer Inst.*, 491 U.S. 324, 337 n.14 (1989)); *see also Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012), *cert. denied*, 133 S.Ct. 1241 (2013) (rejecting Dormant Commerce Clause argument).

The City would have to treat all owners of the loans in the same fashion and all would receive just compensation for their property.  Some investors in the trusts would be located in California, and in-state and out-of-state investors would be treated alike.  The hypothetical condemnation plan therefore would not discriminate against out-of-state interests either "facially," "purposefully," or "in practical effect."  *Nat'l Ass'n of Optometrists & Opticians v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009); *see also C & A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 390 (1994) ("The central rationale for the rule against discrimination is to prohibit state or municipal

1  laws whose object is local economic protectionism, laws that would excite those jealousies and

2  retaliatory measures the Constitution was designed to prevent.").

3      Nor would the hypothetical exercise of eminent domain authority "directly regulate"

4  interstate commerce. *Nat'l Collegiate Athletic Ass'n*, 10 F.3d at 638. As explained above, the situs

5  of the loans for purposes of condemnation is the City. Thus, condemnation would not "transfer . . .

6  thousands of loans across state lines," Pls. PI Motion (Doc. 8) at 13, or constitute a reach by the

7  City "outside of its geographic boundaries," *id.* at 15. Indeed, the hypothetical condemnation of

8  mortgage loans would not "regulate" anything. No municipality exercising eminent domain power

9  purports to lay down rules with which market participants must comply. Rather, through eminent

10  domain power, a municipality acquires property of a private party by paying "just compensation."

11      The one case the Banks cite in which an attempt to condemn property was found to

12  constitute impermissible regulation of interstate commerce presented very different circumstances

13  than those here. In *City of Oakland v. Oakland Raiders*, 174 Cal.App.3d 414 (1985), the court's

14  decision turned entirely on the unique nature of the property at issue – an NFL franchise playing in

15  an inter-state national football league. The court found that the NFL required nationally uniform

16  regulation and that each of the league members was interdependent to the point that they all

17  constituted a joint venture. *Id.* at 420. Individual mortgage loans are a very different form of

18  property. They are not an element in a nationwide joint venture, and none of the other unique

19  factors applicable to an NFL franchise are relevant. Nor does it matter that the loans are held

20  within PLS trusts; those loans are deliberately diversified, so payments on one do not affect

21  payments on another; the investors in the trusts are scattered around the world and do not operate a

22  single venture like the NFL.

23      Even if the City's hypothetical use of the eminent domain power were found to constitute

24  regulation, moreover, government regulation does not violate the Commerce Clause unless "the

25  burden imposed on [interstate] commerce is clearly excessive in relation to the putative local

26  benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). This analysis considers "the

27  nature of the local interest involved, and . . . whether it could be promoted as well with a lesser

28  impact on interstate activities." *Id; see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S.

456, 471 (1981) (same).  Here, the City has yet to articulate the nature of the public interest that would be served by condemnation of mortgage loans, so the analysis must be based on speculation. But the City has very significant local interests in protecting neighbors of underwater borrowers within its jurisdiction and the community generally, protecting property values and its own tax base, and addressing the blight caused by the underwater mortgage crisis and its collateral effects. *See* Lindsay Dec. ¶¶10-16.  An eminent domain plan would not place a "burden" on interstate commerce, like a local requirement for particular mud flaps on trucks.  PLS trusts receive cash in exchange for loans in the event of foreclosures and short sales; an acquisition through eminent domain would be no different.  Hockett Dec. ¶18.  To the extent that the Banks' Dormant Commerce Clause argument depends upon the premise that an eminent domain proceeding would under-compensate the trusts for the mortgage loans, the premise is entirely wrong for the reasons previously stated.  *See supra* at 14.

The parade of horribles the Banks invoke is unfounded.  To the extent it is not based on the false premise that trusts would be undercompensated, it is based on the false assumption that state and local government involvement in housing markets is unusual.  Housing and housing finance are predominantly governed by state and local law, and loan securitization risk disclosures inform investors that returns from mortgage loans will depend on widely varying state and local laws.  For example, the prospectus supplement of one trust involved in this litigation informed investors that "state and local laws regulate the . . . collection of the mortgage loans," and that "[i]n addition to laws limiting or prohibiting deficiency judgments, numerous other . . . state statutory provisions, including . . . state laws affording relief to debtors, may interfere with or affect the ability of the secured mortgage lender to realize upon collateral or enforce a deficiency judgment."[7]  The agreements governing loan securitizations typically include provisions governing the handling of state and local condemnation proceedings, indicating that the central role of the states in dealing with real property and mortgage loans, rather than the federal government, has long been

---

[7] *See* Prospectus Supplement dated Oct. 24, 2004 for Merrill Lynch Mortgage Investors Trust, Series 2004-WMC5, page S-20, and Prospectus included therein, page 64, available at: http://www.sec.gov/Archives/edgar/data/809940/000095012304012610/y67949e424b5.txt.

1   understood in the securitization industry.[8]  Indeed, the use of local eminent domain to take real

2   property is commonplace and, when real property securing a loan in a trust is condemned, the trust

3   loses its security interest in the real property and receives just compensation.  Pooled investment

4   vehicles hold many types of assets that have been subject to eminent domain condemnation in the

5   past, including corporate stocks (in fixed investment trusts) and real property (in real estate

6   investment trusts).  The sky will not fall.

7   **4.    Condemnation would not violate the Contract Clause**

8   The Banks' argument that the Contract Clause bars the potential condemnation at issue here

9   is no more likely to succeed than their other arguments.  The Contract Clause simply does not limit

10  the power of eminent domain.  In *City of Cincinnati v. Louisville & Nashville Railroad Co.*, 223

11  U.S. 390 (1912), the Supreme Court explained:

12          The constitutional inhibition upon any state law impairing the obligation of
           contracts is not a limitation upon the power of eminent domain.  The obligation of a
13          contract is not impaired when it is appropriated to a public use and compensation
           made therefor.  Such an exertion of power neither challenges its validity nor impairs
14          its obligation.  Both are recognized, for it is appropriated as an existing, enforceable
           contract.  It is a taking, not an impairment of its obligation.  If compensation is
15          made, no constitutional right is violated.  All of this has been so long settled as to
           need only the citation of some of the many cases.  [*Id.* at 400.]
16
17  The Court has reaffirmed the principle.  *See, e.g.*, *Midkiff*, 467 U.S. at 243 n.6 (the Contract

18  Clause argument has "no merit" because the "Clause has never been thought to protect against the

19  exercise of the power of eminent domain."); *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 29

20  n.27 (1977) ("The States remain free to exercise their powers of eminent domain to abrogate

21  [creditors'] contractual rights, upon payment of just compensation.").  The Court has even

22  observed that circumstances may require the use of eminent domain power for "the taking of

23  property of individual mortgagees in order to relieve the necessities of individual mortgagors."

24  *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 602 (1935).

25  **CONCLUSION**

26  For the foregoing reasons, the motion for a preliminary injunction should be denied.

27  _____

    [8] *E.g.*, Pooling and Servicing Agreement , Oct. 1, 2004, Merrill Lynch Mortgage Investors Trust, Series 2004-WMC5,
28  pp. 25, 31 & 64, at:  http://www.sec.gov/Archives/edgar/data/1307262/000095012304013631/y68850exv4w1.txt.

Defendants' Opposition to Motion for Preliminary Injunction, Case No. CV-13-3663-CRB

1    Dated: August 22, 2013                    Respectfully submitted,

2                                              */s/ Scott A. Kronland*

3                                              Scott A. Kronland

4                                              Stephen P. Berzon

5                                              Scott A. Kronland
                                               Jonathan Weissglass

6                                              Eric P. Brown
                                               Altshuler Berzon LLP

7
                                               Attorneys for Defendants
8                                              *City of Richmond* and
                                               *Mortgage Resolution Partners LLC*
9

10                                             Bruce Reed Goodmiller
                                               Carlos A. Privat
11                                             City of Richmond

12                                             Attorneys for Defendant *City of Richmond*

13                                             William A. Falik

14
                                               Attorney for Defendant
15                                             *Mortgage Resolution Partners LLC*

16

17

18

19

20

21

22

23

24

25

26

27

28