STEPHEN P. BERZON (SBN 46540)
SCOTT A. KRONLAND (SBN 171693)
JONATHAN WEISSGLASS (SBN 185008)
ERIC P. BROWN (SBN 284245)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
E-mail: sberzon@altber.com
  skronland@altber.com
  jweissglass@altber.com
  ebrown@altber.com

Attorneys for Defendants *City of Richmond* and
*Mortgage Resolution Partners LLC*

BRUCE REED GOODMILLER (SBN 121491)   WILLIAM A. FALIK (SBN 53499)
City Attorney                         100 Tunnel Rd
CARLOS A. PRIVAT (SBN 197534)         Berkeley, CA 94705
Assistant City Attorney               Tel: (510) 540-5960
CITY OF RICHMOND                      Fax: (510) 704-8803
450 Civic Center Plaza                E-mail: billfalik@gmail.com
Richmond, CA 94804
Telephone: (510) 620-6509             Attorney for Defendant
Facsimile: (510) 620-6518             *Mortgage Resolution Partners LLC*
E-mail: bruce_goodmiller@ci.richmond.ca.us
  carlos_privat@ci.richmond.ca.us

Attorneys for Defendant *City of Richmond*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee, *et al*.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF RICHMOND, CALIFORNIA, a municipality, and MORTGAGE RESOLUTION PARTNERS LLC,<br><br>Defendants. | Case No. CV-13-3663-CRB<br><br>**DECLARATION OF PETER DREIER IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:   September 13, 2013<br>Time:   10:00 a.m.<br>Judge:  Honorable Charles R. Breyer<br>        Courtroom 6, 17th Floor |

Dreier Decl. iso Defendants' Opposition to Motion for Preliminary Injunction, Case No. CV-13-3663-CRB

**DECLARATION OF PETER DREIER**

I, Peter Dreier, hereby declare:

1. I was asked by the attorneys for the City of Richmond to submit this declaration, and I am not receiving any payment in return. I have no financial stake in whether the City of Richmond does or does not exercise eminent domain authority to acquire mortgage loans, and I am not endorsing any particular plan.

2. I am chair of the Urban and Environmental Policy Department and the Dr. E.P. Clapp Distinguished Professor of Politics at Occidental College in Los Angeles. I received my Ph.D. from the University of Chicago. I joined the Occidental faculty in January 1993 after serving for nine years as Director of Housing at the Boston Redevelopment Authority and senior policy advisor to Boston Mayor Ray Flynn.

3. I have been involved in housing finance and urban policy for more than 30 years as a government official, scholar, journalist, and advocate for reform. I have served in a variety of positions dealing with real estate, finance, and housing policy including:

   a. A member of the Advisory Board of the Resolution Trust Corporation, which resolved the last major real estate finance crisis, the Savings and Loan collapse.

   b. For nine years, Director of Housing at the Boston Redevelopment Authority and senior policy advisor to Boston Mayor Ray Flynn, during which I drafted the Community Housing Partnership Act, sponsored by Congressman Joseph Kennedy and Senator Frank Lautenberg, which became part of HUD's HOME program under the National Affordable Housing Act of 1990 and provides federal funds to community-based non-profit housing development organizations.

   c. Co-coordinator of the Cry Wolf Project, which examines the accuracy of and debunks threats by business groups and their allies that government action to protect American families will reduce credit availability, increase the cost of credit, stifle growth, or otherwise harm the economy (see www.crywolfproject.org/about).

   d. Member of two Los Angeles City Council task forces -- on economic development and on affordable housing.

  e. Co-coordinator of a Ford Foundation-funded project on using tax policy to expand homeownership opportunities.

  f. Board member of the National Housing Institute, and the Los Angeles Alliance for a New Economy.

4. I have authored or co-authored a large number of books, articles, and policy reports on topics in housing and housing finance, including: strengthening the effectiveness of federal housing programs, expanding homeownership opportunities, improving homeownership tax policy, economic segregation in housing, foreclosure abuses, the future of public housing, and fixing the mortgage crisis.

5. I have received funding for my work from a wide variety of governmental and philanthropic organizations, including: The Department of Housing and Urban Development, the Haynes Foundation, the Irvine Foundation, Atlantic Philanthropies, the Century Foundation, the Ford Foundation, the Brookings Institution, the Eisenhower Foundation, and the Public Welfare Foundation.

6. My opinions on the plan being considered by the City of Richmond (the "City") to purchase local underwater mortgage loans are based on my experience and expertise.

7. The underwater mortgage crisis is one of the most damaging and intractable problems for local communities and governments to result from the Great Recession. The problems are especially severe in places like Richmond whose Black and Latino residents were disproportionately targeted for high risk, privately securitized loans like subprime and option adjustable rate mortgage loans.

8. The plan being considered by the City to purchase local underwater mortgage loans so the City can reduce principal balances, refinance the loans, and keep people in their homes is a rational and sound public policy effort to protect the local community and the City from harm. Underwater mortgages drown entire neighborhoods and the City, creating spillover harm to neighbors and the community generally. The harm is contagious, bringing down the value of neighboring homes, reducing City revenues, and increasing City costs.

9. Since 2008 I have urged government to fix the mortgage crisis by directly purchasing mortgage loans and writing down principal. Doing this will stabilize the financial system, restore balance to the housing market, and help Main Street -- and do so more efficiently than indirect efforts like providing subsidies for Wall Street to trade the securities backed by these mortgages. I have made clear since 2008 that toxic loans like subprime and adjustable rate loans originated for securitization trusts are highly risky and contribute to the financial crisis that tragically still afflicts local governments like Richmond.[1]

10. The financial services industry routinely buys and sells loans like those that Richmond has offered to purchase, including performing but underwater loans. The loans are financial instruments, and the industry has standard methodologies for pricing and trading these instruments, including discounting projected cash flows taking into account factors like payment history, the likelihood of default, loss given default, and future expected home price appreciation. The discounting of these projected cash flows includes a risk factor to account for the risk of variability in cash flows and the yields available on competing investments. The City utilized one of the major mortgage appraisal firms to appraise the fair value of the loans using just such standards -- a firm that has received praise for its work from both of the main industry trade associations, the American Securitization Forum and the Securities Industry and Financial Markets Association. The City does not determine the fair market values of the loans. The market does, and the appraisals reflect the market's determination of those values.

11. Governments routinely aggregate, acquire and then sell or resolve large pools of distressed loans (including performing but underwater loans) at times of financial crisis, directly or in partnership with private capital. Examples are the activities of the Resolution Trust Corporation (the "RTC") and the Federal Deposit Insurance Corporation (the "FDIC").

---

[1] See "How to Fix the Mortgage Mess 101," (Sept. 30, 2008), at http://www.huffingtonpost.com/peter-dreier/how-to-fix-the-mortgage-m_b_130481.html.

12. It is absolutely possible to purchase such loans at their fair market values then refinance, modify, or otherwise resolve them and generate sufficient proceeds to cover costs (including financing costs) and earn a profit. This is precisely what financial institutions did in acquiring loans from the RTC, and it is exactly what they do now when purchasing pools of loans from bank portfolios or the FDIC. It is false to say that the City can only achieve its public purpose by undercompensating securitization trusts for the loans. A loan sale benefits the seller and creates a profit opportunity for the buyer. The seller receives cash equal to the fair value of the loans without having to invest any time or effort in working with the borrower and sheds any downside risk from later credit deterioration. The buyer who manages the loans to the market assumptions built into the pricing will earn a rate of return equal to the opportunity cost of capital -- the return that it would have earned from investing in similar assets with similar risk.

13. It is fundamental to capitalism that a party can purchase an asset at its fair value, improve it by adding labor or capital, and earn a profit. Claims to the contrary are simply false -- like the claim that any return the City generates by resolving purchased loans must have been part of their fair value all along, and therefore must have been stolen from the old lender. This is not true for loans purchased from the RTC or the FDIC, and it will not be true of any loans that the City purchases for fair market value from securitization trusts.

14. A buyer that manages the loans more efficiently -- such as by exceeding the market expected rates of refinancing and default risk reduction -- can earn substantially more. There are many impediments to successfully managing underwater mortgage loans that contribute to their riskiness and their discounted value. These include the difficulty of reaching borrowers who are weary and wary of banks, the difficulty of convincing them of the validity of loan modification or refinance offers given the large numbers of scams in the news, the geographic diversity of loans in pools normally available for sale, and the work required to complete a modification or refinance. A municipal loan acquisition program will be dramatically more efficient by aggregating local loans, utilizing the local government, and most importantly leveraging the credibility, trust, skills and talents of local nonprofit organizations (including

homeowner rights and faith based groups) to reach borrowers and to provide independent balance to both the local government and private partners.

15. Municipal loan condemnation will not cause reductions in credit availability or increases in credit costs. Industry groups have threatened to withhold lending in the City if it condemns loans. These are only threats, part of a coordinated industry effort to intimidate the City.

16. In addition, the industry claims that loan condemnation would fundamentally alter lenders' rights and lead inevitably to restricted credit availability and increased credit costs. This claim is simply another example of the industry crying wolf, as it often does when governments propose to act in a way that will help the community. The Cry Wolf Project has documented numerous instances of similar industry claims and demonstrated that they were merely intimidation tactics -- government action did not result in any of the predicted harms. For example, the industry claimed that the federal CARD Act regulating credit cards would "fundamentally change[] the entire business model of credit cards by restricting the ability to price credit for risk. It is a fundamental rule of lending that an increase in risk means that less credit will be available and that the credit that is available will often have a higher interest rate."[2]   Yet after CARD was enacted, the cost of credit fell and credit availability remained the same.[3]

17. Contrary to the industry's threats, action by the City to purchase mortgage loans, reduce principal, and keep families in their homes will stabilize the market, as I have pointed out since 2008. This will make credit more available, and sooner, than in cities that do nothing and allow the underwater mortgage crisis to continue. This is particularly true for California, where residential loans are almost entirely nonrecourse due to the state's antideficiency laws. These laws, enacted after the real estate bust of the Great Depression, specifically assign to lenders the risk of home prices falling by more than the borrower's down payment. California law assigns this risk to

---

[2] See Edward L. Yingling, the chief executive of the American Bankers Association, at http://crywolfproject.org/taxonomy/term/370/quotes.

[3] See report of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/credit-cards/credit-card-act/feb2011-factsheet/ , and report of the Cry Wolf Project at http://www.responsiblelending.org/credit-cards/research-analysis/credit-card-clarity.html .

the lender in order to prevent the moral hazard of overlending and to protect the community broadly from precisely the downward spiral of default, foreclosure, spillover price declines for neighboring homes, and resulting additional defaults that the City faces now. Purchasing these loans for their fair value, reducing principal, and keeping families in their homes is consistent with this longstanding California public policy and will mitigate the contagion that defaults and foreclosures cause within the City, helping to return it more quickly to normal credit conditions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _19th__ day of August 2013.

_____
Peter Dreier