1  SCOTT A. KRONLAND (SBN 171693)
   JONATHAN WEISSGLASS (SBN 185008)
2  ERIC P. BROWN (SBN 284245)
   Altshuler Berzon LLP
3  177 Post Street, Suite 300
   San Francisco, CA 94108
4  Tel: (415) 421-7151
5  Fax: (415) 362-8064
   E-mail: skronland@altber.com
6          jweissglass@altber.com
           ebrown@altber.com
7
8  Attorneys for Defendants *City of Richmond* and
   *Mortgage Resolution Partners LLC*
9
10 BRUCE REED GOODMILLER (SBN 121491)      WILLIAM A. FALIK (SBN 53499)
   City Attorney                           100 Tunnel Rd
11 CARLOS A. PRIVAT (SBN 197534)           Berkeley, CA 94705
   Assistant City Attorney                 Tel: (510) 540-5960
12 CITY OF RICHMOND                        Fax: (510) 704-8803
   450 Civic Center Plaza                  E-mail: billfalik@gmail.com
13 Richmond, CA 94804
   Telephone: (510) 620-6509               Attorney for Defendant
14 Facsimile: (510) 620-6518               *Mortgage Resolution Partners LLC*
   E-mail: bruce_goodmiller@ci.richmond.ca.us
15         carlos_privat@ci.richmond.ca.us
16
17 Attorneys for Defendant *City of Richmond*

18                  **UNITED STATES DISTRICT COURT**

19                 **NORTHERN DISTRICT OF CALIFORNIA**

20                    **SAN FRANCISCO DIVISION**

21 WELLS FARGO BANK, NATIONAL              Case No. CV-13-3663-CRB
   ASSOCIATION, as Trustee, *et al.*,
22                                         **DECLARATION OF ROBERT HOCKETT**
23              Plaintiffs,                **IN SUPPORT OF OPPOSITION TO**
                                           **PRELIMINARY INJUNCTION**
24        v.
                                           Date:     September 13, 2013
25 CITY OF RICHMOND, CALIFORNIA, a         Time:     10:00 a.m.
   municipality, and MORTGAGE             Judge:    Honorable Charles R. Breyer
26 RESOLUTION PARTNERS LLC,
27              Defendants.
28

---

# DECLARATION OF ROBERT HOCKETT

Robert Hockett does hereby declare:

1.          I am a Professor of Law at Cornell Law School in Ithaca, New York, where since 2004 I have taught courses on finance and financial regulation.  Over the past several years I have also served as a consultant for the Federal Reserve Bank of New York (FRBNY), the International Monetary Fund (IMF), Americans for Financial Reform, and a number of members of the U.S. Senate and House of Representatives as well as state and city officials.  I am a member of the New York City Bar and its Committee on Banking Law, and am the incoming Chair of the Association of American Law Schools' Section on Financial Institutions and Consumer Financial Services.  I am also a Fellow of The Century Foundation and a commissioned author for the New America Foundation.

2.          Much of my research and writing since 2007 has focused on the causes and consequences of the recent bubble and bust in housing prices, as well as on how best (a) to clean up the mess that has been left in their aftermath, while (b) preventing a recurrence.  In connection with (a), I have developed and long advocated "lease swap" and eminent domain plans for underwater Private Label Securitization ("PLS") mortgage loans whose contract arrangements render voluntary, economically sensible modifications of those mortgage loans impossible.  In connection with (b), I have long worked on a variety of "macroprudential" finance-regulatory and home finance reform projects, including the drafting of a mortgage bridge loan statute recently introduced in the Senate of the State of New York.[1]

3.          One development that I and many others have concluded must occur if U.S. cities are ever fully to emerge from the aftermath of the bubble and bust is the writing-down of post-bubble private debt overhang.  The overwhelmingly greater part of that overage is mortgage debt overhang.  I firmly believe that debt-writedowns can and must be done in a manner that is not only fair, but also efficient, by which I mean beneficial to debtors and creditors alike.  I believe this possible owing to (a) the extraordinary degree of default risk that attends deeply underwater

---

[1]      See NY S5035-2013, available at http://open.nysenate.gov/legislation/bill/S5035-2013.

1   mortgage loan obligations, and (b) the high cost of foreclosure, when default occurs, to creditor and

2   debtor alike.  Because fair and efficient writedowns of the mentioned sort are possible, the success

3   of a debt-reduction plan does not depend upon under-compensating investors; indeed if done

4   properly, it will render investors better off even as it leaves homeowners and cities better off.  I

5   elaborate in more detail below.

6       4.      In early 2012, I received a small fee to assist Mortgage Resolution Partners, but

7   I have no ongoing business relationship with the firm and no investment interest in Mortgage

8   Resolution Partners, Gordian Sword, or the outcome of this case.  The opinions in this declaration

9   are based on my research and study of the issues here discussed over the years leading up to and

10  following the mortgage price bubble and bust.  Citations to some of my prior writings on these

11  issues, as well as to Congressional testimony provided one year ago, will be found at the end of this

12  declaration.

13      5.      In many American cities like the City of Richmond, California, where large

14  percentages of homeowners are deeply underwater on their mortgages, creditors, debtors, and their

15  communities alike continue to suffer the aftereffects of the housing price bubble and bust.  The

16  underwater mortgage loan problem continues to place – as it has done for six years and counting –

17  enormous pressure on investors (themselves homeowners), homeowners (themselves investors),

18  and their communities alike.  It also continues to operate as by far the principal ongoing drag upon

19  post-crash local and national economic recovery.[2]

20      6.      Underwater mortgagors struggle to stay current on their loans.  In consequence,

21  more go delinquent each month.  Today's delinquent loans were once current, and many –

22  astonishingly many – of today's current loans will go delinquent and default.  The suffering

23  wrought by this ongoing struggle befalls not only mortgagors, but also their ultimate creditors – the

24  holders of mortgage-backed securities issued by pools of now underwater loans.  It also spills over

25
26  [2]     Academic studies show that negative equity reduces consumption expenditures and economic activity, even absent a default, and that the effect is disproportionately greater in areas with high concentrations of underwater mortgages.  *See, e.g.*, Mian, Rao and Sufi, "Household Balance Sheets, Consumption, and the Economic Slump," Chicago Booth Working Paper  No. 13-42  (June 7, 2013), available at
27  http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1961211.  The Federal Reserve Board and Federal Reserve Bank
28  of New York, as cited in some of my own work referenced at the end of this declaration, have found likewise.

1  to neighbors, in multiple ways, as study after study has shown.  Foreclosure on one home depresses

2  the value of neighboring homes.  That in turn cuts into municipal revenues as property values – the

3  basis on which municipal tax revenues are determined – decline.  This happens, ironically, just as

4  municipal abatement costs wrought by foreclosures – costs of boarding and maintaining abandoned

5  properties, policing neighborhoods in which empty homes become magnets for crime, etc. – begin

6  mounting.  City services – police, sanitation, fire protection, etc. – accordingly come to be cut,

7  people of means who are able to leave find it more tempting to do so, property values and revenues

8  accordingly fall even lower, and so on.

9         7.     Self-worsening "downward spirals" of this sort account for the high correlation

10  we find between high average loan to value (LTV) ratios on the one hand, and the incidence of

11  municipal insolvencies on the other.  High rates of negative equity, mass foreclosure, blight and

12  municipal bankruptcy go hand in hand.  That is why so many American cities are now in crisis.

13         8.     The loss and the suffering described above are needless.  They constitute waste,

14  sheer deadweight loss.  I say this because in ordinary credit transactions, creditors and debtors

15  commonly write down underwater debt in a manner that renders the debt more payable and

16  accordingly renders both debtor and creditor better off.  There is an established market for

17  mortgage loans that are not locked in trusts, and that market reflects that the writedown of principal

18  of many underwater mortgage loans would increase the market values of the loans as financial

19  assets.  Simply refinancing these underwater loans to reduce interest payments or extend payment

20  durations is not a solution because it still leaves the homeowners in negative-equity situations with

21  high risk of default and eventual costly foreclosure.  The market for saleable mortgage loans

22  reflects this reality.  For this very reason, some states and community groups already are

23  purchasing available underwater loans to reduce principal and keep homeowners in their homes.

24  The Mortgage Resolution Fund has adopted this model in Illinois and Ohio, for example, and The

25  Resurrection Project is now taking similar steps in Chicago.[3]

26  _____

27  [3]    For more information see: http://mortgageresolutionfund.org/ and http://resurrectionproject.org/the-resurrection-project-and-self-help-federal-credit-union-joint-venture-acquires-1100-loans-to-prevent-massive-foreclosures/.

28

9. A very large class of securitized mortgage loans, however, are presently not saleable or modifiable. Unlike portfolio loans, they have not thus far been sold or modified in adequate numbers because they are locked up in PLS trusts.[4] They are now at the core of the local and national mortgage problem because the securitization arrangements pursuant to which they are pooled operate as obstacles to economically sensible transactions that would bring simultaneously creditor- and debtor-friendly principal reductions. That is why the problem may be repairable only through use of some government's or governments' eminent domain authority.

10. During the bubble, buyers had to pay inflated market prices to purchase their homes; they were price-takers, not -makers. Buyers accordingly had to incur large debt obligations to pay for their homes. This did not present any obstacle so long as housing prices were rising, for credit flowed freely and inexpensively for as long as those prices continued to rise. Once prices began dropping, however, matters were turned upside-down. The variable prices of mortgagors' homes dropped, but the fixed debt obligations they had had to incur in order to pay for the houses did not. That meant that literally millions – at present, still 11 to 13 millions – of American families owed more on the debts they had had to incur than their homes were now worth.

11. When people fall below water as dramatically as so many millions of American homeowners did in the wake of the crash, they find it increasingly difficult to stay current on their payments, no matter how hard they try. Fannie Mae and Freddie Mac's 10-K and 10-Q filings afford a telling illustration, anticipating a 71% default rate among the Government-Sponsored Enterprises' (GSEs') underwater subprime loans, a 67% rate among the alt-As, and a remarkable 40% even among the 30-year fixed-rates. With default rates like that, and with foreclosure costs as high as they are, it is easy to understand why so many portfolio loan holders – that is, banking institutions that own and have power to modify whole loans – write down the underwater loans of

---

[4] The term "Residential Mortgage-Backed Securities" ("RMBS") refers to securities issued by securitization trusts that hold residential real estate mortgage loans as distinguished from commercial real estate mortgage loans or other assets. The term "Private Label Securitization" ("PLS") applies to RMBS trusts whose assets receive no backing from any government agency such as Ginnie Mae. Some, but not all RMBS trusts are PLS trusts, and these are the trusts to which I refer in this declaration.

1   their borrowers.  Writing down the loans is value-salvaging for the banks.  Hence it's a "win-win"

2   for lender and borrower alike.

3       12.     The problem for America's still struggling cities, however, is that very few

4   loans are portfolio loans of this sort.  Most – and by far the most troubled – are private label

5   securitized (PLS) loans.  The arrangements pursuant to which these loans are securitized,

6   formulated during the bubble years when few seem to have appreciated the prospect of a market-

7   wide price drop, do not provide for value-salvaging loan modifications or sales on the scale that the

8   crash has necessitated – not even when writedowns would be as good for the creditors as they are

9   for the debtors.

10      13.     The ways in which PLS securitization arrangements impede even value-

11  salvaging writedowns are manifold, but many if not most are either rooted in or kept in place by

12  the terms of the pooling and servicing agreements (PSAs) pursuant to which PLS loans were

13  securitized during the bubble years.  Among other things, these contracts typically (a) authorize

14  trustees or servicers to modify or sell only small percentages of loans held by the trusts; (b) provide

15  for exceptions to those prohibitions only when ambiguously formulated or impossible criteria –

16  such as supermajority voting by thousands or more small-holding bondholders scattered world

17  wide – are met; (c) stipulate compensation arrangements for loan servicers per which the latter

18  derive greater fee revenue from protracted foreclosure than from creditor- and debtor-friendly loan

19  modifications or sales; and (d) name as servicers certain banking institutions – Wells Fargo being a

20  prominent example – that also hold second liens on properties that secure securitized loans, thereby

21  underwriting significant conflicts of interest when primary and secondary creditors' interests

22  diverge as they do in the vicinity of debtor-insolvency.

23      14.     Arrangements of this sort made sense – they harmed no one and benefited many

24  – in a world where home prices in general only ascended and where delinquency and default were

25  accordingly rare and exceptional.  Where prices fall marketwide and loan-to-value (LTV) ratios go

26  upside-down, however, so do these contract arrangements.  They present the most senseless and

27  calamitous of "unintended consequences" – harming nearly all parties in interest by standing in the

28  way, post-bust, of even value-maximizing modifications or sales that aid debtor and creditor alike.

1  Were ultimate creditors to have practical control of these loans, they would be selling or writing

2  them down just as portfolio loan holders do.  But under PLS loans' securitization arrangements,

3  they do not have that control.  An assortment of middlemen do – trustees, servicers, debt-

4  collectors, etc. – and none of these middlemen's incentives align with those of the creditors or the

5  debtors.

6         15.     Because, as noted before, writedowns on deeply underwater debt benefit

7  creditor and debtor alike and continued suffering is accordingly needless, eminent domain plans for

8  underwater mortgage loans can be structured in "win-win" ways that require no expenditure of

9  public funds and no bilking of any parties in interest.  I and others who have advocated plans of

10  this type since the housing price crash have accordingly framed them as means of enabling the

11  ultimate creditors on PLS loans – the bondholders – in effect to engage in the same form of

12  collaterally homeowner-benefitting "self-help" that portfolio loan-holders routinely do.  Indeed,

13  ultimately the hope would be that more and more bondholders themselves could put up the funds

14  used to pay the condemnation awards because such plans ultimately would be to their advantage.

15         16.     In order to do what it is meant to do, it should here be noted, an eminent domain

16  plan should ultimately target both performing and non-performing underwater mortgage loans.  For

17  the relevant loan characteristic is the fact that it is deeply underwater and accordingly subject to a

18  40%, 67%, 71% or similarly high chance of default[5] – not the fact that it has or has not yet

19  defaulted.  Again, today's delinquent loans were among yesterday's performing loans; and high

20  percentages of today's performing loans, where they are underwater, will be tomorrow's delinquent

21  and then defaulted loans.  This is precisely why programs like the federal Home Affordable

22  Modification Program ("HAMP") cover loans in which homeowners are current on payments but

23  nevertheless likely, pursuant to well established actuarial criteria, to default in the future.

24         17.     Recent claims of "recovery" on the part of housing prices in some markets do

25  not in any way diminish the need for fair and efficient value-salvaging eminent domain plans in

26  cities like Richmond.  The reasons are principally three.  First, the so-called "recovery" is highly

27

28

---

[5]    The given figures, recall, are the sample GSE figures cited above.

localized in character, much as the crisis itself has been. While prices rise (for now) and foreclosures diminish (for now) in some cities, the trends are reversed in other cities. Second, much of the "recovery" of housing prices in such localities as have shown them is showing itself thus far to be the product of (a) a search for yield among investment firms and private equity companies, (b) low borrowing costs in the current monetary policy environment, and (c) a growing inventory of low-price foreclosed homes that the aforementioned firms are speculatively purchasing with a view to converting them into rental properties. Finally, and more fundamentally, it is in a certain sense conceptually impossible for there to be recovery without principal-reduction if we use price as the measure of recovery as claimants of "recovery" do. The prices in relation to which some 11 to 13 million homeowners' continuing mortgage debt obligations were determined years back were bubble prices. This means that the only way most of these people can fully "recover," in the sense of rising above water, is either for principal to be reduced or for prices to rise back to their bubble-era heights. The latter prospect is quite as unlikely as it is undesirable (a new bubble would be nothing to celebrate), meaning that real recovery awaits value-salvaging writedowns.

18. I have reviewed the declarations submitted by plaintiffs in support of their motion for a preliminary injunction, and I respectfully disagree with the opinions expressed therein about the negative consequences of an eminent domain plan. For the reasons described above, it is simply not true that eminent domain plans cannot succeed without harming the investors in PLS trusts or the broader economy, or without discouraging future lending in the cities that adopt such plans, or without raising borrowing costs. The targeted loans can (and indeed legally must) be acquired for their full fair market value, simply exchanging one asset in the PLS trust for its equal value in cash. The PLS trusts already receive cash in exchange for loans in the event of foreclosures on non-recourse loans or short sales, and the acquisition of loans in an eminent domain proceeding would be no different. Many of the issues raised in the Stevens and Burnaman Declarations are simply factors to be taken into account in the valuation analysis; and their assertions that condemnation will result in losses to trusts and their investors, then trigger a fanciful parade of horribles that the declarants elaborate with admirable imaginative verve, is predicated in

1  its entirety on the simply false and offensive assumption that the court's valuation analysis will –

2  simply *will* – result in an unconstitutional outcome.

3          19.      I have written on the above-mentioned matters in multiple venues in recent

4  years, and have testified on them before members of Congress. A sampling here follows:

5  Paying Paul and Robbing No One: An Eminent Domain Solution for Underwater Mortgage Debt,
6  19 (5) CURRENT ISSUES IN ECONOMICS AND FINANCE 1 (Federal Reserve Bank of New
   York, June 2013), available at: http://www.newyorkfed.org/research/current_issues/ci19-5.html.
7
   It Takes a Village: Municipal Condemnation Proceedings and Public/Private Partnerships for
8  Mortgage Loan Modification, Value Preservation, and Local Economic Recovery, 17 STANFORD
   JOURNAL OF LAW, BUSINESS, AND FINANCE 121 (2012), available at:
9  http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2038029.

10
   House Financial Services Panel Series, the Honorable Maxine Waters (CA-35) Presenting "The
11 Housing Crisis and Policy Solutions: Should Eminent Domain Be Used to Save Underwater
   Homeowners?," Testimony of Robert Hockett, September 11, 2012, Rayburn 2226, available at
12 http://www.lawschool.cornell.edu/spotlights/upload/Testimony-of-Robert-Hockett-11-September-
13 2012-Third-Round.pdf.

14 "What the Eminent Domain Plan Is – And is Not," Los Angeles Daily Journal, August 12, 2013,
   available at: http://www.lawschool.cornell.edu/spotlights/upload/LDJ-Editorial-08-12-13-LDJ-P-
15 Hockett-P-ed.pdf.

16 "Eminent Domain: All Gain, No Pain," Las Vegas Review Journal, August 18, 2013, available at:
17 http://www.reviewjournal.com/opinion/eminent-domain-all-gain-no-pain.

18 Six Years On and Still Counting: Sifting Through the Mortgage Mess, 9 HASTINGS BUSINESS
   LAW JOURNAL 1 (2013), available at:
19 http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2029262.

20 Debt, Deflation, and Debacle, White Paper, Global Interdependence Center, Federal Reserve Bank
21 of Philadelphia (April 2013) (with Richard Vague), available at
   http://www.interdependence.org/wp-content/uploads/2013/04/Debt-Deflation-and-Debacle-RV-
22 and-RH1.pdf.

23 The Way Forward: Moving from the Post-Bubble, Post-Bust Economy to Renewed Growth and
   Competitiveness, White Paper, New America Foundation, (October 2011) (with Daniel Alpert &
24 Nouriel Roubini), available at  http://newamerica.net/publications/policy/the_way_forward.

25
          I declare under penalty of perjury under the laws of the United States that the foregoing is
26
27 true and correct. Executed this 22 day of August 2013.

28
                                                              Robert Hockett

8