ROCKY C. TSAI (SBN 221452)
(rocky.tsai@ropesgray.com)
**ROPES & GRAY LLP**
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315-6300
Facsimile: (415) 315-6350

Attorneys for Plaintiffs Wells Fargo Bank,
N.A., as Trustee, *et al.*

**ADDITIONAL COUNSEL LISTED
ON SIGNATURE PAGE**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF RICHMOND, CALIFORNIA, a municipality, and MORTGAGE RESOLUTION PARTNERS LLC,<br><br>Defendants. | Case No. CV-13-3663-CRB<br><br>**PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>ACCOMPANYING PAPERS:  Reply Declarations of John C. Ertman, Esq. and Phillip R. Burnaman, II; Declaration of Douglas G. Duncan<br><br>Date:           September 13, 2013<br>Time:          10:00 a.m.<br>Judge:        Hon. Charles R. Breyer |

**TABLE OF CONTENTS**

**Page**

SUMMARY OF THE ARGUMENT ............................................................................................. i

I.  An Injunction Is Necessary to Prevent Irreparable Harm to Plaintiffs ......................................... 1

II.  A Preliminary Injunction Will Not Cause Harm to Defendants .................................................... 5

III.  Plaintiffs Have Established High Likelihood of Success on the Merits ...................................... 7

    A.  The Loan Seizure Program Unconstitutionally Takes Extraterritorial Property............. 7

    B.  The Loan Seizure Program Improperly Seizes Property for Private Use ...................... 10

    C.  The Loan Seizure Program Violates the Dormant Commerce Clause.......................... 13

        i.  The Program Constitutes Forbidden Direct Regulation of Interstate Commerce........................................................................................... 14

        ii.  The Program Fails the Dormant Commerce Clause's Balancing Test ............. 16

    D.  The Loan Seizure Program Violates the Contracts Clause............................................. 19

    E.  Defendants Threaten to Violate Plaintiffs' Constitutional Rights While Acting Under Color of State Law ................................................................................................. 19

IV.  CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AIA v. Garamendi*
    539 U.S. 396 (2003)........................................................................................... 17

*Am. Trucking Ass'ns v. City of Los Angeles*
    559 F.3d 1046 (9th Cir. 2009) ............................................................................. 1

*Armendariz v. Penman*
    75 F.3d 1311 (9th Cir. 1996) ......................................................................... ii, 2

*Backpage.com, LLC v. McKenna*
    881 F. Supp. 2d 1262 (W.D. Wash. 2012) ......................................................... 18

*Baltimore v. Baltimore Football Club, Inc.*
    624 F. Supp. 278 (D. Md. 1985) ............................................................. 8, 9, 10

*Bank of Am., N.A. v. City & Cnty. of San Francisco*
    215 F.3d 1332 (9th Cir. 2000) .............................................................................. 6

*Cal. ex rel. Lockyer v. United States Dep't of Agric.*
    575 F.3d 999, 1011 (9th Cir. 2009) .................................................................... 4

*Chertkof v. Mayor and City Council of Baltimore*
    497 F. Supp. 1252 (D. Md. 1980) ....................................................................... ii

*City of Carlsbad v. Rudvalis*
    109 Cal.App.4th 667 (2003) ................................................................................ 3

*City of Des Moines, Iowa v. Continental Ill. Nat. Bank & Trust*
    205 F.2d 729 (8th Cir. 1953) ............................................................................... 6

*City of Morgan Hill v. Alberti*
    211 Cal. App. 3d 1435 (Ct. App. 1989) ........................................................ ii, 2

*City of Oakland v. Oakland Raiders*
    174 Cal. App. 3d 414 (1985) ..................................................................... 9, 14, 19

*Crosby v. NFTC*
    530 U.S. 363 (2000) ........................................................................................... 14

*Delaware v. New York*
    507 U.S. 490 (1993)............................................................................................. 7

*Eastern Enterprises v. Apfel*
   524 U.S. 498 (1998)..................................................................................ii

*Edgar v. MITE Corp.*
   457 U.S. 624 (1982)..........................................................................iv, 15, 16

*Fed. Housing Financing Agency v. City of Chicago*
   No. 11-8795, 2013 WL 4505413 (N.D. Ill. Aug. 23, 2013)...................... 18

*Harris v. Balk*
   198 U.S. 215 (1905)....................................................................................8

*Healy v. Beer Institute*
   491 U.S. 324 (1989)................................................................................. 18

*Home Bldg. & Loan Ass'n v. Blaisdell*
   290 U.S. 398 (1934)............................................................................. v, 19

*Just Film, Inc. v. Merchant Servs., Inc.*
   2011 WL 2433044 (N.D. Cal. 2011) ......................................................... 3

*Kelo v. City of New London*
   545 U.S. 469 (2005)..............................................................iv, 10, 11, 12, 13

*M&A Gabaee v. Cmty. Redevelopment Agency*
   419 F.3d 1036 (9th Cir. 1982) ................................................................... 1

*Melendres v. Arpaio*
   695 F.3d 990 (9th Cir. 2012) ..................................................................... 1

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*
   457 U.S. 423 (1982).................................................................................. 1

*Mitchum v. Foster*
   407 U.S. 225 (1972)...............................................................................ii, 1

*Nat'l Ass'n of Optometrists & Opticians v. Brown*
   567 F.3d 521 (9th Cir. 2009) ................................................................... 15

*Nat'l Collegiate Ass'n v. Miller*
   10 F.3d 633 (9th Cir. 1993) ..................................................................... 14

*New Orleans Water Works Co. v. City of New Orleans*
   164 U.S. 471 (1896)................................................................................... 6

*99 Cents Only Stores v. Lancaster Redev. Agency*
   237 F. Supp. 2d 1123 (C.D. Cal. 2001) .................................................... 9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Offield v. New York, New Haven & Hartford R.R. Co.*
    203 U.S. 372 (1906)...................................................................................................... 9

*Redevelopment Agency v. Gilmore*
    38 Cal.3d 790 (1985) ..............................................................................................iii, 3

*Regional Railroad Reorganization Act Cases*
    419 U.S. 102 (1974)..............................................................................................i, 2, 6

*Richardson v. Superior Court*
    43 Cal. 4th 1040 (Cal. 2008) ....................................................................................... 2

*Rumber v. District of Columbia*
    487 F.3d 941 (D.C. Cir. 2007) .................................................................................... 2

*Santa Cruz County Redevelopment Agency v. Izant*
    37 Cal. App. 4th 141 (1995) ....................................................................................... 6

*Texas v. New Jersey*
    379 U.S. 674 (1965)........................................................................................iv, 7, 8, 9

*Transwestern Pipeline Co. v. 17.19 Acres*
    550 F.3d 770 (9th Cir. 2008) ...................................................................................... 2

*U&I Sanitation v. City of Columbus*
    205 F.3d 1063 (8th Cir. 2000) .................................................................................. 18

*Virginia v. Consumers Union*
    446 U.S. 719 (1980) .................................................................................................... 1

*Waite v. Waite*
    6 Cal.3d 461 (1972) .................................................................................................... 8

*Western Union Tel. Co. v. Pennsylvania*
    368 U.S. 71 (1961) .................................................................................................... 10

**FEDERAL STATUTES**

12 U.S.C. §§ 1451-1459 ................................................................................................ 16

12 U.S.C. §§ 1716-1723i ............................................................................................... 16

12 U.S.C. § 5201 ..................................................................................................... 17, 18

12 U.S.C. § 5211(a)(1) ................................................................................................... 17

26 U.S.C. §§ 860A – 860G .......................................................................................... 15

1

**CALIFORNIA STATUTES**

2

Cal. Code Civ. Proc. § 1230.020 .......................................................................................... 5

3

Cal. Code Civ. Proc. § 1255.410 ...................................................................................iii, 2, 3

4

Cal. Code Civ. Proc. § 1263.320 .......................................................................................... 3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# SUMMARY OF THE ARGUMENT

Plaintiffs submit this Reply Memorandum in response to Defendants' opposition to Plaintiffs' Motion for Preliminary Injunction ("PI Motion") and in further support of that Motion.[1] Defendants' opposition is premised almost entirely on the flawed proposition that Plaintiffs' only (and purportedly complete) remedy in the face of Richmond's patently illegal Loan Seizure Program, which will inflict billions of dollars in unrecoverable losses on pension funds and investors across America, is to wait and defend themselves in the forthcoming state eminent domain proceedings.  Contrary to Defendants' empty assurances, Plaintiffs will suffer irreparable injury if Richmond is permitted to start seizing loans, at which point it will be too late to prevent immense injury that Defendants could never possibly compensate.

Preliminary injunctive relief is particularly appropriate where, as here, the harm that will be inflicted on the Plaintiffs in the absence of such relief is effectively irreversible. *See Regional Railroad Reorganization Act Cases*, 419 U.S. 102, 144 (1974) (noting that a court should exercise its jurisdiction to adjudicate the constitutionality of a takings program promptly, so as to "minimize or prevent irreparable injury").  That is precisely the situation here.  The seizure of loans, once accomplished, would be difficult, if not impossible to reverse – and the subsequent refinancing, and resale of the newly issued loans into new securitized pools could not, as a practical matter, be unwound after the fact.

If a preliminary injunction is not issued, the Trusts and their investors will be immediately and irreparably harmed:  the value of their certificates, traded in federally-regulated national securities markets, will fall to reflect the risk that the anticipated income stream from performing loans in the pool targeted for seizure by Richmond (and other municipalities that implement MRP's Loan Seizure Program) will be stripped from the pools in exchange for a payment worth far less than the income stream that they will generate – less, even, than the foreclosure value of the home securing the loan.  This would be an immediate and dramatic reduction in the value of those

---

[1] Defendants have filed a Motion to Dismiss the Complaint for lack of subject matter jurisdiction on the grounds that the case is not ripe for review. Plaintiffs are simultaneously filing an opposition to that motion.

PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION; Case No. CV-13-3663-CRB

1   mortgage securities that could never be compensated through the California eminent domain

2   process.

3          Indeed, Richmond is a test case for MRP's Program, and if Richmond is permitted to

4   condemn loans through eminent domain, more municipalities will undoubtedly follow suit,

5   exponentially magnifying the harm to investors, which will never be compensated.  For these

6   reasons and others discussed below, in the absence of a preliminary injunction now, Defendants

7   could effectively prevent this Court from ever awarding adequate relief to Plaintiffs.  *See Eastern*

8   *Enterprises v. Apfel*, 524 U.S. 498, 521 (1998) (the Declaratory Judgment Act "allows individuals

9   threatened with a taking to seek a declaration of the constitutionality of the disputed governmental

10  action before potentially uncompensable damages are sustained.").

11         Defendants' assertion that Plaintiffs would not suffer irreparable harm because their claims

12  can be litigated in the context of California's "Quick Take" proceeding is incorrect as a matter of

13  law because it ignores the many limitations of that procedure.  And there is no requirement that

14  Plaintiffs exhaust state court proceedings before seeking relief in federal court.  *See Mitchum v.*

15  *Foster*, 407 U.S. 225, 242 (1972); *Armendariz v. Penman*, 75 F.3d 1311, 1321 n.5 (9th Cir. 1996)

16  *overruled in part on other grounds as stated in Crown Point v. City of Sun Valley*, 506 F.3d 851,

17  852–53 (9th Cir. 2007).  In short, the Quick Take procedure – which is designed to allow the taker to

18  obtain early possession of the property before legal challenges are resolved – is wholly inadequate to

19  protect Plaintiffs' rights in this situation.  *See, e.g.*, *Chertkof v. Mayor and City Council of*

20  *Baltimore,* 497 F. Supp. 1252, 1256-57 (D. Md. 1980) (rejecting claim that constitutional challenges

21  to eminent domain seizure program could be adequately litigated in state court "quick take"

22  proceeding) (citing *Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719 (1980)).

23         The Quick Take procedure is not a complete adjudication on the merits, but is rather

24  "preliminary only," and a property owner has no right to appeal an order of possession granted under

25  the procedure.  *See Cal Code Civ Proc. § 1255.410 & Legislative Committee Comment; *City of*

26  *Morgan Hill v. Alberti*, 211 Cal. App. 3d 1435, 1436 (1989).  Thus, the refinancing, resale, and

27  resecuritization transactions that Defendants intend to carry out under the Loan Seizure Program

28

would be completed well-before the RMBS Trusts are able to fully litigate their claims on the merits in any level of the state courts.

Additionally, because the principal remedy available in eminent domain proceedings is any additional payment beyond the deposited amount necessary to satisfy the "just compensation" requirement with respect to the specific property seized, it is far from clear that the Quick Take procedure would provide a mechanism to fully compensate the Trusts or their investors for losses caused by the loan seizures, including losses caused by the diminution in the market value of the certificates while the condemnation proceedings are litigated.  *See, e.g.*, *Redevelopment Agency v. Gilmore*, 38 Cal.3d 790, 802-03 (1985) (holding that compensation under state eminent domain proceedings includes the fair market value of the condemned property, not consequential losses).

In all events, and even if the harm were quantifiable, it is highly unlikely that MRP and Richmond would have the financial means to fully compensate the RMBS Trusts for their losses in the context of finally adjudicated eminent domain proceedings for the targeted loans.  That is precisely why MRP considers the Quick Take procedure a "necessary component" of its Loan Seizure Program.  Compl. (Dkt. 1) Ex. B at 3.

While the harm to Plaintiffs and investors would be immense and irreparable if the Program is not enjoined, Defendants would not suffer if the injunction is granted.  Defendants' argument that public debate would be stifled is a red herring; as explained below, Plaintiffs are not seeking to enjoin any legislative act or stop any public discussion.  Moreover, given the billions of dollars in irreparable losses that could result from the *failure* to issue a preliminary injunction, the balance of equities is decidedly in favor of maintaining the status quo.

Plaintiffs also have shown that they have a high likelihood of success on the merits on their claims that the Loan Seizure Program violates multiple provisions of the U.S. and California Constitutions.  Rather than rebut these claims, Defendants feign ignorance as to what the Program would do.  But their own public statements, emails, documents, and briefing demonstrate the Program's constitutional shortcomings.  For example:

(1)  Defendants concede that they are forbidden by the U.S. Constitution from seizing property located outside of California and prohibited by California law from seizing property located

outside of Richmond.  They also concede that the Plaintiff RMBS Trusts that own the loans at issue here are mostly located outside of California and are all located outside of Richmond.  Defendants' only argument, that the loans should be treated as being located with the debtor, is wrongly based on cases involving simultaneous personal jurisdiction among multiple states.  For cases of exclusive jurisdiction, such as eminent domain, the Supreme Court has adopted a "simple and easy to resolve" rule that "a debt is property of the creditor, not of the debtor."  *Texas v. New Jersey*, 379 U.S. 674, 680-81 (1965).  Accordingly, Defendants are illegally reaching beyond Richmond's geographic borders to seize the loans.

(2)  Defendants' own internal emails and documents show that the Program is primarily for private gain, not public use.  MRP, a private investment firm, devised the Program, selected the loans to be seized, arranged financing, and, along with its investors, stands to be the primary beneficiary.  The 624 loans that the Program initially targets for seizure are not those most likely to default, but rather those that would bring a profit to MRP and its financial backers.  Such "transfers intended to confer benefits on particular, favored private entities, and with only incidental or pretextual public benefits are forbidden by the Public Use Clause."  *Kelo v. City of New London*, 545 U.S. 469, 490 (2005) (Kennedy, J., concurring).

(3)  Defendants have publicly admitted that the Loan Seizure Program is specifically intended to impact interstate commerce by attempting to fix what Defendants view as a "national mortgage problem."  Defendants also publicly admit that they are in essence seeking to substitute their judgment for that of Congress by reversing Congress's own policy choice to prohibit RMBS trusts such as Plaintiffs from selling performing loans.  Both of these types of "direct regulation" of interstate commerce by Richmond are prohibited by the Dormant Commerce Clause. *Edgar v. MITE Corp.*, 457 U.S. 624, 640-43 (1982).  And even if the effects on interstate commerce were only indirect, they would dwarf any legitimate public benefit.  The Loan Seizure Program, if carried out by other cities, would reduce the value of RMBS trusts by billions of dollars.  By inflicting dramatic losses while injecting significant uncertainty, Richmond would discourage private investment in the secondary mortgage market precisely when the federal government is trying to encourage such

1    investment, which is critical to our economic recovery.  The Constitution does not allow such local

2    interference in the national economy.

3          (4)  Defendants simply assert that the Contracts Clause cannot limit the power of eminent

4    domain but do not address that the Loan Seizure Program's unprecedented use of eminent domain is

5    the exact type of local interference with interstate commerce and arbitrary abrogation of creditor's

6    rights that the Contracts Clause was designed to prevent.  *See Home Bldg. & Loan Ass'n v. Blaisdell*,

7    290 U.S. 398, 427 (1934).

8          Defendants also repeat in their Opposition the argument from their Dismissal Motion that

9    Plaintiffs' suit is not ripe for adjudication.  Plaintiffs respond to that argument in full in their

10   Opposition to the Dismissal Motion and do not repeat those points here.

11         For these reasons, the Court should grant Plaintiffs' PI Motion and enjoin Defendants from

12   taking any further action to seize loans from the residential mortgage-backed securitization trusts for

13   which Plaintiffs serve as trustees (the "Trusts").

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(v)

I.      **An Injunction Is Necessary to Prevent Irreparable Harm**

Defendants assert that Plaintiffs will suffer no irreparable harm if this Court were to decline to exercise its jurisdiction because Plaintiffs could litigate their constitutional claims in the context of California's "Quick-Take" proceeding.  Def. PI Mem. at ix.  This argument is contrary to settled law.

First, and most fundamentally, the deprivation of constitutional rights caused by the Program constitutes irreparable harm for which Plaintiffs are entitled to seek prompt judicial relief in federal court.  *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'").  The Ninth Circuit applied that rule in *Am. Trucking Ass'ns v. City of Los Angeles*, a Commerce Clause and pre-emption case that involved claims of economic harm, reasoning that "constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."  559 F.3d 1046, 1059 (9th Cir. 2009).

The Supreme Court has consistently held that the federal courts have a strong interest in adjudicating serious constitutional claims such as those presented by Plaintiffs.  *See Mitchum v. Foster*, 407 U.S. 225, 242 (1972) ("The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights – to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'"); *Virginia v. Consumers Union*, 446 U.S. 719, 737 (1980) (rejecting argument that a § 1983 claimant be required to await the institution of state-court proceedings to assert federal constitutional claims).[2]  Thus, contrary to Defendants' suggestion, there is no requirement that Plaintiffs exhaust state court proceedings before seeking injunctive relief in this Court.  *See*

---

[2] Defendants' citations to *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982) and *M&A Gabaee v. Cmty. Redevelopment Agency*, 419 F.3d 1036, 1039-41 (9th Cir. 1982), for the proposition that the state courts will adequately protect constitutional rights, are inapposite. Those decisions were in the context of *Younger* abstention, where the federal courts abstained in deference to ongoing state court proceedings.  But here, there are no ongoing state court proceedings. Indeed, Defendants could not now rush into state court and seek to stay this federal action under the abstention doctrine, in light of the significant activity has occurred in this action, including the fact that issue has been joined and the parties have already engaged in extensive motion practice on multiple issues.

*Armendariz*, 75 F.3d at 1321 n.5; *see also Rumber v. District of Columbia*, 487 F.3d 941, 944 (D.C. Cir. 2007).

Second, the Supreme Court has recognized that the need for federal-court review is especially acute where, as here, the harm that will be experienced by the Plaintiffs is effectively irreversible. *See Regional Railroad,* 410 U.S. at 145 (district court should exercise jurisdiction to enjoin takings program where delay creates risk that it might be "too late to prevent the conveyance" of the property). Here, Plaintiffs have submitted unrefuted evidence that if Defendants are able to seize loans from the Plaintiff Trusts, and then refinance those loans, it would be effectively impossible to reverse those transactions – the bell could not be "unrung." *See, e.g.*, Declaration of Phillip Burnaman (Dkt. 11) ("Burnaman Moving Decl.") ¶ 45. Thus, prompt federal court review is critical to avoid a situation in which Defendants can effectively prevent this Court from ever providing adequate relief as a result of the constitutional violations.

Third, the California "Quick Take" procedure, which Defendants have publicly stated they intend to utilize, cannot possibly provide Plaintiffs adequate protection. *See Transwestern Pipeline Co, LLC v. 17.19 Acres*, 550 F.3d 770, 777 (9th Cir. 2008) ("quick take" procedures would not protect the due process rights of landowners). Critically, any ostensible merits proceeding on the City's authority to take the property by eminent domain through a Quick Take would be "preliminary only" – not a complete adjudication on the merits. Cal Code Civ Proc. § 1255.410 & Legislative Committee Comment. Moreover, there is no right to appeal a quick-take order of possession while the just compensation proceeding remains pending.[3] *Id*.; *City of Morgan Hill v. Alberti*, 211 Cal. App. 3d 1435, 1436 (Ct. App. 1989) (dismissing quick-take order of possession as non-appealable). That means Defendants would be able to seize the loans from the RMBS Trusts solely on a limited record and prediction of success, and before the RMBS Trusts ever had a chance to appeal. The irreversible series of transactions that the Defendants plan to initiate – including obtaining, refinancing, and reselling the loans after seizing them from the Trusts – could be well

---

[3] An order of possession can only be challenged by the state court writs of mandamus, prohibition, or certiorari, which are deferential standards of review with low likelihood of being granted. *See, e.g., Richardson v. Superior Court*, 43 Cal. 4th 1040, 1048 (Cal. 2008) (in mandamus proceeding, the "judgment or order of the lower court is presumed correct," and can only be disturbed where lower court "exceeded the bounds of reason or contravened the uncontradicted evidence.").

1    underway or even completed before the RMBS Trusts ever have an opportunity to fully litigate their

2    claims on the merits in the state courts.

3          In addition, the suggestion by Defendants that Plaintiffs would be fully compensated in

4    connection with the Quick Take procedure misses the point. The compensation that is primarily at

5    issue in an eminent domain proceeding is any additional payment beyond the deposited amount

6    necessary to satisfy the "just compensation" requirement.  But Plaintiffs raise categorical arguments

7    that Richmond lacks the authority to take the loans.  It is far from clear whether the full scope of

8    losses caused by the Loan Seizure Program, including the diminution of certificates' market value

9    while the issue is litigated, would be compensable in an eminent domain proceeding.  *See, e.g.*,

10   *Redevelopment Agency v. Gilmore*, 38 Cal.3d at 802-03 (holding that compensation under state

11   eminent domain proceedings includes the fair market value of the condemned property, not

12   consequential losses, including, for example, the costs of borrowing funds necessary to secure

13   replacement property for a business); *City of Carlsbad v. Rudvalis*, 109 Cal.App.4th 667, 686-87

14   (2003) (holding that economic damages for diminution in value of business assets caused by

15   condemnation not compensable in eminent domain). [4]

16         Even if there is some post-deprivation mechanism for seeking the full scope of damages

17   inflicted by the Loan Seizure Program, Defendants do not have the financial means to compensate

18   Plaintiffs for the great magnitude of losses to the Trusts that would be caused by the loan seizures.

19   *See, e.g.*, *Just Film, Inc. v. Merchant Servs., Inc.*, 2011 WL 2433044 (N.D. Cal. June 13, 2011)

20   (finding irreparable harm based on plaintiffs' allegations that defendant was a shell company from

21   which plaintiffs may not be able to collect).  As discussed in the Moving Brief, Richmond's

22   expenditures exceeded its revenues in 2012, and MRP, which has purported to "fully indemnify"

23   Richmond for its losses and legal expenses under the Program, has no other known business

24

25   ─────────────────────
     [4] California's eminent domain statute provides that the compensation for a taking be based upon the
     price that a willing seller and a willing buyer, neither under any compulsion or necessity to buy or sell,
26   would agree upon in a hypothetical sale of the property.  Cal Code Civ Proc § 1263.320.  While that
     approach to valuation might be adequate with respect to parcels of real estate, it is unsuitable to
27   calculate the value of loans held by RMBS Trusts because their value to the structure and cash flows of
     the RMBS Trusts is substantial, the illiquid market renders the fair market value calculation wildly
28   imprecise, and the collateral harm their seizures would cause to the rest of the trust is significant and
     hard to calculate.

                                                    3

operations. (In attempting to effect service of court papers on MRP, Plaintiffs were unable to find a single operating office address for the firm, out of the multiple addresses listed on MRP's publicly available documents.) Defendants have responded with no declarations or other factual submissions as to Richmond or MRP's ability to compensate for the losses that would result from this Program.[5]

Moreover, this Court's review of the Program presents the most efficient way to litigate the Program's constitutionality, in contrast to hundreds of piecemeal condemnation proceedings. The avoidance of that piecemeal approach further establishes the hardship of delay. *Cal. ex rel. Lockyer v. United States Dep't of Agric.*, 575 F.3d 999, 1011 (9th Cir. 2009) ("With this suit, the plaintiffs are taking advantage of what may be their only opportunity to challenge the State Petitions Rule on a nationwide, programmatic basis. Therefore, we agree with the district court that this dispute is ripe for adjudication.").

Finally, Plaintiffs have established other elements of irreparable harm that they would experience if the Loan Seizure Program is not promptly enjoined, none of which has been refuted by Defendants:[6]

- Plaintiffs would be irreparably harmed by the fact that the Program would seize high quality performing loans from the pools, leaving the RMBS Trusts with higher concentrations of non-performing loans, thereby upending the heavily negotiated, diversified investment structure pursuant

---

[5] It is highly unlikely that Defendants could ever fully compensate Plaintiffs even for "just compensation" in the state court condemnation proceeding, much less compensate Defendants for all of their injuries that may potentially fall outside of the scope of what is compensable in such a proceeding. As Defendants admit, the Quick Take procedure allows for possession of the loans prior to judgment if the trial court finds that plaintiff has deposited with the court the "probable" amount of just compensation. After fully adjudicating the condemnation proceeding, the state court could find that the plaintiff owes additional compensation – in which case, Plaintiffs would become creditors of Defendant for the shortfall, and Defendants' abilities to pay become highly relevant. *See* Def. PI Mem. at 4 (discussing Cal. Code Civ. Proc. § 1230.020).

[6] Defendants have failed to meaningfully challenge any of these points through the submission of expert evidence. Instead, they merely cite two non-experts – Robert Hockett, a law professor and paid consultant to MRP, and Peter Dreier, a professor of "politics" – for the conclusory proposition that "Mortgage loans have a market value and, indeed, are much easier to value than many other assets." But as discussed in the expert declaration of Phillip Burnaman and as Defendants' own documents acknowledge, there is no active trading market for performing loans held by PLS trusts, due to the non-saleable nature of such loans. *See* Burnaman Moving Decl. ¶¶ 36-37.

to which the Trusts were created. *See, e.g.*, Reply Declaration of Phillip Burnaman ("Burnaman Reply Decl.") ¶¶ 5-11 (showing that the Program would seize primarily performing loans).

- Plaintiffs would be irreparably harmed by the fact that the loan seizures would have an immediate effect on the cash flows of the Trusts' certificates and their corresponding market values that could not easily be quantified. Indeed, for many investors (including those who sell their interests), those losses would never be compensated. *See, e.g.*, Declaration of David Stevens (Dkt. 10) ("Stevens Decl.") ¶ 25; Burnaman Moving Decl. ¶ 45.

- Additionally, there is evidence that Defendants' actions to date are causing and imminently threating additional harm to both the national market for RMBS certificates (including those issued by the Plaintiff Trusts to their beneficiaries), and to the national mortgage lending market. All three major credit ratings agencies have announced that Richmond's Program would negatively affect their credit ratings for RMBS certificates. Burnaman Reply Decl. ¶ 32. Moody's has called the Program "credit negative" and determined that it "would increase losses in RMBS," and S&P has explained that it would likely have to downgrade credit ratings on existing RMBS certificates and demand greater credit protection on RMBS certificates issued in the future. *Id*. Those credit downgrades will, in turn, negatively impact the value of the RMBS certificates issued by the Trusts to their beneficiaries. *Id*. There is also evidence indicating that Defendants' implementation of the Program has already begun to cause harm to the Richmond and nationwide mortgage markets. A recent research report has identified an increase in "sizable dispersion rates" for mortgage loans issued in Richmond and other municipalities considered at risk of implementing MRP's Program. Burnaman Moving Decl. ¶ 51. The financial harm imposed on the RMBS Trusts, their investors, and the broader securities and mortgage lending markets will be vast and incalculable, and will far exceed any monetary remedy that any court could provide or that Defendants could possibly pay.

## II. A Preliminary Injunction Will Not Cause Harm to Defendants

On the other side of the coin, Defendants do not credibly argue that they or the Richmond community would be harmed by a preliminary injunction against taking further action to seize loans.

Defendants' argument that a preliminary injunction would "stifle" public debate and "interfere" with the operations of municipal government is a red herring. In support, Defendants cite

*New Orleans Water Works Co. v. City of New Orleans,* 164 U.S. 471 (1896), which held that a court of equity may not enjoin a municipal body from exercising legislative powers.  But that case is inapposite, as Plaintiffs have not sought to enjoin Richmond's City Council from meeting or taking any legislative acts, nor do Plaintiffs seek to stifle public debate or the legislative process. [7]  Instead, Plaintiffs seek to enjoin Defendants from further implementing their unconstitutional program and unlawfully seizing the loans held by the Trusts, including filing state court condemnation proceedings or taking other non-legislative steps towards seizing the loans.  Such activities are unquestionably within a federal court's discretion to enjoin.  *See e.g., Bank of Am., N.A. v. City & Cnty. of San Francisco,* 215 F.3d 1332 (9th Cir. 2000) (affirming injunction against enforcement of municipal ordinance). [8]  Indeed, a federal court may even enjoin the enforcement of a takings program before all of the legislative steps have been completed.  *See Regional Railroad*, 419 U.S. at 107, 140 (holding that injunction against enforcement of Regional Rail Reorganization Act ripe, even though Congress had to take additional steps to fully implement the Act).

          In the face of the billions of dollars in irreparable losses that could result from the *failure* to issue a preliminary injunction, the balance of equities is decidedly in favor of maintaining the status quo.

---

[7] Defendants cite *Santa Cruz County Redevelopment Agency v. Izant*, 37 Cal. App. 4th 141 (1995) for the proposition that a resolution of necessity is a "legislative act."  However, that case is inapposite, as it (quite obviously) did not concern the scope of a federal court's injunctive power, but rather stated only that a resolution of necessity is a "legislative act" for purposes of determining what sort of evidence is admissible to challenge it under state trial court evidentiary procedures.  Indeed, it is within this Court's power to enjoin even the passage of the resolution of necessity, as a federal court has the broad discretion to enjoin the passage of municipal ordinances.  *See City of Des Moines, Iowa v. Continental Ill. Nat. Bank & Trust*, 205 F.2d 729, 732-34 (8th Cir. 1953) (affirming injunction restraining city council from issuing any ordinances or resolutions to effect any forfeiture of franchise pending the outcome of litigation).

[8] Notably, *City of New Orleans* reasoned that "[w]e repeat that when the city council shall pass an ordinance that infringes the rights of the plaintiff . . . . it will be *time enough* for equity to interfere." *Id.* at 482 (emphasis added).  But here, unless Defendants are enjoined from filing state court condemnation proceedings to seize the loans, there would not be "time enough" after the resolution of necessity is issued for this Court to assess the constitutionality of the seizures, as Defendants could file the state court condemnation proceeding immediately thereafter (and according to their documents, Defendants plan to do just that, *see* Ertman Reply Decl. Exs. H, I; Ertman Moving Decl. Ex. D.  As noted above, Defendants rejected a proposed agreement that would have allowed time for decision of the PI Motion.

1    **III.    Plaintiffs Have Established High Likelihood of Success on the Merits**

2          **A.    The Loan Seizure Program Unconstitutionally Takes Extraterritorial Property**

3          Defendants do not dispute that they are constitutionally forbidden from seizing intangible

4    property located outside of California, or that California law prohibits them from seizing intangible

5    property located outside of Richmond.  Nor do they dispute that the RMBS Trusts that own the loans

6    are mostly located outside of California, and that none of them is located in Richmond.  Instead,

7    Defendants seek to justify their threat to illegally seize loans held outside of Richmond – and mostly

8    out of state – by claiming that "for purposes of condemnation authority . . . the loans at issue here are

9    located with the debtor and the security property."  That contention defies law and logic.  Every court

10   to have addressed the location of intangible property for purposes of exclusive jurisdiction has

11   concluded that a loan is an asset that is domiciled with the lender, who is the only person with the

12   potential legal authority to modify, sell, or otherwise alter or dispose of it.  *See, e.g., Delaware v. New*

13   *York*, 507 U.S. 490, 498-500 (1993).

14         "[T]he property interest in any debt belongs to the creditor rather than the debtor."  *Id.* at 499.

15   Indeed, it would be odd to think that the situs of the property interest in a debt being seized by eminent

16   domain resides with the debtor, who has a *liability*, rather than a property interest.  *See Texas v. New*

17   *Jersey*, 379 U.S. 674, 680 (1965).  Eminent domain is distinguishable from the garnishment cases cited

18   by Defendants for this very reason.  In the garnishment cases, the main "property" being taken is the

19   money in the debtor's hands at the beginning of the transaction, payment of which extinguishes the

20   debtor's debt.  In contrast, the property being seized under this eminent domain program is the right of

21   the creditor to receive payment.  After the "taking" is accomplished, the homeowner still owes the debt

22   on the note, at least until the debt is modified.  Only the creditor (the Trust) is deprived of its property

23   or has its rights altered by the seizure.

24         Defendants try to obscure the axiom that a debt (to the extent it is property) belongs to the

25   creditor by citing a series of cases that do not involve a state's *exclusive* authority over property

26   located within its physical boundaries, and most of which involve the entirely separate "minimal

27   contacts" test for personal jurisdiction.  Defendants' argument on this point utterly ignores the

28   fundamental difference between personal jurisdiction – which can simultaneously exist against a given

7

1    party in any number of states, depending upon its contacts with each state – and matters of exclusive

2    jurisdiction, like escheat, or eminent domain, which can only exist in one state.

3        Defendants' own cases highlight the shortcomings of their argument.  In *Waite v. Waite*, 6 Cal.

4    3d 461 (1972), *overruled on other grounds by In re Marriage of Brown*, 15 Cal. 3d 838, 851 n.14

5    (1976), the California Supreme Court explained the difference between cases that depend upon on

6    exclusive territorial jurisdiction, like escheat (and by implication eminent domain), which can lie only

7    in one state, in contrast to personal jurisdiction over a debtor, which can exist in multiple states.  *Id*. at

8    467 (distinguishing escheat and taxation cases from personal jurisdiction cases).  As Defendants

9    acknowledge, *Waite* holds that "[t]he location assigned to [a property] depends on what action is to be

10   taken with reference to it." *Id*. (quoting *In re Waits' Estate*, 23 Cal. 2d 676, 680 (1944)).  And while

11   *Waite* held that a creditor can sue to collect a debt "in any state in which personal jurisdiction of the

12   debtor can be obtained," that holding is inapposite to cases involving escheat or eminent domain, in

13   which one state's jurisdiction is necessarily exclusive of any other's.  In the latter type of cases

14   involving exclusive jurisdiction over intangible property, like a loan, *Waite* makes clear that the power

15   is exercised only by "the jurisdiction of the owner's [or lender's] domicile." *Id.  See also Baltimore v.*

16   *Baltimore Football Club, Inc.*, 624 F. Supp. 278, 284 (D. Md. 1985) (applying escheat cases to

17   eminent domain case because "[a] state's power of eminent domain is, by its very nature, exclusive of

18   another state's power to condemn the same property, . . . only one state may condemn a particular

19   piece of property, whether tangible or intangible.") (internal citation omitted).

20       The garnishment cases relied upon by the defendants are also irrelevant for the same reason:

21   they involve non-exclusive personal jurisdiction to collect payment from a debtor, which "authorize a

22   demand upon the debtor everywhere." *Harris v. Balk*, 198 U.S. 215, 225 (1905), *overruled on other*

23   *grounds by Shaffer v. Heitner*, 433 U.S. 186 (1977).  Critically, as the Supreme Court recognized in

24   *Texas*, personal jurisdiction holdings have no bearing in a case involving exclusive jurisdiction, since a

25   person can be subject to personal jurisdiction in multiple states, while exclusive jurisdiction over

26   property – as required in an eminent domain or escheat case – can lie only in one state. *Texas*, 379

27   U.S. at 678 ("The issue before us is not whether a defendant has had sufficient contact with a State to

28   make him or his property rights subject to the jurisdiction of its courts, a jurisdiction which need not be

8

1    exclusive."); *see also id*. at 681 n.12 (noting that *Harris v. Balk* applied a different rule in garnishment

2    cases and not adopting that rule). As the court clearly explained in *Baltimore*, "the minimum contacts

3    required for personal jurisdiction are inadequate for jurisdictional purposes in eminent domain. A

4    state's power of eminent domain is, by its very nature, exclusive of another state's power to condemn

5    the same property." 624 F. Supp. at 284. The use of personal jurisdiction standards in an eminent

6    domain proceeding "would eviscerate the established rule that only one sovereign may properly

7    condemn property, and would lead to the exercise by a foreign state of extraordinary powers over

8    property located in another state." *Id.* at 285.

9        Defendants also cite a series of cases involving confiscation by the federal government of the

10   property of Confederates and enemies of the United States. Those cases are irrelevant because they

11   have nothing to do with delineating the authority of a single state or municipality vis-à-vis other states;

12   the territorial jurisdiction of the federal government is not limited to the courts of a single state, but

13   extends throughout the country. Further, contrary to Defendants' description of *City of Oakland v.*

14   *Oakland Raiders* case, 174 Cal. App. 3d 414 (1985), the court there said nothing about a "totality-of-

15   the circumstances test." It simply rejected an extraterritoriality argument that appellees raised as an

16   alternate ground for affirming summary judgment, because there was at least a disputed question of

17   fact whether the Oakland Raiders football team was located in Oakland.[9]

18       While Defendants belittle the Supreme Court's escheat and taxation decisions as merely

19   turning on rules of "administration" (Def. PI Mem. at 20), rather than substantive legal principles,

20   those holdings cannot be so easily dismissed. The Supreme Court specifically held that answering the

21   question which state has exclusive jurisdiction over property *must* be one that is "simple and easy to

22   resolve." *Texas*, 379 U.S. at 680. Defendants' multi-factored approach is neither simple nor easy, as

23   each state's courts would be free to come up with a justification why their state has the greatest

24   interest. The Supreme Court, by contrast, has adopted a single, definitive rule to determine where a

25   _____

[9] *Offield v. New York, New Haven & Hartford R.R. Co.*, 203 U.S. 372 (1906), another case relied upon
26   by Defendants, did not address extraterritorial issues at all but rather considered public purpose in the
     context of the highly regulated consolidation of two Connecticut railroad companies whose tracks
27   connected. The domicile of the plaintiff (the only subject of the narrow taking of a railroad company's
     stock) is not even mentioned. In *Offield*, the unique statutory regime that created and regulated semi-
28   public railroad corporations allowed one company to seize shares of outstanding stock of another if it
     owned 75% of the target company's stock. *Id*. at 376.

9

1   debt resides for purposes of the exercise of exclusive sovereign power such as escheat and eminent

2   domain:  "a debt is property of the creditor, not of the debtor," and is accordingly located in the

3   creditor's home state.  *Id.* at 677;  *see also W. Union Tele. Co. v. Pennsylvania*, 368 U.S. 71, 75 (1961)

4   ("Pennsylvania does not claim and could not claim that the same debts or demands could be escheated

5   by two States."); *Baltimore*, 624 F. Supp. at 286 ("[T]he [*Western Union*] Court was recognizing the

6   exclusive nature of escheat - and by analogy, condemnation - proceedings.").  In this case, the

7   Supreme Court's simple rule forbids Defendants' attempt to seize loans owned by Trusts located

8   outside of Richmond's territorial jurisdiction and mostly outside of California.

9         **B.**      **The Loan Seizure Program Improperly Seizes Property for Private Use**

10         In *Kelo v. City of New London*, Justice Kennedy made clear that "transfers intended to confer

11   benefits on particular, favored private entities, and with only incidental or pretextual public benefits are

12   forbidden by the Public Use Clause."  545 U.S. 469, 490 (2005) (Kennedy, J., concurring).[10]  In this

13   case, the Loan Seizure Program does exactly what *Kelo* prohibits:  MRP – a private investment firm –

14   devised the Program, agreed to fund it, selected the mortgage loans that Richmond has already taken

15   steps to seize by eminent domain, and stands to be the primary beneficiary of the Program.[11]

16   Defendants' opposition brief ignores this, and instead feigns ignorance about their well documented

17   plans to implement what is first and foremost a private transfer of wealth, only mentioning MRP once in

18   the entire section on public use.  The actual Program that Defendants have publicly explained at length

19   and have already begun to implement is designed primarily to benefit specific private parties – MRP and

20   MRP's investors.  This case is the opposite of *Kelo*, where the Supreme Court emphasized that the

21   identities of the private parties who would benefit from the takings were not even known when the plan

22   was adopted.  545 U.S. at 478 n. 6, 493.  Here, by contrast, the illegal takings scheme was unknown to

23   Richmond until MRP convinced the city to rent its eminent domain authority to MRP.

24

25   _____

26   [10] Defendants ignore this key limitation in *Kelo*.  While the Supreme Court did acknowledge that 'public use' is defined broadly and that the pursuit of a public purpose can benefit unnamed private parties, 545 U.S. at 485, the City is not allowed "to take property under the mere pretext of a public

27   purpose, when its actual purpose [is] to bestow a private benefit."  *Id.* at 478.

28   [11] Purely incidental principal reductions to a relatively small number of lucky private homeowners is not, by itself, a public use.

1    There is no doubt that, regardless of which specific loans are seized, the Program is being

2  implemented primarily to benefit specific favored private entities who stand to earn a large payday from

3  their efforts to promote the Loan Seizure Program to Richmond and drive its implementation.  MRP

4  screens and selects the loans to be seized.  *See* Declaration of John C. Ertman (Dkt. 9) ("Ertman Moving

5  Decl.") Ex. C at 9; Reply Declaration of John C. Ertman ("Ertman Reply Decl.") Ex. M.  MRP identifies

6  the supposed "public purposes" for the plan.  Ertman Reply Decl. Ex. O.  MRP arranges the funding,

7  servicing, and "resolution" of the acquired mortgages.  Ertman Moving Decl. Exs. D at 12; J at 10.

8  Indeed, Richmond and MRP have already made formal offers to purchase loans of approximately $126

9  million, without a financing contingency.  *See, e.g.*, Burnaman Reply Decl. ¶3.[12]  For their effort, MRP

10  gets $4,500 per loan seized and its financial backers get the profit between the supposedly "fair" market

11  value Richmond pays and the price at which the refinanced loan is sold.  Ertman Moving Decl. Ex. J at

12  17-19.  Tellingly, MRP is even slated to prepare the resolution of necessity for Richmond.  Ertman Reply

13  Decl. Exs.  H, I.[13]  Indeed, Defendants do not even contest in their briefing that MRP is acting under

14  color of state law with respect to the Loan Seizure Program, confirming that MRP has taken over an

15  essential sovereign function from the City.  The control and benefits ceded to MRP are in marked

16  contrast to *Kelo*, where the identity of the private parties to be benefitted was not even known.

17    Meanwhile, Defendants' "hypothetical" public uses for the Loan Seizure Program are even less

18  than hypothetical – they are implausible.  The 624 loans initially targeted by MRP and Richmond show

19  that the Program's primary purpose is to secure a profit for MRP and its investors; any actual public

---

[12] This belies William Lindsay's declaration that Richmond "has not committed to working with any specific group of investors."  Declaration of William Lindsay (Dkt. 33) ("Lindsay Decl") at ¶ 23. MRP has already lined up the financing and chosen the investors to be benefitted by the Loan Seizure Program.  Indeed, as early as May 17, 2013, MRP had already raised at least $46 million for Richmond to seize the targeted loans.  Ertman Reply Decl. Ex. O.

[13] The timeline documents confirm the involvement of MRP and its investors "WAM" (believed to be a reference to Waterfall Asset Management), in virtually every phase of the Program.  Ertman Reply Decl. Ex. H.  Remarkably, nowhere in Defendants' opposition papers do they make any reference to the role of MRP and its investors in the Loan Seizure Program.  Instead, Defendants seek to give the impression that Richmond alone is proceeding with the Program.  Defendants seek to avoid any discussion of MRP and the underlying profit motive that is at the core of the Program, because those facts undermine Defendants' assertion that the Program primarily serves a public purpose along with the assertion that the Richmond has exclusive control over the Loan Seizure Program.

---

11

benefits would be incidental.[14]  Rather than focusing on the loans most likely to default, Defendants target those that are "relatively current (not in default)" from "borrowers who appear likely to repay their loans."  Ertman Moving Decl. Ex. C at 9.  Analysis of the actual loans selected by MRP and Richmond shows that they include many that are not even underwater and that a "significant majority" are performing loans not at serious risk of default.  Burnaman Reply Decl. at ¶¶ 5, 8-11; *see also id.* at ¶ 23 ("a significant percentage of the loans relate to large homes purchased by relatively affluent borrowers"). This focus on seizing the loans that would bring profit to MRP and its investors rather than those loans which are most at risk of default shows that any benefit to the homeowners whose loans are refinanced is secondary and incidental.  *See, e.g.* Burnaman Reply Decl. at ¶¶ 25-26 (calculating profit spread available to MRP and its funders).[15]  Defendants try to claim the Loan Seizure Program *could* serve a public purpose by reducing future blight yet the actual loans they are targeting show this is just a pretext.

Moreover, Defendants' nebulous proffered public uses of "preventing blight" (Def. PI Mem. at 23) or fixing the housing market are very similar to the alleged public use of preventing "future blight" that was rejected in *99 Cents Only Stores v. Lancaster Redev. Agency*, 237 F. Supp. 2d 1123, 1130 (C.D. Cal. 2001).  There, the Court found that such a broad public use rationale would permit condemnation of any property because "no redevelopment site can ever be truly free from blight because blight remains ever latent, ready to surface at any time."  *Id.* at 1131.  The Supreme Court in *Kelo* cited *99 Cents* as an example of a Court viewing a transfer of property to a private party, executed outside the confines of an

---

[14] As explained in more detail in Plaintiff's Opposition to Defendants' Motion to Dismiss, Defendants cannot disclaim all responsibility for the Loan Seizure Program by claiming that they do not know its final contours.  Enough of the Program has already been implemented for this Court to determine that whatever public use Defendants decide to claim will be pretextual given that its primary purpose is to benefit MRP and its investors.

[15] Moreover, if private profit was not the primary motivation of the Loan Seizure Program, it would make no sense to put principal reduction for a few hundred private homeowners (including some with very valuable homes) above the needs of the rest of Richmond's residents.  Defendants cite to William Lindsay's declaration noting that property values in Richmond are less than half of what they were seven years ago.  Def. PI Mem. at 23; Lindsay Decl. ¶ 11.  Of course, as Lindsay admits elsewhere (but the Opposition does not cite), property values in Richmond have risen by over 50% since March 2011.  Lindsay Decl. at ¶ 6; *see also,* Burnaman Reply Decl. ¶ 19.  In attempting to secure the largest profit possible for its designer (MRP), the Program would put this recovery in danger as mortgage lenders would likely either cut off loans to Richmond altogether or at least increase interest rates in order to account for the new risk that Richmond might seize their loans at any time.  *See, e.g.*, Stevens Decl. ¶¶ 11-17; Burnaman Moving Decl. ¶ 62; Burnaman Reply Decl. ¶¶ 33-37.

1   integrated development plan, with a "skeptical eye," and explained that such an exercise of eminent

2   domain "would certainly raise a suspicion that a private purpose was afoot." *Kelo*, 545 U.S. at 487 and

3   n.17.  The Loan Seizure Program, also executed outside an integrated development plan, is exactly the

4   type of case where a private purpose is afoot because MRP proposed and designed the Program and is set

5   to implement it and directly profit from it.  Any connection between the incidental benefit of principal

6   reduction for 624 homeowners and the prevention of "blight" is tenuous at best.  As demonstrated in the

7   Burnaman Reply Declaration, the large majority of these loans are either not underwater at all or they are

8   underwater but performing in a rising housing market where many will soon be above water.  Burnaman

9   Reply Decl. at ¶¶ 5-11.  Moreover, Defendants' speculation that these loans will widely default is wholly

10  without foundation and, even where a loan does default, default does not equate with foreclosure, as

11  servicers have been willing to work with borrowers and have granted extensive, significant modifications

12  of Richmond loans, including permanent principal reductions.  Burnaman Reply Decl. at ¶¶ 12-18

13  (showing loan modifications occur in "substantial quantities").  Accordingly, there is a fundamental

14  disconnect between the Loan Seizure Program's supposed targeting of "blight" and what forcible seizure

15  of these loans would actually accomplish, beyond profiting MRP and its investors.

16          **C.      The Loan Seizure Program Violates the Dormant Commerce Clause**

17          Plaintiffs are not merely *likely* to prevail on the merits of their claim that the Program violates the

18  Dormant Commerce Clause, Defendants' own statements and submissions to this Court *prove* that it

19  does.  Defendants have publicly admitted that their Loan Seizure Program is intended to impact interstate

20  commerce directly by resolving what Defendants regard as an "intractable problem that drags down the

21  whole economy."  Ertman Moving Decl. Ex. F at 3.  Defendants' Opposition papers confirm that they

22  seek to compel the sale of loans held in interstate commerce using Richmond's eminent domain power

23  and to then resell those loans back into interstate commerce because Defendants disapprove of "the

24  way the PLS trusts" are "structured."  Def. PI Mem. at 3.  Specifically, Defendants believe that PLS

25  Trusts are causing a "local and national mortgage problem" because their loans are "locked in trusts"

26  and cannot be sold.  Hockett Decl. ¶¶ 8-9, 12, 14.  But it is a fundamental premise of federalism that

27  states and municipalities do not get to decide what is best for the "whole economy" or attempt to rectify

28  how entire sectors of the national economy are conducted, such as the structure of  PLS trusts.

As Plaintiffs demonstrated in their opening brief, state action violates the Dormant Commerce Clause if it either (1) "directly regulates interstate commerce," or (2) has "indirect effects on interstate commerce" and the "burden on interstate commerce clearly exceeds the local benefits," regardless whether it additionally constitutes unlawful discrimination. *Nat'l Collegiate Ass'n v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993) (quoting *Healy v. Beer Inst.*, 491 U.S. 324 (1989)).[16] Here, the Program suffers from both of these deficiencies, and Plaintiffs will accordingly prevail on their Dormant Commerce Clause claim.

### i.   The Program Constitutes Forbidden Direct Regulation of Interstate Commerce.

Although Richmond claims that the Loan Seizure Program cannot violate the Dormant Commerce Clause because exercising the eminent domain power does not "regulate anything," Def. PI Mem. at 25, a city "does not escape commerce clause review" simply because "its action is grounded on its governmental power of eminent domain." *Oakland Raiders,* 174 Cal. App. 3d at 419.  Eminent domain is a quintessentially sovereign power possessed only by the government, and its exercise can constitute a form of "regulation" subject to preemption under the Dormant Commerce Clause.  *See id.*; *cf. Crosby v. NFTC*, 530 U.S. 363, 374 n.7 (2000) (noting that the fact that the State "had chosen to use its spending power rather than its police power" to achieve its regulatory goals did not lessen the risk of interference with Congress's regulation of interstate commerce).  Defendants do not dispute that the Dormant Commerce Clause would bar Richmond from adopting a regulation directing the Trustees to sell their underwater Richmond mortgages on the open market in interstate commerce, and Richmond cannot accomplish this same regulatory purpose by forcing a sale to MRP through eminent domain, so that MRP can resell the loans into the interstate economy.

The fact that Richmond's Seizure Program constitutes economic "regulation" is further evidenced by the extent to which the Seizure Program conflicts with Congress's own regulation of the Trusts.  The very case upon which Defendants rely confirms that "[t]he dormant Commerce Clause is

---

[16] Richmond's Program is also invalid because it targets property held by out-of-state trusts and compels transfer of the loans to a local California investment firm, in violation of the separate prohibition against regulation that "discriminates against" interstate commerce.  *See Miller*, 10 F.3d at 638.  But there is no need for Plaintiffs to prove such discrimination in order to show that the Loan Seizure Program violates the Commerce Clause's prohibitions against a municipality's direct regulation of interstate commerce and against indirectly burdening interstate commerce in a manner disproportionate to local benefits.

1  implicated if state laws regulate an activity that ' "has a substantial effect" on interstate commerce *such*

2  *that Congress could regulate the activity.*' " *Nat'l Ass'n of Optometrists & Opticians v. Brown*, 567

3  F.3d 521, 524 (9th Cir. 2009) (quoting *Conservation Force, Inc. v. Manning,* 301 F.3d 985, 993 (9th

4  Cir. 2002)) (emphasis added).  There is no doubt that Congress "could regulate" the activity that

5  Richmond now seeks to regulate through compelled mortgage sales, because this activity *is already*

6  subject to extensive regulation by Congress.  In fact, the trust "structure" that Richmond views as a

7  problem and seeks to remedy is actually a feature mandated by the federal Tax Reform Act of 1986, 26

8  U.S.C. §§ 860A – 860G.  That statute, enacted by Congress, effectively prohibits Real Estate

9  Mortgage Investment Conduits ("REMICs") such as the Trusts from selling performing loans by

10  imposing a 100% tax on any profits realized from such a sale.  *Id.* § 860F(a).  In order to achieve

11  stability and certainty in the secondary market for residential mortgages, Congress adopted this

12  limitation to ensure that REMICs would be "*fixed pool[s]* of mortgages."  H.R. Rep. No. 99-841, at II-

13  224 to II-225 (1986) (Conf. Rep.) (emphasis added).

14       By prohibiting the sale of performing loans (which could leave the trusts with only loans at

15  greater risk of default), Congress gave private investors confidence to make the investments in RMBS

16  trusts that are critical to liquidity in the home loan market.  Defendants apparently disagree with

17  Congress's policy choice and believe that "lock[ing]" underwater but performing loans in PLS trusts

18  has caused a "local and national mortgage problem."  Hockett Dec. ¶¶ 8-9, 12, 14.  But, whatever the

19  merits of Richmond's policy choice, it is not a choice that is Richmond's to make.  Congress's action

20  to prohibit the sale of these performing loans precludes Richmond from charting a different course.

21       The Program thus exemplifies precisely the kind of "direct regulation" of interstate commerce

22  by a locality that flatly "is prohibited" by the Commerce Clause.  *Edgar v. MITE Corp.*, 457 U.S. 624,

23  640-43 (1982).  Plainly, Richmond could not countermand the Congressional mandate against

24  REMICs selling performing loans by adopting a city ordinance that directs the Trusts to sell on the

25  open market all their Richmond loans, both performing and non-performing, to buyers who would

26  further reduce the homeowner's principal balance.  Nor can Richmond accomplish the same thing by

27  the two-step process of compelling the Trusts to sell their loans to MRP, so that MRP can reduce the

28  principal and then re-sell the loans back into the interstate market.  No matter how strenuously the City

1   of Richmond (or Professor Hockett, for that matter) believes that the Congressional policy of

2   "lock[ing]" performing loans in PLS Trusts is responsible for causing a "local and national mortgage

3   problem," Hockett Decl. ¶¶ 8-9, 12, 14, the City of Richmond lacks the authority to direct the Trusts to

4   reduce the principal balance of loans purchased in interstate commerce or to compel the Trusts to sell

5   the loans to someone who will.  This type of direct regulation of interstate commerce by a municipality

6   is forbidden, without regard to any balancing of the regulation's effect on the local vs. national

7   economy.  *See Miller*, 10 F.3d at 638.

8          **ii.   The Program Fails the Dormant Commerce Clause's Balancing Test**

9          Even if the Program were not a direct regulation of interstate commerce, it independently

10  violates the Dormant Commerce Clause because it also has "indirect effects on interstate commerce"

11  and imposes a burden on interstate commerce that "is clearly excessive in relation to putative local

12  benefits."  *See Edgar*, 457 U.S. at 640.  As already explained, the supposed "benefits" to the

13  Richmond community cited by the Opposition are fictional.  *See supra* at 12-13.  By contrast, the

14  effect on national mortgage lending markets, homeowners, and certificateholders – including

15  government-sponsored entities like Fannie Mae and Freddie Mac – will be both real and significant.

16  *See* Def. PI Mem. at 14-15; Declaration of Douglas G. Duncan ("Duncan Decl.") ¶¶ 14-15 (describing

17  losses that would result to trusts Fannie Mae invests in or guarantees); Burnaman Reply Decl. ¶¶ 31-

18  37.

19         Here again, the Loan Seizure Program would undermine significant federal legislation and

20  regulatory programs adopted to encourage mortgage modification and to stabilize the mortgage

21  market.  Fannie Mae and Freddie Mac were themselves created in order to ensure liquidity in the

22  national mortgage market.  *See* 12 U.S.C. §§ 1451-1459, 1716-1723i; Duncan Decl. ¶ 4.  Under their

23  authority to stabilize the secondary mortgage market, Fannie Mae and Freddie Mac have made

24  considerable investments in PLS trusts holding RMBS.  *See* Duncan Decl. ¶ 12.[17]   More recently,

25  Congress has passed additional legislation, including authorizing the Treasury to invest $187 billion, to

26

27  ---

   [17] *See also* Federal Housing Finance Agency, General Counsel Memorandum: Summary of Comments and Additional Analysis Regarding Input on Use of Eminent Domain to Restructure Mortgages 3, 7

28  (Aug. 7, 2013) ("FHFA Memorandum"), available at
http://www.fhfa.gov/webfiles/25418/GCMemorandumEminentDomain.pdf.

PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION; Case No.
CV-13-3663-CRB

provide for their continued financial stability and to further encourage their participation in programs designed to stabilize the secondary mortgage market. *See* 12 U.S.C. §§ 1455(*l*)(1)(A), 1719(g)(1)(A), 4501-4642.  Because the Loan Seizure Program threatens certificateholders by withdrawing select loans from the RMBS trusts, and because Fannie Mae and Freddie Mac have significant holdings in those trusts, Richmond's seizure Program directly threatens these government-sponsored entities' statutory mission. Indeed, the Federal Housing Finance Agency ("FHFA"), which Congress charged with operating Fannie Mae and Freddie Mac in conservatorships, has publicly cautioned that programs like the Loan Seizure Program cause "harm to [the] conservatorship[s], through losses to" Fannie Mae and Freddie Mac and thus conflict with FHFA's statutory responsibility to "preserve and conserve" their assets.  FHFA Memorandum at 3, 7 (citing 12 U.S.C. § 4617).

The Program likewise undermines the objectives of the federal Home Affordable Modification Program ("HAMP").  In the depths of the 2008 financial crisis, Congress enacted the Emergency Economic Stabilization Act with a goal, among other things, of "preserv[ing] homeownership."  12 U.S.C. § 5201.  The Act also authorized the Secretary of the Treasury to establish the Troubled Asset Relief Program ("TARP").  12 U.S.C. § 5211(a)(1).  Pursuant to the statute, Treasury created HAMP in order to assist three to four million homeowners who are either in default or at imminent risk of default by reducing their monthly mortgage payments to sustainable levels.[18]   HAMP works by providing financial incentives (in the form of TARP funds) to participating mortgage servicers to modify the terms of certain eligible loans.[19]  Richmond's different, coercive approach to solving the "national mortgage problem" will undermine the objectives of this federal program.  Whereas HAMP seeks to *encourage voluntary* participation in loan modifications by mortgage servicers through financial incentives that build upon the existing market structure, Richmond would seize such loans by compulsion, thereby deterring investment in RMBS trusts and significantly altering servicers' incentives to participate in HAMP modifications.  *Cf. AIA v. Garamendi*, 539 U.S. 396, 421, 427

---

[18] *See* Treasury Dep't Supplemental Directive 09-01, Apr. 6, 2009, available at http://www.hppinc.org/_uls/resources/Supplemental_Directive_09-0.pdf.

[19] *See* Making Home Affordable: An Official Program of the Departments of the Treasury & Housing and Urban Development, http://www.makinghomeaffordable.gov/about-mha/faqs/Pages/default.aspx (last visited Aug. 29, 2013).

1  (2003) (invalidating state statute that impermissibly replaced federal policy of encouraging companies

2  to "volunteer settlement funds" with an "iron fist" of state sanctions).  If Richmond's modification-by-

3  seizure approach is permitted, many homeowners will likely face *higher* mortgage payments than they

4  would have been able to achieve under HAMP or other loan modification programs.  *See* Duncan

5  Decl. ¶¶ 21-23.

6       Richmond's preferred coercive economic policy would also place new financial risks on

7  lenders and investors so as to depress demand for mortgage-backed securities, lead to a restriction of

8  credit, and consequently shrink demand and thus prices for home purchases, undermining the very

9  "preserv[ation of] homeownership" that Congress intended to promote through authorizing programs

10  like HAMP.  12 U.S.C. § 5201; Stevens Decl. ¶¶ 18-24; Burnaman Moving Decl. ¶¶ 62-67;  Burnaman

11  Reply Decl. ¶¶ 31-37.

12       It is no answer to contend, as Richmond does, that the Loan Seizure Program's effect on the

13  Trusts and mortgage markets will be minimal because Richmond is presently only seizing a few of the

14  loans in the Trusts and the Trusts are "diversified."  Def. PI Mem. at 25.  If Richmond can legally

15  implement the Program, then every state or municipality can do so, with the result that PLS RMBS

16  trusts will no longer be a diversified portfolio of loans that reduces risk, but will instead be a fortuitous

17  hodge podge of those loans that no state or municipality wants to purchase.  The constitutionality of

18  Richmond's Program must be assessed not merely by the impact of Richmond's first wave of proposed

19  seizures but by "considering . . . what effect would arise if not one, but many or every, State adopted

20  similar legislation."  *Healy v. The Beer Inst.*, 491 U.S. 324, 336 (1989); *see also U&I Sanitation v. City

21  of Columbus*, 205 F.3d 1063, 1069 (8th Cir. 2000) (same); *Backpage.com, LLC v. McKenna*, 881 F.

22  Supp. 2d 1262, 1285 (W.D. Wash. 2012) (same).[20]

23  

24  [20] The extent of conflict with federal policy reflected in the Tax Reform Act, the FHFA memorandum, and the declaration of Douglas G. Duncan, would support a claim of *affirmative* preemption, in addition to "negative" preemption under the Dormant Commerce Clause.  Plaintiffs give notice that they intend to amend their complaint to add a claim of affirmative preemption.  *See, e.g.,* FHFA Memorandum at 3 (federal interests prelude localities from "alter[ing] the terms of a contract held by [Fannie Mae and Freddie Mac] through their ownership of a mortgage-backed security"); *cf. Fed. Housing Financing Agency v. City of Chicago*, No. 11-8795, 2013 WL 4505413, at *10-16 (N.D. Ill. Aug. 23, 2013) (city ordinance preempted by federal law because it interfered with operations of Fannie Mae, Freddie Mac and FHFA in the mortgage markets).

In short, the Program's seizure of mortgage loans across state lines is a far cry from the run-of-the mill "state and local regulation" of local "housing and housing finance" to which Richmond refers as support.  *See* Def. PI Mem. at 26-27.  Instead, it directly undermines the significant efforts Congress and federal agencies have made to bring stability to the mortgage market and make homeownership more affordable.  Richmond's self-appointment as regulator of the "national mortgage problem" should be rejected. [21]

### D.     The Loan Seizure Program Violates the Contracts Clause

Defendants state that the Contracts Clause does not limit the power of eminent domain but do not address Plaintiffs' argument that while the normal operation of a local government's eminent domain power may not implicate the Contracts Clause, the Loan Seizure Program goes much further than a typical targeted seizure of real property and represents the very problem of arbitrary abrogation of the rights of creditors and local interference with interstate commerce that the Contracts Clause was designed to prevent.  *See, e.g.*, *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 427 (1934) (noting that Contracts Clause was intended to prevent "legislative schemes for the defeat of creditors and the invasion of contractual obligations").   Richmond cannot do via eminent domain what it would not be able to do by statute.  There is no precedent for such a sweeping eminent domain action.

### E.     Defendants Threaten to Violate Plaintiffs' Constitutional Rights While Acting Under Color of State Law

Finally, Defendants concede that, if Plaintiffs show any of the underlying constitutional violations, they have a high likelihood of success on the merits of their Section 1983 claims against both MRP and Richmond.

---

[21] The fact that the national lending market does "not operate" in the form of a "joint venture" or that investors in RMBS trusts are dispersed throughout the country, and even internationally, does not ameliorate the extensive negative consequences that Richmond's Seizure Program will have on interstate commerce.  *See* Def. PI Mem. at 25 (purporting to distinguish *Oakland Raiders*).  If anything, Richmond's  interference with national mortgage markets  – an entire segment of the U.S. economy that directly impacts the finances of almost every homeowner in the country – even more directly impacts interstate commerce than Oakland's action against a single team of a professional sports league.

1  **IV.  CONCLUSION**

2      For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for a

3  preliminary injunction.

4

5

DATED:  August 29, 2013

6                         Respectfully submitted,

7

8                         By: /s/ Rocky C. Tsai

9                       _____

Thomas O. Jacob (SBN 125665)

10  tojacob@wellsfargo.com         ROPES & GRAY LLP

**WELLS FARGO & COMPANY**

11  Office of General Counsel       Attorneys for Plaintiffs

45 Fremont Street, Twenty-Sixth Floor

12  MAC A0194-266           Rocky C. Tsai (SBN 221452)

San Francisco, CA 94105     (rocky.tsai@ropesgray.com)

13  Telephone:  (415) 396-4425    ROPES & GRAY LLP

Facsimile:  (415) 975-7864     Three Embarcadero Center

14                         San Francisco, CA 94111-4006

*Attorney for Wells Fargo Bank*   Telephone: (415) 315-6300

15                         Facsimile: (415) 315-6350

16                         John C. Ertman

17                         (john.ertman@ropesgray.com)

(Pro hac vice applications pending)

18                         Lee S. Gayer

(lee.gayer@ropesgray.com)

19                         Evan P. Lestelle

(evan.lestelle@ropesgray.com)

20                         ROPES & GRAY LLP

1211 Avenue of the Americas

21                         New York, NY 10036-8704

Telephone: (212) 596-9000

22                         Facsimile: (212) 596-9090

23                         Douglas H. Hallward-Driemeier

(douglas.hallward-driemeier@ropesgray.com)

24                         (Pro hac vice application pending)

ROPES & GRAY LLP

25                         One Metro Center

700 12th Street, NW

26                         Suite 900

Washington, DC 20005-3948

27                         Phone: 202-508-4600

28

Daniel V. McCaughey
(daniel.mccaughey@ropesgray.com)
Nick W. Rose
(nick.rose@ropesgray.com)
ROPES & GRAY LLP
800 Boylston St.
Boston, MA
Phone: 617-951-7000