1  ROCKY C. TSAI (SBN 221452)
   (rocky.tsai@ropesgray.com)
2  **ROPES & GRAY LLP**
   Three Embarcadero Center
3  San Francisco, CA 94111-4006
   Telephone: (415) 315-6300
4  Facsimile: (415) 315-6350

5  Attorneys for Plaintiffs Wells Fargo Bank,
   N.A., as Trustee, *et al.*
6
7  **ADDITIONAL COUNSEL LISTED
   ON SIGNATURE PAGE**

8
9              **UNITED STATES DISTRICT COURT**
10             **NORTHERN DISTRICT OF CALIFORNIA**
11             **SAN FRANCISCO DIVISION**
12

13 
14 WELLS FARGO BANK, NATIONAL
   ASSOCIATION, as Trustee, *et al.*
15                                          Case No. CV-13-3663-CRB
              Plaintiffs,
16
        v.
17                                          **PLAINTIFFS' MEMORANDUM IN
   CITY OF RICHMOND, CALIFORNIA, a          OPPOSITION TO DEFENDANTS'
18 municipality, and MORTGAGE               MOTION TO DISMISS**
   RESOLUTION PARTNERS LLC,
19
              Defendants.
20                                          A<small>CCOMPANYING</small> P<small>APERS</small>:  Reply Declarations of
                                            John C. Ertman, Esq. and Phillip R. Burnaman,
21                                          II; [Proposed] Order
22
                                            Honorable Charles R. Breyer
23
24
25

26
27
28

**TABLE OF CONTENTS**

Page

SUMMARY OF THE ARGUMENT ................................................................................................ i

RULE 12(B)(1) DISMISSAL STANDARD .................................................................................... 1

ARGUMENT .................................................................................................................................... 1

I.     Plaintiffs' Claims Are Ripe for Review ................................................................................ 1

        A.     The Seizure of Loans is not Merely Speculative or Hypothetical .................................... 2

        B.     Defendants Have Taken Concrete Steps to Implement the Loan Seizure Program ........ 4

        C.     Defendants' Conduct Firmly Refutes Their Assertion that Seizure of Loans Through Eminent Domain is Merely Speculative ............................................................ 6

CONCLUSION ............................................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*99 Cents Only Stores v. Lancaster Redevelopment Agency*,
  237 F. Supp. 2d 1123 (C.D. Cal. 2001) ................................................................ ii, 2, 3

*Chertkof v. Mayor & City Council of Baltimore*,
  497 F. Supp. 1252 (D. Md. 1980) ........................................................................ 3, 4, 9

*Eastern Enterprises v. Apfel*,
  524 U.S. 498 (1998) .................................................................................................. ii, 9

*Employers Insurance of Wausau v. Fox Entertainment Group, Inc.*,
  522 F.3d 271 (2d Cir. 2008) ......................................................................................... 9

*Fed'n of African Am. Contractors v. City of Oakland*,
  96 F.3d 1204 (9th Cir. 1996) ........................................................................................ 1

*Green v. United States*,
  630 F.3d 1245 (9th Cir. 2011) ...................................................................................... 1

*Hawaii Hous. Auth. v. Midkiff*,
  467 U.S. 229 (1984) .................................................................................................. ii, 4

*In re iPhone Application Litig.*,
  844 F. Supp. 2d 1040 (N.D. Cal. 2012) ....................................................................... 1

*Regional Railroad Reorganization Act Cases*,
  419 U.S. 102 (1974) ...................................................................................... i, ii, 2, 3, 4

*Supreme Court of Virginia v. Consumer's Union*,
  446 U.S. 719 (1980) ...................................................................................................... 3

*Texas v. United States*,
  523 U.S. 296 (1998) ...................................................................................................... 9

*Thomas v. Anchorage Equal Rights Commn.*,
  220 F. 3d 1134 (9th Cir. 2000) .................................................................................... 9

*United States v. Sayetsitty*,
  107 F.3d 1405 (9th Cir. 1997) ..................................................................................... 8

*Wendy's Int'l Inc. v. City of Birmingham*,
  868 F. 2d 433 (11th Cir. 1989) .................................................................................... 9

**STATUTES**

Fed. Rule Civ. Pro. 12(b)(1) .................................................................................................... 5

Cal. Gov. Code § 7267.2............................................................................................................ 5

**SUMMARY OF THE ARGUMENT**

Plaintiffs submit this Memorandum in opposition to Defendants' motion to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction ("Dismissal Motion"). Defendants seek dismissal of the Complaint, and oppose Plaintiffs' Motion for Preliminary Injunction ("PI Motion"),[1] based primarily on their improper assertion that Plaintiffs' challenge to Defendants' plan to seize certain targeted mortgage loans through Richmond's eminent domain power is merely "hypothetical" and "speculative" (Def. Mem. at 7) and therefore not ripe for review by this Court. But the evidence – including Richmond's public statements and internal Richmond and MRP emails and memoranda – is to the contrary, and establishes that Defendants already have taken substantial steps in implementing their Loan Seizure Program in accordance with a pre-determined plan, and have rejected all requests to hold it in abeyance pending this Court's adjudication of Plaintiffs' significant constitutional challenges.

In the face of that evidence, Defendants rest primarily on the fact that no resolution of necessity has yet been approved by the Richmond City Council. But the fact remains that Defendants are proceeding with their Program to seize loans by eminent domain, just as the plan previously adopted by the City Council provides. Although Defendants have now briefed the issue of ripeness multiple times, they have come forward with nothing to contradict Plaintiffs' evidence that they already have targeted specific loans for seizure, have made offers to acquire those loans under threat of seizure, and are preparing to effectuate those seizures by initiating state court condemnation proceedings.

The law is well settled that Plaintiffs need not wait until Defendants complete every step in their Loan Seizure Program before seeking injunctive relief in this Court. *See Regional Railroad Reorganization Act Cases*, 419 U.S. 102, 142 (1974) (holding that the subject of an unconstitutional taking does "not have to await the consummation of threatened injury to obtain preventive relief," even where the legislative body still "can reject the first plan," where many of the targeted properties "could be eliminated from the [takings program]," where certain of the program's terms "remain to

---

[1] Plaintiffs also are filing simultaneously herewith their Reply Memorandum in further support of Plaintiffs' PI Motion.

be decided," or where any takings might not occur for many years); *see also Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 234 (1984) (suit ripe for adjudication after compulsory negotiations, a statutory prerequisite step to condemnation, had occurred, despite the fact that compulsory arbitration, the following prerequisite step, had not); *99 Cents Only Stores v. Lancaster Redevelopment Agency*, 237 F. Supp. 2d 1123, 1128 (C.D. Cal. 2001) (holding that action to enjoin eminent domain program was justiciable, despite rescission of Resolutions of Necessity by the city), *aff'd in relevant part*, *appeal dismissed on mootness grounds due to changed facts*, 60 Fed. Appx. 123 (9th Cir. 2003). Plaintiffs' constitutional challenges to the Program are thus ripe for review. Indeed, Defendants have, by their very conduct, demonstrated that the seizure of loans from the Plaintiff Trusts is imminent, and that the real purpose of their supposed "ripeness" challenge is to avoid federal court review entirely.

Absent prompt federal court review, the Trusts and their investors will suffer immediate harm. The value of their certificates, traded in federally-regulated national securities markets, will fall to reflect the risk that the anticipated income stream from performing loans in the pool targeted for seizure by Richmond (and other municipalities that implement MRP's Loan Seizure Program) will be stripped from the pools in exchange for a payment worth far less than the income stream that they will generate – less, even, than the foreclosure value of the home securing the loan. This would be an immediate and dramatic reduction in the value of those mortgage securities that could never be compensated through the California eminent domain process. *See Eastern Enterprises v. Apfel*, 524 U.S. 498, 521 (1998) (the Declaratory Judgment Act "allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained.").

Plaintiffs' Reply Memorandum in further support of Plaintiffs' PI Motion contains a lengthy discussion of the significant harm to the Plaintiff Trusts and their investors absent a Preliminary Injunction. That harm is real and it is imminent, and is "in no way hypothetical or speculative." *Regional Railroad,* 419 U.S. at 143. This action is ripe for review now, and this Court should therefore deny the Dismissal Motion in its entirety.

**RULE 12(B)(1) DISMISSAL STANDARD**

Where, as here, a defendant asserts in a Rule 12(b)(1) motion that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction, a court will accept all material allegations in the complaint as true and construe them in favor of the nonmovant. *See Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040 (N.D. Cal. 2012) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).[2] "On a motion to dismiss for lack of subject matter jurisdiction under [Rule] 12(b)(1), proof of jurisdictional facts may be supplied by affidavit, declaration, or any other evidence properly before the court, in addition to the pleadings challenged by the motion." *Green v. United States*, 630 F.3d 1245, 1248 (9th Cir. 2011). Here, the unrefuted evidence submitted by Plaintiffs establishes that this action is ripe and that Defendants' Dismissal Motion should be denied.

**ARGUMENT**

**I.   Plaintiffs' Claims Are Ripe for Review**

Defendants have now filed two motions challenging this Court's jurisdiction to adjudicate Plaintiffs' constitutional claims. Defendants' efforts to evade review of the Loan Seizure Program rest, almost exclusively, on their assertion that unless and until the City Council issues a resolution of necessity authorizing the seizure of loans through eminent domain, and Richmond actually begins the process of seizing loans by initiating actions in state court, Plaintiffs' claims are merely "hypothetical" and "speculative" and are thus unripe for review. Def. Mem at 6. But the only place Defendants refer to the loan seizures in hypothetical terms is in their submissions to this Court. Their published documents, public statements, and internal emails and planning documents confirm that Defendants have been methodically rolling out the Program in accordance with a pre-arranged plan approved by Richmond officials – including targeting 624 specific loans for seizure, sending letters to the owners offering to acquire loans under threat of eminent domain seizure, and making formal offers for those loans amounting to approximately $126 million. Reply Declaration of John

---

[2] To avoid unnecessarily duplicative papers, the facts are set forth fully in Plaintiffs' Memorandum of Points and Authorities in Support of their Motion for a Preliminary Injunction, to which the Court respectfully is referred. To the extent necessary, relevant facts are also discussed below and in the accompanying Declaration of John C. Ertman.

C. Ertman in Support of PI Motion ("Ertman Reply Decl.") ¶¶5–28; Reply Declaration of Phillip Burnaman ("Burnaman Reply Decl.") ¶ 3.

While Defendants ask this Court to believe that they might decide not to adopt a resolution of necessity after all, and to halt the process of seizing loans through eminent domain that is already underway, the City's internal planning documents tell a different story. They demonstrate that Defendants are proceeding on the basis that the seizures will occur. And while Defendants have now had multiple opportunities to rebut the evidence, they have come forward with no such showing – other than the hollow assertion that the City *might* still change course and not proceed with the seizure.

Tellingly, Defendants have refused to agree to even a brief stay on filing state court condemnation proceedings so that this Court can consider Plaintiffs' constitutional challenges to the Program – a reasonable request if Defendants were actually entertaining the possibility of foregoing eminent domain seizures. Defendants' refusal to grant that reasonable request only confirms that Plaintiffs' claims are justiciable. *See 99 Cents Only Stores v. Lancaster Redevelopment Agency*, 237 F. Supp. 2d 1123, 1128 (C.D. Cal. 2001) (justiciability "heavily" supported by fact that city has "persistently refused to enter into any stipulation agreeing not to condemn 99 Cents' leasehold interest at Costco's behest"), *aff'd in relevant part*, *appeal dismissed on mootness grounds due to changed facts*, 60 Fed. Appx. 123 (9th Cir. 2003). Under these circumstances, Defendants' use of eminent domain to seize loans is hardly "hypothetical" and Defendants cannot evade review of Plaintiffs' constitutional challenges to the Program simply by arguing, in the face of overwhelming evidence to the contrary, that they "might not" go forward with the Program. Def. Mem. at 3.

**A.     The Seizure of Loans is not Merely Speculative or Hypothetical**

As a threshold matter, Defendants' effort to pin their entire argument on the absence of a resolution of necessity is based upon a fundamental misapprehension of the applicable legal principles. Those principles do not involve a formulaic inquiry into whether any particular step in a multi-step process has been taken, but whether the evidence reflects that the program has advanced to the stage where the seizure through eminent domain is not merely speculative or hypothetical, thus giving rise to a demonstrable need for federal protection. Indeed, the Supreme Court has

expressly held that a victim of an unconstitutional eminent domain process does "*not have to await the consummation of threatened injury to obtain preventive relief.*" *Regional Railroad Reorganization Act Cases*, 419 U.S. 102, 142 (1974) (emphasis added); *see also 99 Cents Only Stores*, 237 F. Supp. 2d at 1128 (holding that action to enjoin eminent domain program was justiciable, despite rescission of Resolutions of Necessity by the city).

In *Regional Railroad*, the Court noted that various contingencies had not yet occurred: that it was as possible that "Congress can reject the first plan," that many of the targeted properties "could be eliminated from the [takings program]," that certain of the program's terms "remain to be decided," and that any takings might not occur for many years. *Id.* at 140-42. Yet despite those possibilities, the Court held, based on the totality of the evidence, that plaintiffs' constitutional challenge to the takings program was "in no way hypothetical or speculative." *Id.* at 143. In so holding, the Court ruled that a district court should exercise its jurisdiction to adjudicate the constitutionality of a takings program promptly, so as to "minimize or prevent irreparable injury." *Id*. at 144.

Likewise, *Chertkof v. Mayor & City Council of Baltimore,* 497 F. Supp. 1252 (D. Md. 1980), involved a situation in which the municipality had drawn up an urban renewal plan that included property owned by the defendant. When the municipality sought to have the property appraised, the plaintiff, concerned that the appraisal was a prerequisite to filing a condemnation proceeding in state court, filed an action in federal court asserting that the taking program was unconstitutional and seeking injunctive relief. As in this case, the defendant argued that the case was not ripe because the "mere inclusion of land within an urban renewal area does not amount to exercise of the City's eminent domain powers." *Id.* at 1255. The district court rejected that contention, determining that the harm was not merely speculative and that "objective evidence does indicate a real threat of condemnation." *Id.* at 1256. Among other factors, the court noted that City officials had passed a bill "which included plaintiff's property" as a possible target for seizure, had "circulated memoranda evidencing their intent to acquire plaintiff's property" and had "evidenced an intent to obtain plaintiff's property by 'quick-take.'" *Id*. Citing the Supreme Court's decision in *Supreme Court of Virginia v. Consumer's Union,* 446 U.S. 719 (1980), the court held that "plaintiff has established the

existence of a substantial controversy between the parties having adverse legal interests, under circumstances evidencing a demonstrable need for federal protection." *Id*. at 1257. *See also Hawaii v. Midkiff*, 467 U.S. 229, 234 (1984) (suit ripe for adjudication after "compulsory negotiations," a statutory prerequisite step to condemnation, had occurred, despite the fact that "compulsory arbitration," the next prerequisite step, had not).

Here, as in *Regional Railroad*, *Chertkof*, and *Midkiff*, the unrefuted objective evidence establishes that the threat of condemnation under the Loan Seizure Program that Defendants are already implementing in not merely speculative or hypothetical. Like the appraisals in *Chertkof* and the compulsory negotiations in *Midkiff*, the offer letters here are sufficient to show that Defendants have already taken substantial steps towards satisfying the statutory prerequisite to effectuate the unconstitutional seizures.[3] Plaintiffs have thus established an acute need for judicial review. Accordingly, this case is ripe.

**B.   Defendants Have Taken Concrete Steps to Implement the Loan Seizure Program**

Here, Defendants already have taken concrete steps to implement the Loan Seizure Program, including the following:

- On April 2, 2013, the City Manager of Richmond, William Lindsay, formally recommended that the City Council enter into a partnership with MRP under which MRP would advise Richmond "on the acquisition of mortgage loans through the use of eminent domain." Declaration of John C. Ertman in Support of PI Motion ("Ertman Moving Decl."), (Dkt. 9), Ex. H.

- On the same day, Richmond's City Council deliberated the proposal at a public hearing and formally voted (6-0 with one member absent) to approve entering into a partnership with MRP for the purpose of seizing loans by eminent domain. *See* Ertman Reply Decl. ¶ 21; Ertman Moving Decl. Ex H. At that hearing, Mr. Lindsay testified that, under the Program, if there was not a "negotiated purchase" of a targeted mortgage, "the City would be asked to use eminent domain to acquire the mortgage." Ertman Reply Decl. ¶ 21. In an email to MRP later that day, Mr. Lindsay

---

[3] Here, as in *Chertkof* and *Midkiff,* appraisals of the underlying properties have been performed, as stated in the offer letters.

advised MRP that the City Council had unanimously approved the agreement and that "they gave approval for the program to start."  *Id.* Ex. G.

- After the hearing, and pursuant to the City Council vote, Richmond executed a formal Advisory Services Agreement with MRP, which expressly provides that MRP will advise Richmond on "acquiring mortgage loans through the use of eminent domain."  Ertman Moving Decl. Ex. K.

- On April 8, 2013, Mr. Williams of MRP sent an e-mail to various Richmond officials including Mr. Lindsay, attaching a timeline concerning the Loan Seizure Program.  Ertman Reply Decl. Ex. H.  A chart along the same lines also was circulated that day.  Ertman Reply Decl. Ex. I. These internal planning documents set forth a step-by-step outline of the Program, including the seizure of loans through eminent domain.  According to the planning documents, "MRP prepares [the] Resolution of Necessity" which Richmond then "approves."  *Id.* Exs. H, I.  The timeline does not entertain the possibility that the resolution of necessity will not be adopted, nor does it include any contingency plan if that were to occur.

- The planning documents and other MRP materials reflect that once the resolution of necessity is adopted, Richmond will quickly file actions in state court to seize loans by eminent domain using California's "Quick Take" procedure.  Ertman Moving Decl. Ex. D at 3; Ertman Reply Decl. Exs. H, I.

- On July 31, 2013, Richmond extended offer letters to trustees and servicers with respect to a first wave of 624 targeted loans.  Ertman Moving Decl. Ex. A; Declaration of Kevin Trogdon ("Trogdon Decl."), (Dkt. 12), Ex. B; Declaration of Ronaldo Reyes ("Reyes Decl."), (Dkt. 13), Ex. 1.  Those offer letters are a prerequisite step to seizing property under California eminent domain law.  *See* Cal. Gov. Code § 7267.2 (before adopting a resolution of necessity, "the public entity shall establish an amount that it believes to be just compensation therefor, and shall make an offer to the owner or owners of record to acquire the property for the full amount so established").  The offer letters seek to acquire the loans at deeply discounted prices, and advise that Richmond could seize the targeted loans if the offers are not accepted.  Ertman Moving Decl. Ex. A at 2 ("in the event that negotiations fail to result in agreement," Richmond could "decide[] to proceed with the acquisition

of the Loans through eminent domain"); Trogdon Decl. Ex. B at 2; Reyes Decl. Ex. 1 at 2.  The offer letters set a deadline of August 13, 2013 for responding – a little more than two weeks ago.

- As Defendants are aware, at least some of the trustees, including the Plaintiffs, have already responded to the offer letters with written rejections, noting among other things that the trusts could not legally sell loans to Richmond and MRP, and thus setting the predicate for Defendants to seize the loans through the Loan Seizure Program.  Ertman Reply Decl. Ex. AA.  Plaintiffs are not aware of any servicer or trustee having accepted any offer, and Defendants' opposition papers are tellingly silent about the responses to their offers.

- Richmond/MRP's offers for the 624 loans amounted to approximately $126 million, and did not contain a financing contingency.[4]  Internal MRP/Richmond documents, obtained through a Public Records Act request, reflect that as of May 17, 2013 at least $46 million (and possibly much more) in financing has already been arranged for the acquisition of the targeted loans by Richmond.  Ertman Reply Decl. Ex. O.

The foregoing evidence establishes that Richmond has taken substantial steps in implementing the Program, and that the threat of loan seizures is "in no way speculative or hypothetical."

### C. Defendants' Conduct Firmly Refutes Their Assertion that Seizure of Loans Through Eminent Domain is Merely Speculative

Not only have the Defendants proceeded to roll out their Program to an extent that makes this action, and Plaintiffs' PI Motion, ripe for review, but their conduct, including their submissions to this Court, confirms their publicly stated intention to proceed with eminent domain seizures.

First, as already demonstrated, the offer letters sent by Richmond are not merely hypothetical – they are real; they involve many loans in the Plaintiff Trusts; and preliminary analysis confirms that they are fully in accord with the Program's ultimate goal of seizing loans at a steep discount through eminent domain, so that they can be flipped for a profit to MRP and its investors.

---

[4] The absence of the financing contingency in the offer letters appears to indicate that MRP has assembled the entire financing of approximately $126 million.

6

Second, the fact that the overwhelming majority of loans included in the first wave are performing loans confirms that the only purpose of the offer letters is as a predicate for eminent domain seizure. Because the trusts in which the loans are held are organized as Real Estate Mortgage Investment Conduits, or "REMICs," *they are prohibited from selling the loans to Richmond*, a fact the Defendants and their consultant, Professor Hockett, openly acknowledge. *See* Hockett Decl. ¶ 9 (the loans are not saleable because they are "locked up" in PLS trusts); Ertman Moving Decl. Ex. D (MRP FAQ Sheet), at 3 ("Private securitization trusts hold approximately $ 1.4 trillion of loans; we could offer to buy their underwater loans, but their trust agreements forbid them to voluntarily sell the loans."); Ertman Reply Decl. Ex. F ("Securitization agreements and tax laws prohibit the sale of PLS mortgages except when the mortgages are condemned."). Thus, there is simply no purpose for issuing offer letters to purchase these performing loans, *except* the statutory prerequisite for seizing them pursuant to the Program, as threatened in the "offer" letters themselves.

Third, the fact that Defendants have already secured financing to acquire the first wave of loans confirms that the financing is for the purpose of acquiring loans through eminent domain because the vast majority of the loans – the performing ones – cannot be acquired through voluntary sale.[5]

Fourth, Defendants' assertion that they are simply seeking to acquire the loans on a "voluntary" basis is belied by their own statements to the contrary. Although internal Richmond/MRP talking points reflect an effort to be secretive about the use of eminent domain – *e.g.*, "We don't want to emphasize too much the eminent domain issue because we know it is very controversial and we don't really want to tip our hands to the opposition" (Ertman Reply Decl. Ex. J) – the Mayor and others have nevertheless repeatedly and publicly declared their intention to proceed with seizures through eminent domain. The many statements to this effect are too numerous to list here and, accordingly, are set forth in the accompanying Ertman Declaration. However, it is noteworthy that, on the very day that Plaintiffs filed their *ex parte* motion in which they represented to this Court that they might not proceed with eminent domain seizures, Richmond's Mayor

---

[5] Internal correspondence between Richmond and MRP indicates that the first set of offers is an initial set and that more are to follow. Ertman Reply Decl. Ex. M.

arranged a media event at Plaintiff Wells Fargo's offices in San Francisco where she publicly declared that she was "absolutely not backing down" from the Program. *Id.* Ex. V (Mayor of Richmond "said that the city will not be dissuaded from its plan to use eminent domain to seize underwater mortgages.").

Defendants' assertion that such public statements are no substitute for action by the City Council, Def. PI Op. Mem. at 6, misses the point. The statements stand in stark contrast to the conclusory assertions made in Defendants' court submissions and constitute strong evidence of Defendants' actual intent. *See, e.g.*, *United States v. Sayetsitty*, 107 F.3d 1405, 1415 (9th Cir. 1997) (affirming use at trial of admissions from which intent could be inferred).[6]

Fifth, as previously discussed in the context of Defendants' improper *ex parte* motion, Plaintiffs have offered to extend the briefing schedule and the hearing date for the PI Motion if Defendants would agree to hold off on proceeding with state court condemnation proceedings until the Court has an opportunity to rule. Such an agreement would allow for an opportunity following the City Council's decision on adopting a resolution of necessity for the Court to rule on the PI Motion, thus eliminating Defendants' supposed ripeness concerns. Defendants have flatly refused this offer, further indicating that they are proceeding according to their plan for seizing the loans – *i.e.,* to commence state court condemnation proceedings immediately after adopting a resolution of necessity. PI Motion. Ertman Reply Decl. ¶¶ 29–32. Defendants apparently believe that once in state court they will be better positioned to argue against federal court jurisdiction (and perhaps preclude this Court's scrutiny of the Program entirely).

Defendants have, by their conduct, demonstrated that the seizure of loans from the Plaintiff Trusts is not merely theoretical and speculative. If anything is speculative here it is Defendants' assertion in their papers that seizure through eminent domain is merely "one potential solution" that Defendants are considering. Def. Mem. at 1. In reality, such eminent domain seizures are the very core of the Program which Defendants are in the process of implementing. Plaintiffs need not await Defendants' adoption of a resolution and the initiation of state court condemnation proceedings

---

[6] Defendants' assertion that the Mayor is only one vote on the City Council also misses the point, as the City Council already has voted to adopt the Loan Seizure Program, and the Mayor is continuously promoting the Loan Seizure Program on the City's behalf. Ertman Reply Decl. ¶¶ 20–28.

before seeking this Court's review. Plaintiffs have established a "demonstrable need for federal protection" and their claims therefore are ripe for review. *Chertkof,* 497 F. Supp. at 1257; *Employers Insurance of Wausau v. Fox Entertainment Group, Inc.,* 522 F.3d 271, 278 (2d Cir. 2008) (holding that in determining ripeness, "courts should focus on the practical likelihood that the contingencies will occur.").[7]

The ripeness of this controversy is further demonstrated by the fact that, absent prompt federal court review, the Trusts and their investors will suffer immediate harm as soon as Richmond files is state eminent domain action. *See Eastern Enterprises v. Apfel*, 524 U.S. 498, 521 (1998) (the Declaratory Judgment Act "allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained."). The value of their certificates, traded in federally-regulated national securities markets, will fall to reflect the risk that the anticipated income stream from performing loans in the pool targeted for seizure by Richmond (and other municipalities that implement MRP's Loan Seizure Program) will be stripped from the pools in exchange for a payment worth far less than the income stream that they will generate – less, even, than the foreclosure value of the home securing the loan. *See* Declaration of Phillip Burnaman ("Burnaman Moving Decl."), (Dkt. 11), ¶ 43; Burnaman Reply

---

[7] The cases relied upon by Defendants actually support Plaintiffs' position that their claims are ripe for review. For example, *Texas v. United States*, 523 U.S. 296 (1998), involved a voting rights case where Texas had not "pointed to any particular school district" which might fall under the provision at issue. Similarly, in *Thomas v. Anchorage Equal Rights Commn.,* 220 F. 3d 1134, 1260 (9th Cir. 2000), the landlords seeking to challenge a regulation could not establish that they were a potential target of the regulation or that anyone in government had ever heard of them before they brought suit. Here, by contrast to the theoretical or speculative risk of harm addressed by the Courts in *Texas* and *Thomas*, Defendants have already expressly targeted specific loans held by Plaintiffs and have already taken the predicate steps towards eminent domain seizure. Defendants' reliance on *Wendy's Int'l Inc. v. City of Birmingham*, 868 F. 2d 433 (11th Cir. 1989), is similarly misplaced, as in that case the court determined that the plaintiffs had not alleged a "manifest threat of condemnation." There, the takings program still required several steps before property could be seized, which, at a minimum, would take a year or more to satisfy: the developer was required to negotiate in "good faith" with the landowners and to offer each the fair market value of the property as determined by an independent appraiser, a process that was required to last at least eight months, after which the city would be required to negotiate for the property over the course of a four month period. *Id.* at 436. Thus, there was a delay of at least a year before the city could "exercise its eminent domain power." *Id.* Here, unlike *Wendy's* (which noted that "ripeness must be decided on a case-by-case basis," *id.* at 436, 437 n.7), a "manifest threat" exists, as Richmond could exercise its eminent domain powers almost immediately: within the 15-day notice period for the hearing on necessity.

Decl. ¶¶ 26, 32.  This would be an immediate and dramatic reduction in the value of those mortgage securities that could never be compensated through the California eminent domain process.  Indeed, Richmond is a test case for MRP's Program, and if Richmond is permitted to condemn loans through eminent domain, more municipalities will undoubtedly follow suit, exponentially magnifying this irreparable harm.  *See* Burnaman Moving Decl. ¶ 66.

Because the harm to the Plaintiff Trusts and their investors is imminent, this action is ripe for review now.  As discussed in Plaintiffs' Reply Memorandum, the imminent harm to Plaintiffs would be irreparable and fully warrants the issuance of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Defendants' Dismissal Motion should be denied.

DATED:  August 29, 2013

Respectfully submitted,

By: /s/ Rocky C. Tsai
_____

Thomas O. Jacob (SBN 125665)
tojacob@wellsfargo.com
**WELLS FARGO & COMPANY**
Office of General Counsel
45 Fremont Street, Twenty-Sixth Floor
MAC A0194-266
San Francisco, CA 94105
Telephone:  (415) 396-4425
Facsimile:   (415) 975-7864

*Attorney for Wells Fargo Bank*

ROPES & GRAY LLP

Attorneys for Plaintiffs

Rocky C. Tsai (SBN 221452)
(rocky.tsai@ropesgray.com)
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315-6300
Facsimile: (415) 315-6350

John C. Ertman
(john.ertman@ropesgray.com)
(Pro hac vice applications pending)
Lee S. Gayer
(lee.gayer@ropesgray.com)
Evan P. Lestelle
(evan.lestelle@ropesgray.com)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

Douglas H. Hallward-Driemeier
(douglas.hallward-driemeier@ropesgray.com)
(Pro hac vice application pending)
ROPES & GRAY LLP
One Metro Center
700 12th Street, NW
Suite 900
Washington, DC 20005-3948
Phone: 202-508-4600

Daniel V. McCaughey
(daniel.mccaughey@ropesgray.com)
Nick W. Rose
(nick.rose@ropesgray.com)
ROPES & GRAY LLP
800 Boylston St.
Boston, MA
Phone: 617-951-7000