ROCKY C. TSAI (SBN 221452)
(rocky.tsai@ropesgray.com)
**ROPES & GRAY LLP**
Three Embaracadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315-6300
Facsimile: (415) 315-6350

Attorneys for Plaintiffs Wells Fargo Bank, N.A. as Trustee *et al.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee, *et al.*

Plaintiffs,

vs.

CITY OF RICHMOND, CALIFORNIA, a municipality, and MORTGAGE RESOLUTION PARTNERS LLC;

Defendants.

Case No. CV-13-3663-CRB

**DECLARATION OF DOUGLAS G. DUNCAN**

Date: September 13, 2013
Time 10:00 a.m.
Judge: Hon. Charles R. Breyer

I, Douglas G. Duncan, hereby declare, pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the United States, that the following is true and correct:

1. I am a Senior Vice President and the Chief Economist of the Federal National Mortgage Association ("Fannie Mae"). I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently to them.

2. I joined Fannie Mae in 2008 as the Chief Economist and a Vice President. In 2011, I was promoted to Senior Vice President.

3. My current responsibilities include providing forecasts and analyses on the economy, housing, and mortgage markets for Fannie Mae. Additionally, I am in charge of strategic research regarding external factors and their potential impact on the company and the housing industry.

4. Fannie Mae is a government-sponsored enterprise ("GSE") that was chartered by Congress in 1938. Fannie Mae's public mission is to support liquidity and stability in the secondary mortgage market by purchasing loans and guaranteeing mortgage-related securities and thereby increasing credit availability for affordable housing. Since September 6, 2008, Fannie Mae has been under conservatorship by the Federal Housing Finance Agency ("FHFA").

5. Through its work guaranteeing securities and purchasing loans from mortgage lenders, Fannie Mae is the leading source of residential mortgage credit in the U.S. secondary market. From January 1, 2009 through June 30, 2013, Fannie Mae provided $3.7 trillion in mortgage credit enabling 3.1 million home purchases and 11.4 million mortgage refinancings, including loans refinanced through the Home Affordable Refinance Program (HARP). Borrowers who refinance through HARP have an average weekly savings of approximately $84 or an average monthly savings of $336.

6. During the same period, Fannie Mae also provided financing for more than 1.9 million units of multifamily rental housing. Further, Fannie Mae helped families and individuals avoid more than 1.3 million foreclosures from 2009 through June 30, 2013.

7. Fannie Mae's profits are paid to the U.S. government for the benefit of taxpayers. It has paid $105.3 billion in dividends to taxpayers through the third quarter of 2013. The U.S.

Department of the Treasury has made a commitment under a senior preferred stock purchase agreement to provide Fannie Mae with funds to maintain a positive net worth under specified conditions.

8. I understand that the City of Richmond, California ("Richmond"), in partnership with Mortgage Resolution Partners LLC ("MRP"), a private for-profit entity, intends to seize approximately 624 loans ("Richmond loans") through the use of eminent domain. I have analyzed data regarding the characteristics of the Richmond loans with the assistance of analysts at Fannie Mae. I have also reviewed certain documents, including "Richmond Cares", a publication by MRP describing its proposed eminent domain program in Richmond ("Richmond Program"); a July 31, 2013 letter from the Richmond City Manager's Office to Deutsche Bank as Trustee of loans targeted for seizure by Richmond; and other materials that explain the Richmond eminent domain program in order to familiarize myself with the facts in this case.

9. I have also reviewed the Reply Declaration of Phillip R. Burnaman, II. The data and analysis relied upon by Mr. Burnaman is consistent in substance with the results of Fannie Mae's own internal analysis and therefore I am relying upon both to reach certain of the positions that I take in this declaration.

10. As a way of expanding the sources of credit to American households, mortgage loans are often pooled together. They are pooled based on various characteristics (such as geographical location, the type of loan, credit risk of the borrower, the percentage of the value of the property the loan comprises or loan-to-value ("LTV") and other factors). These pools become securities that are designed to generate income for investors in the securities based on the principal and interest payments made by the property owners in the underlying collateral. Fannie Mae, for example, securitizes mortgage loans originated by lenders into Fannie Mae mortgage-backed securities ("MBS") that Fannie Mae guarantees and refers to as Fannie Mae MBS. By purchasing and securitizing mortgages Fannie Mae provides liquidity to mortgage lenders who use the proceeds of the sales to make new loans.

11. The Richmond loans are collateral in certain Private Label Securities ("PLS") which are another form of MBS. PLS are pooled into securitizations by private sponsors and are

not guaranteed[1] or backed by Fannie Mae, another GSE (absent further securitization), or government agency. The loan pools are placed in trusts which hold title to the pooled loans and their cash flow. The trust then issues securities that are sold to investors. The trusts are administered by trustees such as Deutsche Bank and Wells Fargo, the plaintiffs in this action.

12. Up to, and including 2007, Fannie Mae purchased certain classes of PLS. Fannie Mae owns or guarantees a portfolio of PLS with an unpaid principal balance ("UPB") of approximately $40.8 billion as of June 30, 2013. Some of the 624 Richmond Loans at issue are owned by PLS trusts in which Fannie Mae owns a beneficial interest in certain classes of the related PLS (i.e., held in portfolio). Similarly, some of the Richmond Loans are in PLS loan pools that have been further securitized by Fannie Mae, and now Fannie Mae serves as the guarantor of timely payments on those loans.

13. I reviewed and considered certain aspects of Richmond's and MRP's proposals to seize the 624 loans as it relates to Fannie Mae's PLS holdings as well as the wider implications if the eminent domain program is extended to other municipalities and jurisdictions at the state and national level. Based on information provided by Richmond, Fannie Mae was able to match and obtain data on 572 of these loans ("matched loans") from CoreLogic's LoanPerformance Mortgage Securities Database ("LoanPerformance Database"), a privately owned loan database commonly used by PLS investors for analytics. The remaining 52 loans could not be matched because the loan number or trust name provided by Richmond is not consistent with information in the LoanPerformance database.

**Potential Losses to PLS Trusts**

14. Of the 572 matched Richmond Loans, 93 are included in the collateral of PLS owned by Fannie Mae. Those 93 loans have a UPB of $33.4 million. Richmond proposes to repurchase the loans at a weighted average discount of more than 40% off of the current property value. If Richmond seized these 93 loans through the eminent domain program as proposed, the immediate principal loss on the collateral in the trusts that Fannie Mae invests in or guarantees

[1] Fannie Mae acts as a guarantor when it provides a guaranty on the timely payment of principal and interest received from private label bonds or Fannie Mae re-securitizations of private label bonds.

would be $17 million.[2]

15. If the Richmond Program were extended throughout California to all negative equity loans in PLS trusts in which Fannie Mae invests or is the guarantor various jurisdictions in the state could seize approximately 44,000 loans resulting in immediate collateral losses to the trusts of about $7.5 billion. Moreover, if the Richmond Program were extended throughout the United States to all negative equity loans in PLS trusts in which Fannie Mae invests or guarantees, various jurisdictions throughout the country could seize approximately 190,000 loans resulting in immediate collateral losses to the trusts of about $24 billion.[3]

**Other Considerations**

16. A mortgage loan is said to have negative equity or be "underwater" if the value of the property is less than the outstanding balance of the loan. The underwater status reflects a singular point in time on a loan with a term of up to 30 years. Therefore, based upon a loan's amortization schedule and changing home price values, the underwater status is not likely a permanent state.

17. Between the first quarter of 2012 and the first quarter of 2013, the share of underwater properties in Richmond, CA dropped by about nine percentage points. In the first quarter of 2012, approximately 53% of residential properties had negative equity. In the first quarter of 2013, the number of negative equity properties dropped to approximately 44% of the residential properties with mortgages.

18. As of June 2013, 15% of Fannie Mae backed Single Family loans (or 763 loans out of 4,933 Fannie Mae loans) in Richmond, CA are underwater. These 763 loans reflect a cumulative UPB of $212,032,221 or about 24% of the total UPB of Fannie Mae Single Family loans in Richmond. As property values continue to increase and borrowers pay down their loans,

[2] Our calculation of immediate collateral losses is the difference between the loan balance and the purchase price we estimate a municipality would pay if it were to use a similar discount of the property value as employed by the Richmond Program. Fannie Mae does not own 100% of the certificates in these trusts and not all these collateral losses will result in actual bond losses to Fannie Mae.

[3] FHFA has commented that it "continues to have serious concerns on the use of eminent domain to restructure existing financial contracts and has determined such use presents a clear threat to the safe and sound operations of Fannie Mae, Freddie Mac and the Federal Home Loan Banks." FHFA Statement, Aug. 8, 2013, http://www.fhfa.gov/webfiles/25419/FHFAStmtEminentDomain080813.pdf

fewer and fewer of these loans will be underwater and I estimate that a large number (about 80%), of the Fannie Mae current negative equity or underwater loans in Richmond, CA will return to a positive equity position by the end of 2017 measured either by percent of underwater loans or percent of underwater UPB.

19. Indeed, as Mr. Burnaman estimates in his declaration, 31% of the loans Richmond proposes to seize have positive equity and are not currently underwater.

**Implications**

20. A stated policy goal of the United States government has been to encourage the return of private capital to the mortgage finance system. The Richmond eminent domain program will hinder the achievement of that goal. Investors are more likely to take on credit risk when they have certainty regarding the risks associated with an asset and are able to price for that risk appropriately. Thus, the Richmond Program will add to the risks and increase uncertainty associated with extending mortgage credit, thus further complicating attempts to induce private investors to accept mortgage credit risk while raising costs to future borrowers.

21. One manifestation of the effect of such increased risk is evident in an August 26, 2013, comment from Standard & Poor's ("S&P") Financial Services LLC, indicating that it will "likely increase its request for credit support being provided to loans" from jurisdictions affected by eminent domain. According to S&P, "the comparative decline in value for mortgages in jurisdictions that have employed eminent domain would likely make securitizations more speculative." As a result, S&P "would expect this to translate into a higher mortgage rate and/or fewer credit opportunities for borrowers in those jurisdictions."[4]

22. If the plan to seize mortgages is successful, borrowers in Richmond will likely face higher future borrowing cost for mortgages. As David Stevens explains in his August 6, 2013 declaration, the risk of cities seizing loans through eminent domain as proposed by Richmond will likely result in higher interest rates and higher down payment requirements in Richmond and

[4] "Richmond, Calif.'s Eminent Domain Proposal Could Have A Far-Reaching Impact On The U.S. RMBS Market, S&P, Aug. 26, 2013, http://www.standardandpoors.com/ratings/articles/en/us/?articleType=HTML&assetID=1245356340080

potentially throughout the nation. If the risk of eminent domain is fully priced into new mortgages, the rates for new mortgages in the affected areas could rise as much as 200 basis points (or two percentage points). This would significantly decrease the value of all homes and the demand for housing in those areas. Purchasers could purchase more expensive homes in other areas without increasing their monthly payment. For example, the monthly payment is the same on a $250,000 mortgage with a seven percent rate and a $310,000 mortgage with a five percent rate. Alternatively, lenders or investors could decide to ration credit in jurisdictions employing eminent domain by reducing the size of the loans they are willing to approve.

23. Further, central to the Richmond Program is that the seized loans will be refinanced through the United States Department of Housing & Urban Development (HUD) insured Federal Housing Administration ("FHA") loans (HUD, however, has indicated that it does not know if such loans will be insurable)[5]. Under this plan, 58% of the borrowers would likely face increased monthly mortgage costs. Of the 572 matched loans, 301 loans had been previously modified usually reducing their interest rates substantially below currently available market rates. The average current principal and interest (P&I) payment for the modified loans is $1,499 with a weighted average interest rate of 3.05%. If the loan were to be refinanced as proposed by the Richmond Program, following seizure through eminent domain, the loan could be refinanced into a FHA mortgage at 95% of its current property value. Using the current prevailing FHA interest rate of 4.2% over 30 years plus a 1.3% mortgage insurance premium, the average monthly payment would be $1,784, a 19% increase over the current payment.[6] These loans were previously modified because the borrower could not sustain a higher mortgage payment. A 19% increase in the borrower's current payment would make them more likely to default in the future.

[5] On June 11, 2013, several U.S. congressmen wrote HUD Secretary Shaun Donovan expressing concern that the use of eminent domain would "slow the return of private capital to the housing finance system, and threaten our fragile housing recovery." In response, HUD Acting Assistant Secretary Elliot Mincberg wrote on August 12, 2013, in a letter that addressed the Richmond Program, that HUD shares "your concerns about events that could harm the recovery and the growth of private capital in the mortgage market." Mincberg also noted that "[p]ending legal developments and possible further execution of the plans in questions, HUD does not know whether any new mortgage which might be created would qualify for insurance by the [FHA]."

[6] Assuming 95% LTV (as shown in the "Richmond CARES" pamphlet; 4.2% interest, 1.3% mortgage insurance premium.

By my signature below, I represent that this affidavit is my true and correct opinion as of the date it is written.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 28th day of August 2013, at Washington, D.C.

Douglas G. Duncan