ROCKY C. TSAI (SBN 221452)
(rocky.tsai@ropesgray.com)
**ROPES & GRAY LLP**
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315-6300
Facsimile: (415) 315-6350

Attorneys for Plaintiffs Wells Fargo Bank, N.A. as Trustee *et al.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF RICHMOND, CALIFORNIA, a municipality, and MORTGAGE RESOLUTION PARTNERS LLC;<br><br>Defendants. | Case No. CV-13-3663-CRB<br><br>**REPLY DECLARATION OF PHILLIP R. BURNAMAN, II**<br><br>Date: September 13, 2013<br>Time: 10:00 a.m.<br>Judge: Hon. Charles R. Breyer |

I, Phillip R. Burnaman, II, hereby declare, pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the United States, that the following is true and correct:

## I.   Purpose of this Reply Declaration

1.   I incorporate by reference my prior Declaration dated August 8, 2013 submitted in support of Plaintiffs' Motion for a Preliminary Injunction (my "August 8 Declaration"), including all materials, references, citations and appendices thereto.[1]  I submit this Reply Declaration primarily to address various assertions made in the August 22, 2013 Declaration of Robert Hockett ("Hockett Decl."), the August 22, 2013 Declaration of Peter Drier ("Drier Decl."), and the August 22, 2013 Declaration of Richmond's City Manager, William Lindsay ("Lindsay Decl.") submitted on behalf of Richmond and MRP in opposition to Plaintiffs' Preliminary Injunction Motion (together referred to as "Defendants' Declarations").

2.   Since the time I submitted my August 8 Declaration I have had an opportunity to conduct a further analysis of the 624 loans that are the subject of Richmond's offer letters.[2]  As I discuss below, data relating to this universe of loans (the "Target Loans") demonstrates that many of the generalized assertions and conclusions set forth in Defendants' Declarations which they rely upon to support the Richmond Seizure Program are not supported by actual data on the Target Loans.  In addition, many of those assertions and conclusions also are refuted by data relating to the current state of the residential mortgage market.

---

[1] All capitalized terms not defined herein are shall have the meanings ascribed to them in my August 8 Declaration.

[2] In this declaration I refer to the 624 loans identified by Richmond for the Seizure Program. I identified and analyzed these loans using some of the offer letters sent to the trustees for the RMBS Trusts that own these loans, along with a master spreadsheet identifying all of the loans on which offers were made, which I understand that the City of Richmond provided in response to a Public Records Act request. Using the CoreLogic database, I was only able to definitively tie out 572 of these specific loans by their identifying loan number. The 52 loans which I could not identify have combined principal balances of $19 million. I elected to assign these loans the weighted average characteristics of the 572 loans which I could definitively identify for the purpose of characterizing the statistical analysis of the Seizure Program as proposed by Richmond.

From a statistical perspective the potential error introduced by this allocation is not meaningful. In this declaration, where I cite attributes of specific individual loans, such as the 7 loans that were settled in June 2013 or loan amounts in excess of $600,000, I have verified the individual loan information. In other circumstances, such as payment histories or loan to value ratios, I have extrapolated the portfolio weighted average date from the 91.7% of the portfolio I have data for, to the 8.3% of the portfolio for which the data is not definitively verifiable.

---

1

Declaration of Phillip R. Burnaman, II

## II. The Seizure Program is not Merely "Exploratory"

3. As a threshold matter, while the Lindsay Declaration asserts that the Richmond Seizure Program is "exploratory" and that the City is merely "investigating" loan seizures by eminent domain as "one option [under] consideration" (Lindsay Decl. ¶ 4), in fact, based on the loan offer data provided by Richmond in response to a Public Record Act request, Richmond has made offers to purchase the 624 Target Loans for consideration totaling approximately $126.6 million The offer letters I have reviewed relating to those Target Loans do not contain a "financing contingency" clause, or any other reservation that the City might not be able to pay if the offers were accepted, indicating that the City has committed financing from private sources necessary to execute those purchases.

## III. Data Concerning the Target Loans Refutes Defendants' Assertions

4. Defendants' Declarations assert that the Richmond Seizure Program targets for seizure underwater loans – *i.e.,* those where the amount of the mortgage indebtedness is greater than the current value of the property – and that such seizures are necessary to save cities like Richmond from the imminent threat of multiple foreclosures and the resultant consequences of urban blight. However, an analysis of the data relating to the 624 Target Loans refutes many of the assumptions underlying Defendants' assertions.

### A. Many of the Homeowners are not Underwater on Their Loans

5. Most strikingly, current data regarding the Target Loans indicates that many are not underwater at all. Indeed, while the decline in home prices from their peak in 2005 has created a substantial number of mortgage loans with negative homeowner equity, I calculate that roughly 31% of the Target Loans have loan-to-value ("LTVs") below 100%, indicating that the homeowners are not "underwater," but have substantive equity in their homes as shown in the table below.

Declaration of Phillip R. Burnaman, II

| Current Loan-to-Value | Number of Loans | Percent of Total | Current Balance |
|---|---|---|---|
| <=60 | 15 | 3% | 2,144,761 |
| 60.1-80 | 59 | 10% | 12,551,566 |
| 80.1-100 | 101 | 18% | 30,138,130 |
| 100.1-120 | 149 | 26% | 58,670,599 |
| 120.1-140 | 147 | 26% | 65,012,944 |
| >140 | 101 | 18% | 48,457,037 |
| **Total** | **572** | **100%** | **216,975,037** |

*Source: Greensledge Group, based on CoreLogic data*

6. In addition, 43% of the Target Loans are underwater but are current on their payments – *i.e.*, they are performing loans, and based on current house price trends, I would estimate that 45% of this group will reach a positive equity position or be "above water" over the next two years. A further summary of relevant data pertaining to these loans is set forth in Exhibit A to this declaration. Contrary to the stated mission of the Seizure Program to rescue "underwater" borrowers, there is no apparent basis to include these loans in the Program to prevent them from defaulting, even allowing for the Defendants' incorrect assumption that underwater loans are necessarily subject to a high default rate.

**B.     Most of the Targeted Loans are Not at Serious Risk of Default**

7. Defendants' Declarations assert that the Program is necessary to prevent a rapidly approaching wave of future foreclosures also is refuted by the loan data, which indicates that the vast majority of the Target Loans are performing loans that are not at serious risk of default.

8. As noted in footnote 2 above, of the 624 Target Loans, I was able to identify 572 in the CoreLogic database.[3] The table below details the 572 identified loans by Delinquency Status.

---

[3] CoreLogic is a leading provider of consumer, financial and property information. Their databases contain more than 147 million property records covering virtually the entire U.S. population.

3

Declaration of Phillip R. Burnaman, II

| Delinquency Status | Number of Loans | Percent of Total | Current Balance | Richmond's Purchase Price |
|---|---|---|---|---|
| Current | 389 | 68% | 144,147,424 | 61% |
| DQ 30-59 Days | 29 | 5% | 11,272,808 | 54% |
| DQ 60-89 Days | 8 | 1% | 2,331,116 | 45% |
| DQ 90+ Days | 98 | 17% | 40,999,437 | 31% |
| Foreclosure | 41 | 7% | 18,224,253 | 29% |
| Paid Off | 7 | 1% | - | 0% |
| **Total** | **572** | **100%** | **216,975,037** | **52%** |

*Source: Greensledge Group, based on CoreLogic data*

9. As shown in the chart, of the 572 loans, 389 were current, confirming that the Program primarily targets performing loans.

10. From my analysis of the loan histories, I note the following important facts that dispute Defendants' assertions of significant impending defaults. First, 141 (25%) of the loans for which MRP/Richmond have made offers on have had perfect pay histories (i.e. they have never missed a payment). Second, 50 (9%) of the loans have been current on their payments for all but one or two months. And third, 264 (46%) of the loans have had perfect pay histories for the past two years. In mortgage portfolio risk analysis, payment history is an important indicator of the borrower's commitment to stay in the home.

11. Based upon the performance of these loans it is clear that a significant majority of the Target Loans are not at serious risk of default, and certainly have a very low risk of imminent default.

C. **Defendants' Assertion that the Target Loans Cannot be Modified is Incorrect**

12. Defendants' Declarations assert that Richmond is targeting loans for seizure because the homeowners cannot receive loan modifications or principal reductions. Hockett Decl. ¶9. However, the data relating to the Target Loans conclusively confirms that that is not, in fact, true. Indeed, as discussed below, my analysis of the loan data indicates that approximately 53% of the Target Loans been modified previously and that approximately 30% of these modified loans actually

have received principal reductions. The loan data clearly indicates that modifications have occurred and, in fact, have been effective in maintaining affordability for these homeowners.

13. By way of brief background, and directly contrary to Professor Hockett's assertions, loan modifications are common, and servicers are both authorized to make such modifications and are incentivized to do so. There are different types of loan modifications, including rate modifications, term modifications, capitalized interest modifications, and principal forgiveness modifications. As I discussed in my moving declaration, there have been a significant number of loan modifications of all types in the aftermath of the housing crisis.

14. If a loan modification can meaningfully reduce the probability of default for a borrower, then the servicer is encouraged to modify the loan pursuant its PSA (as comprehensively described in Burnaman Decl. ¶ 26). Beyond their contractual obligation, however, servicers have financial incentives to modify loans, again contrary to the statements made by Professor Hockett. For example, in the Home Affordable Mortgage Program ("HAMP"), investors are eligible to receive Home Price Decline Protection ("HPDP") or Principal Reduction Alternative ("PRA") incentives. These payments can be substantial, approaching 2% of the loan balance, payable over a 24 month period.[4]

15. Despite Professor Hockett's assertions to the contrary, loan modifications do occur in PLS and in substantial quantities. According to Amherst Securities, over 1.8 million loans to PLS borrowers have been modified with an aggregate principal balance of $291 billion.[5]

16. The chart below identifies those of the Target Loans that have been modified and the nature of the modification.

---

[4] Exhibit D, Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages, Version 4.1.

[5] Amherst Securities Group LP, "Amherst Non-Agency Mortgage Market Monitor" June 2013, p. 60.

5

Declaration of Phillip R. Burnaman, II

|  | Type of Modification | | |
|---|---|---|---|
|  | Capitalization | Principal Forgiveness | Interest Rate |
| Number of Loans | 41 | 91 | 223 |
| Current Balance | 16,436,135 | 37,199,510 | 94,835,141 |
| Current LTV | 129 | 96 | 124 |
| Total Amt Capitalized | 4,403,761 | - | - |
| Total Amt Forgiven | - | 13,428,566 | - |
| Avg Rate Reduction | - | - | 4.05 |
| Avg Pmt Before Mod | 2,044 | 2,034 | 2,540 |
| Avg Pmt after Mod | 1,543 | 1,350 | 1,484 |
| Average Pmt Reduction ($) | 501 | 684 | 1,056 |
| Average Pmt Reduction (%) | 25% | 34% | 42% |

*Source: Greensledge Group, based on CoreLogic data*

17. From my analysis of the loan data it is clear that more than half of the identified loans (53%) have been modified, and these homeowners have realized substantial benefits from those modifications. For example 91 of the Target Loans have received permanent principal reductions, and 61 have been moved into positive equity positions as a result of those reductions. The average LTV of the loans post modification is 96%, versus 160% pre-modification, and the modified loans received an average monthly payment reduction of $897, or 38% of their original mortgage payment amounts.

18. In light of the foregoing factual evidence, I can state that not only have loan modifications been occurring in Richmond PLS transactions, but they appear to have been effective in the cases I discovered, and have resulted in substantial benefits to homeowners.

D. **Rising Home Prices and Other Factors Further Undercut Defendants' Assertions**

19. Defendants' Declarations also fail to take into account that home prices in Richmond are increasing. In fact, since the market trough in 2011, home prices in Richmond zip codes have increased over 28%.[6] Over the past year, home prices in Richmond have risen 21.5%, and Zillow estimates that they will rise another 10.3% in the upcoming year. Mr. Lindsay himself states that

---

[6] CoreLogic HPI.

median house prices in Richmond have recovered over 50% from their low point. In fact, the recovery of housing prices in Richmond is actually above the national average.

20. Second, homeowner's equity in the Target Loans is increasing. Indeed, while the current weighted average LTV for all of the Target Loans is 123%, using Zillow's home price appreciation rate of 10.3% the average LTV for the Target Loans would fall to 99% in 2015.

21. Third, no significant increase in interest rates that might cause defaults to spike unexpectedly is likely in the intermediate term. There is little pressure on short-term interest rates in the near term according to market forecasters. "The Fed has said it will keep short-term interest rates low until the unemployment rate slips below 6.5%, which is projected to be reached in mid-2015."[7] Moreover, the floating rate mortgages subject to the Richmond Seizure Program have indices based upon the London Interbank Offered Rate ("LIBOR") or alternatively an index that is based on the 12-month U.S. Treasury rate. While the Fed does not directly control these short-term rates, its actions strongly influence them. Generally, these variable-rate loans have an annual adjustment cap (usually 2.00%) and a lifetime adjustment ceiling of 6.00%. Given Federal Reserve Chairman Bernanke's public statements of intent to maintain short term rates at low levels for the next 18 to 24 months, I believe it is unlikely there will be any meaningful payment increase for those floating rate mortgage borrowers for at least the same period. And in the Target Loans there are a significant number of fixed rate loans, approximately 28% (163 loans). Because their mortgage interest rates are fixed their mortgage payments do not increase, even when interest rates rise.

22. Despite these factors, Professor Hockett nevertheless opines that "astonishingly many" mortgage loans that are current today will become delinquent and ultimately default. Hockett Decl. ¶ 6. However, he does not quantify the number of supposed defaults. Professor Hockett bases his conclusion on what he describes as Fannie Mae and Freddie Mac predictions in a securities filing of significant default rates ranging between 40% and 71% for certain residential mortgage loans. In my opinion and belief that estimate is unsupportable in the current mortgage market and is either

---

[7] Carolyn Cui, Wall Street Journal, August 22, 2013 "Fed seeks more control over rates".

7

Declaration of Phillip R. Burnaman, II

misleading, misquoted or very out-of-date. I conducted a search of the most recent forms 10Q and 10K of Fannie Mae and Freddie Mac in order to confirm Professor Hockett's unspecified citation, but was unable to find any evidence of these numbers. In any event, as I stated in my August 8 Declaration, using standard mortgage finance analysis I estimate that defaults in the next 12 months for the Target Loans will be 7.2%.[8]

### E. Other Data Regarding the Target Loans

23. The foregoing discussion reflects that many of the Target Loans are performing loans, are not underwater, and that many already have benefited from modifications. Other specific loan data raises questions concerning why some of these loans have been included in the Seizure Program. For example, 41 loans (7%) have unpaid principal balances of over $600,000, 111 (19%) have unpaid principal balances of over $500,000, and one loan has an unpaid principal balance in excess of $1.1 million. This information demonstrates that a significant number of the Target Loans relate to larger homes purchased by relatively affluent borrowers.

24. Additionally, many of the owners of Target Loans who have already refinanced their loans and many have been equity extraction or "cash-out" refinancings. Since the original purchase date, these homeowners, through equity extraction refinancings, have borrowed an additional $53 million over and above the original purchase price of their home.[9] Today, the average homeowner's LTV would be less than 60% (i.e., significantly above water) had they opted not to incur additional debt on their residences.

### III. THE PROGRAM IS DESIGNED TO ACQUIRE LOANS FOR LESS THAN FMV IN ORDER TO GENERATE PROFITS FOR THE PROGRAM'S INVESTORS

25. Across their marketing literature and program descriptions, the proponents of the Richmond Seizure Program speak of the value of the mortgage loans (the price at which they will

---

[8] Projecting recent delinquency bucket transition rates for loans in Richmond (or, "roll rates") for the next 12 months. This captures recent loan servicer performance for the specific loans in question and similar loans in the local area, not national averages.

[9] Zillow provides the purchase price of 493 of the Target Loan homes from public records. For purposes of calculating the cash extracted, I have assumed 100% financing of the purchase price (in the aggregate, an overstatement) and compared that amount to the original balance of the existing first mortgage.

purchase or seize the loans) on the one hand, and the value of the property (the value that will be used to write the new mortgage loan) on the other hand as if they are interchangeable. But these are two distinct calculations, which the proponents of the Program have conflated in order to mask the potential substantial profit for Richmond and its partners that the Program is intended to generate.

26. To avoid confusion, I will discuss the profitability of the Richmond Seizure Program in terms of the property, or collateral value. As I made clear in my August 8 Declaration, there is no efficient market for seasoned residential mortgage loans, performing or non-performing. If we focus solely on collateral value to avoid obfuscation by terminology, Richmond and its for-profit partners propose to pay 59% of the collateral value of the 624 identified loans. They would then originate and sell a newly-minted mortgage loan set at 95% of the value of the same collateral. The simple arithmetic economics of purchasing at 59% and selling at 95% are compelling to investors given the obvious profit spread, and show that the Program is designed to generate profits, not to pay fair value for the loans.

27. Contrary to Professor Dreier's assertions, this process is nothing like the auctions for RTC and FDIC distressed mortgage loans, where the purchase price was set at auction by competitive bid and the eventual future value of the loan assets was unknown at the time of purchase. During my career, I acquired over $700 million of loan assets from the RTC and can speak authoritatively from firsthand experience regarding the material differences between the Seizure Program and that process.

### IV. THE PROGRAM WILL CAUSE SIGNIFICANT ECONOMIC HARM

28. Professor Hockett further opines in his Declaration that the "necessary" write-downs on performing loans "benefit creditor(s)" and are a "win-win"[10] and thanks to the Richmond Seizure Program, creditors will be somehow better off, although he does not specify how this is the case. However, the June payment reports on the 624 Target Loans that I reviewed readily demonstrate that Professor Hockett's position is incorrect. In reality, the Program redistributes wealth to MRP and its

---

[10] Hockett Decl., ¶ 15.

financial backers, and to a small number of home-owners, leaving the certificateholders with the losses.

29. In reviewing the July 2013 remittance data for the 187 affected PSL trusts, I noted that seven of the loans that Richmond identified as being within the Target Loans had been paid off and are no longer held by any trust. Two of these loans had prepaid in full, with no loss to the certificateholders. Had these loans been purchased by Richmond at the prices proposed in the offer letters, the purchase would have caused a loss to certificateholders of $87,000.[11]

30. The remaining five loans were liquidated through the normal course of servicing protocols with a total loss to the certificateholders of $939,000. These loans were either foreclosed upon, or the borrower and lender agreed to a short sale (the data available to me from CoreLogic does not distinguish between these outcomes). However, had these loans been purchased by Richmond at the prices indicated in the offer letters, the trusts would have lost $1.2 million, an increased loss on the disposition of $266,000.[12]

31. In the case of these seven loans alone, it is an irrefutable certainty that the certificateholders would have been directly injured in the amount of $354,000 if they had been seized by Richmond under the auspices of this Program. Professor Hockett's statement about "robbing no one to pay Paul" cannot be reconciled with the economic reality I have brought to light in this case, as the Program will result in significant injury to certificateholders that would not have occurred in the ordinary course of the PLS trusts' business.

32. The threat of seizure by eminent domain of performing mortgages is having a notable effect on mortgage markets as attention is focused on the mechanics, the economics and the potential repercussions of Richmond's Seizure Program. Notable RMBS research analysts[13] have recently published their own estimates of potential losses based on Richmond's disclosure that it intends to

---

[11] Richmond offered to purchase one loan at 85% and the other at 91% of current balance.

[12] Richmond's average purchase price for these loans is 39% of current balance.

[13] Laurie Goodman Amherst, Scott Gimple RBS, for example.

10

Declaration of Phillip R. Burnaman, II

seize loans through eminent domain. The rating agencies are also closely monitoring this lawsuit. Standard & Poor's "believes that implementing eminent domain, which we view as a localized approach to an issue with far-reaching nationwide implications, may present inconsistencies in solving the root cause of the housing problem in the U.S., create unintended consequences for both borrowers and investors, and inadvertently limit mortgage lending activity." Standard & Poor's also says that the exercise of eminent domain would require it to downgrade the credit ratings on existing and newly issued RMBS certificates, which would in turn negatively impact the value of those certificates. It concludes that "the comparative decline in value for mortgages in jurisdictions that have employed eminent domain would likely make securitizations more speculative. *We would expect this to translate into a higher mortgage rate and/or fewer credit opportunities for borrowers in those jurisdictions*"[14] (emphasis added). The other two major ratings agencies have also concluded that the Program would negatively impact the value of RMBS certificates and would harm the mortgage lending market: Moody's has described the use of eminent domain to seize mortgage loans as "credit negative," determining that it "would increase losses on RMBS," and Fitch has concluded that it would "negatively affect private label U.S. RMBS and future lending," in affected regions.[15]

33. In addition to its harm to the value of RMBS certificates, the risk of seizure of performing mortgage loans will undoubtedly affect mortgage rates in California.[16] I researched the benchmark, or indicative 30 year fixed jumbo mortgage rates for prime borrowers[17] from seven active California lenders[18] in late July 2013. I compared the average quoted rate on July 23, 2013

---

[14] "Richmond, Calif.'s Eminent Domain Proposal Could Have A Far-Reaching Impact On The U.S. RMBS Market", Standard & Poor's, August 26, 2013. Emphasis added.

[15] "Richmond, California's Eminent Domain Plan is Credit Negative, but Replication Elsewhere is Unlikely," Moody's Investor Services, August 5, 2013; "US RMBS, Regional Lending at Risk in Eminent Domain Plans," Fitch, August 16, 2013.

[16] "Introducing the Non-agency New Issue Jumbo Model" J.P. Morgan US Fixed Income Strategy, May 10, 2013.

[17] Specifically the indicative rate for a non-conforming or "jumbo" 30 year fully amortizing fixed rate, full documentation mortgage loan to a borrower with a 720+ FICO score on an owner-occupied property with a LTV of 80%.

[18] Including Union Bank, EverBank, Fremont Bank, Quicken Loans, and NationStar.

11

Declaration of Phillip R. Burnaman, II

with the average quoted rate on August 1, 2013—before and after the city of Richmond announced commencement of the Seizure Program. The average quoted mortgage interest rate in this short time period increased by 50 basis points (½%) from July 23rd to August 1st— a marked rise significantly in excess of the 21 basis point increase (0.21%) in the yield on the 10-year US Treasury[19] which occurred between the same dates. I investigated the national mortgage rate indices from the Mortgage Bankers Association and found that this increase was not contemporaneously reflected in the published national averages for the same type of thirty year fixed jumbo mortgage rates between July 23 and August 1. I could find no other news during that period that would have had such an impact on quoted California mortgage interest rates, and consequently believe that the rate increase was an immediate reaction by mortgage lenders to the announcement by Richmond of the Seizure Program. Supporting my conclusion regarding this rate increase, I note that it is the opinion of many market professionals that the Seizure Program will lead to an increase in the cost of mortgage loans or a decrease in the availability of mortgage credit.[20]

34. It is economically certain that if Richmond is allowed to seize performing mortgages based upon its assessment of equity in the property, lenders will be disinclined to make new mortgage loans due to the new external risk factor without a significant risk premium to incentivize them. PLS with Richmond exposures will be discounted to take into account this risk, immediately upon seizure and repeatedly in the future as and when house prices decline. The only possible compensating factor for this risk is a higher mortgage rate which will be demanded by both lenders and RMBS investors.

---

[19] The 10-year US treasury yield is a benchmark level for 30-year fixed rate mortgage loans, see for example the Mortgage Bankers Association, *Mortgage Finance Forecast* August, 2013.
http://www.mbaa.org/files/Bulletin/InternalResource/85416_.pdf

[20] See Sim, et al p. 16 Securitized Products Weekly, J.P. Morgan "It is likely that as the city pursues eminent domain, lenders will raise rates or simply avoid lending in Richmond. This may provide enough impetus for the city to halt its plans. Additionally, when houses are seized via eminent domain, the locality is required to pay the fair market value. Disputes are settled before a judge in court. Here, trustees can make the argument that loans to performing underwater borrowers should be worth the discounted value of the cash flows, not the value of the underlying home. We can see scenarios where the city is required to pay a much higher price than 80LTV, which would render it uneconomic to pursue eminent domain."

Declaration of Phillip R. Burnaman, II

35. Beyond the obvious and immediate effect of reducing demand for PLSs while increasing the interest rate required by investors, the Richmond Seizure Program will reduce Richmond's tax revenue base and impede the local economy tied to housing. Like all economic activity, a home purchase results in spending in other sectors. As this income is re-spent, the effect is repeated. The National Association of Realtors modeling suggests that the multiplier of increased spending from home acquisition is 1.34 to 1.62.[21] Ultimately this reduction in demand for RMBS coupled with higher interest rate requirements will increase mortgage rates and lower house prices, as the price of borrowing to purchase a home becomes artificially inflated.

36. A reduction in house prices in Richmond would increase the number of borrowers with negative equity, creating more potential candidates for seizure. This is not the stated objective of the Program but a real and potentially injurious outcome. If the local mortgage market continues to exist for Richmond's homeowners (or potential homeowners) the cost of mortgage finance will surely increase due to the higher risks faced by lenders and the compensation they will require. As a result, home prices will fall as affordability, a measure of the supply/demand equilibrium, will be impacted by higher financing costs.

37. Falling home prices directly impact property tax revenues, as municipalities around the United States demonstrated in the wake of the financial crisis. A declining municipal tax base adds public sector stress to the obvious negative economic effects on the mortgage market stemming from the increase in the cost of mortgage finance, as credit is restricted and demand for mortgage securities goes down. This in turn acts to slow the pace of new home construction, as evidenced by the wave of bankruptcies that shook the homebuilding industry in 2009-2010. For Richmond itself, I would expect building trade activity will slow and the pace of economic activity will suffer. Residents and taxpayers, the majority of whom derive no benefit from the Seizure Program, may suffer its adverse effects.

---

[21] National Association of Realtors.

## V. CONCLUSION

38. The additional information I have supplied in this declaration further supports my opinion and belief that the eminent domain seizure of mortgage loans by the City of Richmond will cause a serious and immediate threat to the U.S. mortgage market. The Declarations made on behalf of the Defendant are not at all consistent with, or even supported by, the actual loan data that I have set forth in this Declaration. The Seizure Program will cause injury to PLS trusts and consequently their certificateholders, who include individual savers and investors in pension and retirement plans. The injury to citizens of Richmond and the State of California who are employed in the housing and mortgage industry is equally significant and is potentially severe. The benefits of the Seizure Program would be realized by a few and the costs would be borne by many.

By my signature below, I represent that this declaration is my true and correct opinion as of the date it was written.

I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct. Executed on _29 August 2013_, at _New York, NY_.

PHILLIP R BURNAMAN, II

---

14

Declaration of Phillip R. Burnaman, II

# EXHIBIT A

## A SUMMARY OF IMPORTANT FACTS REGARDING THE LOANS MRP/RICHMOND HAS OFFERED TO BUY

### I. Many Targeted Borrowers are not in a Negative Equity Position or "Underwater"

- 31% of the loans for which MRP/Richmond have made offers are not "underwater" at all. In these loans the borrower has positive equity value today.

### II. Many Targeted Borrowers are "Underwater" but Paying as Agreed (or Performing)

- 43% of the loans for which MRP/Richmond have made offers are "underwater" but are current on their payments.
- Based on current house price trends, roughly 45% of this group will return to positive equity or no longer be "underwater" at some point within the next 24 months.

### III. Many Borrowers have already negotiated Loan Modifications with their Lenders

- 141 (25%) of the loans for which MRP/Richmond have made offers to purchase have perfect pay histories. They have never missed a payment.
- Another 50 (9%) of the loans for which MRP/Richmond have made offers have been current on their payments for all but one or two months.
- 264 (46%) of the loans targeted by MRP/Richmond for purchase have perfect pay histories for the past two years.
- More than half – 53% of the borrowers identified by MRP/Richmond for their Program – have already negotiated loan modifications with their lenders:
  ○ Of this group, 91 (30%) have received permanent principal reductions or loan forgiveness.
    - 61 of these loans currently have positive equity as a result of those principal reductions - they are not "underwater" today.
    - The average loan to value ratio of these principal reduction loans was 160% pre-modification, and 96% post-modification.
  ○ Across all the modified mortgages, the average monthly payment reduction was $897, or 38% of their original mortgage payment amount.

### IV. Nearly Two Thirds of the Richmond Loans are Cash-Out Refinancing

- 63% of the loans targeted by MRP/Richmond for their program are cash-out refinancing or "equity extraction" loans.
- Measured from the borrower's original purchase date, these homeowners, through cash-out refinancing loans, have borrowed an additional $53 million over and above the original purchase price of their home.
  ○ Today, the average homeowner's estimated LTV would be less than 60% if their additional un-forced borrowings had not occurred.

Declaration of Phillip R. Burnaman, II

## V. Other Considerations

- 41 (7%) of the mortgage loans have unpaid principal balances of over $600,000.
- 111 (19%) of the mortgage loans have unpaid principal balances of over $500,000.
  - 1 mortgage loan has an unpaid principal balances of over $1.1 million.
- MRP/Richmond's average offer price per loan is 59% of the estimated home value.

Declaration of Phillip R. Burnaman, II