1  PAUL J. HALL (State Bar No. 66085)
    paul.hall@dlapiper.com
2  ISABELLE L. ORD (State Bar No. 198224)
    isabelle.ord@dlapiper.com
3  MATTHEW COVINGTON (State Bar No. 154429)
    matthew.covington@dlapiper.com
4  DLA PIPER LLP (US)
    555 Mission Street, Suite 2400
5  San Francisco, CA  94105-2933
    Tel: 415.836.2500
6  Fax: 415.836.2501

7

8  Attorneys for *Amici Curiae*
    California Bankers Association,
    American Bankers Association,
9  California Mortgage Bankers Association,
    and California Credit Union League

10

           UNITED STATES DISTRICT COURT
11
          NORTHERN DISTRICT OF CALIFORNIA
12
             SAN FRANCISCO DIVISION
13

| | |
|---|---|
| 14  WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee, et al., | CASE NO. CV-13-03663-CRB |
| 15 | **REQUEST FOR JUDICIAL NOTICE IN** |
|       Plaintiffs, | **SUPPORT OF BRIEF OF *AMICI CURIAE*** |
| 16 | **CALIFORNIA BANKERS** |
|       v. | **ASSOCIATION, AMERICAN BANKERS** |
| 17 | **ASSOCIATION, CALIFORNIA** |
|   CITY OF RICHMOND, CALIFORNIA, a | **MORTGAGE BANKERS** |
| 18  municipality; and MORTGAGE | **ASSOCIATION, AND CALIFORNIA** |
|   RESOLUTION PARTNERS, L.L.C., | **CREDIT UNION LEAGUE IN SUPPORT** |
| 19 | **OF PLAINTIFFS' MOTION FOR A** |
|       Defendants. | **PRELIMINARY INJUNCTION** |
| 20 | |
| 21 | Date:    September 13, 2013<br>Time:   10:00 a.m. |
| 22 | Judge:  Hon. Charles R. Breyer |

23        *Amici Curiae*, the California Bankers Association, American Bankers Association,

24  California Mortgage Bankers Association, and California Credit Union League, hereby

25  respectfully request that the Court take judicial notice of the following documents in support of

26  Plaintiffs' Motion for a Preliminary Injunction pursuant to Federal Rule of Evidence 201 ("Rule

27  201") and 44 U.S.C. § 1507:

28

1       1.    Notice of Federal Housing Finance Agency, published August 9, 2012, Federal

2  Register, Vol. 77, No. 154, p. 47652, a true and correct copy of which is attached hereto as

3  Exhibit 1;

4       2.    Federal Housing Finance Agency General Counsel Memorandum, "Summary of

5  Comments and Additional Analysis Regarding Input on Use of Eminent Domain to Restructure

6  Mortgages," published August 7, 2013, available at: http://www.fhfa.gov/webfiles/25418/

7  GCMemorandumEminentDomain.pdf, a true and correct copy of which is attached hereto as

8  Exhibit 2; and

9       3.    August 12, 2013 letter from U.S. Department of Housing and Urban Development

10  Acting Assistant Secretary for Congressional and Intergovernmental Relations Elliot M.

11  Mincberg to Congressmen Ed Royce, Gary G. Miller, and John Campbell regarding "the potential

12  use of eminent domain to refinance underwater mortgages, available at

13  http://online.wsj.com/public/resources/documents/08122013HUDEminentDomainLtrtoCADelega

14  tion.pdf, a true and correct copy of which is attached hereto as Exhibit 3.

15       Under Rule 201, the Court "may judicially notice a fact that is not subject to reasonable

16  dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can

17  be accurately and readily determined from sources whose accuracy cannot reasonably be

18  questioned." Pursuant to this Rule, courts routinely grant requests for judicial notice of

19  information promulgated by federal agencies. *See, e.g., Allen v. United Fin. Mortgage Corp.*, 660

20  F. Supp. 2d 1089, 1093-94 (N.D. Cal. 2009) ("[T]he Court grants Defendants' RJN because the

21  [noticed information] is available online, from the FDIC's web site."); *see also New Mexico ex*

22  *rel. Richardson v. BLM*, 565 F.3d 683, 702 n. 22 (10th Cir.2009) (taking judicial notice of data on

23  web sites of federal agencies); *Louis v, McCormick & Schmick Rest. Corp.*, 460 F. Supp. 2d 1153,

24  1156 (C.D. Cal. 2006) (taking notice of "various opinion letters issued by federal and state

25  regulatory agencies"). In addition, "federal courts are required to take judicial notice of the

26  Federal Register." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1179 (9th Cir. 2002);

27  *see also* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed.").

28       Because the *Amici Curiae* request judicial notice of information in the Federal Register

1   and information created by federal agencies, and because none of this information is subject to

2   reasonable dispute, the request for judicial notice should be granted and the information

3   considered in connection with the brief of the *Amici Curiae*.

4

5                                              Respectfully submitted,

6   DATED:  August 29, 2013

7                                              DLA PIPER LLP (U.S.)

8

9                                    By:      /s/ Paul J. Hall
                                              PAUL J. HALL
                                              ISABELLE L. ORD
10                                            MATTHEW COVINGTON
                                              Attorneys for *Amici Curiae*
11                                            CALIFORNIA BANKERS
                                              ASSOCIATION, AMERICAN BANKERS
12                                            ASSOCIATION, CALIFORNIA
                                              MORTGAGE BANKERS ASSOCIATION,
13                                            AND CALIFORNIA CREDIT UNION
                                              LEAGUE
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   PAUL J. HALL (State Bar No. 66085)
    paul.hall@dlapiper.com
2   ISABELLE L. ORD (State Bar No. 198224)
    isabelle.ord@dlapiper.com
3   MATTHEW COVINGTON (State Bar No. 154429)
    matthew.covington@dlapiper.com
4   DLA PIPER LLP (US)
    555 Mission Street, Suite 2400
5   San Francisco, CA 94105-2933
    Tel: 415.836.2500
6   Fax: 415.836.2501

7
    Attorneys for *Amici Curiae*
8   California Bankers Association,
    American Bankers Association,
9   California Mortgage Bankers Association,
    and California Credit Union League

10
                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12
                      SAN FRANCISCO DIVISION
13

14   WELLS FARGO BANK, NATIONAL         CASE NO. CV-13-03663-CRB
     ASSOCIATION, as Trustee, et al.,
15                                      **REQUEST FOR JUDICIAL NOTICE IN**
            Plaintiffs,                 **SUPPORT OF BRIEF OF** *AMICI CURIAE*
16                                      **CALIFORNIA BANKERS**
         v.                             **ASSOCIATION, AMERICAN BANKERS**
17                                      **ASSOCIATION, CALIFORNIA**
     CITY OF RICHMOND, CALIFORNIA, a    **MORTGAGE BANKERS**
18   municipality; and MORTGAGE        **ASSOCIATION, AND CALIFORNIA**
     RESOLUTION PARTNERS, L.L.C.,       **CREDIT UNION LEAGUE IN SUPPORT**
19                                      **OF PLAINTIFFS' MOTION FOR A**
            Defendants.                 **PRELIMINARY INJUNCTION**
20
                                        Date:      September 13, 2013
21                                      Time:      10:00 a.m.
                                        Judge:     Hon. Charles R. Breyer
22

23          *Amici Curiae*, the California Bankers Association, American Bankers Association,

24   California Mortgage Bankers Association, and California Credit Union League, hereby

25   respectfully request that the Court take judicial notice of the following documents in support of

26   Plaintiffs' Motion for a Preliminary Injunction pursuant to Federal Rule of Evidence 201 ("Rule

27   201") and 44 U.S.C. § 1507:

28

1          1.      Notice of Federal Housing Finance Agency, published August 9, 2012, Federal

2  Register, Vol. 77, No. 154, p. 47652, a true and correct copy of which is attached hereto as

3  Exhibit 1;

4          2.      Federal Housing Finance Agency General Counsel Memorandum, "Summary of

5  Comments and Additional Analysis Regarding Input on Use of Eminent Domain to Restructure

6  Mortgages," published August 7, 2013, available at: http://www.fhfa.gov/webfiles/25418/

7  GCMemorandumEminentDomain.pdf, a true and correct copy of which is attached hereto as

8  Exhibit 2; and

9          3.      August 12, 2013 letter from U.S. Department of Housing and Urban Development

10  Acting Assistant Secretary for Congressional and Intergovernmental Relations Elliot M.

11  Mincberg to Congressmen Ed Royce, Gary G. Miller, and John Campbell regarding "the potential

12  use of eminent domain to refinance underwater mortgages, available at

13  http://online.wsj.com/public/resources/documents/08122013HUDEminentDomainLtrtoCADelega

14  tion.pdf, a true and correct copy of which is attached hereto as Exhibit 3.

15          Under Rule 201, the Court "may judicially notice a fact that is not subject to reasonable

16  dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can

17  be accurately and readily determined from sources whose accuracy cannot reasonably be

18  questioned." Pursuant to this Rule, courts routinely grant requests for judicial notice of

19  information promulgated by federal agencies. *See, e.g., Allen v. United Fin. Mortgage Corp.*, 660

20  F. Supp. 2d 1089, 1093-94 (N.D. Cal. 2009) ("[T]he Court grants Defendants' RJN because the

21  [noticed information] is available online, from the FDIC's web site."); *see also New Mexico ex*

22  *rel. Richardson v. BLM*, 565 F.3d 683, 702 n. 22 (10th Cir.2009) (taking judicial notice of data on

23  web sites of federal agencies); *Louis v, McCormick & Schmick Rest. Corp.*, 460 F. Supp. 2d 1153,

24  1156 (C.D. Cal. 2006) (taking notice of "various opinion letters issued by federal and state

25  regulatory agencies"). In addition, "federal courts are required to take judicial notice of the

26  Federal Register." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1179 (9th Cir. 2002);

27  *see also* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed.").

28          Because the *Amici Curiae* request judicial notice of information in the Federal Register

1   and information created by federal agencies, and because none of this information is subject to

2   reasonable dispute, the request for judicial notice should be granted and the information

3   considered in connection with the brief of the *Amici Curiae*.

4

5                                           Respectfully submitted,

6   DATED:  August 29, 2013

7                                           DLA PIPER LLP (U.S.)

8

9                                           By:     /s/ Paul J. Hall _____
                                                    PAUL J. HALL
                                                    ISABELLE L. ORD
10                                                  MATTHEW COVINGTON
                                                    Attorneys for *Amici Curiae*
11                                                  CALIFORNIA BANKERS
                                                    ASSOCIATION, AMERICAN BANKERS
12                                                  ASSOCIATION, CALIFORNIA
                                                    MORTGAGE BANKERS ASSOCIATION,
13                                                  AND CALIFORNIA CREDIT UNION
                                                    LEAGUE
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

RECORD ACCESS PROCEDURES:

Direct inquiries as to whether this system contains a record pertaining to an individual to the Privacy Act Officer either electronically, or by regular mail, or facsimile. Submit electronic requests at *https://publicaccesslink.fhfa.gov/ palMain.aspx*. The regular mail address is: Privacy Act Officer, Federal Housing Finance Agency, 400 7th Street SW., Washington, DC 20024. The facsimile number is: 202–649–1073. For the quickest possible handling, mark your electronic submission, letter, or facsimile and the subject line, envelope, or facsimile cover sheet "Privacy Act Request" in accordance with the procedures set forth in 12 CFR part 1204.

CONTESTING RECORD PROCEDURES:

Direct inquiries as to whether this system contains a record pertaining to an individual to the Privacy Act Officer either electronically, or by regular mail, or facsimile. Submit electronic requests at *https://publicaccesslink.fhfa.gov/ palMain.aspx*. The regular mail address is: Privacy Act Officer, Federal Housing Finance Agency, 400 7th Street SW., Washington, DC 20024. The facsimile number is: 202–649–1073. For the quickest possible handling, mark your electronic submission, letter, or facsimile and the subject line, envelope, or facsimile cover sheet "Privacy Act Request" in accordance with the procedures set forth in 12 CFR part 1204.

RECORD SOURCE CATEGORIES:

Information is provided by individuals accessing or using FHFA telecommunication resources or devices.

EXEMPTIONS CLAIMED FOR THE SYSTEM:

None.

Dated: August 1, 2012.

**Edward J. DeMarco,**

*Acting Director, Federal Housing Finance Agency.*

[FR Doc. 2012–19572 Filed 8–8–12; 8:45 am]

BILLING CODE 8070–01–P

---

## FEDERAL HOUSING FINANCE AGENCY

[No. 2012–N–11]

## Use of Eminent Domain To Restructure Performing Loans

**AGENCY:** Federal Housing Finance Agency.

**ACTION:** Notice; input accepted.

---

The Federal Housing Finance Agency (FHFA) oversees the Federal National

Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), and the Federal Home Loan Banks (Banks). Fannie Mae and Freddie Mac (the Enterprises) are operating in conservatorships with a core mission of supporting the housing market. FHFA's obligations, as conservator, are to preserve and conserve assets of the Enterprises and to minimize costs to taxpayers. The Enterprises purchase a large portion of the mortgages originated in the United States and they hold private label mortgage backed securities containing pools of non-Enterprise loans. The Banks likewise have important holdings of such securities. In addition, the Banks accept collateral that consists of mortgages of member financial firms pledged in exchange for advances of funds.

### FHFA Concerns

FHFA has significant concerns about the use of eminent domain to revise existing financial contracts and the alteration of the value of Enterprise or Bank securities holdings. In the case of the Enterprises, resulting losses from such a program would represent a cost ultimately borne by taxpayers. At the same time, FHFA has significant concerns with programs that could undermine and have a chilling effect on the extension of credit to borrowers seeking to become homeowners and on investors that support the housing market.

FHFA has determined that action may be necessary on its part as conservator for the Enterprises and as regulator for the Banks to avoid a risk to safe and sound operations and to avoid taxpayer expense.

Among questions raised regarding the proposed use of eminent domain are the constitutionality of such use; the application of federal and state consumer protection laws; the effects on holders of existing securities; the impact on millions of negotiated and performing mortgage contracts; the role of courts in administering or overseeing such a program, including available judicial resources; fees and costs attendant to such programs; and, in particular, critical issues surrounding the valuation by local governments of complex contractual arrangements that are traded in national and international markets.

### Input

FHFA will accept input from any person with views on this subject through its Office of General Counsel (OGC), no later than September 7, 2012, as the agency moves forward with its

deliberations on appropriate action. Communications may be addressed to FHFA OGC, 400 Seventh Street SW., Eighth Floor, Washington, DC 20024, or emailed to FHFA OGC at *eminentdomainOGC@fhfa.gov*. Communications to FHFA may be made public.

Dated: August 6, 2012.

**Richard Hornsby,**

*Chief Operating Officer, Federal Housing Finance Agency.*

[FR Doc. 2012–19566 Filed 8–8–12; 8:45 am]

BILLING CODE 8070–01–P

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

[Docket No. FDA–2012–N–0001]

### Second Annual Food and Drug Administration Health Professional Organizations Conference

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice of conference.

---

The Food and Drug Administration (FDA) is announcing a conference for representatives of health professional organizations. Topics on the agenda include an update on the FDA Safety and Innovation Act (Pub. L. 112–144) and an overview of FDA's Network of Experts (public/private partnerships).

The afternoon will consist of interactive breakout sessions facilitated by FDA staff from various Centers and Offices, including a networking session to meet FDA personnel.

**DATES:** *Date and Time:* The conference will be held on October 4, 2012, from 9 a.m. to 4 p.m.

*Location:* The conference will be held at FDA White Oak Campus, 10903 New Hampshire Ave., Bldg. 31 Conference Center, the Great Room (rm. 1503), Silver Spring, MD 20993.

*Contact Person:* Janelle Derbis, Office of Special Health Issues, Food and Drug Administration, 10903 New Hampshire Ave., Silver Spring, MD 20993, 301–796–8460, email: *Janelle.Derbis@fda.hhs.gov*.

*Registration:* Register at: *https:// www.surveymonkey.com/s/ FDAConference*. Please include the name and title of the person attending, the name of the organization, and email address. There is no registration fee for this conference. Early registration is suggested because space is limited.

**SUPPLEMENTARY INFORMATION:** The aim of the conference is to further the public health mission of FDA through training,

# EXHIBIT 2



# Federal Housing Finance Agency

## Constitution Center
400 7ᵗʰ Street, S.W.
Washington, D.C. 20024
Telephone: (202) 649-3800
Facsimile: (202) 649-1071
www.fhfa.gov

### General Counsel Memorandum

### Summary of Comments and Additional Analysis Regarding Input on
### Use of Eminent Domain to Restructure Mortgages

August 7, 2013

In response to suggestions that local governments employ eminent domain authority to restructure mortgage obligations, the Federal Housing Finance Agency (FHFA) published a Notice in the *Federal Register* entitled "Use of Eminent Domain to Restructure Performing Loans," 77 Federal Register 47652 (August 9, 2012).

At that time, FHFA indicated it had significant concerns about the use of eminent domain to revise existing financial contracts and the resulting alteration of value of securities holdings of Fannie Mae and Freddie Mac and the twelve Federal Home Loan Banks. Additionally, FHFA noted it would review certain questions regarding such usage of eminent domain and would accept public input. This memorandum provides a review of the topic, input received and implications for FHFA.[1]

**General**

A proposal for local government use of eminent domain authority to restructure mortgages has generated much discussion both from the points of legality of such an action to the implementation of such a proposal and its impact on institutions under Federal Housing Finance Agency oversight and the broad securities market that supports housing finance.

Input received came from individuals in government, private sector financial institutions, labor unions, businesses and academics as well as interest groups for homeowners and from businesses involved in financial markets. Seventy-five submissions were made, almost evenly divided between supporters and opponents.[2] The general thrust of input from the public fell into two categories— those supporting the use of eminent domain for restructuring loans as falling within the purview of localities and as an effective device to assist homeowners and those opposing such use of eminent domain as violating law, eroding the value of existing financial obligations and de-stabilizing the market that supports housing finance.

---

[1] This paper provides a summary of eminent domain issues, including legal issues, but is not intended to serve as a formal legal opinion.

[2] Submissions may be found at
http://www.fhfa.gov/Default.aspx?Page=89&ListNumber=5&ListID=22550&ListYear=2012&SortBy=#22550.

Supporters advocated that, if securities have lost value, then the proper and fair valuation of mortgages backing the securities through eminent domain results in no loss to a securities investor, but permits a restructuring of a loan that would benefit homeowners and stabilize housing values.

Supporters advocated that FHFA had no role to play in a local or state action, as many local actions affect housing markets and are entrusted to state and local officials by law. These supporters advanced that assisting underwater borrowers who are paying their mortgage obligations justifies the use of eminent domain to adjust their mortgages to a more affordable obligation which they could not otherwise receive.[3] Several supporters argued that use of eminent domain would be a form of principal forgiveness that would benefit homeowners.

Opponents advocated numerous legal problems with the proposed use of eminent domain; some centered on the proper use of eminent domain itself and others on attendant constitutional issues related to taking of property or sanctity of contract. Opponents noted strong reaction of financial markets that support home financing in terms of upsetting existing contracts but as well creating an unworkable situation for providing and pricing capital based on the uncertainty of such a use of eminent domain.

## Eminent Domain

Eminent domain, also referred to in operation as a condemnation, involves a state action to seize property founded on a public purpose and for which fair value is paid to the person or entity whose property is seized. Eminent domain authority resides with the states; states enact laws permitting local governments to exercise eminent domain and local laws may vary on conditions, terms and methods for acting on this authority so long as the ordinances do not permit conduct contrary to enabling state law. At the same time, constitutional provisions relating to the sanctity of contracts, due process, "takings" prohibitions and interstate commerce provide a nexus for federal review.

The Supreme Court in 2005 upheld an eminent domain transfer of real property from one private party to another; many states reacted to this by enacting laws that denied local governments the authority to undertake such transfers, in order to focus the exercise of eminent domain more clearly on a public purpose.[4] While eminent domain has been viewed as predominantly related to taking of

---

[3] If accepted that eminent domain may be employed to seize performing loans, then it might be argued that eminent domain could be employed to seize non-performing loans as well.

[4] Kelo v. City of New London, 545 U.S. 469 (2005). In *Kelo*, the transfer of real property, effected by the use of eminent domain from one private party to another, was supported by the Court as part of a comprehensive plan by the city similar to urban planning and development for multiple properties. Here, the taking was of real estate, not contract rights, and involved a wide ranging plan for redeveloping real property. Further the Court noted that a public purpose must exist even if the taking included just compensation to the property owner. In reaction to *Kelo*, the enactment of the Housing and Economic Recovery Act in 2008, PL 110-289 (2008), provided congressional views regarding the use of eminent domain relating to use of funds for certain affordable housing programs. At section 1337(g)(12 USC 456ʲ(g)), Congress indicated that no funds allocated to affordable housing programs at the Department of Housing and Urban Development or the Treasury Department could be used "in conjunction with property taken by eminent domain, unless eminent domain is employed only for a public use, except that for purposes of this section, public use shall not be construed to include economic development that primarily benefits any private entity."

real property, such as to support road, airport or infrastructure construction by a locality, it has been employed in very limited circumstances with intangible property. In some cases, the intangible property, such as goodwill, has been compensated attendant to a taking of business's real property. On balance, use of eminent domain for addressing contractual rights or intangible rights has been rare.

Supporters for a use of eminent domain to restructure performing mortgage loans indicate that it is a right of localities to employ this approach, that such a program helps investors by avoiding strategic defaults by performing, but underwater borrowers, that the program would benefit local communities by avoiding defaults and that states have inherent rights to act without federal intervention. To date, no community has implemented fully such a program and supporters have indicated that they would modify their proposals to address some concerns that have been raised.

### Issues for the Federal Housing Finance Agency

From the perspective of the Federal Housing Finance Agency, acting as Conservator for Fannie Mae and Freddie Mac (Enterprises) and regulator for the Federal Home Loan Banks, the use of eminent domain for altering contractual arrangements raises several core issues— the conflict of federal and state interests; assuming that a legitimate state interest may exist, the legality of such a plan; operation of such a plan and its impact on mortgage markets; safety and soundness concerns; valuation matters; and, creation of losses to the conservatorships.

*Federal Interest*

Where a federal interest exists and is established, that interest would preempt a conflicting state interest. Here, the interest of the Conservator to preserve and conserve assets and to operate the Enterprises in conservatorships would be superior to the interest of a locality to alter the terms of a contract held by the Enterprises either through their ownership of a mortgage-backed security, their guarantee of a pool of mortgages or their ownership of a mortgage held in portfolio. As regulator for the Home Loan Banks, entrusted with safety and soundness responsibilities by federal law, concern would exist for any de-stabilization of investments held by the Banks as well as for values for collateral pledged to secure advances.

For the Enterprises, only the Conservator is empowered to alter contracts and state action to affect the assets held by the Enterprises in conservatorships would run contrary to the Housing and Economic Recovery Act provisions on conservatorship that bar actions by federal or state actors that would interfere with conservatorship operations.[5]

Harm to a conservatorship, through losses to the Enterprises, would result from a third party acting under eminent domain to remove a performing loan from a pool, thereby reducing the value of the

---

[5] 12 USC 4617 (a)(7) Initial reports of eminent domain programs purported to exclude Fannie Mae and Freddie Mac mortgages in any securities from which loans are removed for the time being, possibly to avoid statutory prohibitions. As noted this does not address investments in securities held by the Enterprises. Further, eminent domain may address not only mortgages in securities, but as well could be employed to address any mortgage loan including those held in lender portfolios.

asset of the Enterprise and the loss of a stream of income.  As well, any program that affects loans held in securities might be argued to be available to modify loans held in portfolio by a regulated entity, which also raises concerns.  It may be noted that the harm involved in eminent domain takings includes not only the removal of a performing loan through a discounted acquisition price, but also the extraction of value by a locality or its designee for administrative or other expenses. Finally, the estimation of fair value is frequently the subject of significant litigation and involves complex matters including benchmarks and value of a performing asset.  Involvement in such litigation and other legal costs further increase losses for an Enterprise operating in conservatorship or a Home Loan Bank.

*Legality of Use of Eminent Domain to Restructure Mortgage Contracts*

Assuming that a valid state interest exists, one that is not preempted by federal interests, the legality of such use of eminent domain remains in doubt.  Indeed, supporters of an eminent domain program anticipate and have communicated that they anticipate significant legal action regarding all aspects of the use of eminent domain to restructure contracts in existing pools of mortgages.

Legal questions fall into several categories.

First, it is questioned whether the exercise of eminent domain for intangible assets fits within state laws authorizing eminent domain by localities.  This may not exist in certain states and present a conflict for a locality.

Second, it is questioned whether the exercise of eminent domain in such a manner as discussed by certain localities violates certain constitutional provisions.  These questions center on an improper "taking" under the Fifth Amendment as to public purpose as noted above; an improper taking as the intangible asset is performing and creates no threat to the community; a taking of a performing asset when no assurance exists that the asset would cease performing (a predictive action); a violation of the Contracts Clause of the Constitution that prohibits impairing the obligations of a contract, including debt contracts such as a mortgage; and, finally, since mortgage backed securities are traded domestically and internationally, the action of a state could be seen as a violation of the Commerce Clause which requires states not to interfere with interstate commerce except where there is a legitimate state interest,  the state has chosen the least burdensome means of promoting that interest and the interest outweighs the burden on interstate commerce.

Third, employment of eminent domain in the area of housing contracts for underwater borrowers could target only certain areas of a community and lead to questions regarding redlining and fair housing laws.

Fourth, challenges may exist to a local jurisdiction's action operating under state laws.

*Operation of Such a Plan*

There has been much discussion of the operation and impact of eminent domain for revising mortgage contracts and impact on mortgage markets.  Among core concerns have been—

First, such a program will encounter difficulty in determining values for performing loans as there are too many variables either with static or dynamic modeling to accurately measure the full value of a mortgage, including its stream of income.

Second, even if an economic valuation could be approximated on the mortgage contract, such a program cannot operate without extracting value to localities and consulting firms.  In short, fees to localities and consulting firms would be part of any analysis of the ultimate costs of the program to the investor or lender.

Third, such a program would create fundamental uncertainties.  With over 60,000 municipalities, the implementation would be anticipated as being very uneven and problematic for national lending programs.  Which loans are selected, under what criteria and how valuations would be undertaken, all would generate uncertainties with multiple approaches and multiple legal actions.

Fourth, such a program does not provide a national uniform structure as does HAMP or HARP, but rather creates a program implemented on an ad hoc basis, presenting different risk factors in different markets.  No supervision or oversight is envisioned in local eminent domain decisions, absent action by a state regulator or by a court.

Fifth, such a program could be counter-productive and difficult to assess.  In a market where home values are stabilizing and, in some cases, moving upwards, the need for such a program (even if it were merited) appears to diminish, the effect of such a program could be to depress artificially the value of homes and lower the tax base for communities and chill lending to support a rising market.  The uncertainties of an eminent domain loan restructuring program as well as the predictable results lead to a concern for market reaction adverse to housing finance.

Finally, adverse reactions to such a program could dramatically alter the business model for lending.  If investors and lenders see increased uncertainty, two routine results would be anticipated—limitation on lending and on investing in certain markets and higher costs to address uncertainties.

*Safety and Soundness Concerns and Conservatorship Interests*

There are significant safety and soundness concerns, some aligned with the market effects noted above.

First, no program oversight exists.  Local programs would be administered by a mixture of local governments, external consulting firms and the judiciary.  This would produce uncertainty and unreliability for a system that today relies on contracts between parties with relatively clear federal and state laws.  Use of eminent domain for this purpose would represent a move to a new form of action, without established methodologies or predictable dispute resolution vehicles.  Thus, this use

of eminent domain would be fundamentally different from its current usage for condemnation of homes and other real properties.

Second, liability for program deficiencies remains uncertain. Consulting firms operating as limited liability companies and localities attempting to shield themselves from liability through special purpose government structures provide no clarity as to who would be responsible and with what resources to meet legal costs and potential damages from law violation and related litigation.

Third, operation of such a program to select a group of loans for a purported benefit would present potential claims that do not exist with current programs for restructuring loans by the contracting parties themselves. Existing programs for loan modifications create eligibility standards for modifications that follow initial borrower evaluations, have modification guidelines and occur under federal regulation or oversight. As noted above, use of eminent domain has been challenged for potential violations of the Fair Housing Act and, as a new device, could be subject to additional charges of discrimination or consumer protection violations.

Fourth, the value of loans to all FHFA regulated entities would be called into question. Existing mortgage portfolios, existing pledged collateral for advances, investments in private label securities (PLS) and liability for securitized mortgage pools would all come under scrutiny and potential valuation changes or downgrading.

Fifth, eminent domain for restructuring mortgages could run contrary to the conservatorships which prohibit states from interfering with the operation of FHFA.[6] Pulling performing loans out of PLS by a state or state-authorized body could remove FHFA discretion to maintain the value of PLS and not to have investments under its control affected by state action.

Sixth, there is uncertain precedent with the extent of state action. When would such a program stop— when individuals are 30%, 20% or 10% underwater. Also, would such a program be expanded to other types of mortgage obligations including modified loans, home equity loans and other housing-related financings based on the determinations of a locality.

---

[6] *See* County of Sonoma v. Federal Housing Finance Agency, 710 F.3d 987 (9th Cir. 2013). Conservator direction to Enterprises not to purchase mortgages encumbered by county loans issued as tax assessments upheld. The Circuit Court noted, "A decision not to buy assets that FHFA deems risky is within its conservator power to 'carry on' the Enterprises' business and to 'preserve and conserve the assets and property of the [Enterprises].' 12 U.S.C. § 4617(b)(2)(D)(ii)." As well, the Court noted, "When FHFA decides not to purchase a class of mortgages that it believes pose excessive risk, it is attempting to preserve and conserve the Enterprises' assets and property. Indeed, careful management of its mortgage purchase decisions appears to be the only way FHFA can avoid the financial problems which precipitated the Enterprises' conservatorship. Although FHFA's powers as conservator are not limitless, the ability to decide which mortgages to buy is an inherent component of FHFA's charge to preserve and conserve the Enterprises' assets. *See Leon Cnty.*, 700 F.3d at 1279 ('It is fully within the responsibilities of a protective conservator, acting as a prudent business manager, to decline to purchase a mortgage when its lien will be relegated to an inferior position for payment.')."

*Valuation Concerns*

All laws and court cases relating to eminent domain require a payment of "just compensation." This turns on the valuation of the property and is frequently the crux of legal dispute; such disputes can be expensive, long lasting and produce a "chill" on financial markets. In the case of a performing mortgage, the value of the mortgage is a mixture of the unpaid balance and the income stream from that mortgage. Clearly, for an intangible asset, the value of the property is only a part of a calculation; there is a great concern with the value of the contract, particularly a performing contract.

First, valuations must be made on a case-by-case basis for each property. Attempts to advocate a pool-based approach do not work. Pulling an individual loan out of a pool requires analysis that is undertaken today in HAMP about individual assets and ability to pay, along with other measures that do not appear to exist for an eminent domain program. An argument that Enterprise pool level analytics for PLS loans and securities disclosures would suffice is misplaced; such reports are pool level reports based on analytics that do involve some review of individual loans, but do not replace in an eminent domain proceeding, the need for individual valuation, particularly where a loan is performing. Nor can the GSE calculations be reverse engineered for an individual loan. Further, the process might include a calculation of likelihood to default, noted above as difficult if market values are rising.

Second, what analysis is employed on valuation under various local programs remains uncertain both as to methods and as to expertise brought to bear.

Third, valuation itself could generate claims of discrimination and legal challenges as noted above.

**Conclusion and Potential Actions**

On balance, after conducting a review of law and markets and considering public input, there is a rational basis to conclude that the use of eminent domain by localities to restructure loans for borrowers that are "underwater" on their mortgages presents a clear threat to the safe and sound operations of Fannie Mae, Freddie Mac and the Federal Home Loan Banks as provided in federal law, would run contrary to the goals set forth by Congress for the operation of conservatorships by FHFA and presents a direct relationship to FHFA's responsibility for overseeing entities that deal in "federally related mortgage loan[s]" as defined at 12 USC 2602.

FHFA has a broad range of authorities both as a regulator and as a conservator that could be deployed to respond to the findings made here regarding the risks posed by eminent domain. In making a determination on an appropriate course, the Agency would consider carefully and fully the context of an action or planned action by a locality and the impact on FHFA's regulated entities.

Alfred M. Pollard
General Counsel

# EXHIBIT 3



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-1000

ASSISTANT SECRETARY FOR CONGRESSIONAL
AND INTERGOVERNMENTAL RELATIONS

AUG 1 2 2013

The Honorable Ed Royce
U.S. House of Representatives
Washington, DC 20515

The Honorable Gary G. Miller
U.S. House of Representatives
Washington, DC 20515

The Honorable John Campbell
U.S. House of Representatives
Washington, DC 20515

Dear Representatives Royce, Miller and Campbell:

I am writing in response to your letter to Department of Housing and Urban Development
(HUD) Secretary Shaun Donovan of June 11, 2013, regarding the potential use of eminent domain
to refinance underwater mortgages, which is currently being considered by a number of
municipalities around the country. HUD shares your goals of ensuring the continued recovery of
the housing market, as well as your concerns about events that could harm the recovery and the
growth of private capital in the mortgage market.

As Deputy Assistant Secretary for Single Family Housing Charles Coulter testified during
the hearing on May 16, 2013 before the Subcommittee on Housing and Insurance of the House
Financial Services Committee. HUD is concerned about the developments you cite in your letter.
At the same time, HUD recognizes that eminent domain is an inherent and often indispensable tool
for local governments to accomplish important public purposes. Notions of using eminent domain
to condemn and refinance mortgages, however, raise a number of potential and novel issues that
state and local governments and the courts will have to consider and resolve. Municipalities would
have to decide whether pursuing such a policy best serves their residents. They would also have to
develop and execute a condemnation and compensation plan that will survive legal scrutiny under
both federal and state laws and legal precedent, as well as political scrutiny from their citizens and
other stakeholders.

While some municipalities have approved such an idea in theory and have taken preliminary
steps to pursue it, others have already rejected it. For instance, the municipal governments of San
Bernardino, California; Salinas, California; and Brockton, Massachusetts, among others, have all
considered and ultimately rejected such proposals. However, on July 31, 2013, Richmond,
California took the step of mailing letters to a number of trustees and servicers with offers for both
performing and non-performing securitized mortgages. The letter set a response deadline of
August 13, 2013. At least three of the recipients, all trustees for some of the trusts holding some of
the identified mortgage loans, responded on August 7, 2013, by filing two court complaints seeking
preliminary injunctive relief.

HUD recognizes the serious concerns raised by these legal actions against Richmond, California and the private entities working with the city. Pending legal developments and possible further execution of the plans in question, HUD does not know whether any new mortgage which might be created would qualify for insurance by the Federal Housing Administration (FHA). Moreover, until such plans produce concrete, analyzable results, HUD will not know what if any effects they will have on FHA and the mortgage market. Any guidance from FHA on this issue should take into account these factors and should be narrowly tailored to avoid any unintended consequences. Therefore, we believe it is most prudent to consider what if any programmatic response from FHA is appropriate when more information about such possible use of eminent domain becomes available.

HUD shares the concerns raised in your letter and is continuing to monitor closely events on this issue as they unfold among state and local governments. If necessary, HUD will issue informational guidance to FHA approved lending institutions as appropriate. Thank you for your interest in HUD's programs, and we look forward to our continued work together to further strengthen the housing recovery.

Sincerely,

Elliot M. Mincberg
Acting Assistant Secretary for Congressional
    and Intergovernmental Relations